## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1)  O. GENE BICKNELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No.:  25-cv-00383-SEH-SH |
| | ) |
| (1) RICHARD M. SILANSKAS, JR., | ) |
| (2) LARRY K. WILHITE, and | ) |
| (3) STEPHEN D. HEDRICK, | ) |
| | ) |
| Defendants. | ) |

---

## DEFENDANT LARRY WILHITE'S MOTION TO DISMISS
## AND BRIEF IN SUPPORT

---

J. Christopher Davis, OBA #16639
Deric J. McClellan, OBA #32827
CROWE & DUNLEVY, P.C.
222 North Detroit Ave., Suite #600
Tulsa, OK  74120
(918) 592-9800
(918) 592-9801 (Facsimile)
chris.davis@crowedunlevy.com
deric.mcclellan@crowedunlevy.com

-and-

Evan G. Vincent, OBA #22325
CROWE & DUNLEVY, P.C.
Braniff Building
324 North Robinson Ave., Suite #100
Oklahoma City, OK 73102-8273
(405) 235-7700
(405) 239-6651 (Facsimile)
evan.vincent@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT
LARRY K. WILHITE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .................................................................................................................. 1

BACKGROUND ..................................................................................................................... 5

    I.    The Parties and Their Business Relationship ................................................................. 5

    II.   The American Heartland Project ....................................................................................... 6

    III.  The Daily Word Messages and Sister Catherine Emails ............................................... 7

    IV.  The Alleged Scheme ......................................................................................................... 8

ARGUMENT AND AUTHORITY ...................................................................................... 9

    I.    Standard of Review. ......................................................................................................... 9

    II.   The RICO Claims against Wilhite must be dismissed (Counts I and II). ................... 10

        A.  Plaintiff did not adequately plead a violation of § 1962(c) (substantive RICO claim). ...... 11

           1.  Every element of RICO must be pleaded with particularity. ............................................ 11

           2.  Plaintiff's RICO claim should be dismissed because he failed to plead a pattern of racketeering activity. ................................................................................................................... 12

               a.  Plaintiff has failed to plead open-ended continuity because he has not alleged any threat of continued illegal activity ...................................................................................... 13

               b.  Plaintiff has failed to plead closed-ended continuity because he has alleged a single scheme targeting a single victim with one discrete goal. ................................... 14

        B.  Wilhite did not violate § 1962(d) (conspiracy to commit a substantive RICO claim) ....... 15

    III.  The Fraud Claims must be dismissed as to Wilhite (Counts IV, V, VI). .................. 16

        A.  Legal standards for fraud ................................................................................................ 16

        B.  The fraud claims fail because the Complaint does not show that Wilhite made any false statement. ..................................................................................................................... 17

        C.  The constructive fraud claims must be dismissed because Wilhite did not gain an advantage. ........................................................................................................................... 19

        D.  The deceit claim must be dismissed to the extent it alleges deception of third parties. ... 19

    IV.  The Intentional Infliction of Emotional Distress Claim must be dismissed (Count VII). ..... 20

i

V.   The Unjust Enrichment Claim must be dismissed as to Wilhite (Count VIII). .......................22

VI.  The Civil Conspiracy Claim must be dismissed (Count III)........................................................24

CONCLUSION.........................................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AGC Flat Glass N. Am. v. John,*
  No.2:23-cv1980, 2024 WL 1174209 (S.D. Ohio Mar. 19, 2024)........................................15

*Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians,*
  155 F.3d 500 (4th Cir. 1998)................................................................................................12

*Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.,*
  521 F.3d 1278 (10th Cir. 2008) .............................................................................................9

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (1991) .............................................................................................................10

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...........................................................................................................9, 10

*Babieca Cap., LP v. Cohen Anytime, Inc.,*
  No. 1:24-CV-24460-PCH, 2025 WL 1488524 (S.D. Fla. May 23, 2025) .........................15

*Bachi-Reffitt v. Reffitt,*
  820 F. App'x 913 (6th Cir. 2020) .......................................................................................15

*BancOklahoma Mortg. Corp v. Capital Title Co., Inc.,*
  194 F.3d 1089 (10th Cir. 1999) ..........................................................................................16

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).........................................................................................................9, 10

*Bicknell v. Kansas Dep't of Revenue,*
  509 P.3d 1211 (Kan. 2022) ........................................................................................ 1, 2, 3

*Borrego Cmty. Health Found. v. Hebets,*
  No. 3:22-CV-01056-RBM-SBC, 2025 WL 935496 (S.D. Cal. Mar. 27, 2025) ...............15

*Bradshaw v. Uber Techs., Inc.,*
  No. CIV-16-388-R, 2017 WL 2455151 (W.D. Okla. June 6, 2017)...................................17

*Calcasieu Marine Nat. Bank v. Grant,*
  943 F.2d 1453 (5th Cir. 1991) ............................................................................................11

*Cayman Exploration Corp. v. United Gas Pipe Line Co.,*
  873 F.2d 1357, 1362 (10th Cir.1989)..................................................................................12

*Cisneros v. Petland, Inc.,*
    972 F.3d 1204 (11th Cir. 2020) ...................................................................................15

*City of Tulsa v. Bank of Oklahoma, N.A.,*
    2011 OK 83, 280 P.3d 314 ...........................................................................................23

*Computer Publ'n, Inc. v. Welton,*
    49 P.3d at 732, 735 (Okla.2002) ........................................................................... 21, 22

*Condict v. Condict,*
    826 F.2d 923 (10th Cir. 1987) .....................................................................................10

*Cyr v. Battah,*
    No. 22-10290, 2023 WL 1798733 (E.D. Mich. Feb. 7, 2023) .........................................15

*Dill v. Rader,*
    1978 OK 78, 583 P.2d 496 (Okla.1978) ........................................................................25

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n,*
    48 F.3d 1260 (D.C. Cir. 1995) .....................................................................................14

*Edwards v. First Nat. Bank, Bartlesville, Okla.,*
    872 F.2d 347 (10th Cir. 1989) .....................................................................................10

*Energy Fluids, Inc. v. Cimarex Energy Co.,*
    Case No. CIV-07-0653-HE, CIV-07-0667-HE, 2008 WL 2404226 (W.D. Okla.
    June 10, 2008) ...........................................................................................................24

*Farlow v. Peat, Marwick, Mitchell & Co.,*
    956 F.2d 982 (10th Cir. 1992) .....................................................................................11

*Feldman v. MCZ Dev. Corp.,*
    No. 12-CV-431-GKF-TLW, 2013 WL 12131596 (N.D. Okla. Feb. 4, 2013) ................... 16, 17

*Flip Mortg. Corp. v. McElhone,*
    841 F.2d 531 (4th Cir. 1988)........................................................................................10

*French Energy, Inc. v. Alexander,*
    1991 OK 106, 818 P.2d 1234 .................................................................................. 22, 23

*Gaylord Ent. Co. v. Thompson,*
    1998 OK 30, 958 P.2d 128 ...........................................................................................24

*Gokool v. Oklahoma City Univ.,*
    716 F. App'x 815 (10th Cir. 2017) ...............................................................................23

*H.J. Inc. v. Northwestern Bell Tel. Co.,*
    492 U.S. 229 (1989)....................................................................................10, 12, 13, 14

*Herron v. Watson's of Okla. City Inc.*,
  2020 WL 3086256 (W.D. Okla. June 10, 2020) ...................................................................22

*Horton v. Sw. Med. Consulting, LLC*,
  No. 17-CV-0266-CVE-MJX, 2017 WL 2951922 (N.D. Okla. July 10, 2017).................20

*Johnson v. Heath*,
  56 F.4th 851, 859 (10th Cir. 2022) ...........................................................13, 14, 15

*Johnson v. Spirit Aerosystems, Inc.*,
  No. 20-CV-00138-GKF-FHM, 2020 WL 12800851 (N.D. Okla. Aug. 4, 2020) ...........22

*Lapkin v. Garland Bloodworth, Inc.*,
  2001 OK CIV APP 29, 23 P.3d 958 ...........................................................................23

*Lillard v. Stockton*,
  267 F. Supp. 2d 1081 (N.D. Okla. 2003) ...................................................................16

