IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| O. GENE BICKNELL, | ) | |
| | ) | Case No. 25-cv-00383-SEH-SH |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD M. SILANSKAS JR., | ) | |
| LARRY K. WILHITE, and | ) | |
| STEPHEN HEDRICK, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT WILHITE'S MOTION TO DISMISS**

Amelia A. Fogleman
Joseph W. Lang
GABLEGOTWALS
110 N. Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120
(918) 595-4800

Michael S. Nadel
Sagar K. Ravi
Rachel M. Peltzer
Theresa M. Babendreier
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

Attorneys for Plaintiff O. Gene Bicknell

**TABLE OF CONTENTS**

Introduction .................................................................................................................................1

Legal Standard ...........................................................................................................................2

Argument in Opposition .............................................................................................................3

I.      Count I – Civil RICO ....................................................................................................3

II.     Count II – RICO Conspiracy .........................................................................................11

III.    Count III – Civil Conspiracy .........................................................................................11

IV.     Count IV – Fraud ...........................................................................................................14

V.      Count V – Constructive Fraud ......................................................................................16

VI.     Count VI – Deceit ..........................................................................................................17

VII.    Count VII – Intentional Infliction of Emotional Distress .............................................18

VIII.   Count VIII – Unjust Enrichment....................................................................................23

Conclusion ..................................................................................................................................25

# TABLE OF AUTHORITIES

<u>Cases</u>

*Bachi-Reffitt v. Reffitt*, 802 F. App'x 913 (6th Cir. 2020) ..........................................................9, 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................21

*Chellen v. John Pickle Co., Inc.*, 446 F. Supp. 2d 1247 (N.D. Okla. 2006) ................................14

*Cisneros v. Petland, Inc.*, 972 F.3d 1204 (11th Cir. 2020) ............................................................9

*CitiFinancial Mortg. Co. v. Frasure*, No. 06-cv-160-TCK-PJC, 2008 WL 2199496
(N.D. Oka. May 23, 2008) ...............................................................................................23

*Clann Enters. v. Wilson*, No. 25-cv-00108-GKF-MTS, 2025 WL 2792740
(N.D. Okla. Sept. 30, 2025) ................................................................................4, 6, 7, 8, 11

*Clinton HMA, LLC v. Clinton Hosp. Auth.*, No. 22-cv-569-J, 2023 WL 5668016
(W.D. Okla. July 25, 2023) ...............................................................................................12

*Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264 (10th Cir. 2023)......................................3, 16

*Comput. Publ'ns, Inc. v. Welton*, 49 P.3d 732 (Okla. 2002)...............................................18, 21, 23

*Daoud v. Weldnow, LLC*, No. 21-cv-476-TCK-JFJ, 2022 WL 994884
(N.D. Okla. Apr. 1, 2022) ..................................................................................................15

*Doe 1 v. Mt. St. Mary H.S. Corp.*, No. 22-cv-992-R, 2025 WL 490011
(W.D. Okla. Feb. 13, 2025) ..........................................................................................21, 23

*Durham v. McDonald's Restaurants of Okla., Inc.*, 256 P.3d 64 (Okla. 2011)............................21

*Est. of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840 (10th Cir. 2005) ....................18

*Gaylord Ent. Co. v. Thompson*, 958 P.2d 128 (Okla. 1998).........................................................11

*George v. Urb. Settlement Servs.*, 833 F.3d 1242 (10th Cir. 2016)..................................................3

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)...................................................................3, 4

*I.P.I.C., GSP, S.L. v. Ruhrpumpen, Inc.*, No. 08-cv-0510-CVE-PJC, 2009 WL 484355
(N.D. Okla. Feb. 24, 2009) ...............................................................................................23

*Johnson v. Heath*, 56 F.4th 851 (10th Cir. 2022) .......................................................................10

*Lillard v. Stockton*, 267 F. Supp. 2d 1081 (N.D. Okla. 2003) ......................................................17

*Manhattan Const. Co. v. Degussa Corp.*, No. 06-cv-611-M, 2007 WL 983084
(W.D. Okla. Mar. 29, 2007)..........................................................................................15, 16

*McNeely v. Nat'l Mobile Health Care, LLC*, No. 07-cv-933-M, 2008 WL 2944933
(W.D. Okla. July 25, 2008) ...............................................................................................24

*Miller v. Miller*, 956 P.2d 887 (Okla. 1998) .........................................................................18, 21

*Minter v. Prime Equip. Co.*, 451 F.3d 1196 (10th Cir. 2006)......................................................25

*Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006) ..................................................10

*N. Tex. Prod. Credit Ass'n v. McCurtain Cnty. Nat'l Bank*, 222 F.3d 800 (10th Cir. 2000)........12

*Northmarq Cap., LLC v. Kabani*, No. 24-cv-00073-SH, 2024 WL 4467522
(N.D. Okla. Oct. 10, 2024)......................................................................2, 25

*Okla. Dep't of Sec. ex rel. Faught v. Blair*, 231 P.3d 645 (2010)...............................24

*Petco Petro. Corp. v. West*, No. 19-cv-439-GKF-SH, 2021 WL 6053682
(N.D. Okla. July 12, 2021)...........................................................................7, 8

*Peterson v. Grisham*, 594 F.3d 723 (10th Cir. 2010) ........................................................2

*Resol. Tr. Corp. v. Stone*, 998 F.2d 1534 (10th Cir. 1993).................................4, 6, 7, 18

*Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158 (Okla. 2008)...................11, 23

*Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir. 1997).......................14

*Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507 (10th Cir. 1990) ..........................................7

*Specialty Beverages LLC v. Pabst Brewing Co.*, 537 F.3d 1165 (10th Cir. 2008)......................16

*Stepp v. Talihina Pub. Sch. Dist.*, No. 6:24-cv-146, 2025 WL 1139471
(E.D. Okla. Apr. 17, 2025)...........................................................................21

*Stepp v. Talihina Pub. Sch. Dist.*, No. 6:24-cv-146-JAR, 2025 WL 1238367
(E.D. Okla. Apr. 29, 2025)...........................................................................12

*TD Williamson, Inc. v. Lincoln Elec. Automation, Inc.*, No. 21-cv-153-GKF-JFJ,
2022 WL 16842907 (N.D. Okla. Jan. 21, 2022)...........................................3, 16

*Williams Field Servs. Grp. LLC v. Gen. Elec. Int'l*, No. 06-cv-530-CVE-SAJ,
2008 WL 2809902 (N.D. Okla. July 21, 2008) ...............................................16

<u>Statutes and Rules</u>

76 Okla. Stat. § 2.............................................................................................17

Fed. R. Civ. P. 9...............................................................................................3

Fed. R. Civ. P. 15............................................................................................25

## INTRODUCTION

Defendant Larry K. Wilhite begins his motion to dismiss by asserting that "even at age 91," Plaintiff O. Gene Bicknell "is not vulnerable to elder abuse of the kind the complaint filed by Bicknell now alleges." Doc. 44 at 1. Plaintiff is 92 now. "Elder abuse" is an apt description of what the Defendants did. And apparently Plaintiff *was* vulnerable to it: The Complaint sets forth in great detail how Wilhite subjected Plaintiff to it, and how Plaintiff fell victim to it.

