**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| O. GENE BICKNELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 25-cv-00383-SH |
| RICHARD M. SILANSKAS, JR., LARRY | ) | |
| K. WILHITE, and STEPHEN D. | ) | |
| HEDRICK, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Before the Court are the motions to dismiss of Defendants Larry K. Wilhite and Stephen D. Hedrick.[1]  Having considered the parties' briefing, the Court finds Plaintiff has failed to state a pattern of racketeering activity, a necessary element of his RICO claims.  The RICO claims, therefore, will be dismissed.  The motions are otherwise denied.

## I.    Factual Background

Taking the factual allegations in the complaint as true, and viewing them in the light most favorable to the nonmoving party, Plaintiff alleges as follows:

O. Gene Bicknell ("Bicknell") is a 91-year-old businessman who amassed a personal fortune over his career as the world's largest Pizza Hut franchisee.  (Dkt. No. 1 ¶¶ 23–25.)  Bicknell also founded several companies and invested in other business ventures, one of which was the Mansion Theatre for the Performing Arts (the "Mansion Theatre") in Branson, Missouri.  (*Id.* ¶¶ 26–27.)  Bicknell hired Defendant Larry Wilhite

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a).  (Dkt. No. 50.)

("Wilhite"), a preacher, to manage the Mansion Theatre, and Wilhite held that job for over 20 years. (*Id.* ¶¶ 27–28.)

### A.     2019–2021: Introductions and the Mansion Theatre

In 2019, while managing the theater, Wilhite met Defendant Richard M. Silanskas, Jr. ("Silanskas"). (*Id.* ¶ 29.) Silanskas held himself out as knowledgeable and experienced in the entertainment industry, claiming to have worked for the Walt Disney Company ("Disney"), a CBS affiliate, ESPN, and various theme parks in Asia. (*Id.* ¶ 30.) Silanskas had also been involved in two unsuccessful theme park projects in Texas and Alabama. (*Id.* ¶ 31.)

In January 2021, Wilhite introduced Silanskas to Bicknell by email. (*Id.* ¶ 35.) Wilhite included a copy of Silanskas's biography, which indicated Silanskas had spent 39 years in the creative industry, including working under a "Disney Legend." (*Id.*) Wilhite also included an email from Silanskas with his vision for expanding the Mansion Theatre. (*Id.*)

By March 2021, Silanskas (endorsed by Wilhite) was a full-time employee of the Mansion Theatre. (*Id.* ¶ 37.)

In June 2021, Silanskas facilitated a meeting between Bicknell and Ronald Logan, a retired Disney executive. (*Id.* ¶¶ 31, 38.) After the meeting, Silanskas drafted a letter of recommendation for Logan to send on his behalf. (*Id.* ¶ 39.) Silanskas then sent the letter himself, using an email account he created to impersonate Logan. (*Id.* ¶¶ 40–41.) Bicknell responded to the message as if it was from Logan. (*Id.* ¶ 42.)

In September 2021, Silanskas again impersonated Logan, copying Bicknell on an email that discussed the "Mansion Studios complete plan" and emphasized the urgency

2

of the moment in the industry. (*Id.* ¶ 43.) Bicknell made Silanskas an executive producer at the Mansion Theatre, with a base salary at $110,000. (*Id.* ¶ 44.)

> **B.    2022:  Beginning of the American Heartland Project and "Messages from God"**

In January 2022, the Mansion Theatre announced a major expansion to be developed in Southwest Missouri. (*Id.* ¶ 45.)

By the next month, Silanskas and Wilhite had begun sending Bicknell daily devotional text messages called "Todays Word."[2] (*Id.* ¶¶ 47–48.) The messages started at least as early as February 2022. (*Id.* ¶ 188.) The first such message quoted in the complaint is dated May 2, 2022. (*Id.* ¶ 49.) It is written in the first person, as if from God.[3] (*Id.*) The message includes statements that the "mission will not tolerate anything but ABSOLUTE OBEDIENCE and ABSOLUTE CLIFF DIVING FAITH"; instructions to "REMOVE EVERY THOUGHT OF OPERATING AS YOU HAVE IN THE PAST WITH BUSINESS AND DECISION MAKING" and to "EMPTY THE STOREHOUSES AND ACCELERATE THIS MISSION WITHOUT DELAY"; and demands that Bicknell trust the "gifted leaders" sent to "complete this work" and to "AVOID INSERTING ANY DISTRACTIONS OR DOUBTFUL QUESTIONS." (*Id.* ¶¶ 49–51.)

---

[2] A later investigation revealed that Wilhite sent a compilation of the February–April 2022 Todays Word messages to his wife's personal email account. (*Id.* ¶ 188.) The investigation also revealed that, at least once, Silanskas sent a "Todays Word" message to Wilhite that was then sent on to Bicknell from the "heavendirectword" email account. (*Id.* ¶ 190.) On another occasion, Silanskas sent the contents of a Todays Word message from his work email to his personal email and then, two days later, Bicknell received a nearly identical message from "heavendirectword" and in a text from Wilhite. (*Id.* ¶ 191.)

[3] "I HAVE SPOKEN TO YOU SO VERY LONG . . . ." (*Id.* ¶ 49.) "I HAVE SHOWN YOU A VISION AND SPECIFIC PLAN . . . !  I FILLED YOUR STOREHOUSES OVER THE YEARS FOR THIS MOMENT.  I ALONE HAVE BEEN YOUR SOURCE.  I ALONE HAVE BEEN YOUR PROVISION.  WHATEVER YOU HAVE ACCUMULATED . . . CAME FROM ME ALONE. . . .  I AM INSTRUCTING YOU . . . ." (*Id.* ¶ 50.)

On May 6, 2022, Wilhite emailed Bicknell a project development plan for a theme park to be built in Oklahoma. (*Id.* ¶ 52.) Over a two-month period, Bicknell spent almost $7 million acquiring 1,600 acres in Vinita, Oklahoma. (*Id.* ¶ 53.) Bicknell told a friend that the Oklahoma park was God's plan, laid upon him by God. (*Id.* ¶ 54.) Once the land was procured, Silanskas and Wilhite—using an entity owned by Bicknell—began to commit millions of dollars to contractors for project development. (*Id.* ¶ 56.) Bicknell continued to receive "messages from God." (*Id.*) Through 2022, Bicknell transferred another $2.8 million from his personal trust accounts to an entity owned and controlled by Wilhite. (*Id.* ¶¶ 56–62.)

In 2022, Silanskas and Wilhite also appointed Defendant Stephen Hedrick ("Hedrick") to serve as the vice president of project development and executive producer of the American Heartland Project. (*Id.* ¶ 55.) Hedrick held himself out as a businessman and executive producer with 40 years of industry experience with a major theme park, with Disney, and with other entertainment companies. (*Id.*)

### C.    2023: Continued Funding and Introduction of the "Triune" Concept

In early 2023, Bicknell continued to contribute to the project through direct transfers of $2.1 million to Wilhite's entity and through land acquisition—purchasing an additional 1,200 acres near Vinita for $5.5 million. (*Id.* ¶¶ 64–66.) Continuing throughout the first half of 2023, Bicknell transferred funds to Wilhite's company, to an animation company, and to a vendor affiliated with Silanskas's son. (*Id.* ¶¶ 69–74 (roughly $9. 5 million, $1.8 million, and $162,000, respectively.)