*Makarem v. Get Buzzed LLC*,
  No. 2:25-CV-02357 MWC (ASX), 2025 WL 2092818 (C.D. Cal. July 15, 2025) ...........15

*Menasco, Inc. v. Wasserman*,
  886 F.2d 681 (4th Cir. 1989).....................................................................................15

*Mengert v. United States*,
  620 F. Supp. 3d 1157 (N.D. Okla. 2022), aff'd, 120 F.4th 696 (10th Cir. 2024) ...........21

*Mills v. Amazon.com Servs., LLC*,
  No. 24-CV-0188-CVE-CDL, 2024 WL 3205397 (N.D. Okla. June 27, 2024) ...........21, 22

*Moon v. Harrison Piping Supply*,
  465 F.3d 719 (6th Cir. 2006).....................................................................................15

*N. Texas Prod. Credit Ass'n v. McCurtain Cnty. Nat. Bank*,
  222 F.3d 800 (10th Cir. 2000) ...................................................................................25

*N.C. Corff Partnership, Ltd. v. OXY USA, Inc.*,
  1996 OK CIV APP 92, 929 P.2d 288 ...........................................................................24

*Pagel v. Washington Mut. Bank, Inc.*,
  153 F. App'x 498 (10th Cir. 2005) ...........................................................................15

*Patel v. OMH Med. Ctr., Inc.*,
  1999 OK 33, 987 P.2d 1185 .......................................................................................17

*Peterson v. Grisham*,
  594 F.3d 723 (10th Cir. 2010) ...................................................................................25

*Randle v. City of Tulsa*,
    2024 OK 40, 556 P.3d 612, reh'g denied (Sept. 9, 2024) .......................................... 22, 24

*Resolution Trust Corp. v. Stone*,
    998 F.2d 1534 (10th Cir. 1993) ............................................................................ 12, 14, 15

*Schovanec v. Archdiocese of Oklahoma City*,
    2008 OK 70, 188 P.3d 158 ................................................................................................ 24

*Sever v. Alaska Pulp Corp.*,
    978 F.2d 1529 (9th Cir. 1992) ......................................................................................... 15

*SIL-FLO, Inc. v. SFHC, Inc.*,
    *917 F.2d 1507, 1516 (10th Cir. 1990)* ........................................................................... 15

*Singh v. Curry*,
    69 F.3d 540 (7th Cir. 1995) ............................................................................................ 15

*Specialty Beverages, L.L.C. v. Pabst Brewing Co.*,
    537 F.3d 1165 (10th Cir. 2008) ....................................................................................... 17

*Sutton v. David Stanley Chevrolet, Inc.*,
    2020 OK 87, 475 P.3d 847 .......................................................................................... 17, 19

*Tal v. Hogan*,
    453 F.3d 1244 (10th Cir. 2006) .................................................................................. 11, 12

*Thacker v. Walton*,
    2021 OK CIV APP 5, 499 P.3d 1255 ............................................................................... 24

*Thomas v. Metro. Life Ins. Co.*,
    631 F.3d 1153 (10th Cir. 2011) ....................................................................................... 20

*Torwest DBC, Inc. v. Dick*,
    810 F.2d 925 (10th Cir. 1987) ......................................................................................... 15

*United States v. Knight*,
    659 F.3d 1285 (10th Cir. 2011) ....................................................................................... 10

*United States v. Smith*,
    413 F.3d 1253 (10th Cir. 2005) ....................................................................................... 14

*Wells v. Redwine*,
    41 F. App'x 327 (10th Cir. 2002) .................................................................................... 25

*Zeran v. Diamond Broadcasting, Inc.*,
    203 F.3d 714 (10th Cir. 2000) ......................................................................................... 22

**Statutes**

18 U.S.C. § 1961 ................................................................................................. 12

18 U.S.C. § 1962 ........................................................................................... 10, 11

18 U.S.C. § 1962(c) ....................................................................................... 11, 16

18 U.S.C. § 1962(d) .............................................................................................. 16

18 U.S.C. § 1964(c) .............................................................................................. 10

Okla. Stat. 15, tit. § 58 ......................................................................................... 16

Okla. Stat. tit. 15, § 59 ......................................................................................... 17

Okla. Stat. tit. 76, §§ 2, 3 ..................................................................................... 16

Organized Crime Control Act of 1970 Pub. L. No. 91-452, 84 Stat. 922, 923 (1970) ........................ 10

Organized Crime Control Act of 1970 title IX ..................................................... 10

Racketeer Influenced and Corrupt Organizations Act ........................................... 4

RICO .................................................................. 5, 7, 10, 11, 12, 13, 14, 15, 16

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 9(b) .......................................................................................... 11, 17

Rule 8's ................................................................................................................. 12

Rule 9(b)'s ............................................................................................................ 19

Rule 9's ................................................................................................................. 12

Rule 12(b)(6) ........................................................................................................ 11

**Other Authorities**

About Mariner, https://joinmariner.com/about-mariner/ .......................................... 1

Bicknell Family Foundation, Shrine of the Holy Spirit,
    https://www.shrineoftheholyspirit.com ............................................................. 3

Mansion Theatre, Press Release (Aug. 18, 2022),
    https://www.themansiontheatre.com/mansion-sound-and-solid-state-logic-
    reveal-one-of-a-kind-state-of-the-art-audio-studio-for-music-film-television-
    raising-the-bar-worldwide ................................................................................. 2

Mansion Theatre, Press Release (Jan. 20, 2022),
https://www.themansiontheatre.com/mansion-entertainment-group-unveils-
major-film-television-animation-and-music-expansion-in-missouri....................................................2

O. Gene Bicknell, https://www.genebicknell.com/copy-of-about-me; ...................................................1

O. Gene Bicknell, https://www.genebicknell.com/projects ....................................................................1

O. Gene Bicknell, https://www.genebicknell.com/resume ....................................................................1

Gene Bicknell is not some "babe in the brambles of the business world," even at age 91, and is not vulnerable to elder abuse of the kind the complaint filed by Bicknell now alleges. The story told in the complaint is almost completely backwards. Bicknell undertook the American Heartland Project (the Project) because he wanted to—it fit many of his long-standing goals. And the Project eventually floundered because Bicknell did not secure the funding that he knew would be essential to a project of this scale. Larry Wilhite never wanted to lead, let alone own, anything as large and complex as the Project. He was simply following Bicknell's instructions, as he had for many years. Despite all his years of faithful service, Wilhite is now being accused of running a criminal enterprise with the sole purpose of defrauding Bicknell out of an ownership stake in the Project, a stake he never sought nor received. For the reasons discussed below, all claims against Wilhite should be dismissed under Fed. R. Civ. P. 12(B)(6) for failure to state a claim.

## INTRODUCTION

Gene Bicknell is an accomplished businessman who describes himself as the founder of five companies, along with separate investments in multiple radio stations, "farm, cattle, motel, commercial properties, and real estate." *See* O. Gene Bicknell, https://www.genebicknell.com/resume. Since 2007, he has been a consultant at Mariner Wealth Advisers, a company founded by his son Martin ("Marty") Bicknell. *See Bicknell v. Kansas Dep't of Revenue*, 509 P.3d 1211, 1223 (Kan. 2022); *see also* About Mariner, https://joinmariner.com/about-mariner/ (company currently "advise[s] on over $577 billion in assets"). In addition to business and philanthropy, he has long been involved in the arts, considering himself an author, composer, vocalist, actor, screenwriter, and executive director. *See* O. Gene Bicknell, https://www.genebicknell.com/projects. In 2002, Bicknell wrote and directed a stage production called Celebrate America at the Mansion Theatre that he owned in Branson, Missouri, and gave himself a starring role. *See* O. Gene Bicknell, https://www.genebicknell.com/copy-of-about-me; *Bicknell*, 509 P.3d at 1223.