Wilhite and his co-Defendants operated a criminal enterprise that defrauded Plaintiff and duped him into sinking $60 million into the attempted development of the "American Heartland Theme Park" ("the Project"), which they claimed would rival the size and scale of Disney World but in an unlikely location: Vinita, Oklahoma. *Complaint* (Doc. 1) at 1. To commit this fraud, Wilhite and Co-Defendant Richard M. Silanskas Jr. embarked on a years-long campaign of psychological and spiritual abuse. *E.g., id.* ¶ 6. They tricked Plaintiff by impersonating God and religious figures purportedly communicating "God's" directives in hundreds of electronic messages. *Id.* They made Plaintiff believe that God Himself was commanding Plaintiff to infuse ever more cash into the Project and to trust them completely with its management. *Id.* For years, those electronic messages preyed upon Plaintiff's devout faith and admonished Plaintiff to obey "God's" will without doubts or second-guessing. *Id.* They used the word of "God" to convince Plaintiff he must equally share ownership of the completed Project with them. *Id.* ¶ 7. Meanwhile, they paid themselves handsomely and otherwise took money out of the Project for themselves. *Id.*

As part of the scheme, Wilhite and Silanskas drove a wedge between Plaintiff and his family, which isolated Plaintiff and prevented his family from adequately protecting him. *Id.* ¶ 8. The intensity of Wilhite and Silanskas's manipulation of Plaintiff made it impossible for Plaintiff's family and friends to dissuade him from putting more money into the Project or convince him that the texts and emails he was receiving were not really from God. *Id.* The resulting strife caused

Plaintiff's estrangement from his family—an estrangement that, in turn, aided Wilhite and Silanskas in their scheme. *Id.* Wilhite and Silanskas's fraud caused Plaintiff to lose a substantial portion of his remaining wealth, even prompting him to try to sell his personal possessions to raise additional money for the Project. *Id.*

The fraud was devastating to both Plaintiff's physical health and mental well-being. It has resulted in severe emotional distress and, ultimately, a stroke. *Id.* ¶ 10. Plaintiff brought this action to hold Defendants accountable.

Now Wilhite moves to dismiss. Wilhite acknowledges, as he must, that in evaluating a motion to dismiss, the Court accepts the Complaint's factual allegations as true and construes those facts in the light most favorable to the Plaintiff. Doc. 44 at 9. Yet Wilhite contends that Plaintiff "has failed to adequately plead wrongdoing by Wilhite regarding his involvement in the Project." *Id.* at 23. Wilhite tells this Court that allegations of "active wrongdoing" such as "fraud, abuse of confidence, or unconscionable conduct" are missing from the Complaint. *Id.*

The Complaint itself compels the rejection of Wilhite's arguments. Plaintiff has alleged— with more specificity than required—the elements of each of the eight counts asserted against Wilhite. Wilhite's contrary arguments are wrong, and his motion should be denied.

## LEGAL STANDARD

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the [pleading] alone is legally sufficient to state a claim for which relief may be granted." *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)). The Court accepts all well-pleaded allegations as true and views them in the light most favorable to Plaintiff. *Northmarq Cap., LLC v. Kabani*, No. 24-cv-00073-SH, 2024 WL 4467522, at *3 (N.D. Okla. Oct. 10, 2024).

In "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  This generally requires that a plaintiff "specify the source, time, place, manner and content of the allegedly fraudulent representations, and the consequences thereof."  *TD Williamson, Inc. v. Lincoln Elec. Automation, Inc.*, No. 21-cv-153-GKF-JFJ, 2022 WL 16842907, at *7 (N.D. Okla. Jan. 21, 2022) (citation omitted).  In other words, the plaintiff must at least provide the "who, what, where, when, and how" of the alleged fraud.  *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023).  Rule 9(b)'s purpose is to provide fair notice of the asserted claims and the factual bases of those claims.  *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016).  "[N]ot every allegation of fraudulent misconduct must be pleaded with particularity for a complaint to survive at the motion to dismiss stage."  *Clinton*, 63 F.4th at 1280.  The focus, instead, is on "whether the complaint, taken as a whole, sufficiently apprises the defendant of its involvement in the alleged fraudulent conduct."  *Id.* (cleaned up).

## ARGUMENT IN OPPOSITION

### I.    Count I – Civil RICO

"RICO provides a private right of action in federal court for individuals injured in their business or property through fraudulent conduct."  *George*, 833 F.3d at 1248.  To avoid dismissal as to Wilhite, Plaintiff must plausibly allege that Wilhite "(1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Id.* (citing 18 U.S.C. § 1962(c)).

Wilhite's motion challenges only the third element:  a pattern.  Doc. 44 at 11-15.  To allege a pattern, Plaintiff must allege (i) "related" racketeering activities (ii) amounting to a "continued threat of criminal activity.  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  Wilhite aims only at the second requirement, which courts call "continuity."  "'Continuity' is both a closed- and

open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that

by its nature projects into the future with a threat of repetition."  *Id.* at 241.  Proving continuity

may be done in several ways; there is no bright-line rule.  Indeed, whether this requirement is met

"depends on the specific facts of each case." *Id.* at 242.

"A party alleging a RICO violation may demonstrate continuity over a closed period by

proving a series of related predicates extending over a substantial period of time."  *Id.*  "It is not

necessary to show a threat of future repetition for close-ended continuity."  *Clann Enters. v.

Wilson*, No. 25-cv-00108-GKF-MTS, 2025 WL 2792740, at *4 (N.D. Okla. Sept. 30, 2025).  Here,

Plaintiff has successfully alleged closed-ended continuity.  "There are two elements the court

considers: (1) the duration of the related acts, and (2) the extensiveness of the RICO enterprise

scheme." *Id.*

1.    <u>Duration.</u>  "First, because continuity is 'centrally a temporal concept,' we consider

the duration of the related predicate acts."  *Resol. Tr. Corp. v. Stone*, 998 F.2d 1534, 1543 (10th

Cir. 1993) (citation omitted).  A period of seven to eighteen months is sufficient to establish

continuity.  *Id.* at 1544; *Clann*, 2025 WL 2792740, at *4.

Here, Plaintiff alleges a scheme that lasted longer than three years.  Wilhite introduced

Silanskas to Plaintiff in January 2021.  *Complaint* ¶¶ 35-37.  In June 2021, Silanskas created a

fraudulent reference, sent through a fake email account, to insert himself into Plaintiff's inner

circle.  *Id.* ¶¶ 38-42, 212.  Silanskas created a fraudulent email again in September 2021 to push

the scheme forward.  *Id.* ¶ 43.  At least as early as February 2022, as reflected by the compilation

Wilhite sent to his wife's email account, Wilhite and Silanskas began sending emails and text

messages inflicting religious and psychological manipulation with a "Today's Word" message,

purportedly from God, demanding "absolute obedience" and "absolute cliff diving faith from the

highest mount above the sea." *Complaint* ¶¶ 47-49, 188, 210. The Complaint reprints a representative sample of the "Today's Word" messages.[1] Wilhite and Silanskas, writing as God, castigated Plaintiff and commanded him to trust *them*: "Have I not sent you specific trusted and gifted leader*s* to complete this Work? … All those I sent to you to move forward without obstruction or delay. Trust them completely and avoid inserting distractions or doubtful questions." *Id.* ¶ 51. Wilhite and Silanskas made it appear that God was angry with Plaintiff because of "the delay in resources and provision … due to your lack of obedience … The fulfillment of this vision awaits your faithful obedience immediately! … Follow my instructions precisely and nothing more!" *Id.* ¶ 87.