In February 2023, Hedrick emailed Bicknell and Wilhite an overview of an economic analysis purportedly conducted by an economic research firm which indicated,

*inter alia*, that the American Heartland Project was "of transformative quality"; was responding to "a clear market opportunity"; would attract "an anticipated 3.9 million visitors annually"; would become one of Oklahoma's "anchor tourist destinations"; was in a location that could support it; and would generate approximately $500 million in annual spending.  (*Id.* ¶ 68.)  Hedrick knew these "conclusions were baseless" and the "economic analysis was unreliable at best."  (*Id.*)

In May 2023, Hedrick represented to Bicknell that the "feasibility study consultant" now classified the project as a destination park, like Universal Studios, that would draw visitors nationwide.  (*Id.* ¶ 75.)  According to the complaint, Hedrick was either lying about the consultant's statements, or knew the statements were false and that the projections were unattainable.  (*Id.*)  Hedrick knew Bicknell was the sole financial backer of the project.  (*Id.* ¶ 82.)

In June 2023, Hedrick sent photographs of a completed model of the park and falsely claimed to have assembled a "dream team" of former Disney engineers and designers who would work on the project.  (*Id.* ¶¶ 76–77.)  Gene transferred another $3.5 million to Wilhite's entity.  (*Id.* ¶¶ 76, 78.)

That same June, Silanskas and Wilhite moved the Todays Word messages to email and increased their frequency.  (*Id.* ¶ 79.)  Over a six-month period, Bicknell received more than 500 messages.  (*Id.*)  In the email, God continued to admonish and demand obedience and trust.  (*Id.* ¶¶ 80–81 ("Allow nothing to distract you from doing exactly what I have instructed regarding resources and provision"); *id.* ¶ 87 ("FOLLOW MY INSTRUCTIONS PRECISELY AND NOTHING MORE!").)

On July 3, 2023, Todays Word told Bicknell,

> For many months, I have clearly instructed you on how to obtain the required resources and provision to complete the vision I entrusted to you. But you ignored Me day after day, attempting to execute your "own" plan rather than following My instructions.

(*Id.* ¶ 84.)  Bicknell forwarded this email to Silanskas, Wilhite, and Hedrick, discussing a decision to be made and stating he would yield to the "majority" on that matter.  (*Id.*)  Bicknell later forwarded another Todays Word email to Wilhite, saying, "This is what we must heed."  (*Id.* ¶ 88.)  Wilhite responded, "You are so right!!!"  (*Id.*)

By July, the Todays Word email also began referencing a "triune," a "triune foundation," and the "formation of [a] chosen triune leadership."  (*Id.* ¶¶ 82–86, 93–94.)  Bicknell interprets this as "an idea built around the Christian idea of the Holy Trinity."[4]  (*Id.* ¶ 82.)  On July 4, 2023, Todays Word told Bicknell:  "within My triune structure, look to your side and trust the one next to you with much experience in such things, whom I alone brought into this trinity of leadership . . . ."  (*Id.* ¶ 86.)  The email further directed Bicknell to "share the harvest equally," which Bicknell now interprets as a command to divide the proceeds of the American Heartland Project with Silanskas and Wilhite.  (*Id.*; *see also id.* ¶ 93 (Todays Word email to "My beloved triune leaders" directing them to "[m]aintain control over the 'lions share' of this entire endeavor, distributing it equally among yourselves as My triune chosen ones"); *id.* ¶ 94 ("Share equally among yourselves as My triune leaders").)  Bicknell told others that God "has chosen a triune with me and my two associates."  (*Id.* ¶ 89.)  Silanskas also referred to keeping "the triune fully updated . . . to ensure we are all current and fully informed."  (*Id.* ¶ 92.)

---

[4] *Merriam-Webster* defines the "Trinity" as "the unity of Father, Son, and Holy Spirit as three persons in one Godhead according to Christian dogma." *Trinity*, Merriam-Webster, https://www.merriam-webster.com/dictionary/Trinity [https://perma.cc/EA6M-J7XL] (last visited May 4, 2026).

**D.    2023:  Public Unveiling, Funding Struggles, and Continued Email**

On July 19, 2023, Defendants announced the American Heartland Project to the public, stating it was a $2 billion theme park in Northeast Oklahoma that would attract more than 4.9 million guests a year.  (*Id.* ¶ 95.)  After the announcement, Silanskas emailed Bicknell an "'official' feasibility study purportedly prepared by a third party" that offered a glowing economic analysis of the park, which Bicknell now claims was "baseless." (*Id.* ¶ 103.)

Meanwhile, "Todays Word" continued to emphasize obedience, sharing, and the triune:  "Do you not understand that the three of you were specifically chosen from every person upon your planet?"; "Within this triune structure, no others shall enter, for it is uniquely crafted and designed to carry out the grand purpose I have set forth only through each of you"; "Do not exhibit impatience or set deadlines with your own worldly wisdom from your past business ways." (*Id.* ¶¶ 104, 106.)  The communications between Bicknell, Wilhite, and Silanskas also included references to religion, and Wilhite frequently used three exclamation points ("!!!") as emphasis, something found in many of the Todays Word emails.  (*Id.* ¶¶ 49, 105.)

Bicknell continued to infuse the project with cash as its projected monetary needs for design and future construction ballooned.  (*Id.* ¶¶ 107−09 (*e.g.*, $10 million on July 27, 2023).)  By October 3, 2023, Bicknell was suffering "emotional and mental distress." (*Id.* ¶ 115.)  He texted Silanskas and Wilhite,

> $5 million from sales will come this week.  Bank loan next week $10 mil.
> That's all I can do.  If it needs any more I'm out of options.  Loan must be
> repaid in 6 months.  I'm really Down.  No where to go.  I'm basically broke.
> If this goes on without revenue.  I'm bankrupt just letting you know.  I'm
> still positive of this happening but I can't do it any more.

(*Id.*) Silanskas and Wilhite then resumed sending text messages to Bicknell that used the capitalized pronoun "My" and appeared to come from God. (*Id.* ¶ 118.) As before, the texts included Bible verses and continued emphasis on obedience without question, the "triune leaders," and abandoning "your own calculations or plans." (*Id.* ¶¶ 118, 121–23.)

### E.    Late 2023:  Groundbreaking and False Signatures

On October 30, 2023, the project held a groundbreaking at the Three Ponies R.V. Park and Campground.[5] (*Id.* ¶ 124.)

Later, on December 4, 2023, Bicknell responded to an e-mail that Hedrick had sent to him and Wilhite. (*Id.* ¶ 126.) In it, Bicknell discussed a "struggle" and stated he was "sick over circumstances" for the first "time in [his] life." (*Id.*) The next day, Todays Word sent Bicknell a message, noting "the path may seem arduous," but again directing Bicknell to follow "My guidance" and reminding him that his "wealth" was intended for this moment. (*Id.* ¶ 127.) That day, Bicknell paid over $500,000 for the project's insurance. (*Id.* ¶ 128.) On December 8, 2023, he overdrafted an account by transferring another $200,000 to the project. (*Id.*)

On December 11, 2023, Wilhite signed Bicknell's name to vendor contracts, increasing the amounts owed, without Bicknell's permission. (*Id.* ¶ 130.) Immediately after, Silanskas emailed Wilhite a statement, purportedly from Bicknell, authorizing such signatures. (*Id.* ¶ 131.) Wilhite continued to sign Bicknell's name to contracts, without authorization, for months. (*Id.* ¶ 132.)

---

[5] The complaint includes allegations as to actions by "someone" on the project team regarding interaction with the press and an email by an unnamed project employee. (*Id.* ¶¶ 111–114.) The complaint, however, provides no basis from which the Court could attribute these actions to any of the named defendants.

In total, Bicknell put almost $48 million into the project in 2023, most of which was under Silanskas and Wilhite's control.[6] (*Id.* ¶ 133.)