Wilhite served as Bicknell's employee and right-hand man in Branson, Missouri for over twenty years. Since 2004, Wilhite's main role was operating the Mansion Theatre for Bicknell. But he also did whatever Bicknell asked, including regularly checking on all of Bicknell's properties in Branson and taking on responsibility for another theater (the Oak Ridge Boys Theater) when Bicknell decided to buy it in 2007. In 2012, Bicknell instructed Wilhite to create an entity in Wilhite's name for the theater operations. Wilhite complied, as he always did, and the two named the company Big Time Productions. Wilhite operated Bicknell's theaters through Big Time Productions from 2012 to 2023 and continued receiving as a salary what he and Bicknell had agreed to back in 2004: $80,000.[1]

In 2021, Rick Silanskas entered the scene, suggesting that he could help with expanding and branding the Mansion Theatre, particularly in the context of television and animation. Silanskas had real bona fides in this area, including awards for animated shorts that he produced. Bicknell hired him onto the Mansion Theatre staff, and, in late 2021, Bicknell decided to expand the Mansion Theatre to include a state of the art classically designed motion picture and television studio complex including multiple soundstages. *See, e.g.*, Mansion Theatre, Press Release (Jan. 20, 2022), https://www.themansiontheatre.com/mansion-entertainment-group-unveils-major-film-television-animation-and-music-expansion-in-missouri. This included a state-of-the-art audio facility used to film a live concert for a PBS special. *See* Mansion Theatre, Press Release (Aug. 18, 2022), https://www.themansiontheatre.com/mansion-sound-and-solid-state-logic-reveal-one-of-a-kind-state-of-the-art-audio-studio-for-music-film-television-raising-the-bar-worldwide.

As 2022 progressed, Bicknell won a Kansas Supreme Court case concluding that the state owed him for millions in taxes it had collected while he resided elsewhere. *See Bicknell*, 509 P.3d 1211. Bicknell believed that there needed to be some sort of an attraction to go along with the expanded

---

[1] After arranging the same salary for Wilhite for 18 years, Bicknell raised Wilhite's salary to $110,000 in 2021, to account for his new responsibilities associated with the Project, and Wilhite continued at that salary until Bicknell fired him in November 2024.

theater, like a theme park, and that some competition would be good for the area. Accordingly, the Project expanded. While this was to initially occur on several hundred acres in Southwest Missouri, Bicknell was unhappy about the Missouri tax incentives, so, as an Oklahoma native, he quickly shifted his focus to Northeast Oklahoma and began purchasing land in Vinita. Bicknell also hired Steve Hedrick in 2022 to lead the Project. The Project was vast and daunting, and numerous people repeatedly asked Bicknell if he was aware of the challenges and the costs, and every time he scoffed at the notion. Once, in a meeting with Hedrick and Wilhite, Hedrick asked him where his plan B funding would come from, and Bicknell responded "I am plan B. You build it and let me worry about the money."

For early stages of the Project, Bicknell was running much of the finances through Big Time Productions. Wilhite was trying to keep up with his new responsibilities helping to launch the Project while simultaneously continuing to run the Mansion Theatre in Branson for Bicknell as he had always done since 2004. In June 2023, Bicknell and his family orchestrated the purchase of Big Time Productions from Larry Wilhite by Mansion Entertainment Group, LLC, a company Bicknell owned. Bicknell purchased Big Time Productions for $17.9 million on paper. Wilhite received nothing from the sale but a promise that Bicknell would take care of him[2]. As was his practice for nearly twenty years, Wilhite simply trusted his friend and employer's guidance.

Bicknell and Wilhite are both deeply religious men, and their faiths have been at the center of their friendship since the beginning. Bicknell's church attendance was described in the Kansas litigation. *See, e.g.*, *Bicknell v. Kansas Dep't of Revenue*, 509 P.3d at 1247. More than a decade ago, Bicknell also designed and built a shrine in Branson based on a vision. *See* Bicknell Family Foundation, Shrine of the Holy Spirit, https://www.shrineoftheholyspirit.com/ ("Dedicated on Sunday April 11, 2010,

---

[2] Bicknell had made repeated assurances over the years directly to Wilhite that Bicknell would "take care of" Wilhite in his later years, in an effort to keep Wilhite loyal to him even to the extreme of Bicknell buying Wilhite's company and yet paying him nothing for it.

this monument is the result of a vision given to Gene Bicknell by our Lord. That vision specifically outlined how it was to be constructed from top to bottom." "I am humbly honored to be chosen to make this structure a reality."). So, when Wilhite began getting devotional text messages titled "Todays Word" from various random phone numbers in 2021 and 2022 that seemed to be relevant to their lives, he naturally told Bicknell about them. Bicknell was intrigued and asked Wilhite to forward them to him. Wilhite did and the two of them, along with Silanskas, would discuss them regularly. Wilhite also shared the text messages with his family, who found comfort in them and encouraged Wilhite to keep following God's plan. Wilhite took the messages to be general guidance from God to stay committed to the Project and trust that it would all work out.

Only after Bicknell abruptly fired Wilhite in November 2024 and this lawsuit was filed in July, did Wilhite begin to suspect anything untoward involving the Todays Word messages. The messages began after Wilhite had met and shared his contact information with Silanskas. The messages stopped immediately after Wilhite was fired by Bicknell. The Complaint provides information of which Wilhite was unaware, including evidence tying Silanskas to the Sister Catherine emails. It now appears possible that Silanskas may have authored and sent the Todays Word texts and emails in an effort to fool both Wilhite and Bicknell and prey on their faith. Because this is Wilhite's first forum to speak in this case, he feels it necessary to inform the Court and the world that he did <u>not</u> create any of the Todays Word messages, that he did <u>not</u> create any of the Sister Catherine emails, and that he was <u>never</u> aware (if it is indeed the case) that Silanskas was behind either one.

Turning to the merits of this motion to dismiss, Wilhite is aware that for purposes of this motion the Court must take all of Plaintiff's well-pleaded facts as true. The Complaint, stripped down to the facts actually pled with regard to Wilhite, fails to state a claim as to any of the eight causes of action brought against Wilhite: (1) substantive violation of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"); (2) RICO conspiracy; (3) civil conspiracy; (4) fraud; (5) deceit; (6) constructive fraud; (7) intentional infliction of emotional distress; and (8) unjust enrichment.

*First*, the RICO claims fail because Bicknell has pled that Silanskas and Wilhite were involved in a single scheme (a deluge of fraudulent texts and emails), against one alleged victim (himself), with one discrete goal (to coerce Plaintiff into funding the American Heartland Project and giving away one-third interests in it). This, as a matter of law, does not satisfy RICO's pattern element. *Second*, the fraud, deceit, and constructive fraud claims fail because Plaintiff does not allege that Wilhite drafted any of the texts or emails and offers only conclusory allegations that Wilhite intended to deceive Bicknell by forwarding him messages that he too thought were real. *Third*, the Complaint does not state a claim for intentional infliction of emotional distress because such claims require allegations of emotional distress so severe that no reasonable person could be expected to endure it. Here, the Complaint's conclusory allegations of distress fall far short of that standard. *Fourth*, there can be no unjust enrichment where the Complaint primarily alleges that Wilhite received a salary for services he rendered. Oklahoma law does not recognize an unjust enrichment claim in such circumstances. *Finally*, civil conspiracy is not an independent cause of action, and there can be no civil conspiracy where the act complained of and the means employed are lawful. Accordingly, because all of Plaintiff's other claims must be dismissed, so too must this claim.

## BACKGROUND

The introduction above provides Wilhite's perspective regarding the issues in this case. For purposes of this motion to dismiss, the following section summarizes the well-pleaded facts that fail to state a claim against Wilhite.

### I. The Parties and Their Business Relationship

Plaintiff is a 91-year-old businessman who built substantial wealth through an 800-store Pizza Hut franchise empire. Compl. ¶¶ 23-26. In the 1990s, Plaintiff invested in the Mansion Theatre for

the Performing Arts in Branson, Missouri. *Id.*, ¶ 27. He hired Larry Wilhite as his employee to manage the theater, which Wilhite did successfully for over two decades. *Id.*, ¶ 28. In late 2019, while managing the Mansion Theatre, Wilhite came into contact with Defendant Rick Silanskas, who presented himself as having extensive entertainment industry experience. *Id.*, ¶¶ 29-30. The Complaint does not allege that Wilhite independently verified or endorsed the accuracy of Silanskas's biographical claims, and Bicknell was ultimately the person who decided to hire Silanskas in 2021 *Id.*, ¶ 44. Steve Hedrick was hired in 2022 to spearhead the American Heartland Project based on his experience with major theme park and entertainment companies. *Id.*, ¶ 55. Hedrick was responsible for managing the design work and the Project's contractors, including tracking Project finances. *Id.*, ¶¶ 68, 77, 108-109, 213-214.