In mid-2023, Defendants supplemented their religious deception of Plaintiff through a bogus feasibility study, *id.* ¶¶ 75, 103, 112, and a purported "dream team" of former Disney engineers and designers that Defendants claimed were working on the Project but, in reality, were not substantially involved, ¶ 77. These were also used to deceive the public. *Id.*

By December 2023, over the course of 22 months, Wilhite and Silanskas had sent Plaintiff more than 500 "Today's Word" messages purportedly from God. *Id.* ¶ 79. "God" directed Plaintiff to pour into the Project the "wealth acquired and built throughout your business life before truly knowing Me," and admonished: "Remember, Do Not even contemplate or speak an utterance of delaying, pausing or stopping all that has begun!" *Id.* ¶ 127.

Then Wilhite and Silanskas began targeting Plaintiff with emails from a fictional nun, "Sister Catherine." Beginning in January 2024, they sent approximately 100 "Sister Catherine"

---

[1] *Complaint* ¶¶ 49, 50, 51, 80, 81, 84, 85, 93, 94, 104, 106, 118, 121, 122, 123, 127. The messages are often written in all upper case letters, as shown in the Complaint. For ease of reading, in this brief we quote from them using upper and lower case.

emails. *Id.* ¶ 136. The Complaint reprints several.[2] The "Sister Catherine" emails continued until at least May 29, 2024—about three years after the messaging from fake email accounts began. *Id.* ¶ 174. And during that period, Wilhite committed additional predicate acts by fraudulently signing Plaintiff's name to vendor contracts using DocuSign without Plaintiff's knowledge or authorization, a practice that continued for months. *Id.* ¶¶ 129-132.

The predicates acts described in the Complaint lasted from at least as early as June 2021 to at least as late as May 2024. A period of three years satisfies the duration requirement. *See Resol. Tr. Corp.*, 998 F.2d at 1544; *Clann*, 2025 WL 2792740, at *4.

2.    <u>Extensiveness</u>. "Second, [courts] consider the extensiveness of the RICO enterprise's scheme." *Resol. Tr. Corp.*, 998 F.2d at 1543. Under the rubric of "extensiveness," courts consider "a number of factors: the number of victims; the number of the racketeering acts; the variety of racketeering acts; whether the injuries caused were distinct; the complexity and size of the scheme; and the nature or character of the enterprise or unlawful activity." *Id.* at 1543-44 (citations omitted). "In doing so, we may consider external facts that are not necessarily charged as predicate acts." *Id.* "No factor is required or dispositive." *Johnson*, 56 F.4th at 860-61. The factors are meant to guide "a natural and commonsense result." *Clann*, 2025 WL 2792740, at *4.

Here, the Complaint alleges that the scheme left a trail of victims: Plaintiff; multiple vendors who were hired and directed by Defendants and have gone unpaid, bringing lawsuits for millions of dollars; innocent people who bought up land with property values inflated by news of theme park that would never exist; public officials who bought into the fraud; the Mansion Theatre, from which Wilhite misappropriated funds, and the citizenry of northeast Oklahoma. *Complaint* ¶¶ 11, 133, 182, 213, 215. Thus, "[t]his case is unlike *Sil–Flo*, where we noted that the scheme

---

[2] *Complaint* ¶¶ 138, 139, 142, 144, 148, 150, 153, 155, 159, 160, 162, 163, 167, 172, 174.

was 'directed at one individual with no potential to extend to other persons or entities.'" *Resol. Tr. Corp.*, 998 F.2d at 1544 (distinguishing and quoting *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990)).

Moreover, even a single victim can be sufficient to satisfy the extensiveness requirement when a scheme is complex. *See Petco Petro. Corp. v. West*, No. 19-cv-439-GKF-SH, 2021 WL 6053682, at *5 (N.D. Okla. July 12, 2021). Here, the scheme was complex. It involved fake references, fake feasibility studies and economic analyses, a fake "dream team," fake text messages, fake emails, the fraudulent signing of Plaintiff's name on vendor contracts, false representations to government officials and vendors, and ultimately, the targeting and splitting up of an entire family. *Complaint* ¶¶ 6-8, 38-43, 47-52, 56, 68, 75, 77, 79-87, 93-94, 103-106, 112-113, 118-123, 127, 129-133, 135-175, 188-199, 204-205, 208-215. The racketeering acts— including the wire fraud constituted by the "Today's Word" messages, the "Sister Catherine" emails, and the DocuSign forgeries—exceed *600* in number. *Id.* ¶¶ 79, 130-132, 136. *See Clann*, 2025 WL 2792740, at *5 (finding that "a substantial number—thirty-four—of alleged related, similar predicate acts" weighs in favor of continuity). Defendants manipulated Plaintiff into transferring almost $10 million in 2022, almost $48 million in 2023, and almost $5 million in 2024, for a total of more than $60 million. *Id.* ¶¶ 53, 58-66, 69-74, 76, 78, 107, 116, 119, 128, 133, 140, 152, 164, 166, 169, 175. The scheme induced payment of that money through at least 22 separate wire transfers to an entity controlled by Wilhite, other entities, vendors, and Wilhite personally.[3] *Id.*; *see Clann*, 2025 WL 2792740, at *5 ("Similar to *Resolution Trust*, this case involves numerous

---

[3] The Complaint identifies: money transfers to Wilhite's entity at Paragraphs 58, 59, 60, 61, 62, 64, 66, 69, 70, 71, 74, 76, and 78; money transfers to other entities at Paragraphs 53, 65, 107, 116, 119, 128, 152, 164, 166, and 169; money transfers directly to vendors at 69, 72, 73, and 128; and a payment directly to Wilhite personally at Paragraph 140.

perpetrators and the alleged damages exceed $1,000,000.00; therefore, factor (5) weighs in favor of plaintiffs."). And, like in *Petco Petroleum*, the scheme "was not directed at a single discrete goal." 2021 WL 6053862, at *5. The scheme was directed toward manipulating Plaintiff, over many years, to fund the development of the Project, to gift Wilhite and Silanskas two-thirds of it, and to pay Defendants and their family members handsomely along the way. *Complaint* ¶¶ 6-8, 46-47, 135, 204.