###### F.      Early 2024:  The "Sister Catherine" Email Campaign

By early 2024, the project was out of funds.  (*Id.* ¶ 134.)  Around this time, Silanskas and Wilhite began sending Bicknell email from a fictional figure they called "Sister Catherine."[7]  (*Id.* ¶ 136.)  Beginning in January, roughly 100 email from "Sister Catherine" were sent from a variety of Gmail and Yahoo accounts.  (*Id.*)  These email—personalized and written directly to Bicknell—continued the "triune" motif (*id.* ¶¶ 137–39), continued speaking against "unfaithfulness" and "disobedience" (*id.* ¶ 144), and urged Bicknell to "stand firm against all strategies of evil even . . . those in [his] family" (*id.* ¶ 142).

Bicknell responded to the email as if they were genuine.  (*Id.* ¶ 143.)  Bicknell told the nun that he had left most of his wealth in irrevocable trusts for his children and grandchildren, that his family "will not return it yet," and that this "has caused me depression and guilt."  (*Id.* ¶ 145.)  Bicknell further noted the "Dire need of funds to continue the project God assigned to our Triune"; the $10 million in debt he did not know if he could pay; his efforts to sell controlled assets so he could contribute more; and his

---

[6] At this point, the complaint states in a conclusory fashion:  "All the while, Silanskas and Wilhite were misappropriating the profits from the Mansion Theatre . . . to help fund the Project."  (*Id.* ¶ 133.)  This allegation is too vague and untethered from fact to be considered as part of the RICO and fraud claims.

[7] A later investigation revealed evidence that Silanskas created the first email account used by Sister Catherine and that later email accounts used by Sister Catherine were created and deleted in a similar manner to the first.  (*Id.* ¶¶ 192–193.)  Messages that Bicknell sent to Sister Catherine, alone, would later be forwarded from Silanskas to Wilhite.  (*Id.* ¶¶ 194, 197–98.)  Wilhite forwarded some of these email to an account he opened in the name of his deceased mother-in-law.  (*Id.* ¶¶ 195, 197–98.)  Wilhite also sent the content of messages from Sister Catherine to this account.  (*Id.* ¶ 196.)

general struggles. (*Id.* ¶ 146.) As Bicknell relayed to the nun, these struggles included: "All Night prayers last Monday bad Tuesday as result if the Lord takes me today that's ok." (*Id.*) Meanwhile, in the corporeal world, Silanskas and Wilhite began to compile negative information on Bicknell's family. (*Id.* ¶ 147.)

Communications continued like this throughout February. On February 2, 2024, Sister Catherine told Bicknell that God was seeking his repentance for not obeying. (*Id.* ¶ 148.) Bicknell responded, "Absolutely I will repent and start on my journey to obey my Lord. Not easy and requires legal action against my family which brings another sorrow along with disobedience." (*Id.* ¶ 149.)

On February 5, 2024, Sister Catherine told Bicknell that God wanted his immediate obedience to "the words He is sending you directly each day" and that "He spoke specifically of the Counsel you must retain to retrieve All He has told you and the urgency of this which must not be delayed even one more day." (*Id.* ¶ 150.) Bicknell responded that he was getting counsel and changing his will. (*Id.* ¶ 151.) Bicknell forwarded this email to Silanskas and Wilhite and obtained legal counsel, as he said he would. (*Id.*)

On February 9, 2024, Bicknell transferred more than $2 million to the project from the sale of stock. (*Id.* ¶ 152.)

On February 18, 2024, Sister Catherine told Bicknell that the Lord was seeking his obedience and that there seemed to be a great urgency in offering such obedience. (*Id.* ¶ 153.) Bicknell responded that he was ecstatic to tell her his obedience was happening and that legal counsel was working. (*Id.* ¶ 154.)

The Sister Catherine emails continued in February, March, and April, utilizing similar themes and urging Bicknell to act as instructed. (*Id.* ¶¶ 155, 159–60, 162–63, 167.) Bicknell continued to respond, noting his attempts to obey, his depression, his family

disagreements, and his tears and physical weakness from "disobedience." (*Id.* ¶¶ 156–57, 161, 168.)

On March 1, 2024, Bicknell's attorney sent a letter announcing that Bicknell had made substantial changes to his estate plan, named a new executor and successor trustee, and revoked his son's power of attorney. (*Id.* ¶ 158.) Bicknell then transferred $400,000 to the project on March 19, $2.2 million on April 10, and $228,258 on April 15, 2024. (*Id.* ¶¶ 164, 166, 169.)

After the last transfer, Bicknell's son "made clear" to him that due diligence and strict financial oversight would be required before any further funding could be released. (*Id.* ¶ 170.)

On May 7, 2024, Sister Catherine wrote to Bicknell that another nun:

> spoke about one who is very close to you who has sinned against you in dishonor and great disrespect. She said this one has no power over you and his words are born from a heart of greed and sin. Allow not this one to affect your resolve in Christ.

(*Id.*) Bicknell responded, "God lifted me from my bindings and illness yesterday," and stated his plan to give his "share" of the project to charity. (*Id.* ¶ 171.) On May 10, 2024, Sister Catherine told Bicknell,

> [O]ur Lord is directing you to stand up to this one so very close to you who has been very deceitful and dishonest for many years regarding your wealth. He is to be called out! Sister Marie then said that you must not allow this one to use his arrogance, threats or demands to intimidate you in any way! You owe him nothing! Although this one was supposed to honor you since you first provided him much to begin his life, this one has greatly been dishonest . . . if you Stand in intense form this day against this one who has been intimidating you, you will be able to release immediate needs today! But you must not make any deals with the devil.

(*Id.* ¶ 172 (emphasis removed).)

11

On May 13, 2024, Bicknell told Wilhite, apparently discussing the demand from his son,

> We will Not give in or yield to these restrictions.  I have the right to demand repayment of the millions I loaned them to start all branches of this estate.  I will continue to talk to my lawyers. . . .  My adversary is now my family.  !!!!They don't want to see what we have now!!!!  I no longer will keep the gloves on!!!!

(*Id.* ¶ 173 (citation modified).)  On May 29, 2024, Sister Catherine again wrote to Bicknell about not allowing "those so close to you to intimidate," and again conveying instructions from God.  (*Id.* ¶ 174.)

### G.    Spring 2024:  The Project Ends

Bicknell did not, however, obtain additional funds.  (*Id.* ¶ 175.)  The project ran out of money, and construction halted.  (*Id.* ¶ 176.)  By that point, Bicknell had put more than $60 million into the project.  (*Id.* ¶ 175.)  Bicknell claims the "vast majority" of that money was "squandered or misappropriated" by Defendants.  (*Id.* ¶ 178.)  Silanskas made at least $648,000 for himself and his family members; Wilhite made at least $450,000 for himself and his companies; and Hedrick made at least $1.5 million for himself and his family members.  (*Id.* ¶¶ 179–81.)

By the spring of 2024, Bicknell began receiving lien notices on the Oklahoma land intended for the park.  (*Id.* ¶ 182.)  Vendors eventually filed lawsuits and Bicknell's business reputation was harmed.  (*Id.*)

In July 2024, Bicknell suffered a stroke, which he attributes to the stress from the burden of project-related debt and his belief that he was not satisfying God's will.  (*Id.* ¶ 183.)  By the end of 2024, Bicknell "began to realize what Silanskas and Wilhite had done to him."  (*Id.* ¶ 185.)