## II.    The American Heartland Project

What began as discussions about expanding the Mansion Theatre on property Bicknell already owned in Missouri, evolved into the American Heartland Theme Park project by 2022. *Id.*, ¶ 46. The Project involved purchasing over 2,800 acres in or around Vinita, Oklahoma *Id.*, ¶¶ 53, 65. There is no allegation that Bicknell paid anything other than fair market value for this real estate.

The Complaint alleges that Silanskas and Wilhite "appointed" Hedrick to be the Project's "Vice President of Project Development" and Executive Producer." *Id.*, ¶ 55. The Complaint presumably uses the cryptic term appointed rather than hired because Bicknell ultimately made all the hiring decisions for the Project. The Complaint further alleges that Hedrick "held himself out as a businessman and executive produce and claimed to have 40 years of relevant industry experience working for major theme park and entertainment companies around the world, including Disney." *Id.*, ¶ 55. Despite its use of the term "held himself out," as if to imply that Hedrick was not a legitimate theme park engineer, the Complaint contains no allegation to the contrary. Further, the Complaint alleges that Hedrick, in February 2023, provided an economic analysis to Bicknell that stated there was a "clear market opportunity for the [P]roject[,]" the Project would attract anticipated "3.9 million

6

visitors annually," the Project would "become one of the state's anchor tourist destinations," the "proposed location can support the resort and market," and that the Project would "generate approximately $500 million in annual spending." *Id.*, ¶ 68. The Complaint labels these conclusions as "baseless" and "unreliable" and further alleges that Hedrick knew this when he sent them to Bicknell. The Complaint, however, does not include an any allegation to support this conclusion, nor did Bicknell bring a fraud claim against Hedrick or include him in the RICO enterprise. *Id.*, ¶¶ 200-247 (alleging all causes of action except unjust enrichment against Silanskas and Wilhite only).

Moreover, the Complaint alleges that the Project received external validation from public officials, including U.S. Senator Markwayne Mullin, who publicly stated his belief that the developers "know what they are doing" and included "executives that have left Disney." *Id.*, ¶ 165. The Complaint also alleges that the Project generated substantial public interest and media coverage, meaning there were lots of eyes on its progress and legitimacy. *Id.*, ¶¶ 95- 102, 165. Further, the Complaint states that Bicknell began to construct the Project prior to being sent the Today's Word messages. *Compare id.*, ¶ 46 (describing Bicknell's decision to construct the Project) *with id.*, ¶¶ 47-48 (describing how Silanksas and Wilhite began sending the Today's Word messages after the decision to build the Project had been made by Bicknell). Thus, even under Plaintiff's version of the facts, the Project was a completely legitimate endeavor that had real industry experts associated with it, with the goal of attracting millions of people annually and generating billions in revenue over the next decade, and Bicknell made the decision to proceed with the Project before ever receiving a Today's Word message.

### III. The Daily Word Messages and Sister Catherine Emails

The Complaint alleges that Bicknell began receiving religious messages titled "Todays Word" in 2022. *Id.*, ¶ 48. The Complaint further alleges that Bicknell believed these messages were coming from God. *Id.*, ¶ 51. The Complaint also alleges that the purpose behind these messages was to "manipulate Gene to fund the Project while surrendering to [Silanskas's and Wilhite's] control." *Id.*, ¶

47. The Complaint also alleges that Silanskas and Wilhite "began to target Gene with emails from a fictional figure 'Sister Catherine' who purported to be a nun at 'Mission Agape.'" *Id.*, ¶ 136. The purpose of these emails, the Complaint alleges, was to sow division between Bicknell and his family who Wilhite and Silanskas "believed were hindering access to the funds needed to achieve their grand plan of completing the Project and taking it over." *Id.*, ¶ 135. These emails started in January 2024, and over 100 emails were sent to Bicknell from multiple email accounts. *Id.*, ¶ 136.

The Complaint attempts to tie Silanskas and Wilhite together in all these allegations, but the well-pleaded factual allegations linking Wilhite to any of this is absent. For instance, the Complaint asserts that Silanskas was "the principal architect of the scheme," and that he "orchestrated the central fraud involving the religious messaging and the provision of fraudulent information about the Project." *Id.*, ¶ 205. Further, the Complaint does not allege that Wilhite drafted the Today's Word messages or that he was aware that Silanskas drafted them (if he indeed did). The Complaint also fails to allege that Wilhite told Bicknell that the messages were from God. Moreover, the Complaint indicates that Wilhite himself believed the messages to be true, as he is alleged to have sent a compilation of some Todays Word messages to his wife's email account. *Id.*, ¶ 188.

As for the Sister Catherine emails, the Complaint makes allegations tying Silanskas to the creation of those emails. But there are no well-pleaded allegations that show Wilhite had any involvement in the creation of those email accounts or was aware that they were created and sent by Silanskas. *Id.* ¶189-198 ("Gene would often reply directly to "Sister Catherine," without copying anyone else on the email . . . [and] those replies . . . would make their way directly to Silanskas. …".).

## IV.    The Alleged Scheme

The Complaint alleges that Wilhite and Silanskas's purpose in sending Bicknell all these texts and emails was to convince him to give them each one-third ownership in the Project. *Id.*, ¶ 83. The Complaint also alleges that Wilhite and Silanskas both "believed [the Project] would be worth billions

8

of dollars." *Id.* The Complaint does not include any allegations regarding any other scheme perpetrated by Wilhite and Silanskas against any other alleged victims. Their alleged scheme against Bicknell is the only one pleaded in the Complaint, and the Complaint does not allege that Wilhite and Silanskas are likely to perform another scheme together.

The Complaint asserts that "[e]very penny Gene put into the Project was siphoned off or spent by Defendants." *Id.*, ¶ 133. Notably, outwardly provocative sentence merely states that the money Bicknell put into on the Project was spent on vendors and employees who did actual work on the Project. This sentence insinuates that all the money that Bicknell spent went into the pockets of Wilhite, Silanskas, and Hedrick. But that is not the case, and the Complaint does not state, except through implication, that the Defendants illicitly absconded with any of Bicknell's funds.

To that end, the Complaint does not allege that Wilhite stole any funds from the Project. Rather, the Complaint alleges that he was paid his salary of $110,000 for the years he worked for Bicknell on the Project while simultaneously running the Mansion Theatre. *Id.*, ¶ 180.

## ARGUMENT AND AUTHORITY

### I.    Standard of Review.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In a motion to dismiss, the court accepts as true all the factual allegations in the complaint and construes those facts in the light most favorable to the plaintiff. *See Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1284 (10th Cir. 2008). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

555). The court need not accept as true legal conclusions from the complaint or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.*

## II.    The RICO Claims against Wilhite must be dismissed (Counts I and II).

Congress designed RICO to eradicate organized crime. Originally enacted as title IX of the Organized Crime Control Act of 1970, the "purpose of [RICO was] to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Organized Crime Control Act of 1970 Pub. L. No. 91-452, 84 Stat. 922, 923 (1970). Thus, RICO is primarily a criminal statute designed to "prohibit[] certain conduct involving a 'pattern of racketeering activity.'" *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (1991) (quoting 18 U.S.C. § 1962). However, "one of RICO's enforcement mechanisms is a private right of action, available to '[a]ny person injured in his business of property by reason of a violation' of . . . RICO's substantive restrictions." *Id.* (quoting § 1964(c)).

While courts have been explicit in their pronouncement that civil RICO should not be limited to conduct traditionally associated with organized crime, *see, e.g.*, *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 243-49 (1989) (declining to read "an organized crime limitation into RICO's pattern concept"), they have been equally explicit that RICO does not apply to ordinary business disputes or garden variety fraud claims, *see, e.g., Condict v. Condict*, 826 F.2d 923, 929 (10th Cir. 1987) (affirming district court dismissal of RICO claim because it was "an unsuccessful effort to dress a garden-variety fraud and deceit case in RICO clothing"); *Edwards v. First Nat. Bank, Bartlesville, Okla.*, 872 F.2d 347 (10th Cir. 1989); *United States v. Knight*, 659 F.3d 1285, 1288 (10th Cir. 2011) (cautioning against "subjecting garden-variety fraud or criminal conduct to the statute's severe penal and monetary sanctions"); *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (stating that courts "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO

claims"); *Calcasieu Marine Nat. Bank v. Grant*, 943 F.2d 1453, 1463 (5th Cir. 1991) (stating that "although Congress wrote RICO in broad, sweeping terms, it did not intend to extend RICO to every fraudulent commercial transaction").