Wilhite argues that Plaintiff has alleged a single scheme of "a deluge of fraudulent texts and emails." Doc. 44 at 15. And in a footnote, Wilhite asserts that the "predicate acts were all the same alleged fraud (sending dozens of misleading texts and emails)." *Id.* at 15 n.6. But the scheme, and the predicate acts, also included using DocuSign to fraudulently sign Plaintiff's name to vendor contracts. *Complaint* ¶¶ 130, 211. Wilhite did this for a period of months, *id.* ¶ 132, ensuring that the scheme's victims would include the vendors who would never be paid, *id.* ¶¶ 11, 182. The scheme also included using a fake email account purportedly belonging to a former Disney executive to get Silanskas into Plaintiff's inner circle and to push the project forward. *Id.* ¶¶ 38-43, 212. The scheme included providing baseless information to Oklahoma officials to obtain state funding not justified in fact. *Id.* ¶ 68. The scheme included the creation and circulation of false feasibility studies and false statements to the public. *Id.* ¶¶ 75, 103, 112. The scheme included misrepresenting to Plaintiff, and the public, that the project was led by an executive team of a dozen former Disney engineers and designers. *Id.* ¶¶ 77, 113. The scheme involved misleading the public about Silanskas's involvement, because of his history of theme park-related fraud. *Id.* ¶¶ 111, 114; *see also id.* ¶¶ 30-31. The scheme also included making false representations over the wires to contractors about the Project's funding and ability to pay often without consulting Plaintiff, thereby causing these contractors to perform work for the Project even

8

though Wilhite and Silanskas knew there was no money to pay them at the time. *Id.* ¶ 215. The scheme also included defrauding Plaintiff by siphoning off funding to set up employment and business opportunities, including for Defendants' family members *Id.* ¶ 216. And the scheme involved the separate misappropriation of the profits from The Mansion Theater to fund the theme park project. *Id.* ¶ 133.

Wilhite argues that Plaintiff alleged the scheme had "one discrete goal": "to coerce Plaintiff into funding the American Heartland Project and giving them each a one-third interest in it." Doc. 44 at 15. But the Complaint identifies that as "*one of* the core goals of the scheme." *Complaint* ¶ 83 (emphasis added). Another goal was that Defendants would pay themselves handsomely along the way and siphon off money for their families. *Id.* ¶ 4. Wilhite, for example, received approximately $400,000 in salary payments, over $20,000 in disbursements from Plaintiff's personal bank accounts, and approximately $30,000 in "owner's draws." *Id.* ¶ 180. Wilhite's company, Backstage Ministries, also received approximately $10,000 in purported donations during this period. *Id.* Silanskas made at least $648,000 for himself and his family members. *Id.* ¶ 179. Defendant Hedrick made at least $1.5 million for himself and his family. *Id.* ¶ 181. Additional goals of the scheme included driving a wedge between the elderly Plaintiff and his family so that they could not protect him, and getting Plaintiff to sue his family and change his estate planning. *Id.* ¶¶ 8, 142-151. The object of the RICO enterprise was multi-fold. *Id.* ¶ 204. And because Plaintiff does not allege "a single scheme aimed at a single victim with a single purpose," Wilhite's footnote 5 string cite to mostly out-of-circuit cases is beside the point. Doc. 44 at 15 n.5. A cursory review of the facts of those cases demonstrates why. *See, e.g.*, *Cisneros v. Petland, Inc.*, 972 F.3d 1204 (11th Cir. 2020) (alleging a "puppy's death was the result of a nationwide racketeering conspiracy"); *Bachi-Reffitt v. Reffitt*, 802 F. App'x 913 (6th Cir. 2020)

(alleging fraud in a divorce proceedings by misrepresenting the value of a stake in a company); *Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006) (alleging denial of an employee's workers' compensation benefits).  Those fact patterns are unlike the sprawling scheme alleged by the Complaint.

Wilhite relies upon *Johnson v. Heath*, 56 F.4th 851 (10th Cir. 2022), in which the Tenth Circuit affirmed that a RICO plaintiff had failed to plead closed-ended continuity.  But the contrast between *Johnson* and the instant case supports Plaintiff.  In *Johnson*, "Plaintiff did not allege that the scheme required extensive planning or management.  Plaintiff alleged only that Defendant ripped off some customers at his gas station, failed to perform routine maintenance on the station, and then sold it to Plaintiff without revealing those facts."  *Id.* at 861.  Further, "Defendant accomplished nearly half of the alleged racketeering predicates by simply switching off a marquee sign displaying the price of gasoline—no extensive planning or management required.  And nearly all the alleged racketeering predicates—the fraudulent transactions with customers—involved small amounts of money."  *Id.*  In short, what was alleged in *Johnson* was "at most … a business deal gone sour."  *Id.* at 862.  But here, Wilhite and Silanskas engaged in an extensively planned and carefully managed multi-year fraud, involving hundreds of predicate acts, to target Plaintiff, to seize control of what they believed would be a multi-billion enterprise, and to enrich themselves along the way, all to the detriment of vendors they defrauded, businesses from which they misappropriated, public officials they lied to, and an entire community of ordinary people misled by their scheme.  The "nature of the unlawful activity" here is not a "business deal gone sour."  It is not "garden variety fraud."  It is, to use Wilhite's term, "elder abuse."  Doc. 44 at 1.  But more than that, it is an epic of criminal misconduct resulting in losses of more than $60 million to Plaintiff, to say nothing of the millions of dollars lost by unpaid vendors.  *Complaint* ¶¶ 11, 182.

"[L]ike in *Resolution Trust Corp.* and *Petco Petroleum Corp.*, … the court may reasonably infer that defendants' alleged conduct had the potential to extend to other persons or entities and was 'limited only by the ability of [defendants] to keep it afloat.'"  *Clann*, 2025 WL 2792740, at *5 (quoting *Resol. Tr. Corp.*, 998 F.2d at 1545, and *Petco Petro.*, 2021 WL 6053682, at *5).  This is precisely the extensiveness that Congress intended the RICO statute to address.

## II.      Count II - RICO Conspiracy

Wilhite's only argument for dismissal of Plaintiff's Count II (Violations of Rico – Conspiracy, 18 U.S.C. § 1962(d)) is that Plaintiff's claim for violation of RICO under § 1962(c) is deficient.  Doc. 44 at 15-16.  Wilhite is incorrect, as shown in Part I above.

## III.     Count III – Civil Conspiracy

Civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  *Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158, 175 (Okla. 2008).  The essential elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.  *Id.*

Wilhite offers three arguments against Plaintiff's civil conspiracy claim.  First, Wilhite contends that the claim "must be dismissed because Plaintiff has failed to adequately plead any tort upon which the conspiracy could depend."  Doc. 44 at 24.  As discussed throughout this brief, Plaintiff has successfully pled numerous torts, including fraud, constructive fraud, deceit, intentional infliction of emotional distress, and violations of the civil RICO statute predicated upon hundreds of instances of wire fraud.  Of course "[t]here can be no civil conspiracy where the act complained of and the means employed are lawful."  *Gaylord Ent. Co. v. Thompson*, 958 P.2d 128, 148 (Okla. 1998).  But the Complaint is replete with allegations that Wilhite and Silanskas,

together, engaged in *unlawful* acts and employed *unlawful* means.  An act that gives rise to tort liability is sufficient predicate for a civil conspiracy claim.  *Stepp v. Talihina Pub. Sch. Dist.*, No. 6:24-cv-146-JAR, 2025 WL 1238367, at *20 (E.D. Okla. Apr. 29, 2025); *Clinton HMA, LLC v. Clinton Hosp. Auth.*, No. 22-cv-569-J, 2023 WL 5668016, at *8 (W.D. Okla. July 25, 2023).