## II.    Procedural Background

Bicknell has now filed suit against Silanskas, Wilhite, and Hedrick.  (Dkt. No. 1.)
Against Silanskas and Wilhite, he asserts claims for (1) racketeering and conspiracy under
the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–
1968 (*id.* ¶¶ 200–21); (2) civil conspiracy (*id.* ¶¶ 222–26); (3) fraud, deceit, and
constructive fraud (*id.* ¶¶ 227–40); and (4) intentional infliction of emotional distress (*id.*
¶¶ 241–47).  Against all Defendants, Plaintiff claims unjust enrichment.[8]  (*Id.* ¶¶ 248–52.)

Wilhite and Hedrick now move to dismiss, arguing Bicknell has failed to state a
claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).

## III.   Analysis

### A.    Standard of Review

A complaint must contain "a short and plain statement of the claim showing that
the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss,
"a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is
plausible on its face.'"  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081,
1104 (10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A
claim is facially plausible 'when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"
*Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  All such reasonable inferences
are resolved in the plaintiff's favor.  *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir.
2013).  "Factual allegations must be enough to raise a right to relief above the speculative
level on the assumption that all the allegations in the complaint are true (even if doubtful

---

[8] The parties assume Oklahoma substantive law governs the state-law claims, and the
Court will do the same.

in fact)." *Twombly*, 550 U.S. at 555–56 (citation modified). Rule 8's plausibility standard applies to allegations of malice, intent, knowledge, and other conditions of a person's mind. *Iqbal*, 556 U.S. at 686–87.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This generally requires the complaint "to set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citation modified). In other words, the plaintiff must at least provide the "who, what, where, when, and how" of the alleged fraud. *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023).

Rule 9(b)'s purpose is to provide fair notice of the asserted claims and the factual basis for those claims. *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016). "[N]ot every allegation of fraudulent misconduct must be pleaded with particularity for a complaint to survive at the motion to dismiss stage." *Clinton*, 63 F.4th at 1280. The focus, instead, is on "whether the complaint, taken as a whole, sufficiently apprises the defendant of [his] involvement in the alleged fraudulent conduct." *Id.* (citation modified).

### B.    Racketeering

For his RICO claims, Bicknell alleges Silanskas and Wilhite conducted an enterprise through a pattern of racketeering activity that included wire fraud, and that they conspired to do the same. (*E.g.*, Dkt. No. 1 ¶¶ 207, 220.) Wilhite argues Bicknell has failed to allege a pattern of racketeering activity and, instead, has merely pled a single

14

scheme targeting a single victim with one, discrete goal.  (Dkt. No. 44 at 21–24.[9])  Wilhite also argues Bicknell's conspiracy claim fails for want of an underlying RICO violation.  (*Id.* at 24–25.)

The Court agrees that Bicknell has failed to satisfy RICO's pattern element and that he has failed to state a RICO conspiracy claim.

### 1.    RICO—Generally

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).  "Any person injured in his business or property" by such unlawful acts may file a private cause of action.  *Id.* § 1964(c).  Broadly, "RICO takes aim at 'racketeering activity,' which it defines as any act 'chargeable' under several generically described state criminal laws, any act 'indictable' under numerous specific federal criminal provisions, including mail and wire fraud, and any 'offense' involving bankruptcy or securities fraud or drug-related activities" punishable under federal law.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481–82 (1985) (citing 18 U.S.C. § 1961(1)); *see also BancOkla. Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1102 (10th Cir. 1999) (these "various acts of racketeering activity . . . are often referred to as 'predicate acts' because they form the basis for liability under RICO").

"To successfully state a RICO claim, a plaintiff must allege four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"

---

[9] Page numbers refer to those in the court-provided header.

*Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002) (quoting *Sedima*, 473 U.S. at 496). Wilhite challenges only the pattern element.

### a.    Pattern of Racketeering Activity

Relevant here, "racketeering activity" includes any act indictable as wire fraud under 18 U.S.C. § 1343.[10]  *See* 18 U.S.C. § 1961(1).  A "pattern of racketeering activity," meanwhile, requires at least two acts of racketeering activity that occur within ten years of each other. *Id.* § 1961(5); *see also Johnson v. Heath*, 56 F.4th 851, 858 (10th Cir. 2022). "[W]hile two acts are necessary, they may not be sufficient." *Sedima*, 473 U.S. at 496 n.14.

"Determining what constitutes a RICO pattern is no easy task." *Johnson*, 56 F.4th at 858.  In making this determination, courts take guidance from the Supreme Court, which has reasoned that "the term 'pattern' itself requires the showing of a relationship between the predicates, and of the threat of continuing activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (citation modified).  "It is this factor of *continuity plus relationship* which combines to produce a pattern." *Id.* (citation modified).  Here, Wilhite challenges only whether such continuity exists.  (Dkt. No. 44 at 22–24.)

### b.    Continuity

While a relationship is fairly easy to show,[11] the continuity requirement "is more difficult to meet." *Boone v. Carlsbad Bancorp., Inc.*, 972 F.2d 1545, 1555 (10th Cir. 1992). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period

---

[10] "Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . ., transmits . . . by means of wire . . . communication in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned not more than 20 years, or both." 18 U.S.C. § 1343.

[11] "Predicate acts satisfy the relationship requirement when they make up one common scheme." *Johnson*, 56 F.4th at 859.

of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Here, Bicknell argues only closed-ended continuity. (Dkt. No. 47 at 8.)

"[C]losed-ended continuity consists of a closed period of repeated, related racketeering acts that do not necessarily threaten future repetition." *Johnson*, 56 F.4th at 860. Courts "consider two factors when determining the existence of closed-ended continuity—the duration of the related predicate acts and the extensiveness of the racketeering scheme." *Id.* (because "RICO targets long-term racketeering conduct, closed-ended continuity requires a series of related racketeering acts over a 'substantial period of time'").

The duration requirement can be satisfied by as little as seven to 18 months, if the scheme was extensive enough. *See Resol. Tr. Corp. v. Stone*, 998 F.2d 1534, 1544 (10th Cir. 1993), *abrogated on other grounds by Boyle v. UnCheck mited States*, 556 U.S. 938 (2009); *see also Johnson*, 56 F.4th at 860 ("duration alone may not establish closed-ended continuity—we also consider the extensiveness of the alleged racketeering scheme").

To evaluate the extensiveness of the racketeering scheme, the Court considers "the number of victims, the number of racketeering acts, the variety of racketeering acts, whether the injuries were distinct, the complexity and size of the scheme, and the nature or character of the enterprise." *Id.* (citation modified). "No factor is required or dispositive; the factors merely guide us in seeking a natural and commonsense result." *Id.* at 860–61 (citation modified). Generally, a "single scheme to accomplish 'one discrete goal,' directed at one individual with no potential to extend to other persons or entities" does not establish closed-ended continuity. *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507,

1516 (10th Cir. 1990) ("While a single scheme may suffice in some instances, here there is simply no indication of a threat of continuing illegal activity."); *cf. Petco Petroleum Corp. v. West*, No. 19-CV-439-GKF-SH, 2021 WL 6053682, at *5 (N.D. July 12, 2021) (while scheme had "a single victim," extensiveness factor was met when the alleged "scheme was complex," "was not directed at a single discrete goal," and "was not limited by time or quantity").

### 2. Plaintiff Has Not Alleged Closed-Ended Continuity to Support a Pattern of Racketeering Activity

The parties do not dispute that the length of the alleged scheme was sufficient to satisfy the duration requirement for continuity. Instead, they focus on the scheme's extensiveness. Looking to the relevant factors and seeking a commonsense result, the Court finds no pattern of racketeering activity. As Bicknell alleges,

> The object of the unlawful enterprise was to defraud [Bicknell] out of his hard-earned life savings, to improperly redirect funds to themselves and to their family members, and finally, to psychologically manipulate [Bicknell] over the course of years through extremely targeted fraudulent text and email communications to coerce him into sinking more funds into the American Heartland Project and hand Silanskas and Wilhite majority ownership of the Project.