RICO's prohibited activities are located in 18 U.S.C. § 1962. Subsection (a) prohibits investment in an enterprise engaged in racketeering activity, subsection (b) prohibits acquisition of an enterprise engaged in racketeering activity, subsection (c) prohibits the operation of an enterprise engaged in racketeering activity, and subsection (d) prohibits conspiring to violate subsections (a), (b), or (c). Plaintiff has alleged that Wilhite violated § 1962(c) and (d). But Plaintiff has failed to properly allege a violation of either provision.

### A. Plaintiff did not adequately plead a violation of § 1962(c) (substantive RICO claim).

Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). "To survive a Rule 12(b)(6) motion to dismiss a § 1962(c) claim, Plaintiffs must allege that the relevant Defendants (1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan,* 453 F.3d 1244, 1269 (10th Cir. 2006). Plaintiff has not properly plead a pattern of racketeering activity.

### 1. Every element of RICO must be pleaded with particularity.

RICO claims, like claims of fraud, must be pleaded with particularity. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Not only does this heightened pleading standard apply to a RICO plaintiff's allegations of fraud, but it also applies to "each element of a RICO violation." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 989 (10th Cir. 1992). This heightened pleading requirement for RICO claims is due to RICO's "threat of treble damages and injury to reputation which attend RICO actions." *Cayman*

*Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir.1989). Here, as the following analysis will show, Plaintiff's allegations cannot support a RICO claim under Rule 8's traditional pleading standard, let alone Rule 9's heighted pleading standard.

### 2. Plaintiff's RICO claim should be dismissed because he failed to plead a pattern of racketeering activity.

A "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961. "However, because 'RICO is not aimed at the isolated offender,' proof of two or more predicate acts are not sufficient to prove a pattern unless there is a relationship between the predicate acts and a threat of continuing activity."[3] *Tal,* 453 F.3d at 1267-68 (quoting *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1544 (10th Cir. 1993)). "The Supreme Court has concluded that Congress intended that the pattern element 'requires the showing of a relationship between predicates, . . . and the threat of continuing activity'—that is, '*continuity plus relationship.*'" *Resolution Trust*, 998 F.2d at 1543 (alteration in original) (quoting *H.J. Inc.*, 492 U.S. at 239).

Plaintiff's central allegation of Wilhite's and Silanskas's alleged scheme is as follows:

> Silanskas and Wilhite formed a group of individuals who associated in fact to form an unlawful enterprise. The object of the unlawful enterprise was to defraud Gene out of his hard-earned life savings, to improperly redirect funds to themselves and to their family members, and finally, to psychologically manipulate Gene over the course of years through extremely targeted fraudulent text and email communications to coerce him into sinking more funds into the American Heartland Project and hand Silanskas and Wilhite majority ownership of the Project.

Compl., ¶ 204. Plaintiff also includes additional allegations that Wilhite signed certain contracts without Plaintiff's approval and, oddly, includes various allegations about the conduct of Defendant Hedrick even though Hedrick is not alleged to be a part of the RICO enterprise, but the central thesis

---

[3] Courts "are especially cautious when the predicate acts involved are mail and wire fraud" because "[i]t will be the unusual fraud that does not enlist the mails and wire in its service at least twice." *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998).

of Plaintiff's RICO claim is that Wilhite and Silanskas believed that the American Heartland Project would be massively successful Compl., ¶ 83, so they coerced him into investing millions of dollars into it, and then attempted to coerce Plaintiff into giving them each a third of the project, which Plaintiff never did. Even under Plaintiff's inflammatory and misleading allegations, he has failed to plead the level of continuity required for RICO's pattern element.

"'Continuity' is both a closed- and open-ended concept *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241, (1989). "Closed-ended continuity is a closed period of repeated racketeering conduct, while open-ended continuity consists of racketeering conduct that threatens future repetition." *Johnson v. Heath*, 56 F.4th 851, 859 (10th Cir. 2022) (citing *H.J. Inc.*, 492 U.S. at 241). Plaintiff has failed to allege either closed-ended or open-ended continuity.

### a. Plaintiff has failed to plead open-ended continuity because he has not alleged any threat of continued illegal activity.

"Plaintiffs can establish open-ended continuity by showing that the racketeering acts involved implicit or explicit threats of repetition, that they formed the operations of an association that exists for criminal purposes, or that they were the defendants' regular way of conducting a legitimate enterprise." *Id.* at 859-60 (citing *H.J. Inc.*, 492 U.S. at 242-43). Plaintiff has not made a single allegation—or, for that matter, a conclusory recital of the element—that Wilhite and Silanskas's alleged scheme to defraud him projects into the future with a threat of repetition, that Wilhite and Silanskas's association existed for criminal purposes, or that the alleged conduct was Wilhite and Silanskas's regular way of conducting a legitimate enterprise. Thus, Plaintiff has not attempted to establish open-ended continuity with the allegations in his Complaint, it appears that he has conceded that open-ended continuity is not at issue in this case, and Wilhite will turn to analyzing why Plaintiff has failed to establish closed-ended continuity as well.[4]

---

[4] Moreover, to the extent Plaintiff attempts to solve his failure to plead open-ended continuity in his Complaint by a cursory amendment, he must "indicate a requirement of far more than a hypothetical

13

     **b.  Plaintiff has failed to plead closed-ended continuity because he has alleged a single scheme targeting a single victim with one discrete goal.**

"Unlike open-ended continuity, closed-ended continuity consists of a closed period of repeated, related racketeering acts that do not necessarily threaten future repetition." *Johnson*, 56 F.4th at 860 (citing *H.J.*, 492 U.S. at 241–42). "Because RICO targets long-term racketeering conduct, closed-ended continuity requires a series of related racketeering acts over a 'substantial period of time.'" *Id.* (quoting *H.J.*, 492 U.S. at 242). The Tenth Circuit considers "two factors when determining the existence of closed-ended continuity—the duration of the related predicate acts and the extensiveness of the racketeering scheme." *Id.*

While the Tenth Circuit has held that a duration of seven to eighteen months can support closed-ended continuity, *Johnson*, 56 F.4th at 860; *Resolution Trust*, 998 F.2d at 1544, duration alone, however, will not establish closed-ended continuity, as the Tenth Circuit also considers the extensiveness of the alleged scheme. *Johnson*, 56 F.4th at 860. When evaluating extensiveness, the Tenth Circuit considers "the number of victims, the number of racketeering acts, the variety of racketeering acts, whether the injuries were distinct, the complexity and size of the scheme, and the nature or character of the enterprise." *Id.* (quoting *United States v. Smith*, 413 F.3d 1253, 1272 (10th Cir. 2005)). No factor is required or dispositive, but rather, are merely used as guides in seeking "a natural and commonsense result." *Id.* at 861 (quoting *Resolution Trust*, 998 F.2d at 1544 n.9).

The most important factor in this case is the nature of the scheme because Plaintiff has alleged a single scheme, and "[w]ithout a threat of continued illegal activity, a single scheme rarely supports finding continuity." *Johnson*, 56 F.4th at 862; s*ee also SIL-FLO, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1516 (10th Cir. 1990) ("While a single scheme may suffice in some instances, here there is simply no indication of a threat of continuing illegal activity."). "And a single scheme even less likely supports a

---

possibility of further predicate acts" based on a theory of "once a RICO violator, always a RICO violator." *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995).

continuity finding when the scheme targets only 'one discrete goal.'" *Johnson*, 56 F.4th at 862 (quoting *Sil-Flo*, 917 F.2d at 1516).[5] Here, Plaintiff has alleged a single scheme (a deluge of fraudulent texts and emails), against one alleged victim (himself), with one discrete goal (to coerce Plaintiff into funding the American Heartland Project and giving them each a one-third interest in it).[6] "Thus, the nature of the alleged RICO scheme does not support a finding of extensiveness." *Johnson*, 56 F.4th at 862. Accordingly, the Court should dismiss Plaintiff's RICO claim.