Second, Wilhite argues that "[i]f the alleged conduct could equally have been lawful, and with a lawful purpose, the conspiracy must fail."  Doc. 44 at 24.  Wilhite seems to suggest that because "building the American Heartland Project" might have been accomplished lawfully or because Wilhite might have actually believed the Project could be a success, Wilhite cannot be liable for a conspiracy to commit unlawful acts in the service of building the American Heartland Project.  But Defendants conspired to do more than build the American Heartland Project.  The Complaint alleges that they conspired to defraud Plaintiff of his life savings, to improperly redirect funds to themselves and their family members, and to psychologically manipulate Plaintiff over the course of years through fraudulent text and email communications to coerce him into sinking more funds into the American Heartland Project and to hand them majority ownership of the Project.  *Complaint* ¶ 204.  That was the object of the conspiracy.  It was an unlawful purpose accomplished through unlawful means.

Third, Wilhite argues: "Plaintiff has failed to show that Wilhite had a meeting of the minds with any other person or the intent to commit any fraudulent act, which is required under Oklahoma law."  Doc. 44 at 25.  Wilhite is incorrect.  In a conspiracy, "[t]he agreement is a matter of inference from the facts and circumstances of the alleged conspirators.  The question is whether the circumstances, considered as a whole, show that the parties united to accomplish the fraudulent scheme."  *N. Tex. Prod. Credit Ass'n v. McCurtain Cnty. Nat'l Bank*, 222 F.3d 800, 815 (10th Cir. 2000).  The Complaint alleges:  "To manipulate Gene to fund the Project while surrendering to

their control, Silanskas and Wilhite launched a campaign of text and email messages to manipulate Gene by playing upon his religious faith." *Id.* ¶ 47. The Complaint alleges that Wilhite and Silanskas sent the "Today's Word" messages together. *Id.* ¶¶ 48, 79. The manipulation documented throughout the Complaint is attributed to Wilhite and Silanskas together. *Id.* ¶ 63. The Complaint alleges that Wilhite and Silanskas, together, were assisted by Hedrick in carrying out the conspiracy. *Id.* ¶¶ 2, 5, 55.[4] Wilhite and Silanskas, together, used the "triune" concept discussed throughout the Complaint to coerce Plaintiff into trusting them and sharing equal ownership of the project with them. *Id.* ¶ 83. Wilhite and Silanskas together took to impersonating Plaintiff to authorize expenses. *Id.* ¶¶ 129-132. Wilhite and Silanskas together targeted Plaintiff with the "Sister Catherine" emails. *Id.* ¶¶ 136-164, 167-174, 187, 192-198. The allegations that Wilhite and Silanskas had a meeting of the minds—that they were in the whole scheme together—are unmistakable. Indeed, their surreptitious communications to each other about the "Sister Catherine" emails are a key reason why they were caught and will be held accountable. *Id.* ¶¶ 194-198. Finally, there's no more compelling evidence of a meeting of the minds between the Defendants than the fact that "God" was commanding Gene to trust His "gifted *leaders*," His "chosen triune leadership." *Id.* ¶¶ 51, 85. If Silanskas was a lone actor, why would Silanskas have "God" command Plaintiff to trust Wilhite? This was the quintessential civil conspiracy. And with all inferences drawn in Plaintiff's favor, that is the only reasonable conclusion to be reached.

---

[4] Wilhite asserts that Hedrick "is not alleged to be in the conspiracy." Doc. 44 at 25. Wilhite is mistaken. Plaintiff named Hedrick as a defendant only as to Plaintiff's unjust enrichment claim, but the Complaint clearly alleges that Hedrick *was* part of the conspiracy. *See, e.g.*, *Complaint* ¶¶ 2, 5, 55, 58, 75, 84, 91, 181, 204, 208, 214, 216.

IV.     **Count IV - Fraud**

The elements of common law fraud under Oklahoma law are: (1) a false material misrepresentation, (2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, (3) with the intention that it be acted upon, and (4) which is relied on by the other party to his or her detriment. *Chellen v. John Pickle Co., Inc.*, 446 F. Supp. 2d 1247, 1290 (N.D. Okla. 2006).

Wilhite argues that the Complaint fails to specifically allege any false material misrepresentation or misstated fact. Doc. 44 at 17. That cannot be squared with the Complaint itself, however. The false material representations that underlie the fraud claim include, at least, the "Today's Word" and "Sister Catherine" messages, of which there were more than 600. And the Complaint provides the "who, what, when, and where" required by Rule 9(b). The Complaint identifies *who* impersonated God and "Sister Catherine" by sending those messages: Wilhite and Silanskas. *Complaint* ¶ 6, 7, 47, 48, 56, 83, 136. The Complaint identifies *when* specific fraudulent messages were sent by date. *E.g. id.* ¶¶ 49-51, 80, 81, 85-87, 93-94, 150. The *where* here is the means of communication—text or email—and the Complaint delineates between them. The Complaint identifies *what* the messages said. *E.g. id.* ¶¶ 104, 106, 153, 162. The Complaint identifies the consequences of the fraudulent statements. *E.g. id.* ¶¶ 85-89, 104-105, 118-19, 127-128, 140, 144-158. Nothing more is required to satisfy Rule 9(b). *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) ("Simply stated, a complaint must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'").

Wilhite contends that the "Today's Word" and "Sister Catherine" emails must be "placed into context." Doc. 44 at 17-18. Wilhite asserts that he merely "shared" the "Todays Word" messages with Plaintiff, and that Wilhite only "received" the "Sister Catherine emails." *Id.* But

the Complaint alleges that Wilhite, along with Silanskas, *created* the messages.  Wilhite and Silanskas "impersonat[ed] God and religious figures purportedly communicating 'God's' directives in hundreds of electronic messages targeted at [Plaintiff]."  *Complaint* ¶ 6.  Wilhite and Silanskas "made Plaintiff believe that God Himself was commanding [Plaintiff] to infuse ever more cash into the Project and to trust them completely with its management."  *Id.*  Wilhite and Silanskas "launched" the "campaign of text and email messages to manipulate [Plaintiff] by playing upon his religious faith."  *Id.* ¶ 47.  Wilhite and Silanskas "began sending" Plaintiff the "Today's Word" messages.  *Id.* ¶ 48.  Wilhite and Silanskas targeted Plaintiff with the "Sister Catherine" emails.  *Id.* ¶ 136.  Wilhite is free to argue "context" to the jury, but Plaintiff's allegations, accepted as true, state a claim for fraud.