(Dkt. No. 1 ¶ 204.) Stated at its most basic level, Silanskas and Wilhite's alleged plan was to convince Bicknell to invest in the American Heartland Project for their own enrichment. The primary way they accomplished this was by convincing Bicknell that it was God's will, with additional exaggerations/lies regarding Silanskas's history and connections, as well as regarding the potential for the project's success.

The scheme was large in the monetary sense, because Bicknell had a substantial amount of money to siphon, and it involved hundreds of individual "divine" messages. But while that magnitude adds to the complexity to the scheme, overall it was not a

complex plan—it involved two or three perpetrators, simple email management, and unsophisticated means.[12] *Johnson*, 56 F.4th at 861 (noting facts relevant to complexity include "the number of perpetrators involved, the extent of the planning required to perform the scheme, the extent of the management required to run the scheme, the sophistication of products involved in running the scheme, and the amount of money involved"); *cf Resol. Tr.*, 998 F.2d at 1545 (scheme was complex where it was directed at multiple victims; "involved the participation of several perpetrators"; required "extensive planning and ongoing management to juggle incoming investor premiums . . . while paying out enough interest to keep the scheme afloat"; required "the use of sophisticated financial products"; and required "ongoing decisions not to fund the enhancements for the automobiles and [diversion of] payments . . . [and selling] approximately $100 million in [enhanced automobile receivables]").

The other factors similarly indicate a scheme that was not especially extensive. Defendants targeted one victim;[13] there was little to no variety of racketeering acts;[14] there

---

[12] The Court does not read the complaint as alleging that the <u>entire</u> American Heartland Project was a complete illusion, involving multiple employees all perpetrating a fraud on multiple victims, with fake land contracts, fake vendors, fake financing vehicles, etc. Indeed, such an inference would be contrary to the multiple allegations in the complaint that Silanskas and Wilhite planned to eventually own the majority of the completed project and tried to convince Bicknell that such an outcome was the will of God.

[13] As the racketeering activity at issue here is wire fraud, the "victim" necessarily refers to the victim of that fraud. *See Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1218 (10th Cir. 2025) (to state a private claim under RICO, a plaintiff must "show that a RICO predicate offense not only was a but for cause of his injury, but was the proximate cause as well" (citation modified)). As noted below (note 14, *infra*), the only wire frauds alleged are the messages from God/Sister Catherine and Wilhite's misuse of Bicknell's signature. The only alleged victim of those actions was Bicknell.

[14] Wire fraud requires "evidence of (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to *(cont.)*

was one distinct type of injury (the loss of Bicknell's personal funds); and the character of the enterprise was limited to funding the project and those associated with the project. *See Resol. Tr.*, 998 F.2d at 1545 (where "the scheme has a limited purpose, most courts have found no continuity"). There was no alleged potential to extend the racketeering activity to other individuals or entities. *See SIL-FLO*, 917 F.2d at 1516; *Johnson*, 56 F.4th at 862 ("Without a threat of continued illegal activity, a single scheme rarely supports finding continuity.").

As such, the Court finds that the single, discrete goal of squeezing funds from Bicknell to build the park and pay Wilhite and Silanskas is more akin to the schemes described in *Johnson* or *Modoc Nation v. Bohl*, No. 19-CV-588-JDR-JFJ, 2024 WL 4643701, at *2–5 (N.D. Okla. Oct. 30, 2024),[15] than the one described in *Petco Petroleum*. Bicknell has failed to state a claim that Wilhite conducted an enterprise through a pattern of racketeering activity, and the RICO claim will be dismissed.

### 3.    RICO Conspiracy

Bicknell and Wilhite agree that, without the underlying RICO claim, the RICO conspiracy claim fails. (Dkt. No. 44 at 24–25; Dkt. No. 47 at 15.) Because the underlying

---

defraud, and (3) use of interstate wire or radio communications to execute the scheme." *United States v. Zander*, 794 F.3d 1220, 1230 (10th Cir. 2015) (citation modified). While Bicknell asserts the "scheme left a trail of victims," he acknowledges that the actual "racketeering acts" were wire frauds committed in the Todays Word & Sister Catherine messages, along with Wilhite's use of Bicknell's signature. (Dkt. No. 47 at 10–11.) The complaint does very little to detail the wire fraud committed by the unauthorized signatures. In any event, the vast majority of the scheme involved one particular type of wire fraud—the fake divine messages—with very little variety.

[15] By "Plaintiffs' own admission," the "scheme at issue . . . had a singular focus with a singular goal—defrauding Plaintiffs." *Id.* at *5.

claim is being dismissed, the Court also dismisses the RICO conspiracy claim against Wilhite.

### C.    Fraud, Deceit, and Constructive Fraud

Wilhite next argues that Bicknell has failed to state any fraud or deceit claims against him, because (1) the complaint fails to allege Wilhite made a false statement; and (2) Wilhite gained no advantage.[16] (Dkt. No. 44 at 25–28.) The Court is unpersuaded.

### 1.    Wilhite Made a False Statement

To countenance Wilhite's first argument, the Court would have to ignore the well-pleaded allegations of the complaint, draw inferences in Wilhite's favor, and add facts to the complaint that are not pled.

The parties agree that, for purposes of the current argument, deceit and fraud in Oklahoma are coextensive and contain the same elements. (Dkt. No. 44 at 25, Dkt. No. 47 at 21.) *See Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1111 (N.D. Okla. 2003) (noting the "basic elements of common law fraud and deceit are identical under Oklahoma law"). One of these elements is a "false material misrepresentation." *Bowman v. Presley*, 2009 OK 48, ¶ 13, 212 P.3d 1210, 1217–18. "The gist of a fraudulent misrepresentation is the producing of a false impression upon the mind of the other party . . . ." *Sutton v. David Stanley Chevrolet, Inc.*, 2020 OK 87, ¶ 13, 475 P.3d 847, 854.

---

[16] Wilhite also asks the Court to dismiss the deceit claim "to the extent it alleges deception of third parties." (Dkt. No. 44 at 28–29.) As noted below, the parties agree that the elements of fraud and deceit are coextensive for purposes of this motion, requiring, *inter alia*, a false material misrepresentation. Also as noted below, the Court finds that such a misrepresentation was made to Bicknell. Wilhite does not argue that the deceit claim otherwise fails as to the representations made to Bicknell, and, therefore, the claim survives. The Court sees no need to consider whether Bicknell's claim also survives based on any alternative misrepresentations.

Wilhite argues the complaint "fails to make any non-conclusory allegations that Wilhite said anything untrue or knowingly participated in anything intended to deceive Plaintiff." (Dkt. No. 44 at 25.)  But there is no serious argument that the Todays Word or Sister Catherine messages were true—that is, that God's will was being communicated to Bicknell or that Sister Catherine was a real person.  Nor is there any serious argument that these messages were immaterial—i.e., that they were not likely to influence Bicknell's behavior in providing millions of dollars to the project, Wilhite, and a company owned and controlled by him.  All of the "who, what, where, when, and how" of the alleged fraud has been supplied.  *Clinton*, 63 F.4th at 1277.  Wilhite knows what accounts sent the messages, what the messages were, to whom they were sent, when they were sent, and how they were part of the overall alleged scheme.

Instead, Wilhite asks the Court to find that <u>he</u> did not send the messages and had no idea where they came from.  To do that, the Court would have to ignore the well-pleaded allegations of the complaint, which explicitly state that Wilhite and Silanskas began sending the original Todays Word messages to Bicknell in 2022.  (Dkt. No. 1 ¶¶ 47–49.)  This would also require the Court to ignore additional allegations that the messages were part of a plan conceived by both Silanskas and Wilhite.  (*See, e.g.*, *id.* ¶¶ 6, 118, 136, 147.)  Bicknell provides factual allegations making it plausible that Wilhite was both part of sending these messages and part of the overall fraud.