### B. Wilhite did not violate § 1962(d) (conspiracy to commit a substantive RICO claim).

"[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Id.* (alteration in original). Importantly, "[a] conspiracy claim under 18 U.S.C. § 1962(d) fails when the substantive claim based on § 1962(c) is without merit." *BancOklahoma Mortg. Corp v. Capital Title Co., Inc.*, 194 F.3d 1089, 1103

---

[5] To be sure, this principle—that a single scheme aimed at a single victim with a single purpose will not satisfy RICO's pattern element—is ubiquitous. *See, e.g.*, *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1216 (11th Cir. 2020); *Bachi-Reffitt v. Reffitt*, 820 F. App'x 913, 918 (6th Cir. 2020); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 725 (6th Cir. 2006); *Pagel v. Washington Mut. Bank, Inc.*, 153 F. App'x 498, 502 (10th Cir. 2005) *Singh v. Curry*, 69 F.3d 540 (7th Cir. 1995); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992); *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989); *Torwest DBC, Inc. v. Dick*, 810 F.2d 925, 929 (10th Cir. 1987); *Babieca Cap., LP v. Cohen Anytime, Inc.*, No. 1:24-CV-24460-PCH, 2025 WL 1488524, at *10 (S.D. Fla. May 23, 2025); *Makarem v. Get Buzzed LLC*, No. 2:25-CV-02357 MWC (ASX), 2025 WL 2092818, at *3 (C.D. Cal. July 15, 2025); *Borrego Cmty. Health Found. v. Hebets*, No. 3:22-CV-01056-RBM-SBC, 2025 WL 935496, at *12 (S.D. Cal. Mar. 27, 2025); *AGC Flat Glass N. Am. v. John*, No.2:23-cv1980, 2024 WL 1174209, at *3 (S.D. Ohio Mar. 19, 2024); *Cyr v. Battah*, No. 22-10290, 2023 WL 1798733, at *4 (E.D. Mich. Feb. 7, 2023).

[6] Moreover, while the nature of the scheme (a single scheme with one victim and one discrete goal) is generally dispositive, the other *Resolution Trust* factors weigh in favor of a lack of extensiveness as well. For instance, the variety and complexity of the alleged predicate acts was minimal, as Plaintiff alleges only two people were involved (Wilhite and Silanskas) and predicate acts were all the same alleged fraud (sending dozens of misleading texts and emails). Further, while Plaintiff may argue that his injury was quite large, it is important to note that Plaintiff's entire RICO claim rests on a theory that Wilhite and Silanskas perpetuated this scheme because they thought the American Heartland Project was going to be a great success (Compl. at ¶ 83) and wanted a stake in it for themselves. But the Complaint does not allege that Plaintiff ever gave them the stake they sought.

(10th Cir. 1999). Thus, because Plaintiff's § 1962(c) RICO claim lacks merit, for the reasons discussed above, his § 1962(d) conspiracy claim must fail too.

## III.    The Fraud Claims must be dismissed as to Wilhite (Counts IV, V, VI).

The Complaint attempts to craft sensational fraud theories from the notion that Wilhite somehow participated in an alleged "campaign of text and email messages to manipulate [Plaintiff] by playing upon his religious faith." Compl., ¶ 47. However, the Complaint fails to make any non-conclusory allegations that Wilhite said anything untrue or knowingly participated in anything intended to deceive Plaintiff.

### A.   Legal standards for fraud

To state an actual fraud claim, a plaintiff "must plead with particularity the elements of common law fraud under Oklahoma law: 1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false, or made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his/her own detriment." *Feldman v. MCZ Dev. Corp.*, No. 12-CV-431-GKF-TLW, 2013 WL 12131596, at \*6 (N.D. Okla. Feb. 4, 2013) (quotation marks omitted). Deceit is a statutory claim with "identical" elements to common law fraud. *See Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1111-1112 (N.D. Okla. 2003) (comparing deceit under Okla. Stat. tit. 76, §§ 2, 3 to the statutory definition of fraud "in connection with the execution of contracts" under Okla. Stat. 15, tit. § 58).

"Constructive fraud may be defined as any breach of a duty which, regardless of the actor's intent, gains an advantage by misleading another to his prejudice." *Sutton v. David Stanley Chevrolet, Inc.*, 2020 OK 87, ¶ 14, 475 P.3d 847, 854, *as corrected* (Oct. 21, 2020); *see also* Okla. Stat. tit. 15, § 59 ("In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him[.]"). Constructive fraud does not require the intent to deceive, *Patel v. OMH*

16

*Med. Ctr., Inc.*, 1999 OK 33, ¶ 34, 987 P.2d 1185, 1199, and its intent element can be satisfied by misstating a fact or failing to disclose a fact to another, *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1180 (10th Cir. 2008).

In federal court, all fraud theories must satisfy a heightened pleading standard. Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  This means that the complaint must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Feldman*, 2013 WL 12131596, at *6. Rule 9(b) thus requires "that individual plaintiffs should designate what affirmative misstatements or half-truths were directed to them—and how." *Bradshaw v. Uber Techs., Inc.*, No. CIV-16-388-R, 2017 WL 2455151, at *6 (W.D. Okla. June 6, 2017). The Complaint here fails to meet these standards, including by failing to identify any false statements made by Wilhite.

### B. The fraud claims fail because the Complaint does not show that Wilhite made any false statement.

The Complaint fails to specifically allege any "false material misrepresentation" or "misstated [] fact" made by Wilhite. Because the three fraud counts do not specify what the Complaint is referring to as "false material misrepresentations," Compl., ¶ 228, "misstating facts and failing to disclose facts," *id.,* ¶ 238, and "willfully deceived," *id.,* ¶ 233, it is unclear what specifically Wilhite is accused of. It appears that, as to Wilhite, these allegations primarily concern the Todays Word messages.

The Complaint clearly alleges that Wilhite shared with Plaintiff texts and emails that he himself received titled "Todays Word," which contained Bible verses and cryptic advice. *See* Compl., ¶¶ 48, 188 (compilation of Feb-Apr 2022 texts); *see also id.,* ¶ 79 ("more than 500" emails "sent on a nearly daily basis and sometimes more than once a day").  This must be placed in context.

The Complaint acknowledges Plaintiff's "devout Christian faith" and "religious fervor," *id.,* ¶¶ 6, 116, 243, along with Wilhite's longtime role as a minister, *id.,* ¶ 28, and the decades-long relationship

between the two men. *Id.,* ¶ 28. The Complaint also acknowledges Plaintiff's belief in prophetic communication from God. *See id.,* ¶ 89 (discussing Plaintiff's response to email discussing a "prophecy"). It was in this context that Wilhite shared his genuine faith with Plaintiff over the years. *See id.,* ¶ 105 ("The emails between and among Gene [and] Wilhite . . . are replete with references to religion."). In addition to sharing the "Todays Word" messages he received with Plaintiff, Wilhite also shared them with his own family members. *See, e.g., id.,* ¶ 188.

However, the Complaint fails to support its conclusory allegation that Wilhite "tricked Gene by impersonating God and religious figures purportedly communicating 'God's' directives in hundreds of electronic messages targeted at Gene." *Id.,* ¶ 6. While Wilhite retained copies of the Todays Word messages and shared them with his family, *see id.,* ¶ 188, in addition to sharing them with Plaintiff, this is not evidence that he was the author or knowingly participated in any deceit. Significantly, the Complaint does not state that Wilhite wrote the Todays Word messages, nor does the Complaint identify any specific statement by Wilhite that is false. To the contrary, the only reported statements by Wilhite are general religious expression. *See, e.g., id.,* ¶ 88 (affirming Plaintiff's observation about a Todays Word message that "This is what we must heed."); *id.,* ¶ 105 ("God we pray for your Divine intervention!!!"). Accordingly, the Complaint fails to state an essential element of actual fraud or deceit. For the same reasons, the Complaint does not assert facts showing that Wilhite "misstated a fact or failed to disclose a fact" to Plaintiff regarding the Todays Word messages, as required for constructive fraud.