Wilhite protests that there "is not evidence he was the author [of the "Todays Word" messages] or that he knowingly participated in any deceit."  Doc. 44 at 18.  That is both wrong and beside the point.  While Wilhite goes to great lengths "to inform the Court and the world" that he was "never aware" the messages from God and other religious figures that deceived Plaintiff were fraudulent, Doc. 44 at 4, Wilhite ignores the smoking-gun evidence detailed in the Complaint: Silanskas sent Wilhite copies of Plaintiff's replies to "Sister Catherine"—which copied neither Silanskas nor anyone else; Wilhite then silently forwarded them to his deceased mother-in-law's email address.  *Complaint* ¶¶ 185-198.  And regardless, Plaintiff need not plead "evidence."  "Although Rule 9(b) imposes a heightened duty in pleading a fraud claim, not every detail and misdeed must appear in the pleadings to survive Rule 9(b) scrutiny."  *Daoud v. Weldnow, LLC*, No. 21-cv-476-TCK-JFJ, 2022 WL 994884, at *5 (N.D. Okla. Apr. 1, 2022).  Similarly, "Rule 9(b) does not require particularity to the degree so as to supplant general discovery methods."  *Manhattan Const. Co. v. Degussa Corp.*, No. 06-cv-611-M, 2007 WL 983084, at *1 (W.D. Okla.

Mar. 29, 2007).  In short, "Rule 9(b)'s particularity requirement … is not absolute or limitless; a plaintiff need not go so far as to give the defendant[s] a 'pretrial memorandum containing all the evidentiary support for plaintiff's case.'" *Williams Field Servs. Grp. LLC v. Gen. Elec. Int'l*, No. 06-cv-530-CVE-SAJ, 2008 WL 2809902, at \*1 (N.D. Okla. July 21, 2008).

The Complaint goes well beyond the Rule 9(b) standard.  Moreover the Tenth Circuit holds that "even where 'not *all* of Plaintiff's allegations' are pleaded with particularity, a complaint may nonetheless satisfy Rule 9(b)'s requirements when its allegations are sufficiently particularized when '*taken as a whole*.'" *Clinton*, 63 F.4th at 1280 (emphasis by the Tenth Circuit). "[I]n evaluating the particularity of fraud allegations under Rule 9(b), we must ask whether the complaint, taken as a whole, 'sufficiently apprise[s]' the defendant of its involvement in the alleged fraudulent conduct." *Id.*  Plaintiff's Complaint more than satisfies that inquiry.

## V.     Count VI - Constructive Fraud

To state a claim for constructive fraud under Oklahoma law, plaintiff must plead:  (1) duty, (2) misstatement or omission, (3) materiality, (4) reliance, and (5) damages.  *Specialty Beverages LLC v. Pabst Brewing Co.*, 537 F.3d 1165, 1180-81 (10th Cir. 2008).  "To recover under a theory of constructive fraud, there is no requirement that the plaintiff prove that the defendant acted with the intent to deceive." *TD Williamson*, 2022 WL 16842907, at \*5.  Wilhite challenges the pleading of *none* of the five elements.  They are all present.

Wilhite argues only that the Complaint "fails to plausibly allege that Wilhite gained an advantage" because Wilhite did not achieve the "supposed goal" of "an ownership interest in the Project."  Doc. 44 at 19.  Wilhite contends, in other words, that he cannot be liable because his fraud did not succeed.  A defendant's "gaining an advantage" is not a required element of the tort under the Tenth Circuit's formulation.  *Specialty Beverages*, 537 F.3d at 1180-81.  But in any

event, the Complaint alleges that Wilhite gained advantage from his fraud.  An ownership interest in the project was only one of Wilhite's goals.  The Complaint unambiguously states:  "Silanskas and Wilhite's plan was not to steal [Plaintiff's] money—although they did that. The plan was to use [Plaintiff's] money to build the American Heartland Project and then steal it, paying themselves handsomely along the way."  *Complaint* ¶ 4.  They did that.  As a result of the fraud, Plaintiff transferred $2.8 million to 2022 directly to "an entity owned and controlled by Wilhite." *Id.* ¶¶ 58-62.  In 2023, as a result of the fraud, Plaintiff transferred more than $15 million  to "Wilhite's entity.  *Id.* ¶¶ 64, 66, 69, 70, 74, 76, 78.  On January 19, 2024, as a result of the "Sister Catherine" emails, Plaintiff wrote a check to Wilhite for $60,000.  *Id.* ¶ 140.  And the Complaint alleges that Wilhite made at least approximately $450,000 from the scheme for himself and his companies.  *Id.* ¶ 180.  Wilhite's company, Backstage Ministries, also received approximately $10,000 in purported donations during this period.  *Id.*  The Complaint would satisfy any requirement that Plaintiff plead that Wilhite gained an advantage by his fraud.

## VI.    Count V - Deceit

Oklahoma law provides for damages for deceit.  76 Okla. Stat. § 2 ("One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.").  "The basic elements of common law fraud and deceit are the same under Oklahoma law."  *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1111 (N.D. Okla. 2003).  As discussed above, the Complaint pleads fraud, and so it also states a claim for deceit.

Wilhite's motion does not even dispute that the Complaint's allegations, accepted as true, would be actionable under the deceit statute.  Instead, Wilhite worries:  "The Complaint appears to seek relief for alleged deception against third parties."  Doc. 44 at 19.  But Wilhite's concern is misplaced.  Plaintiff seeks damages from Wilhite only for the deception Plaintiff suffered.  To be

sure, the Complaint includes allegations regarding Defendants' widespread deception.  Those allegations are relevant, for example, to the nature and character of Defendants' fraudulent enterprise, which is a consideration for RICO liability.  *Resol. Tr. Corp.*, 998 F.2d at 1544.  But they are not the basis for the deceit claim, which is sufficiently stated.

## VII.    Count VII – Intentional Infliction of Emotional Distress

The elements for a claim for intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.  *Comput. Publ'ns, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002).  The trial court assumes a "gatekeeper role" as to second and fourth elements.  "If the court concludes that reasonable persons could differ in the assessment of the disputed facts, the court submits the claim to the jury to determine whether the defendant's conduct should result in liability."  *Est. of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 856 n.7 (10th Cir. 2005); *see also Miller v. Miller*, 956 P.2d 887, 902 (Okla. 1998) ("Where reasonable people may differ on this issue, the threshold has been crossed and dismissal is improper.").

1.      Wilhite suggests that the Complaint fails to satisfy the first two elements—that Wilhite intentionally or recklessly engaged in conduct that was extreme and outrageous.  Doc. 44 at 21-22.  The Complaint does plead those elements, however.  Wilhite intentionally acted outside of the boundaries of conduct that can be accepted in a civilized society.  The Oklahoma Supreme Court's test is whether "the recitation of defendant's conduct to an average member of the community would arouse the listener's resentment against the defendant and would lead the listener to exclaim 'Outrageous!'"  *Welton*, 49 P.3d at 735.  That is *precisely* the reaction the Complaint would elicit from an average member of this community.  Wilhite engaged in a years-

long campaign of psychological and spiritual abuse. *Complaint* ¶ 6. Wilhite tricked Plaintiff by impersonating God and religious figures purportedly communicating "God's" directives in hundreds of electronic messages targeted at Plaintiff. *Id.* Wilhite made Plaintiff believe that God Himself was commanding Plaintiff to infuse ever more cash into the project and trust him and Silanskas completely with its management. *Id.* Wilhite preyed upon Plaintiff's devout faith and admonished Plaintiff to obey "God's" will without doubt or hesitation. *Id.* Meanwhile, Wilhite took Plaintiff's money to benefit himself. *Id.* ¶¶ 7, 180.