For instance, at the beginning of the alleged scheme, Wilhite sent a compilation of Todays Word messages that had been sent to Bicknell to his wife's personal email account. (*Id* ¶ 188.)  Similarly, at least once, Wilhite received the contents of a Todays Word email from Silanskas before a nearly identical version was sent to Bicknell.  (*Id.* ¶ 190.)  And, on multiple occasions, Wilhite would receive from Silankas messages that Bicknell had sent

only in reply to Sister Catherine. (*Id.* ¶¶ 194, 197.) Wilhite also sent these messages—and messages from Sister Catherine—to an email account opened in the name of his dead mother-in-law.[17]  (*Id.* ¶¶ 194–98.)   Further, as the email were being sent, Wilhite reinforced their messages. (*E.g.*, *id.* ¶ 88 (agreeing with Bicknell that a Todays Word email must be heeded).)

Wilhite may have a plausible explanation for all these facts, or he may be able to show that they are untrue.  But for now, the Court must accept the well-pleaded factual allegations in the complaint as true and draw all inferences in Bicknell's favor.  Bicknell has alleged that Wilhite made false material representations.

### 2.    Wilhite Gained an Advantage

Wilhite's second argument is that Bicknell's constructive fraud claim requires Wilhite to have gained an advantage, but that Wilhite never received ownership in the project, so there was no advantage. (Dkt. No. 44 at 28.)  But the complaint alleges Wilhite received $400,000 in salary payments, over $20,000 in disbursements from Bicknell's personal bank accounts, and $30,000 in owner's draws from a company called Big Time Productions.  (Dkt. No. 1 ¶ 180.)  The complaint also alleges Wilhite had a company that received $10,000 in purported donations, and that none of the funds received by Wilhite or his companies (and paid by Bicknell) resulted in a benefit to Bicknell.[18]  (*Id.*)

---

[17] Wilhite characterizes this allegation as "nothing more than Wilhite receiving copies of a few of [the Sister Catherine email] from Silanskas and forwarding them to family members." (Dkt. No 51 at 8.)  This characterization draws inferences in Wilhite's favor (that there is nothing nefarious about the creation of an account in the name of a dead person) and assumes facts not in the complaint (that other family members used this account for the normal communication of uplifting religious messaging).

[18] Throughout the complaint, there are also allegations that Bicknell transferred various sums to a company "owned and controlled by Wilhite" or to "Wilhite's entity." (Dkt. No. 1 ¶ 58 ($500,000); ¶ 59 ($600,000); ¶ 60 ($600,000); ¶ 61 ($600,000); ¶ 62 ($500,000); *(cont.)*

Wilhite counters that his salary was for "work actually performed," that "most" of the salary was for work performed at the Mansion Theatre, that the $10,000 donation was not related to the alleged fraud, and that the $30,000 in owner's draws were similarly unrelated.  (Dkt. No. 51 at 9–10 (replying to Bicknell's unjust enrichment arguments).) Again, however, Wilhite is asking the Court to ignore allegations in the complaint, assume additional facts, and draw inferences in his favor, not Plaintiff's.  Because it cannot do so, the Court finds that Bicknell has adequately alleged Wilhite received an advantage from the alleged constructive fraud.  Wilhite's motion to dismiss these claims is denied.

## D.    Intentional Infliction of Emotional Distress

Wilhite further argues Bicknell has failed to state a claim for intentional infliction of emotional distress ("IIED") under Oklahoma law.  (Dkt. No. 44 at 29–31.)  He maintains the complaint fails to show intentional action, outrageous conduct, or severe emotional distress.  (*Id.*)  The Court disagrees on each count.

### 1.    IIED—Generally

Intentional infliction of emotional distress requires that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe." *Est. of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 855–56 (10th Cir. 2005) (applying Oklahoma law).  Generally, the "trial court acts as a gatekeeper regarding the outrageousness of the defendant's conduct and the severity of

---

¶ 64 ($600,000); ¶ 66 ($1.5 million); ¶ 69 ($500,000); ¶ 70 ($4 million); ¶ 71 ($3 million); ¶ 74 ($2 million); ¶ 76 ($504,699); ¶ 78 ($3 million).)  Bicknell does not appear to include these sums in the allegations of the benefit to Wilhite, and the Court need not consider them here.

the plaintiff's distress." *Computer Publ'ns, Inc. v. Welton*, 2002 OK 50, ¶ 8, 49 P.3d 732, 735.

"The second element of this tort requires proof that the defendant's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and that such conduct is regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 735, ¶ 9. "In general, a plaintiff must prove that the recitation of defendant's conduct to an average member of the community would arouse the listener's resentment against the defendant and would lead the listener to exclaim 'Outrageous!'" *Id.* "If the court concludes that reasonable persons could differ in the assessment of" whether conduct was sufficiently extreme and outrageous, "the court submits the claim to the jury to determine whether the defendant's conduct should result in liability." *Est. of Trentadue*, 397 F.3d at 856 n.7.

Meanwhile, the fourth element "requires proof that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." *Computer Publ'ns*, 49 P.3d at 736, ¶ 13 (citation modified). "It is for the court to determine, in the first instance, whether . . . severe emotional distress can be found." *Durham v. McDonald's Restaurants of Okla., Inc.*, 2011 OK 45, ¶ 13, 256 P.3d 64, 68; *see also Est. of Trentadue*, 397 F.3d at 856 n.7 (conversely, "the jury determines whether such distress in fact existed"). "The intensity and the duration of the distress are factors to be considered in determining its severity." *Mengert v. United States*, 120 F.4th 696, 712 (10th Cir. 2024) (applying Oklahoma law) (quoting Restatement (Second) of Torts § 46 cmt. j); *see also Durham*, 256 P.3d at 68, ¶ 13 (noting the tort "does not provide redress for every invasion of emotional serenity or every anti-social act that may produce hurt

feelings").    The "type of distress must be reasonable and justified under the circumstances." *Id.*

"Normally, severe emotional distress is accompanied by some form of illness or bodily harm, but recovery for IIED is not limited to cases where there has been bodily harm; if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without such harm." *Mengert*, 120 F.4th at 712 (citation modified).  Factors showing severity include whether the plaintiff had physical symptoms resulting from the distress, whether he sought medical attention, and whether the distress disrupted his daily affairs.  *Id.* at 713.

### 2.    Bicknell Has Sufficiently Pled IIED

First, the complaint sufficiently alleges that Wilhite acted intentionally, as noted above, and the Court again rejects Wilhite's assertion that there are "no well-pleaded allegation[s] that Wilhite knew the messages were fake or participated in any[]way in the scheme . . . ." (Dkt. No. 44 at 30–31.)  The Court finds it was substantially certain[19] that bombarding a devout practitioner with religious messages intended to make him feel as if he was in constant spiritual disobedience would result in emotional distress.  In fact, Bicknell reported such distress at the time to "Sister Catherine." (Dkt. No. 1 ¶¶ 144–47, 161–63.)  Yet, the messaging continued.  (*Id.*)  Such knowing persistence satisfies the intentionality element under Oklahoma law.

---

[19] An individual acts intentionally for IIED purposes where he desires to inflict emotional distress and also where he knows such distress is certain, or substantially certain, to result from his conduct.  Restatement (Second) of Torts § 46 cmt. i.