As for the "approximately 100 'Sister Catherine' emails" the Complaint alleges that Plaintiff received beginning in January 2024, *see id.,* ¶ 136, the only connection between these emails and Wilhite is that Wilhite received copies of some of them from Mr. Silanskas, and Bicknell himself, and Wilhite forwarded them to family members. *See* Compl., ¶¶ 194-198. The Complaint contains no allegations that Wilhite said anything about those messages to Plaintiff, let alone made false material statements.

Finally, to the extent the Complaint seeks to accuse Wilhite of any false statement regarding the Project or its likelihood of success, it fails to identify anything that Wilhite said or did that could satisfy Rule 9(b)'s heightened pleading standard. Wilhite was a minister, musician, and theater manager, not someone with independent experience assessing the merits of large business plans. The Complaint acknowledges that credentialled professionals put packages together in support of the feasibility of the Project. *See* Compl., ¶¶ 55-56, 68, 75. The Complaint also alleges that Wilhite wanted the Project to succeed and "believed [it] would be worth billions of dollars." *Id.,* ¶ 83. In that context, the Complaint cannot plausibly allege that Wilhite made any false statements regarding the Project's likelihood of success. *Cf.* Compl., ¶ 68 (alleging that Hedrick—not Wilhite—"well knew" that "the economic analysis was unreliable"), *id.,* ¶ 75 (alleging that Hedrick "was lying . . . and/or knew that the feasibility consultant's statements were false").

### C. The constructive fraud claims must be dismissed because Wilhite did not gain an advantage.

As stated above, constructive fraud occurs when one breaches a duty and gains an advantage. *Sutton*, 2020 OK 87, ¶ 14, 475 P.3d at 854. The Complaint repeatedly alleges that Wilhite's goal was an ownership interest in the Project. *See* Compl., ¶¶ 4, 7, 46, 67, 83, 158, 204. However, the Complaint does not allege that Wilhite ever achieved that supposed goal. Plaintiff remains the founder and owner of the Mansion Entertainment Group that sponsored the Project. Nothing allegedly said by Wilhite induced Plaintiff to actually share ownership of the Project. Accordingly, the Complaint fails to plausibly allege that Wilhite gained an advantage, which is an element necessary for a successful constructive fraud claim.

### D. The deceit claim must be dismissed to the extent it alleges deception of third parties.

The Complaint appears to seek relief for alleged deception against third parties. *See* Compl., ¶ 234 (asserting that Defendants "intended to deceive and did deceive the public and misled numerous individuals"). Any such claim must be dismissed for lack of standing. *See Thomas v. Metro. Life Ins. Co.,*

631 F.3d 1153, 1159 (10th Cir. 2011) (rejecting "an attempt to protect the rights of third parties" for lack of standing). The Complaint does not identify what this sentence is referring to. Plaintiff cannot seek relief for alleged injuries to third parties such as "the public," Compl., ¶ 77, 101, or "government officials," *id.,* ¶ 206, or "potential investors," *id.,* ¶ 206.

Indeed, some of the alleged falsehoods, such as those about Mr. Silanskas's role, could not have deceived Plaintiff because he was fully aware of Mr. Silanskas's participation. *See, e.g.*, Compl., ¶¶ 110-113 (asserting that a draft "media brief" prepared by someone other than Wilhite or Mr. Silanskas and sent to Plaintiff for review contained "false" information about Mr. Silanskas' role in project); *id.,* ¶ 177 (alleging that Mr. Silanskas proposed "a public relations strategy of falsely blaming" State of Oklahoma).[7]

While the Complaint generically alleges that Plaintiff was "harmed by the deceit," Compl., ¶ 235, it does not carry Plaintiff's burden to show specifically how alleged deception of third parties harmed him. *See, e.g.*, *Horton v. Sw. Med. Consulting, LLC*, No. 17-CV-0266-CVE-MJX, 2017 WL 2951922, at *4 (N.D. Okla. July 10, 2017) ("To have standing, a plaintiff must show that his or her injury is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.") (quotation marks omitted).

## IV.   The Intentional Infliction of Emotional Distress Claim must be dismissed (Count VII).

The Complaint also fails to plausibly allege the elements of intentional infliction of emotional distress. "To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting

---

[7] To the extent the deceit claim may challenge Wilhite's use of DocuSign, the Complaint does not adequately plead knowing or reckless falsity because it admits that Wilhite received written confirmation that appeared to be from Plaintiff, Compl. ¶ 131, and admits that Plaintiff was aware of continuing obligations to contractors, *see id.* ¶¶ 108, 109.

emotional distress was severe." *Mills v. Amazon.com Servs., LLC*, No. 24-CV-0188-CVE-CDL, 2024 WL 3205397, at *6 (N.D. Okla. June 27, 2024). "The trial court acts as a gatekeeper regarding the outrageousness of the defendant's conduct and the severity of the plaintiff's distress." *Id.* (quoting *Computer Publ'n, Inc. v. Welton*, 2002 OK 50, ¶ 8, 49 P.3d 732, 735.

Here, the Complaint most clearly fails at the fourth element, which "requires proof that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." *Id.* While the Complaint asserts that "the emotional distress was severe," Compl., ¶ 246, it does little to substantiate that allegation. Instead, the Complaint merely repeats the words "severe stress" and "severe distress" a few times and asserts without support that the distress caused a stroke. *See id.,* ¶ 10 ("The fraud has been devastating to both Gene's physical health and mental wellbeing. It has resulted in severe emotional distress and, ultimately, a stroke); *id.,* ¶ 183 ("The burden of all the debt for the Project piling up and Gene's belief that he was not satisfying 'God's' will to build the theme park resulted in Gene experiencing severe stress and, ultimately, suffering a stroke in July 2024."). This is not sufficient. *See, e.g., Mengert v. United States*, 620 F. Supp. 3d 1157, 1164 (N.D. Okla. 2022), affd, 120 F.4th 696 (10th Cir. 2024) (dismissing "panic attacks" for lack of severity where there was "lack of evidence showing that the distress interfered with [p]laintiff's ability to conduct [her] daily life affairs" (quoting *Zeran v. Diamond Broadcasting, Inc.*, 203 F.3d 714, 721 (10th Cir. 2000)); *Johnson v. Spirit Aerosystems, Inc.*, No. 20-CV-00138-GKF-FHM, 2020 WL 12800851, at *3 (N.D. Okla. Aug. 4, 2020) (rejecting conclusory allegation of "severe emotional and psychological damage").

Moreover, as discussed above with regard to the fraud claims, the Complaint fails to plausibly allege that Wilhite took intentional or reckless action that distressed Plaintiff. Wilhite, as Plaintiff's long-time employee and friend, sought to carry out Plaintiff's wishes regarding the Mansion Theatre and the Project. He also shared the Todays Word messages with Plaintiff upon request, as he also did with his own family members. Moreover, Bicknell offers no well-pleaded allegation that Wilhite knew

21

the messages were fake or participated in anyway in the scheme he's alleged to have participated in—and this is so despite the fact that Bicknell had unfettered access to Wilhite's Mansion Theater email account prior to filing his suit. (*Id.*, ¶¶ 188, 190, 195-98.) These actions are not extreme or outrageous. *See Mills*, 2024 WL 3205397, at *6 ("The second element . . . 'requires proof that the defendant's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and that such conduct is regarded as atrocious and utterly intolerable in a civilized community.'" (quoting *Comput. Publ'ns*, 2002 OK 50, ¶ 9, 49 P.3d at 735)). Nor do they meet the "exceptionally high bar for an IIED claim." *Herron v. Watson's of Okla. City Inc.*, 2020 WL 3086256, at *3 (W.D. Okla. June 10, 2020).

## V. The Unjust Enrichment Claim must be dismissed as to Wilhite (Count VIII).

The Complaint's unjust enrichment claim against Wilhite must be dismissed for two reasons. "Recovery, based on unjust enrichment depends upon a showing that [Plaintiffs] have money in their hands that, in equity and good conscience, they ought not be allowed to retain." *French Energy, Inc. v. Alexander*, 1991 OK 106, ¶ 11, 818 P.2d 1234, 1237. "[A]n unjust enrichment claim primarily exists where an exchange or transaction occurs resulting in one party substantially and unjustly benefitting at the expense of another." *Randle v. City of Tulsa*, 2024 OK 40, ¶ 27, 556 P.3d 612, 620, reh'g denied (Sept. 9, 2024).