Wilhite claims that he "shared the Todays Word messages with Plaintiff upon request, as he also did with his own family members." Doc. 44 at 21. That is not what the Complaint alleges. Wilhite didn't "share" the messages with Plaintiff. Wilhite "*crafted*" them. *E.g. id.* ¶ 118. And the Complaint says nothing about Plaintiff "requesting" Wilhite send him these messages. Plaintiff "believed the 'Todays Word' messages were coming from God," not from Wilhite. *Id.* ¶ 54.

Wilhite also argues that Plaintiff "offers no well-pleaded allegation that Wilhite knew the messages were fake or participated in [any way] in the scheme he's alleged to have participated in." Doc. 44 at 21-22. Again, the Complaint alleges that the "Todays Word" messages "were crafted to appear to be written and sent by God Himself," when actually they were sent by Wilhite. *E.g. id.* ¶ 48. Thus, Wilhite knew they were fake. The Complaint also alleges that Wilhite targeted Plaintiff with the "Sister Catherine" emails and used them to manipulate Plaintiff. *Id.* ¶¶ 136, 147. Wilhite knew those emails were fake because they were purportedly from a nun who was speaking on behalf of God, when in fact they were from Wilhite and Silanskas. *E.g. id.* ¶ 150. And—going beyond the requirements at the pleading stage—the Complaint describes some of the evidence that Wilhite was responsible. *Id.* ¶¶ 188, 190. For example, as discussed above, Plaintiff's replies, which were sent only to "Sister Catherine," made their way directly to Silanskas, who forwarded

them to Wilhite after changing the subject lines to descriptors like "Nuns" and "Sister Catherine email." *Id.* ¶¶ 194-98. Wilhite knew exactly what was going on. His silent receipt and forwarding of those emails to his late mother-in-law's email account speaks volumes. And the Complaint provides several other examples of incriminating conduct by Wilhite:

- On one occasion, "Sister Catherine" sent Plaintiff an email titled "Mr Bicknell/MASS OFFERED FOR YOU." The next day, Wilhite sent the *same* message, under the subject "Nuns," to an email account opened in the name of his late mother-in-law. *Id.* ¶ 196.

- On another occasion, "Sister Catherine" sent Plaintiff an email titled "Mr Bicknell/Gods Heart" demanding "full obedience" to the "Word" that "God" was sending Plaintiff. Plaintiff replied to "Sister Catherine" at 1:23 PM that "God" had told him to get counsel and that he had done so, that he was depressed, and that he was begging for forgiveness. By 1:55 PM, Silanskas had Plaintiff's reply. Silanskas changed the subject to "NUN LETTER" and forwarded it to Wilhite. The next day, Wilhite forwarded that reply to his late mother-in-law's email account. *Id.* ¶ 197.

- On yet another occasion, "Sister Catherine" sent an email to only Plaintiff titled "Mr Bicknell/Lenten Sunday Devotionals" urging Plaintiff to "retrieve All He has commanded you without another moment in delay"—in other words, to get access to money from Plaintiff's family. Half an hour later, Silanskas forwarded that message to Wilhite, changing the title to "Sister Catherine email." Five minutes after that, Wilhite forwarded the message to his late mother-in-law's email account. *Id.* ¶ 198.

Wilhite's implausible cries of innocence fly in the face of the Complaint's detailed allegations, which must be accepted as true. And if the predatory campaign of psychological and religious manipulation alleged in the Complaint did not constitute extreme and outrageous

conduct, nothing would.  That, of course, is not the law.  *E.g.*, *Welton*, 49 P.3d at 736 (finding harassment of a former romantic partner could be actionable); *Durham v. McDonald's Restaurants of Okla., Inc.*, 256 P.3d 64, 67 (Okla. 2011) (finding "manager's use of 'f...ing retard' in addressing a minor employee who is filled with apprehension after being denied permission to take anti-seizure medication may reasonably be regarded as" actionable); *Doe 1 v. Mt. St. Mary H.S. Corp.*, No. 22-cv-992-R, 2025 WL 490011, at *7 (W.D. Okla. Feb. 13, 2025) (finding that "multi-year endeavor to cover up rampant sexual assault occurring in the school community, including by blaming the girls that reported assaults, accusing them of fabricating the allegations, and/or misleading them about relevant facts" could be actionable); *Miller*, 956 P.2d at 901-02 (finding that a wife's 15-year-long fraudulent concealment of her son's paternity could be actionable); *Stepp v. Talihina Pub. Sch. Dist.*, No. 6:24-cv-146, 2025 WL 1139471, at *10 (E.D. Okla. Apr. 17, 2025) (finding that "targeted use of derogatory language, homophobic slurs, and belittling tactics toward an eleven-year-old boy in front of his male peers may" be actionable).

2.    Wilhite also argues that the Complaint fails to satisfy the fourth element, which he contends "requires proof that the emotional distress suffered by plaintiff was so severe that no reasonable person could be expected to endure it."  Doc. 44 at 20.  But at the motion to dismiss stage, "proof" is not required.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (explaining that the plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the alleged wrongdoing).  Proof is required at trial, and proof of the allegations in the Complaint will satisfy the element.  *Welton*, 49 P.3d at 736-37.

The Complaint documents Plaintiff's emotional distress in heart-rending detail.   On October 3, 2023, after Wilhite's and Silanskas's impersonations of God had already extracted tens of millions of dollars, Plaintiff texted them:  "$5 million from sales will come this week.  Bank

loan next week $10 mil.  That's all I can do.  If it needs any more I'm out of options.  Loan must be repaid in 6 months.  I'm really Down.  No where to go."  *Complaint* ¶ 115.

In early 2024, Wilhite and Silanskas used the "Sister Catherine" messages to drive a wedge between Plaintiff and his family as he sought ever more money for them.  *Id.* ¶¶ 8, 134-135, 142-158, 167-174.  He wrote—to "Sister Catherine"—of his "depression and guilt."  *Id.* ¶ 145.  When he could not satisfy the "Dire need of funds to continue the project God assigned to our Triune," Plaintiff told "Sister Catherine" that "I'm struggling.  All Night prayers last Monday bad Tuesday as result if Lord takes me today that's ok.  Many people are suffering because of my disobedience."  *Id.* ¶ 146.  Plaintiff told "Sister Catherine" that he believed he might literally die from the strain of being "disobedient" to the commands of "God."  *Id.*

Of course, when Plaintiff was replying to "Sister Catherine," he was really writing to Wilhite and Silanskas—and in response, *they turned the pressure up*.  *Id.* ¶¶ 147-160.  Plaintiff told "Sister Catherine" the result:  "I hear my Lord and I'm taking steps to follow. He told me to get counsel and I have. I've been in desperation to follow. He has blessed me sooooooo much and brought me to where I am and I know that He has this mission for me and I want to be obedient and listening to every word. … I want to please my God and the steps are so challenging I'm depressed and begging for forgiveness please keep praying. I need them badly."  *Id.* ¶ 161.  Wilhite and Silanskas escalated the messages further.  *Id.* ¶¶ 162-167.  Plaintiff wrote that he had been "sick with guilt …. [M]y tears have been abundant and my body has been physically weakened from disobedience."  *Id.* ¶ 168.  Wilhite and Silanskas were *literally* inflicting emotional distress upon Plaintiff to accomplish their ends.  That was their purpose and plan.  They were succeeding, and they *knew* they were succeeding.