Second, the complaint outlines extreme and outrageous conduct, alleging that Wilhite participated in a targeted effort to play upon Bicknell's religious beliefs[20] in order to convince him to act as the sole benefactor of the project. This campaign continued—and, indeed, allegedly ramped up—when Bicknell noted his dwindling finances, expressed emotional distress and depression, and mentioned growing familial disputes. For years, Wilhite and Silanskas crafted messages in such a way that Bicknell believed he was disobeying God by not funding the project faster, and Bicknell subsequently poured over $60 million into the endeavor. Whether this type of targeted manipulation is extreme or outrageous is not something about which reasonable people would disagree.

Such a finding is in accord with cases applying Oklahoma law. *See Durham*, 256 P.3d at 67, ¶ 9 ("manager's use of 'f...ing retard' in addressing a minor employee who is filled with apprehension after being denied permission to take anti-seizure medication may reasonably" meet the test); *Johnson v. Spirit Aerosystems, Inc.*, No. 20-CV-00138-GKF-FHM, 2020 WL 12800851, at *3 (N.D. Okla. Aug. 4, 2020) (test met by allegations of "widespread and prolonged harassment" of plaintiff "and other female employees through derogatory remarks during the entirety of her twelve years of employment," and "targeted harassment against [plaintiff] for eighteen months" by her manager); *CitiFin. Mortg. Co. v. Frasure*, No. 06-CV-160-TCK-PJC, 2008 WL 2199496, at *7 (N.D. Okla. May 23, 2008) ("repeatedly threatening foreclosure on a piece of property in which

---

[20] "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some . . . peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge . . . ." Restatement (Second) of Torts § 46 cmt. f.

[creditors] had no interest, even after being informed . . . that they were in error" satisfied the second element), *aff'd*, 327 F. App'x 49 (10th Cir. 2009).

Lastly, the Court finds Bicknell has alleged the distress was severe.[21]  Bicknell alleges severe physical symptoms resulting from his emotional distress, namely physical weakness and a stroke.[22]  (Dkt. No. 1 ¶ 246; *see also id*. ¶¶ 10, 168.)  The complaint also alleges Bicknell suffered mental distress over an extended period, often based on Bicknell's contemporaneous statements, which were filled with indications of distress and even a willingness to be "taken" by the Lord.  (*Id*. ¶¶ 145–46, 161, 168, 197.)

The complaint further alleges a disruption to Bicknell's daily affairs.  *Mengert*, 120 F.4th at 713.  Indeed, the allegations outline in real time how Bicknell's angst over his "disobedience" caused him to stay up all night praying, hire counsel, substantially change his estate plan, and war with his family.  (*See, e.g.*, Dkt. No. 1 ¶¶ 146, 149, 151, 173.)  If the allegations are proven, a jury easily could find Bicknell's emotional distress to be severe.

Wilhite's motion to dismiss Bicknell's IIED claim is denied.

### E.    Civil Conspiracy

Wilhite next argues that the civil conspiracy claim should be dismissed because Bicknell has failed adequately to allege an underlying tort; because the conduct alleged was not inherently unlawful; and because Bicknell fails to show Wilhite had a meeting of the minds with any other person to commit a fraudulent act. (Dkt. No. 44 at 33–34.)  The Court again disagrees.

---

[21] The Court rejects Wilhite's argument that Bicknell must "substantiate" the allegations in his complaint.  (Dkt. No. 44 at 30.)

[22] There is not a separate allegation that Bicknell sought medical attention for his symptoms, but it is reasonable to infer that the stroke resulted in some medical treatment.

### 1. Civil Conspiracy—Generally

Civil conspiracy "consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." *Brock v. Thompson*, 1997 OK 127, ¶ 39, 948 P.2d 279, 294. "There can be no civil conspiracy where the *act* complained of and the *means employed* are lawful." *Id.*

"The essential elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Clinton HMA, LLC v. Clinton Hosp. Auth.*, No. CIV-22-569-J, 2023 WL 5668016, at *7 (W.D. Okla. July 25, 2023) (citing *Schovanec v. Archdiocese of Okla. City*, 2008 OK 70, ¶ 46, 188 P.3d 158, 175). "The agreement is a matter of inference from the facts and circumstances of the alleged conspirators." *Shadid v. Monsour*, 1987 OK CIV APP 48, ¶ 18, 746 P.2d 685, 689. "The question is whether the circumstances, considered as a whole, show that the parties united to accomplish the fraudulent scheme." *Id.* When disconnected circumstances "are just as consistent with lawful purposes as with unlawful purposes," they "are insufficient to establish a conspiracy." *N. Texas Prod. Credit Ass'n v. McCurtain Cnty. Nat. Bank*, 222 F.3d 800, 815 (10th Cir. 2000) (quoting *Dill v. Rader*, 1978 OK 78, ¶ 8, 583 P.2d 496, 499).

### 2. Bicknell Has Pled a Civil Conspiracy Claim Against Wilhite

The Court easily rejects Wilhite's argument that Bicknell has failed to plead an unlawful act. As outlined above, Bicknell has alleged Wilhite defrauded him.

The Court further rejects Wilhite's argument that the alleged conduct could be equally as consistent with lawful purposes as unlawful ones. Even if the American Heartland Project was a fully viable endeavor, it would be unlawful to impersonate God

or a religious figure through false messages aimed at convincing an individual to invest all their assets in the project or risk the consequences of spiritual disobedience. It similarly reflects an unlawful purpose (and is inconsistent with a lawful purpose) to use those divine messages in an attempt to induce the individual to sign over his interests in the project. None of these theories "depend entirely on the Project being a sham." (Dkt. No. 44 at 34.)

Further, the complaint alleges Silanskas and Wilhite coordinated in crafting, sharing, and archiving their fake communications to Bicknell. This is sufficient to support an inference that Silanskas and Wilhite had a meeting of the minds to commit fraud.

Wilhite's motion to dismiss the civil conspiracy claim is denied.

### F.    Unjust Enrichment

Finally, both Wilhite and Hedrick move to dismiss the claims against them for unjust enrichment. In Wilhite's motion, he repeats the argument that there was no unjust benefit to him, because he was simply paid for services rendered. (Dkt. No. 44 at 31–32.) Wilhite also argues that nothing "unjust" occurred, because Bicknell failed to allege wrongdoing by him. (*Id.* at 32–33.) As discussed above, the complaint alleges Wilhite received more than just a salary, and the Court cannot rely on assertions (not contained in the complaint) that Wilhite, in fact, earned this salary. The Court has already determined that the complaint alleges wrongdoing on Wilhite's part. So, the Court turns to Hedrick's arguments.

Hedrick argues that the complaint does not allege a connection between his compensation and Bicknell's impoverishment (Dkt. No. 43 at 5–6);[23] that his compensation was justified by services to the project (*id.* at 6–8); and that Bicknell has other, adequate legal remedies (*id.* at 6–7).[24]    For reasons explained below, these arguments are unpersuasive.

### 1.    Unjust Enrichment—Generally

Unjust enrichment is "a condition which results from the failure of a party to make restitution in circumstances where it is inequitable, *i.e.*, the party has money in its hands that, in equity and good conscience, it should not be allowed to retain." *Randle v. City of Tulsa*, 2024 OK 40, ¶ 26, 556 P.3d 612, 620 (citation modified).  The remedy accounts for situations where "it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another," *Tillman ex rel. Est. of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1309 (10th Cir. 2005) (quoting *Lapkin v. Garland Bloodworth, Inc.*, 2001 OK CIV APP 29, ¶ 7, 23 P.3d 958, 961), or where "an expenditure by one person adds to the property of another" or "saves the other from expense or loss,"

---

[23] In his motion, Hedrick argues there must be a "direct connection" between "Hedrick's compensation and plaintiff's alleged loss" (Dkt. No. 43 at 4–6), before changing course in reply and arguing the connection need only be "legally cognizable" (Dkt. No. 49 at 2–4).