First, Plaintiff has failed to plead any unjust benefit to Wilhite. Plaintiff identifies no specific benefits other than "receiv[ing] a salary and ha[ving] expenses reimbursed." Compl., ¶ 250.[8] Where payment is analogous to "an hourly fee based on [one's] services," there is no unjust enrichment. *Lapkin v. Garland Bloodworth, Inc.*, 2001 OK CIV APP 29, ¶ 13, 23 P.3d 958, 963; *see also Gokool v.*

---

[8] This paragraph also asserts that "Defendants . . . profited from hiring their family members for the Project." Compl., ¶ 250. However, that allegation does not apply to Wilhite because the Complaint only specifies that codefendants hired their relatives. *See id.*, ¶¶ 179 (Silanskas), 181 (Hedrick), 216 (Hedrick, Silanskas).

*Oklahoma City Univ.*, 716 F. App'x 815, 819 (10th Cir. 2017) (affirming dismissal of unjust enrichment claim because "there is nothing wrong about the University keeping Gokool's first-year tuition because she received the instruction the school agreed to provide."). Indeed, Wilhite's annual salary over a four-year period, *see id.,* ¶ 180, is not solely attributable to the Project. Wilhite was Plaintiff's employee for "over two decades" as the manager of the Mansion Theatre and all Bicknell's other Branson properties. Compl., ¶ 28. Most of his salary remained attributable to those employment duties. While he had additional duties as the CEO of the American Heartland Project from some point after January 2022, *see* Compl., ¶¶ 45-46, 52-53, Wilhite also remained in his role as manager of the Mansion Theatre and all Bicknell's other Branson properties. Moreover, despite the Complaint's efforts to obscure it, the Project was Plaintiff's idea and Plaintiff's project. *See, e.g.,* Compl., ¶ 56; *id.* ¶¶ 53, 65.

Plaintiff does not allege that Wilhite's salary or expenses were excessive for the work that he performed, or that the pay was contingent on any particular result. Nor is this a situation where "both parties can be returned to the position they were in before the transaction." *French Energy, Inc. v. Alexander*, 1991 OK 106, ¶ 14, 818 P.2d 1234, 1238. Wilhite actually worked for Plaintiff for years, and garnishing his salary would itself be unjust. Moreover, Plaintiff's unjust enrichment claim cannot be based on Wilhite's interest in the Project. A recipient of money is "not unjustly enriched by a failed business venture." *City of Tulsa v. Bank of Oklahoma, N.A.*, 2011 OK 83, ¶ 19, 280 P.3d 314, 319–20.

Second, as discussed above, Plaintiff has failed to adequately plead wrongdoing by Wilhite regarding his involvement in the Project. "A claim for unjust enrichment requires an allegation of some active wrongdoing on the part of the person against whom recovery is sought such as fraud, abuse of confidence, or unconscionable conduct." *Randle v. City of Tulsa*, 2024 OK 40, ¶ 26, 556 P.3d 612, 620, reh'g denied (Sept. 9, 2024). The facts here—where Wilhite's alleged benefits are merely his salary and expenses as Bicknell's employee—do not give rise to a situation in which "it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of

23

another." *N.C. Corff Partnership, Ltd. v. OXY USA, Inc.*, 1996 OK CIV APP 92, ¶ 25, 929 P.2d 288, 295. Accordingly, Plaintiff's unjust enrichment claim against Wilhite must be dismissed.

## VI.    The Civil Conspiracy Claim must be dismissed (Count III).

Plaintiff's civil conspiracy must also be dismissed. In Oklahoma, "[a] civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." *Schovanec v. Archdiocese of Oklahoma City*, 2008 OK 70, ¶ 46, 188 P.3d 158, 175, *as corrected* (July 2, 2008). Because Plaintiff alleges conspiracy to commit fraud, he must satisfy heightened pleadings standards, which he cannot do. *See Energy Fluids, Inc. v. Cimarex Energy Co.*, Case No. CIV-07-0653-HE, CIV-07-0667-HE, 2008 WL 2404226, at *1 (W.D. Okla. June 10, 2008) Plaintiff's claim must be dismissed for three reasons.

First, the conspiracy claim must be dismissed because Plaintiff has failed to adequately plead any tort upon which the conspiracy could depend. "[C]ivil conspiracy itself does not create liability. In order to be liable the conspirators must pursue an independently unlawful purpose or use an independently unlawful means. There can be no civil conspiracy where the act complained of and the means employed are lawful." *Gaylord Ent. Co. v. Thompson*, 1998 OK 30, ¶ 40, 958 P.2d 128, 148. For all the reasons discussed above, none of Plaintiff's tort claims can survive a motion to dismiss. *Thacker v. Walton*, 2021 OK CIV APP 5, ¶ 19, 499 P.3d 1255, 1262 ("[W]e will not entertain the allegations of conspiracy when [plaintiff] has been unable to support the underlying elements of the claims at issue").

Second, Oklahoma has heightened pleading standards for conspiracy. *See N. Texas Prod. Credit Ass'n v. McCurtain Cnty. Nat. Bank*, 222 F.3d 800, 815 (10th Cir. 2000) (characterizing "the heightened evidentiary standard for a civil conspiracy claim under Oklahoma law"). If the alleged conduct could equally have been lawful, and with a lawful purpose, the conspiracy claim must fail. *See Dill v. Rader*, 1978 OK 78, ¶ 7, 583 P.2d 496, 499; *Peterson v. Grisham*, 594 F.3d 723, 730 (10th Cir. 2010).  Plaintiff acknowledges that "building the American Heartland Project" was a "lawful act," but asserts that the

24

alleged conspiracy had the unlawful purpose of "obtaining Gene's money through fraud and deceit" and the unlawful means of "using fraud and funds acquired through fraud." Compl., ¶ 223. However, the fraud theories depend entirely on the Project being a sham. The allegations do not support the conclusion that the Project was a sham. To the contrary, the Complaint alleges that Wilhite and Silanskas expected the Project to be a success worth billions. *See* Compl., ¶¶ 4, 46, 83. And an independent professional, Hedrick, who is not alleged to be in the conspiracy, was also claiming the Project would be a success. *Id.*, ¶ 68. Without plausible allegations of an unlawful purpose or unlawful means, courts "do not delve into the reasons for the course of action taken . . . to determine if it was appropriate, or even reasonable." *Wells v. Redwine*, 41 F. App'x 327, 333 (10th Cir. 2002). Moreover, Plaintiff's money went into the project; it did not line Wilhite's pockets. *See, e.g.*, Compl., ¶¶ 133, 213.

Third, even if the Court finds sufficient allegations that another defendant had an unlawful intent, Plaintiff has failed to show that Wilhite had a meeting of the minds with any other person or the intent to commit any fraudulent act, which is required under Oklahoma law. *N. Texas Prod. Credit Ass'n v. McCurtain Cnty. Nat. Bank*, 222 F.3d 800, 815 (10th Cir. 2000).

## CONCLUSION

For the foregoing reasons, the Court should dismiss all claims against Wilhite.

Respectfully submitted,

*/s/ Deric J. McClellan*
J. Christopher Davis, OBA #16639
Deric J. McClellan, OBA #32827
CROWE & DUNLEVY, P.C.
222 North Detroit Ave., Suite #600
Tulsa, OK  74120
(918) 592-9800
(918) 592-9801 (Facsimile)
chris.davis@crowedunlevy.com
deric.mcclellan@crowedunlevy.com

25

-and-

Evan G. Vincent, OBA #22325
CROWE & DUNLEVY, P.C.
Braniff Building
324 North Robinson Ave., Suite #100
Oklahoma City, OK 73102-8273
(405) 235-7700
(405) 239-6651 (Facsimile)
evan.vincent@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT**
**LARRY K. WILHITE**

## <u>CERTIFICATE OF SERVICE</u>

☒ ☐ I hereby certify that on this 12th day of September, 2025, I electronically transmitted the attached document to the Court Clerk using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Ameilia A. Fogelman
Joseph W. Lang
Michael S. Nadel
Rachel M. Peltzer
Theresa M. Babendreier
**Attorneys for Plaintiff**

Lysbeth L. George
**Attorney for Defendant Hedrick**