The burden of all the debt piling up and Plaintiff's belief that he was failing God himself resulted in Plaintiff experiencing severe stress and, ultimately, a stroke in July 2024. *Id.* ¶ 183. No reasonable person should be expected to endure the distress Wilhite inflicted on Plaintiff.

The Oklahoma Supreme Court has made clear that distress of this nature is sufficient to establish the fourth element of the tort. *Welton*, 49 P.3d at 736-37. Even "highly unpleasant mental reactions" that are "reasonable and justified under the circumstances" are sufficient. *Durham*, 256 P.3d at 68. That is because, like the allegations here, "they go beyond mere hurt feelings, insult, indignity, and annoyance and could be reasonably regarded to constitute emotional distress so severe that no reasonable person could be expected to endure it." *Id.*; *see also Schovanec*, 188 P.3d at 176 (finding "past and continuing therapy" sufficient distress to allow claim to proceed to trial). Wilhite's actions resulted in Plaintiff believing he would die, experiencing extreme depression, and suffering a stroke. That states a claim. *See Doe 1*, 2025 WL 490011, at *9 (holding that allegations of "panic attacks and night terrors, sought therapy for the distress, her grades suffered, and she transferred to a different high school" satisfy requirement of "severe emotional distress"); *CitiFinancial Mortg. Co. v. Frasure*, No. 06-cv-160-TCK-PJC, 2008 WL 2199496, at *9 (N.D. Oka. May 23, 2008) (finding generalized "severe distress over the threat of losing [plaintiff's] home to creditors" sufficient to satisfy the fourth element).

## VIII.  Count VIII – Unjust Enrichment

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *I.P.I.C., GSP, S.L. v. Ruhrpumpen, Inc.*, No. 08-cv-0510-CVE-PJC, 2009 WL 484355, at *3 (N.D. Okla. Feb. 24, 2009). "[E]quity eschews mechanical rules," "requires courts to exercise flexibility," and courts should "assess all

relevant facts and circumstances and tailor appropriate relief on a case by case basis." *McNeely v. Nat'l Mobile Health Care, LLC*, No. 07-cv-933-M, 2008 WL 2944933, at *2 (W.D. Okla. July 25, 2008) (citations omitted).  Plaintiff's allegations establish that Wilhite "has money in its hands that, in equity and good conscience, [he] should not be allowed to retain." *Okla. Dep't of Sec. ex rel. Faught v. Blair*, 231 P.3d 645, 658 (2010).

First, Wilhite argues:  "Plaintiff has failed to plead any unjust benefit to Wilhite.  Plaintiff identifies no specific benefits other than 'receiv[ing] a salary and ha[ving] expenses reimbursed.'" Doc. 44 at 22.  To the contrary, the Complaint alleges that, as a result of Wilhite's fraudulent conduct, Plaintiff transferred nearly $18 million to an entity owned and controlled by Wilhite. *Complaint* ¶¶ 58-64, 69-78.  That was not salary and expenses.  The "Sister Catherine" emails led Plaintiff to write a personal check to Wilhite for $60,000. *Id.* ¶ 140.  That was not salary and expenses either.  Taking into account Wilhite's "owner's draws" and purported "donations," Wilhite made at least approximately $450,000 from the scheme for himself and his companies. *Id.* ¶ 180.  And the portion that represents "salary" is properly included in the claim.  Wilhite protests that his salary is "not *solely* attributable to the Project" and that "[*m*]*ost* of his salary" was attributable to other things.  Doc. 44 at 23 (emphasis added).  Thus, Wilhite acknowledges that at least some of his salary was attributable to the Project—an extra $30,000 each year from 2021 through 2024, according to unsupported footnote 1 of Wilhite's brief.  And all of that money *was* attributable to the fraud—it was only because of the "Today's Word" and "Sister Catherine" messages that Plaintiff poured his money into the Project.

Second, Wilhite argues:  "Plaintiff has failed to adequately plead wrongdoing by Wilhite regarding his involvement in the Project."  Doc. 44 at 23.  To the contrary, as set forth in detail above, the Complaint alleges that Wilhite and Silanskas engaged in the most despicable fraud—to

24

use Wilhite's own term, "elder abuse"—to con Plaintiff out of more than $60 million.  *Complaint*

¶ 9.  The Complaint's detailed allegations of Wilhite's fraud are staggering.  *Id.* ¶¶ 28-198.  The

Complaint pleads wrongdoing in spades.

## CONCLUSION

For the above reasons, Plaintiff respectfully requests that the Court deny Wilhite's motion.

In the alternative, if the Court grants any part of Wilhite's motion,  Plaintiff requests that

the Court grant him leave to file an amended Complaint.  Where a party so requests, such leave

should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This is because "[t]he

purpose of the Rule is to provide litigants the maximum opportunity for each claim to be decided

on its merits rather than on procedural niceties."  *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204

(10th Cir. 2006); *Northmarq Cap.,* 2024 WL 4467522, at *10.


October 3, 2025                                      Respectfully submitted,

                                                     /s/ *Michael S. Nadel*

                                                     Amelia A. Fogleman, OBA No. 16221
                                                     Joseph W. Lang, OBA No. 33019
                                                     GABLEGOTWALS
                                                     110 N. Elgin Avenue, Suite 200
                                                     Tulsa, Oklahoma 74120
                                                     (918) 595-4800

                                                     Michael S. Nadel
                                                     Sagar K. Ravi
                                                     Rachel M. Peltzer
                                                     Theresa M. Babendreier
                                                     MCDERMOTT WILL & SCHULTE LLP
                                                     500 North Capitol Street, N.W.
                                                     Washington, D.C. 20001
                                                     (202) 756-8000

                                                     Attorneys for Plaintiff O. Gene Bicknell

## CERTIFICATE OF SERVICE

I certify that on October 3, 2025, I caused a copy of the foregoing to be filed using the CM/ECF system, thereby providing notice to all counsel of record and pro se parties, including:

Counsel for Defendant Larry K. Wilhite:

J. Christopher Davis, Esq.
Deric McClellan, Esq.
Crowe & Dunlevy, P.C.
222 N. Detroit Avenue, Suite 600
Tulsa, Oklahoma 74120

Evan G.E. Vincent, Esq.
Crowe & Dunlevy, P.C.
Braniff Building
324 North Robinson Avenue, Suite 100
Oklahoma City, Oklahoma 73102

Counsel for Defendant Stephen D. Hedrick:

Lysbeth George, Esq.
Jennifer Jackson, Esq.
Liz George and Associates
8101 S. Walker, Suite F
Oklahoma City, Oklahoma 73139

Defendant Richard M. Silanskas, Jr.:

Richard M. Silanskas, Jr.
1338 Peace in the Valley Road
Blue Eye, Missouri 65611

/s/ *Michael S. Nadel*
Michael S. Nadel