[24] For the first time in reply, Hedrick argues that the unjust enrichment claim is barred because Bicknell has failed to show a transaction, quasi-contract, or wrongful conduct connecting Bicknell and Hedrick.  (Dkt. No. 49 at 1, 4–5.)  The Court normally does not consider arguments raised for the first time in reply and to which the opposing party has no opportunity to respond.   Here, however, Bicknell has pled wrongful conduct connecting Bicknell and Hedrick—namely Hedrick's false statements regarding the viability of the project, which induced Bicknell to continue as the sole investor in the project from which Hedrick received his allegedly excessive and unsupported fees and expenses.

*Randle*, 556 P.3d at 620, ¶ 26 (quoting *City of Tulsa v. Bank of Okla., N.A.*, 2011 OK 83, ¶ 19, 280 P.3d 314, 319).

To bring a claim for unjust enrichment, the plaintiff must otherwise have no adequate remedy at law. *Id.*; *see also Horton v. Bank of Am., N.A.*, 189 F. Supp. 3d 1286, 1290 (N.D. Okla. 2016) (where the applicability of contract was undisputed, and breach of contract an adequate remedy, plaintiff could not bring claim for unjust enrichment). There also must be "an allegation of some active wrongdoing on the part of the person against whom recovery is sought[,] such as fraud, abuse of confidence, or unconscionable conduct," or there must otherwise be a "contractual or quasi-contractual relationship" between the parties. *Randle*, 556 P.3d at 620–22, ¶¶ 26, 31, 33.

### 2. Bicknell Has Pled an Unjust Enrichment Claim Against Hedrick

As recounted in the statement of facts, Hedrick was the project's executive producer and knew Bicknell was the sole financial backer of the project. Hedrick (1) emailed Bicknell a glowing economic analysis of the project that he knew was baseless or unreliable at best; (2) provided Bicknell with more positive statements from a feasibility study consultant that were either fictional or that he knew were false; and (3) falsely told Bicknell that he had assembled a dream team of former Disney engineers and designers. Hedrick made at least $1.5 million for himself and his family members through the project.[25] Bicknell alleges he received no benefit from the monies paid, which ultimately wound up in Hedrick's pocket.

---

[25] According to the complaint, this included $900,000 in consulting fees that were paid without any accounting or oversight; $250,000 for extravagant expenses including rent and travel; and $260,000 and $141,000 paid to Hedrick's sons. (Dkt. No. 1 ¶ 181.)

Hedrick first contends there is no "connection" between his enrichment and Bicknell's impoverishment, citing *Tillman*. (Dkt. No. 49 at 2–4.) But *Tillman* does not support this argument. In *Tillman*, the personal representative of Tillman's estate claimed that his employer was unjustly enriched by a life insurance policy the employer had taken on the Tillman's life. *Tillman*, 408 F.3d at 1302. Yet, the employer paid all the premiums on the policy, and the court found no advantage inuring to the employer at Tillman's expense. *Id.* at 1309 (noting "Mr. Tillman was not prevented from obtaining life insurance himself"). The employer's enrichment was also not unjust—or, at least, the alleged injustice was not without a remedy—because the estate had an adequate legal remedy under the Oklahoma insurance code. *Id.* Here, on the contrary, there <u>is</u> a connection between the funds paid by Bicknell and Hedrick's enrichment; Bicknell was the sole source of the monies invested in the project and from which Hedrick was paid—even if those funds passed through an intermediary first.[26] Simply put, Bicknell's expenditures added to Hedrick's property. *See Randle*, 556 P.3d at 620, ¶ 26.

The Court further rejects Hedrick's argument that his compensation was justified because he received it pursuant to a business arrangement. (Dkt. No. 43 at 6 (citing *Dollar Rent A Car Sys., Inc. v. P.R.P. Enters., Inc.*, No. 01-CV-698-JHP-FHM, 2006 WL 1266515, at *27 (N.D. Okla. May 8, 2006), *aff'd*, 242 F. App'x 584 (10th Cir. 2007).) In *Dollar*, the district court simply found that Dollar was not unjustly enriched at the

---

[26] *See Lapkin*, 23 P.3d at 962, ¶ 8 (finding, "regardless of the actual source" of the funds that enriched defendants, they came "from" the plaintiff since they were paid by an insurer on his behalf); *cf. McAnulty v. Standard Ins. Co.*, 81 F.4th 1091, 1098 (10th Cir. 2023) (considering § 48 of the Restatement (Third) of Restitution and Unjust Enrichment (Am. L. Inst. 2011) and Colorado unjust enrichment law, the Tenth Circuit recognized that "the requirement that the benefit to defendant come 'at the expense of' the plaintiff . . . does not mean that the plaintiff must have directly conferred that benefit on the defendant").

defendant's expense when it was justified in terminating certain contracts. *Dollar Rent A Car*, 2006 WL 1266515, at *27. This does not stand for the broad proposition Hedrick cites it for—*i.e.*, that courts "in this District have held that unjust enrichment does not lie where compensation was provided for services under a business arrangement." (Dkt. No. 43 at 6.) Nor does Hedrick cite other cases to support his argument. The fact that Hedrick may have been in business with Bicknell does not inherently preclude unjust enrichment.

Lastly, the Court rejects Hedrick's contradictory argument that Bicknell's adequate remedy at law "would be a breach of contract claim" (*id.*), while also asserting such a claim is not "viable" (*id.* at 7).[27] Here, the allegations in the complaint do not support a breach of contract claim against Hedrick. Even if they did, the Court would allow a claim of unjust enrichment to be pled alternatively, unless it was inarguable that an express contract governed the dispute. *See, e.g.*, *Northmarq Cap., L.L.C. v. Kabani*, No. 24-CV-00073-SH, 2024 WL 4467522, at *10 (N.D. Okla. Oct. 10, 2024). As the Court is unpersuaded by Hedrick's arguments, his motion to dismiss will be denied.

### G.    Leave to Amend

In his responses, Bicknell asks for leave to amend should the Court grant any portion of Defendants' motions. (*E.g.*, Dkt. No. 46 at 16; Dkt. No. 47 at 29.) The local rules require any motion to amend to include a statement as to whether another party objects and a summary of the proposed changes. LCvR 7-1(h). (The undersigned prefers a copy of the proposed amended pleading be attached to the motion.) Bicknell's current

---

[27] Again, for the first time in reply, Hedrick also argues that Bicknell's adequate remedy at law is a fraud claim in tort against Wilhite and Silanskas. (Dkt. No. 49 at 5.) But Hedrick provides nothing supporting an assertion that a legal claim against one party prevents an equitable claim against another, and the Court will not consider the argument.

request does not comply with these requirements, but he may file an appropriate motion to amend within 14 days of this order.

## IV.    Conclusion

IT IS THEREFORE ORDERED that *Defendant Larry Wilhite's Motion to Dismiss* (Dkt. No. 44) is GRANTED IN PART AND DENIED IN PART.  The Court DISMISSES WITHOUT PREJUDICE Plaintiff's RICO claims against Wilhite as pled in Counts I and II of the complaint.  The motion is denied as to all other claims.  Plaintiff may file a motion to amend his complaint, if appropriate, by May 19, 2026.

IT IS FURTHER ORDERED that *Defendant Stephen D. Hedrick's Motion to Dismiss* (Dkt. No. 43) is DENIED.

ORDERED this 5th day of May, 2026.

SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT