**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) O. GENE BICKNELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 25-cv-00383-SH |
| | ) | |
| (1) RICHARD M. SILANSKAS, JR., | ) | |
| (2) LARRY K. WILHITE, and | ) | |
| (3) STEPHEN D. HEDRICK, | ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANT LARRY WILHITE'S MOTION TO EXCLUDE EXPERT TESTIMONY OF JEFF WATTS AND BRIEF IN SUPPORT**

---

J. Christopher Davis, OBA #16639
Deric J. McClellan, OBA #32827
CROWE & DUNLEVY, P.C.
222 North Detroit Ave., Suite #600
Tulsa, OK 74120
(918) 592-9800
(918) 592-9801 (Facsimile)
chris.davis@crowedunlevy.com
deric.mcclellan@crowedunlevy.com

-and-

Evan G. Vincent, OBA #22325
Galen N. Thorp, OBA #36847
CROWE & DUNLEVY, P.C.
Braniff Building
324 North Robinson Ave., Suite #100
Oklahoma City, OK 73102-8273
(405) 235-7700
(405) 239-6651 (Facsimile)
evan.vincent@crowedunlevy.com
galen.thorp@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT LARRY K. WILHITE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

STATEMENT OF FACTS .......... 1

A. Background .......... 1

B. Watts and His Opinions .......... 2

C. Watts's Admissions About Credibility .......... 3

D. What Kristy Adams Told Watts .......... 5

E. Watts's Admissions About His Method .......... 6

F. Docusign .......... 8

G. Watts's Qualifications .......... 8

H. Testimony Watts Did Not Address .......... 9

LEGAL STANDARD .......... 12

ARGUMENT AND AUTHORITIES .......... 13

I. Watts's opinions rest on his own judgments about whom to believe. .......... 13

II. Watts's method is not reliable and was not reliably applied .......... 16

A. Watts does not explain how his experience supports any of his three opinions .......... 16

B. Watts disregarded obvious alternative explanations. .......... 19

C. Watts could not have excluded those alternatives without making the credibility determinations *Hill* forbids. .......... 21

III. Watts Is Not Qualified to Offer These Opinions and Would Serve as a Summary Witness. .......... 22

A. Watts lacks qualifications in the subjects of his opinions. .......... 22

B. Watts is simply Plaintiff's investigator testifying as an expert. .......... 22

C. Watts would pass hearsay to the jury and testify beyond his personal knowledge. .......... 24

IV. Rule 403 Independently Requires Exclusion .......... 24

V. Alternative Relief .......... 25

CONCLUSION .......... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bitler v. A.O. Smith Corp.*,
400 F.3d 1227 (10th Cir. 2005) .......... 19, 21, 22

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......... 12, 13, 24

*Jordan v. City of Chicago*,
No. 08 C 6902, 2012 WL 88158 (N.D. Ill. Jan. 11, 2012) .......... 16

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) .......... 15, 16, 22, 25

*Price v. State Farm Fire & Cas. Co.*,
No. 24-cv-02798-PAB-MDB, 2026 WL 2715954 (D. Colo. Sept. 15, 2026) .......... 19, 20

*Taber v. Allied Waste Sys., Inc.*,
642 F. App'x 801 (10th Cir. 2016) .......... 19, 20, 22

*United States v. Adams*,
271 F.3d 1236 (10th Cir. 2001) .......... 15

*United States v. Benally*,
541 F.3d 990 (10th Cir. 2008) .......... 13

*United States v. Charley*,
189 F.3d 1251 (10th Cir. 1999) .......... 15

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir.2003) .......... 24

*United States v. Garcia*,
635 F.3d 472 (10th Cir. 2011) .......... 23

*United States v. Garza*,
566 F.3d 1194 (10th Cir. 2009) .......... 16

*United States v. Hill*,
749 F.3d 1250 (10th Cir. 2014) .......... 13, 14, 21, 22, 25

*United States v. Kamahele*,
748 F.3d 984 (10th Cir. 2014) .......... 23, 24

*United States v. Medina-Copete*,
757 F.3d 1092 (10th Cir. 2014) ........................................ 16, 17, 19

*United States v. Mejia*,
545 F.3d 179, 194–96 (2d Cir. 2008). ........................................ 22, 23, 24

*United States v. Rodriguez-Flores*,
907 F.3d 1309 (10th Cir. 2018) ........................................ 13, 16

*United States v. Roldan–Zapata*,
916 F.2d 795 (2d Cir.1990) ........................................ 22

*United States v. Samara*,
643 F.2d 701 (10th Cir. 1981), *cert denied*, 454 U.S. 829 (1981) ........................................ 13

*United States v. Scheffer*,
523 U.S. 303 (1998) ........................................ 13

*United States v. Toledo*,
985 F.2d 1462 (10th Cir. 1993) ........................................ 13

*United States v. Walker*,
85 F.4th 973 (10th Cir. 2023) ........................................ 13

**Statutes**

21 O.S. § 843.4 ........................................ 7

**Other Authorities**

Fed. R. Evid. 602 ........................................ 24

Federal Rules of Evidence 702 and 403 ........................................ 1, 25

Rule 403 ........................................ 24, 25

Rule 702 ........................................ 12, 13, 14, 16, 17, 19, 21, 25

Rule 702(a) ........................................ 22

Rule 702(d) ........................................ 22

Rule 703 ........................................ 24

Defendant Larry Wilhite moves under Federal Rules of Evidence 702 and 403 to exclude the testimony of Plaintiff's retained expert, Jeff Watts. Watts, a retired police chief, offers three opinions: that Defendants' conduct was "consistent with" elder exploitation; that Wilhite's silence in response to forwarded e-mails is "consistent with" communication between co-conspirators; and that missing messages are "more consistent with deliberate deletions" than with routine ones. Each opinion depends on a premise Watts admits he cannot know: that Wilhite did not believe the religious messages he received and passed along. Watts reached that premise the way a juror would, by deciding whom to believe. He agreed that part of his role was to assess the credibility of the Wilhites and Plaintiff, and he left Wilhite's explanations out of his report "[b]ecause [he] didn't think Mr. Wilhite's statement was credible." Exhibit 1, Watts Dep. 25:9–19, 163:9–18. He did the same with the one non-party witness he interviewed who knew Wilhite well. Kristy Adams told Watts that Wilhite "can't Google," could not have compiled the messages, and treated them as genuine. Watts's report cites Adams as the only source for sixteen facts that cut against Wilhite. It leaves out everything she said that cut the other way. And three weeks before Watts signed his report, Defendant Rick Silanskas testified that he wrote the messages and that Wilhite did not know it. Watts cites that deposition repeatedly but never mentions that testimony. The Tenth Circuit does not permit expert testimony of this kind, and the method behind it has no error rate, no peer review, no standards, and no record of acceptance in any court. The Court should exclude it.

## STATEMENT OF FACTS

### A. Background

1. Plaintiff alleges that he funded the American Heartland Project because of religious messages, the "Today's Word" and "Sister Catherine" messages, that he believed came from God. Compl. ¶ 6. Wilhite, who worked for Plaintiff for twenty years, received the same messages, came to believe they were divine, and contends that he was deceived along with Plaintiff. Exhibit 2, L. Wilhite

Dep. 154:10–14, 155:9–160:2, 176:12–177:9; Ex. 1, Watts Dep. 97:5–12. Silanskas has testified that he sent Today's Word messages to Wilhite through a Pinger account and that Wilhite did not know Silanskas was the author. Exhibit 3, R. Silanskas Dep. 174:16–18, 209:9–19; Ex. 1, Watts Dep. 113:15–114:8, 152:8–12.

**B. Watts and His Opinions**

2. Watts is a retired chief of the Stillwater Police Department. He has never served as or been admitted as an expert witness. When he has testified, it has been as a fact witness. Ex. 1, Watts Dep. 6:4–7, 52:13–53:5.

3. Plaintiff's counsel retained Watts as an investigator in January 2026, after this suit was filed. *Id.* 9:2–24, 13:7–10. Counsel asked him "to investigate . . . and to form an opinion." *Id.* 9:13–21. He became a testifying expert "as I was coming to conclusions." *Id.* 11:4–7. He also expects to testify as a fact witness. *Id.* 11:8–11, 12:5–18.

4. Watts interviewed four people: Plaintiff, Kelly Holman, Kristy Adams, and Cindy Morris. Each is aligned with or works for Plaintiff, and Watts sought to interview no one else. *Id.* 16:11–21, 22:3–17. He took no notes of his interview with Plaintiff. *Id.* 20:15–18. He found documents largely through keyword searches and did not review every document produced. *Id.* 14:18–15:25. Counsel gave him no assumptions to apply.

*Id.* 16:7–10. His report spends its first forty pages on a narrative titled "Facts Considered Based on My Investigation" before stating any opinion. Exhibit 4, Watts Report at 5–44. It states that all of his opinions are "set forth on my own personal knowledge." *Id.* at 4.

5. Watts offers three opinions. First, "Defendants' Conduct Toward Bicknell Was Consistent with the Typical Elements of Elder Exploitation": abuse of trust, victim vulnerability, social isolation, and financial benefit. Ex. 4, Watts Report at 5, 44; Ex. 1, Watts Dep. 73:2–17. Second, "Silanskas's forwarding of Bicknell's responses to 'Sister Catherine' to Wilhite without any message,

and Wilhite's lack of any response to these messages, is consistent with patterns of communications in such cases where co-conspirators who send and receive such messages without any additional content already understand why they are being sent and what they mean." Ex. 4, Watts Report at 5; Ex. 1, Watts Dep. 29:10–22. Third, "the pattern of missing, deleted, and selectively produced communications by the defendants is more consistent with deliberate deletions than with ordinary technology turnover, routine deletions or incidental gaps in production." Ex. 4, Watts Report at 5; Ex. 1, Watts Dep. 30:10–17.

6. Watts describes his method as "the same methodology I used during more than 30 years of law-enforcement investigations." It includes "comparing statements made by targets and witnesses against objective records," "[c]onsidering alternative explanations" and "comparing observed conduct to patterns repeatedly encountered in training and in similar types of investigations." Ex. 4, Watts Report at 3; Ex. 1, Watts Dep. 28:1–12, 38:11–12, 40:10–41:6. He says he reviewed the record "in much the same way I evaluated oral and written statements and evidence when I was a law enforcement officer . . . ." Ex. 4, Watts Report at 4.

**C. Watts's Admissions About Credibility**

7. Watts agreed that, in attending the Wilhites' depositions and reviewing Plaintiff's, part of his role was to "assess[] their credibility." Ex. 1, Watts Dep. 25:9–19. He preferred deposition videos to transcripts so he could "observe body language." *Id.* 24:11–18.

8. Of his 4,000 hours of training, Watts singled out four courses as relevant, including a 2013 course titled "Deceptive Detection." *Id.* 64:21–66:2, 66:24–67:1. That course matters, he explained, "[b]ecause it gives me insight into observing interviews and looking for deceptive behavior." *Id.* 67:19–24. He concluded that Silanskas displayed deceptive behavior. *Id.* 67:25–68:5.

9. Watts's report recites Wilhite's testimony that he believed the messages were guidance from God, quotes Wilhite's 2021 statement that "I do believe this is a God ordained thing," and

describes Wilhite and Silanskas sharing "their unwavering belief in God's command and the 'triune.'" Ex. 4, Watts Report at 31, 57. The report then concludes that Wilhite's statements about the messages are "consistent with a pattern of leveraging a position of trust to take advantage of a victim's vulnerability . . . ." Ex. 4, Watts Report at 52; Ex. 1, Watts Dep. 109:9–18. Watts considered the alternative, that Wilhite repeated the messages because he believed them, and remarked, "I guess I did" discount it. Ex. 1, Watts Dep. 110:7–16. He agreed that he discounted that possibility as not credible, while admitting, "I don't know what he believed." *Id.* 110:22–111:7. He conceded that if Wilhite believed the messages, "it would be different," and that his report does not explain why he rejected that possibility. *Id.* 111:8–112:2. The report also repeatedly describes the messages in the passive voice, implicitly attributing the alleged fraudulent conduct to both Defendants: they "were used to take advantage of [Bicknell's] vulnerability and manipulate Bicknell," "were used to manipulate Bicknell," and "were used . . . to increase the pressure on Bicknell." Ex. 4, Watts Report at 49–50, 52.

10. Asked why his report omits Wilhite's testimony that Wilhite did not notice the missing forwarding indicators in Silanskas's e-mails, Watts answered: "Because I didn't think Mr. Wilhite's statement was credible." *Id.* 163:9–18.

11. Watts could not recall concluding anywhere in his analysis that something Plaintiff said was likely untrue. *Id.* 198:18–22. He accepted Plaintiff's assertion that he never authorized Wilhite to sign contracts because "[t]hat was Gene's words as well." *Id.* 196:20–197:4.

12. On cross-examination, Plaintiff's counsel asked Watts leading questions, and Watts agreed that his three opinions do not "rely on any finding that any Defendant is credible or not credible" or on "any finding as to a Defendant's intent." *Id.* 201:18–202:13. He also agreed that he had considered that Wilhite "could also be engaged in innocent behavior." *Id.* 204:4–12. In his next answer to Plaintiff's counsel, Watts testified that he had concluded Wilhite engaged in fraud: "I believe he did." *Id.* 204:13–19.

### D. What Kristy Adams Told Watts

13. Adams is the general manager of Plaintiff's Mansion Theatre and worked directly with Wilhite for years. Exhibit 5, Adams Interview Tr.[1] 3:16–20, 6:17–21. Plaintiff's counsel, Rachel Peltzer, conducted the interview; Watts was told he "may jump in." *Id.* 2:2–11; Ex. 1, Watts Dep. 186:15–24. When Watts took his turn, he told Adams that he did not "know as much as probably Rachel and Sagar do." Ex. 5, Adams Interview Tr. 91:2–10.

14. Adams described Wilhite's technical ability as "[z]ero." He "couldn't operate his phone very well," "had trouble sometimes with emails," and came to her "for tech help." *Id.* 28:8–9, 28:17–25. He "can't Google," at least "not by himself," and "could have never transferred those text messages to any kind of a program and laid it out nice and neat." *Id.* 57:5–22. Silanskas, by contrast, was "tech savvy, email savvy," kept a false e-mail account and a false Facebook account, and had his son help with what he could not do himself. *Id.* 27:21–28:14, 63:4–9. Adams said Silanskas avoided e-mail because "he did not want a trail." *Id.* 90:6–12. When Watts asked about deleted e-mails, Adams told him, "Larry didn't know how to do that." *Id.* 109:17–111:5.

15. Adams corroborated Wilhite's testimony that he received the Today's Word messages from ever-changing phone numbers. She said "I asked him to give me the phone number and I would try to look them up and everything, and I wouldn't find anything[.]" *Id.* 53:14–16. When asked whether the messages came from the same number, Adams said "No." and said she thought what she saw was consistent with a program that "rotates through random numbers." *Id.* at 53:18–22. Adams also described Wilhite's belief in the messages. He "didn't know where [the Today's Word] came from." *Id.* 52:21–24. When Adams showed him an app that sends anonymous "message[s] from heaven," "he just did not believe it." *Id.* 53:1–10. When a message addressed a specific problem, it was

---

[1] This interview was produced to Wilhite as an audio file and was relied on by Watts in his report. Wilhite had the audio file transcribed by Professional Reporters. The interview had not been produced to Wilhite at the time of Adams's deposition.

not suspicious "to him. It was not that way to him. It was a message." *Id.* 55:1–5. He read the messages aloud in meetings as encouragement, *id.* 50:23–51:7, and he "thought [Sister Catherine] was real too, or he appeared to think that she was real," *id.* 61:9–12. His wife believed the messages were real, printed them daily, and kept them in binders. *Id.* 50:6–13, 58:4–10. The "triune" concept came "through the word." *Id.* 62:7–15. And when Adams told Wilhite about Silanskas's past, Wilhite repeated Silanskas's explanation that another man "was the one that did something wrong and Rick was just a victim." Adams added: "I'm sure that's what Rick told Larry." *Id.* 37:2–12.

16. She described Silanskas, also to Watts, as moving on to "his next victim." *Id.* 111:7–13. Watts's report omits her statements that Wilhite appeared to believe the messages and lacked the skill to compile them, and Watts could not say why he omitted them. Ex. 1, Watts Dep. 185:13–186:14. Yet sixteen footnotes in the report cite nothing but "Interview of K. Adams." Each supports a fact adverse to Wilhite: that he knew of Silanskas's past but trusted him, that he was "dismissive" of Adams's warning that Silanskas was behind the messages, that he gave Silanskas access to Plaintiff, and that he asked Adams to sign contracts for Plaintiff. Ex. 4, Watts Report at 13 nn.58–61, 16 n.89, 33 nn.192–95, 34 n.199, 42 nn.264–67, 46 nn.293–94. The report also uses Adams's account of Plaintiff's surprise to suggest that Wilhite withheld Silanskas's history from Plaintiff. *Id.* at 13 & n.61. He found that Adams "sounded credible." Ex. 1, Watts Dep. 186:25–187:4.

**E. Watts's Admissions About His Method**

17. Watts does not know his method's error rate or how often it produces false positives or false negatives. Ex. 1, Watts Dep. 45:24–46:7. He does not know whether it has been peer-reviewed. *Id.* 50:5–8. He knows of no one qualified as an expert on the basis of this method and no police officer qualified to testify as an expert about a pattern of elder exploitation. *Id.* 50:9–51:11, 53:6–10. He could not say whether another investigator would reach his conclusions: "Each investigator has their own processes." *Id.* 44:17–22.

18. The four "characteristics" of elder exploitation are Watts's own synthesis of "training and experience." *Id.* 73:18–74:17, 80:9–81:7. He relied on no peer-reviewed literature and applied no validated instrument or checklist. *Id.* 84:7–14. He testified that some of the characteristics come "from state law," and he identified Oklahoma's criminal exploitation statute, 21 O.S. § 843.4, as support for his opinion. *Id.* 73:18–23, 75:1–7, 83:10–84:1. He also acknowledged that the four characteristics can be present without exploitation, *id.* 84:17–85:21, and agreed that most twenty-year employees hold a position of trust, *id.* 97:5–12. He did not analyze the characteristics separately for each Defendant. *Id.* 91:3–14.

19. Watts could not say how closely facts must match a pattern to be "consistent with" it: "No training I've ever attended said that you have to have 93 percent consistency for it to be reliable." *Id.* 179:20–182:24. Asked for a comparison case, he named one he supervised, whose outcome he does not recall, and one recent private matter. *Id.* 87:17–90:20.

20. Watts testified that it was not important to him to address alternative explanations in his report or to explain why he rejected them. *Id.* 39:20–40:9. His report does not explain how he resolved conflicts between witness statements and the documentary record. *Id.* 34:5–35:14, 42:8–17. He also never considered whether Wilhite himself was a victim. *Id.* 151:11–17, 157:8–14.

21. Watts found it "unusual" that Wilhite would delete messages he believed came from God. *Id.* 125:4–6, 126:15–18. He knew that Plaintiff also believed the messages and also deleted them, but he testified that the significance of Plaintiff's deletions "would depend on the circumstances," which he did not recall. *Id.* 125:7–126:4, 126:19–127:2. He does not dispute that the Wilhites compiled the messages, or that doing so took effort, *id.* 127:12–128:1, yet he treats moving messages "from a primary device to a secondary location" as a sign of concealment, *id.* 175:17–24, even though others knew about the compilation effort. He performed no forensic analysis and did not review Joseph Pochron's expert report. *Id.* 177:18–20. He testified that it was not his role to distinguish deliberate

from routine deletion, stating that his "involvement" was "not to answer that question." *Id.* 179:13–19. He then agreed that his conclusion is that the deletion is consistent with a pattern of deliberate evidence loss. *Id.* 179:20–23.

22. Watts's report states that Wilhite "has produced no evidence" that he received Today's Word messages from unknown numbers. Ex. 4, Watts Report at 33; Ex. 1, Watts Dep. 112:10–19. Watts conceded that Wilhite's sworn testimony is evidence and that he meant documentary evidence, and he did not analyze the evidence concerning Silanskas's Pinger account. Ex.1, Watts Dep. 112:20–113:8, 114:16–115:13. Yet his own report shows that the Pinger account tied to Silanskas "was assigned a new phone number almost daily" and that the numbers "follow no pattern with regard to area code." Ex. 4, Watts Report at 29. That is what Wilhite says he saw: messages "from unknown phone numbers that changed frequently and appeared random." *Id.* at 31. Indeed, a table in the message database on Wilhite's phone shows that it had been in contact with 290 of the numbers associated with the Pinger account. Exhibit 6, Pinger Comparison Chart.

**F. Docusign**

23. Watts's report originally followed the Complaint in stating that Silanskas sent Wilhite a purported authorization from Plaintiff only after Wilhite had already Docusigned contracts on December 11, 2023. Ex. 4, Watts Report at 42. However, the documents Watts cited show that Wilhite received the authorization email at 2:58pm CST and that the first contract to be signed that day was sent at 3:16pm CST. *See* Exhibits 8, 9, Docusign Emails. Watts later served written corrections reversing that sequence. Ex. 1, Watts Dep. 27:11–19; Exhibit 7, Report Corrections. He explained that he "incorrectly had the times because [he] didn't convert all of it correctly." Ex. 1, Watts Dep. 193:8–194:25.

**G. Watts's Qualifications**

24. Watts has never been the lead investigator in an elder-exploitation case that went to trial. Ex. 1, Watts Dep. 72:15–18. As lead investigator, he could not identify a specific prosecuted elder-abuse or white-collar case. *Id.* 56:18–57:5, 57:17–58:1, 58:18–59:2. Most of his own caseload was violent crime. *Id.* 62:2–8.

25. He estimated that he supervised ten to twenty elder-exploitation cases and does not know their outcomes. *Id.* 61:1–19, 63:7–21, 203:11–14. The elder-abuse training he identified is less than one percent of his training, and he could not recall its length, its instructors, or its content. *Id.* 68:11–72:24.

### H. Testimony Watts Did Not Address

26. Silanskas was deposed for the second time on June 16, 2026, about three weeks before Watts signed his report, and the report cites that transcript repeatedly. Ex. 4, Watts Report at 7 nn. 12, 22 nn 124–26, 35 nn 207–09, 67–68 nn 407–13. Silanskas admitted that once the Today's Word messages began referring to the Triune and the Project, he was the one drafting and sending them. Ex. 3, R. Silanskas Dep. 156:18–157:16, 204:2–6. He admitted sending them from TextFree numbers, and he acknowledged changing those numbers almost every day. *Id.* 209:9–19, 212:5–13. He admitted creating the Sister Catherine email accounts, and he agreed that by January 16, 2024, he was operating them. *Id.* 205:18–21, 231:10–19. When Silanskas was asked whether Wilhite knew he was composing the Today's Word messages, Silanskas answered: "No, he did not." *Id.* 174:16–18. Silanskas also testified that he knew Wilhite believed the messages came from God. *Id.* 175:2–11. He also stated that he never told Wilhite, felt guilty about it, and that he "should have never hurt Larry like that." *Id.* 135:14–18, 181:16–182:8, 220:2–4, 221:20–222:1. Silanskas also admitted giving false answers at his first deposition. *Id.* 295:10–296:15. Watts's report cites this deposition for Silanskas's admissions and for what he still denied. Ex. 4, Watts Report at 22 & nn.125–26, 35 & nn.207–09, 67–68 & nn.408–13. However, Watts never cites Silanskas's testimony that Wilhite did not know who wrote the

messages, that Wilhite believed them, or that Silanskas regretted deceiving him. Asked why his report ignored Silanskas's testimony that Wilhite did not know Silanskas was the author, Watts answered: "I don't have any verification." Ex. 1, Watts Dep. 114:9–24.

27. Silanskas also explained two facts that Watts's report attributes in part to Wilhite. First, the report acknowledges that Silanskas "admitted to creating" the Sister Catherine accounts. Ex. 4, Watts Report at 37. It then reasons that, because "Sister Catherine" replied to an email that Plaintiff had forwarded only to Silanskas and Wilhite, "Silanskas and/or Wilhite had control" of the account. *Id.* at 37–38. But Silanskas testified that he was operating that account, and that is how the reply came to be sent. Ex. 3, R. Silanskas Dep. 231:2–19, 233:15–19. Second, the report's heading states that "Silanskas and Wilhite Changed the Subject Lines of the Sister Catherine Messages." Ex. 4, Watts Report at 60. The body of that section identifies only one email in which Wilhite chose the subject line: a message he forwarded to his mother-in-law's account under the subject "Nuns." *Id.* at 60–61. Every other example is Silanskas's. *Id.* The report never mentions that Silanskas admitted changing the subject lines on his forwards and could not explain why: "I don't know. Quirk? I don't know." Silanskas Dep. 246:21–247:8, 259:8–11. Wilhite, for his part, testified that he did not pay attention to email subject lines. Ex. 2, L. Wilhite Dep. 49:3–10, 67:11–17. Silanskas testified that he forwarded Plaintiff's replies to Wilhite because he "assumed that that's what Gene wanted." Ex. 3, R. Silanskas Dep. 238:18–239:2, 264:3–8.

28. Watts also disregarded substantial relevant testimony of Wilhite and his wife, Julia. For instance, at his deposition, which Watts attended, Wilhite provided as follows:

- He first thought the Today's Word texts came from "an app or something, a ministry sending them out." Ex. 2, L. Wilhite Dep. 155:16–21.
- He tried calling the numbers that sent them, and "there was no answer, nothing." *Id.* 160:21–162:15.

- He deleted the texts after sending them to his wife "to print off so we would have them archived," as he, Plaintiff, and Silanskas had discussed. *Id.* 163:9–164:12.

- He regularly deleted texts and emails to keep his devices running, as his IT department had advised. *Id.* 164:19–20, 184:22–185:1, 279:13–17.

- He assumed Plaintiff himself had sent his Sister Catherine replies to Silanskas. *Id.* 292:11–15, 300:11–15.

- He did not pay attention to email subject lines. *Id.* 49:3–10, 67:11–17.

- He sent the Sister Catherine emails to his late mother-in-law's account because his wife told him her own account was full. *Id.* 284:13–285:8.

Wilhite further testified that he stopped believing the messages only after this lawsuit was filed and certain evidence began to emerge during discovery regarding their true origin. *Id.* 176:12–177:9.

29. Julia Wilhite, whose deposition Watts also attended, corroborated these explanations:

- Plaintiff, Silanskas, and Wilhite had discussed keeping "a journal of all of this," and she was asked to print and store the messages. Exhibit 10, J. Wilhite Dep. 229:4–230:3.

- She compiled the messages herself because "I'm not super tech-savvy, but Larry is not at all." *Id.* 230:13–14.

- She printed the compilations and deleted the electronic copies: "I deleted them after I printed them. . . . there is no sense in me keeping an electronic file and a printed file." *Id.* 232:10–21; *see id.* 301:14–17.

- Wilhite "deletes everything" because "some tech person told him" his phone and computer would run better if he kept them cleared, "[s]o he since that time he deletes constantly." *Id.* 252:9–20.

- She saw a Today's Word text that Wilhite received from an unknown number. *Id.* 233:19–234:9.

- The sending numbers did not carry over when he forwarded the texts to her. *Id.* 233:19–234:5, 241:16–22.

- Wilhite tried to call the numbers. *Id.* 235:19–236:4.

- She told Wilhite to send the Sister Catherine emails to her mother's account because her own account was full. *Id.* 337:15–19.

30. Watts's report does not mention any of this testimony from the Wilhites except the McDuffey account explanation. The report rejects that explanation because "[n]either Wilhite nor Julia have produced any documentation that Julia's account was full at the time." Ex. 4, Watts Report at 40. But Watts never searched the production for that address, and he had not seen Julia's February 2024 message stating that her account was "99 percent full." Ex. 1, Watts Dep. 165:5–166:7.

31. Finally, Watts's report states that the Triune messages "position[ed] Silanskas and Wilhite as one-third owners" of the Project. Ex. 4, Watts Report at 55. However, Wilhite testified that Plaintiff spoke of giving shares to several people, including Silanskas, Gene McComb, Kristy Adams, and Jordi. *See* Ex. 2, L. Wilhite Dep. 141:10–142:17, 148:20–149:3. He testified that Plaintiff never said how large a share Wilhite would receive and that Wilhite never expected a third: "Gene owned it all." *Id.* 143:4–17. Silanskas likewise testified that Plaintiff never told him he would get a third, never committed to any ownership percentage, mentioned giving ownership percentages to other people, and wanted to give a lot to charity. Ex. 3, R. Silanskas Dep. 129:7–22. Kristy Adams, whom Watts interviewed and who he said "***sounded credible***," Ex. 1, Watts Dep. 186:25–187:4 (emphasis added), also testified that Plaintiff told her that Bicknell said he would give her a percentage of the Project as well, "like, 1 or 3 percent, something like that, and the rest would go to charity." Exhibit 11, Adams Dep. 82:19–83:7. And Plaintiff himself testified that he told Gene McComb and Kristy Adams that he would give them a percentage of the Project. Exhibit 12, O. Bicknell Dep. 57:7–18. Watts's report does not address any of this testimony. At his deposition, Watts could not identify any witness who said Plaintiff planned to give Silanskas or Wilhite a one-third share. Ex. 1, Watts Dep. 151:2–6.

**LEGAL STANDARD**

Rule 702 permits expert testimony only if the proponent shows that it is more likely than not that the expert's specialized knowledge will help the jury, that the testimony rests on sufficient facts or data, that it is the product of reliable principles and methods, and that the opinion reflects a reliable

application of those methods to the facts. Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). The 2023 amendment confirms that the sufficiency of an expert's basis and the application of his method are questions of admissibility for the Court, not merely weight for the jury. Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Expert testimony must be "not only relevant, but reliable," *Daubert*, 509 U.S. at 589, and must rest on more than "subjective belief or unsupported speculation," *id.* at 590. And "[t]he credibility of witnesses is generally not an appropriate subject for expert testimony." *United States v. Toledo*, 985 F.2d 1462, 1470 (10th Cir. 1993) (citing *United States v. Samara*, 643 F.2d 701, 705 (10th Cir. 1981), *cert denied*, 454 U.S. 829 (1981)).

## ARGUMENT AND AUTHORITIES

### I. Watts's opinions rest on his own judgments about whom to believe.

"A fundamental premise of our criminal trial system is that the *jury* is the lie detector." *United States v. Walker*, 85 F.4th 973, 985 (10th Cir. 2023) (quoting *United States v. Scheffer*, 523 U.S. 303, 313 (1998)). Expert testimony on credibility is therefore generally improper because it "(1) usurps a critical function of the jury, (2) is prejudicial and [can] unduly influence[ ] the jury, and (3) is not helpful to the jury, which can make its own determination of credibility." *Id.* (alteration in original) (internal quotations omitted) (quoting *Toledo*, 985 F.2d at 1470). The rule not only bars opinions vouching for credibility, but also, "appl[ies] with equal force in the context of opinion testimony that attacks credibility." *United States v. Hill*, 749 F.3d 1250, 1260–61 (10th Cir. 2014). It reaches out-of-court statements, *id.* at 1261, and opinions about "a class of persons that includes persons whose credibility is at issue in the trial." *United States v. Rodriguez-Flores*, 907 F.3d 1309, 1321 (10th Cir. 2018) (citing *United States v. Benally*, 541 F.3d 990, 993 (10th Cir. 2008)).

Numerous Tenth Circuit cases support exclusion of Watts. Chief among them is *United States v. Hill*. In *Hill*, the government's theory at trial was that Stanley Hill drove the getaway car for a bank robbery committed by two of his brothers. *Hill*, 749 F.3d at 1252. The case agent, an FBI special

agent, testified as an expert that his interrogation training taught him "special tactics and ways to identify [] deception in statements and truths in statements." *Id.* at 1251 (alteration in original). The expert investigator reviewed Hill's recorded interview and told the jury that Hill's account "does not connect the dots. That does not make sense. That is not something that I viewed as reasonable." *Id.* at 1262–63. The Tenth Circuit reversed Mr. Hill's conviction, even under plain-error review. *Id.* at 1258, 1263. It accepted that the agent "arguably had 'specialized knowledge'" about interrogations, but it held that his testimony still failed Rule 702 because he "simply informed the jury that Stanley's version of events was unworthy of belief based on his opinion of what is generally 'reasonable.'" *Id.* at 1263. The court also rejected the argument that the agent merely gave the jury tools to assess credibility, as jurors do not need an expert to tell them that a shifting story may not be true. *Id.* at 1262.

So too here. Like the agent in *Hill*, Watts investigated the case before becoming its expert. SOF ¶ 3. Like the agent, Watts relies on deception training that, in his words, gives him "insight into . . . looking for deceptive behavior," and he watched video for body language. SOF ¶¶ 7–8. Like the agent, he reviewed the defendant's out-of-court statements (interrogatory answers, deposition testimony, and Adams's account of Wilhite's statements) and rejected the innocent explanation because it did not fit his sense of what is reasonable. *See, e.g.,* SOF ¶¶ 4, 6–10, 21–22. Watts testified, in substance, that a believer would not delete messages from God because that would be "unusual." SOF ¶ 21. And he left out of his report Wilhite's explanation that he never noticed the missing forwarding indicators in Silanskas's e-mails "[b]ecause [he] didn't think Mr. Wilhite's statement was credible." SOF ¶ 10. Watts's opinions are thus what *Hill* forbids: an investigator telling the jury that a defendant's account is "unworthy of belief." 749 F.3d at 1263.

The Tenth Circuit's decision in *United States v. Adams*, 271 F.3d 1236 (10th Cir. 2001), further solidifies the point. There, a felon confessed to owning a gun, then testified at trial that he had lied to

protect his pregnant girlfriend. *Id.* at 1240–41, 1245. A psychologist concluded that the recantation was "consistent with his personality and cognitive state." *Id.* at 1246. The Tenth Circuit affirmed exclusion. *Id.* The report was "little more than a professionally-trained witness testifying that . . . 'Mr. Adams is the type of person who would have lied about his involvement to the police,'" and the girlfriend explanation was "precisely the type of explanation that a jury is capable of resolving without expert testimony." *Id.*

Here, Watts's opinions follow the same "consistent with" framing, only aimed at Wilhite rather than offered in Wilhite's defense. For instance, Watts states that Wilhite's statements are "consistent with a pattern of leveraging a position of trust," and his silence is "consistent with" that of a co-conspirator. SOF ¶¶ 5, 9. Wilhite's explanations are that he believed the messages, did not notice the forwarding headers, and regularly deleted texts from his phone. Like the girlfriend explanation in *Adams*, Wilhite's explanations are something a jury can evaluate on its own.

Watts's report makes clear that his opinion rests on a credibility judgment. The report itself recites the evidence that Wilhite believed: his testimony that the messages were guidance from God, his 2021 statement that "I do believe this is a God ordained thing," and his "unwavering belief in God's command." SOF ¶ 9. It then recasts the same statements as "leveraging a position of trust." *Id.* The facts are the same in both descriptions. The only thing that turns belief into manipulation is Watts's view that Wilhite is not telling the truth. That is the kind of credibility-based testimony the *Adams* court excluded.

Courts consistently exclude expert opinions that depend on the expert's view of whom to believe. *See Nimely v. City of New York*, 414 F.3d 381, 398–99 (2d Cir. 2005) (expert's testimony that he "rejected" the possibility that officers were lying was inadmissible, as was the theory he built on that belief, which was "the essence of unverifiable subjectivity"); *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999) (opinion "largely based on crediting [the witnesses'] account" was "essentially

vouching for their truthfulness"); *Rodriguez-Flores*, 907 F.3d at 1321 (admitting agent's experience-based opinion that couriers who deny knowledge are lying was "clearly error"); *Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 88158, at *5–6 (N.D. Ill. Jan. 11, 2012) (excluding retired police chief's opinions because they "rise and fall with his credibility determination").

And Watts's agreement on cross-examination that his opinions do not depend on credibility, SOF ¶ 12, does not change what the opinions require. Courts look to what an expert's reasoning actually depends on, not to how the expert characterizes it. *See Nimely*, 414 F.3d at 395, 398–99 (holding expert's testimony was an inadmissible credibility opinion, even though, in the same answer in which he concluded the officers were "telling the truth as they perceived it," he insisted that whether they were lying was something he "couldn't care less" about). Watts conceded his opinion "would be different" if Wilhite believed the messages, SOF ¶ 9, and in his next answer to Plaintiff's counsel, he said he believes Wilhite committed fraud, SOF ¶ 12. He cannot opine that Wilhite committed fraud without assessing Wilhite's credibility.

## II. Watts's method is not reliable and was not reliably applied.

### A. Watts does not explain how his experience supports any of his three opinions.

To be sure, police officers "can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters." *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009)). But experience does not exempt an opinion from scrutiny. *See id.* A witness "relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

*Medina-Copete* is instructive. There, a U.S. Marshal with 25 years in law enforcement, two books, and "thousands of hours" of study testified that a Santa Muerte prayer the defendant was reading

during a traffic stop was "a very good indicator of possible criminal activity." 757 F.3d at 1098-1100. The Tenth Circuit ultimately vacated the convictions because the officer "proffered no manner of distinguishing individuals who pray to Santa Muerte for illicit purposes from everyone else." *Id.* at 1102. His conclusions rested on cases he had compiled through law enforcement, and "[m]ere observation that a correlation exists—especially when the observer is a law enforcement officer likely to encounter a biased sample—does not meaningfully assist the jury in determining guilt or innocence." *Id.* The district court erred by "conflating [the officer's] 'experience' with the 'facts or data'" that Rule 702 requires. *Id.* at 1103. Because nothing explained how his compiled cases led to his conclusions, his opinion was "connected to existing data only by the *ipse dixit* of the expert." *Id.* at 1104 (quoting *Kumho Tire*, 526 U.S. at 157).

Watts uses his experience the same way the marshal did in *Medina-Copete*, by drawing correlations from prior investigations and applying them to the defendant. But the investigations on which Watts relies necessarily involved people already suspected of wrongdoing, and he offers no way to determine whether the same conduct occurs just as often for innocent reasons. He does not know his method's error rate and cannot say whether another investigator would reach the same conclusions. SOF ¶ 17. Each of his three opinions suffers from that problem.

Watts's elder-exploitation opinion has no defined framework. The four "characteristics" are Watts's own synthesis. He relied on no literature and applied no validated checklist. SOF ¶ 18. He agrees that all four can be present without exploitation. *Id.* He agrees that most twenty-year employees hold a position of trust. *Id.* And he did not apply the characteristics to each Defendant separately. *Id.* He cannot say how closely facts must match before they are "consistent with" the pattern. SOF ¶ 19. He named only two comparison cases and does not know the outcome of one. *Id.*

His co-conspirator opinion has the same problem. Watts says that participants in unlawful activity often share information without explanation because they already understand its significance

and avoid documenting their plans. Ex. 4, Watts Report at 61, 64–65. He points to Silanskas's repeated forwarding of Bicknell's replies without a cover message, Wilhite's failure to ask how Silanskas obtained those replies, telephone calls near some of the forwards, and opportunities for the two men to speak privately. *Id.* at 58–65. But none of that explains how Watts distinguishes coordinated wrongdoing from an innocent recipient who did not notice the forwarding information or understand why the messages were being sent. The report identifies no comparison cases, data, or other basis showing how often the same conduct occurs for innocent reasons. And when Watts was asked about Wilhite's explanation that he did not notice the forwarding indicators, Watts admitted that he omitted it "[b]ecause [he] didn't think Mr. Wilhite's statement was credible." SOF ¶ 10. Thus, without a reliable way to distinguish innocent silence from coordinated conduct, Watts's conclusion ultimately depends on whether he believes Wilhite's explanation.

The deletion opinion is even less supportable. Watts's claimed pattern is that individuals delete evidence "once they become aware that their conduct is under scrutiny." Ex. 4, Watts Report at 65–66. But he did not tie Wilhite's deletions to any such moment. *See id.* By the report's own account, Wilhite sent the Today's Word messages to his wife for compilation in 2022 and January 2023. *Id.* at 68. Wilhite testified that he deleted them after they were printed. SOF ¶ 28. Watts performed no forensic analysis himself, did not review the forensic expert's report, and confusingly testified that distinguishing deliberate deletion from routine deletion was not a question he was asked to answer, yet he concluded the deletions were in fact deliberate. SOF ¶ 21. He also concedes that "[i]ndividually, each deletion may have an innocent explanation." Ex. 4, Watts Report at 66. And while he calls Wilhite's deletions deliberate, he could say only that Plaintiff's identical deletions "would depend on the circumstances." SOF ¶ 21. If his pattern cannot tell him what Plaintiff's deletions mean, it cannot tell the jury what Wilhite's mean either.

Finally, Watts's experience cannot save his opinions. For instance, the marshal in *Medina-Copete* had spent "easily into the thousands of hours" studying his subject, visited shrines in three countries, published two books, produced a law-enforcement training video, and had been qualified as an expert before. 757 F.3d at 1098–99. Watts's elder-abuse training, on the other hand, is less than one percent of his total training, and he cannot recall its content. He has never led an elder-exploitation investigation that went to trial, and no court has ever qualified him as an expert. SOF ¶¶ 2, 24. If the marshal's extensive experience in *Medina-Copete* could not reliably distinguish suspicious conduct from innocent conduct, Watts's more limited experience cannot support his conclusions here. His opinions are connected to the record "only by the *ipse dixit* of the expert." *Id.* at 1104.

**B. Watts disregarded obvious alternative explanations.**

An expert's method is reliable only if he "has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 810 (10th Cir. 2016). The Tenth Circuit requires more than acknowledging those alternatives. An expert "must provide objective reasons for eliminating alternative causes," must "eliminate other possible sources as highly improbable," and must show "that the cause identified is highly probable." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237–38 (10th Cir. 2005). An expert need not rule out every conceivable cause, but he "must exclude those alternative explanations that are obvious or that have been identified by the adverse party." *Price v. State Farm Fire & Cas. Co.*, No. 24-cv-02798-PAB-MDB, 2026 WL 2715954, at *3 (D. Colo. Sept. 15, 2026) (quotation omitted).

*Taber* provides guidance. There, an ergonomics engineer opined that a ladder's defective geometry caused a worker's fall. 642 F. App'x at 804. Asked whether anything else caused the fall, he testified that he "wasn't asked to look at that" and "ha[d] not done that." *Id.* at 812. He agreed that worn boots, contaminated gloves, or a seizure could have caused it, but he could not rule them out. *Id.* The Tenth Circuit affirmed exclusion. *Id.* at 812. It held that "mere acknowledgment of other

possible causes cannot establish the reliability" of a causation opinion, and that the expert "could only speculate." *Id.* at 811–12; *see also Price*, 2026 WL 2715954, at *3 (excluding expert's causation opinions as unreliable because he "assume[d]" a single storm caused the damage and offered no objective reason to rule out later storms the opposing party had identified).

Watts did the same thing. He lists "[c]onsidering alternative explanations" as part of his method, SOF ¶ 6, yet he testified that addressing them, or explaining why he rejected them, was not important to him, SOF ¶ 20. When asked whether he had ruled out the explanations that would distinguish deliberate deletion from routine deletion, he said his "involvement" was "not to answer that question." SOF ¶ 21. Yet in the very next answer, he confirmed that his opinion is that the deletions were deliberate." *Id.* Watts's testimony mirrors that of the expert in *Taber*, who conceded he "wasn't asked to look at" whether anything else caused the fall but still attributed it to the ladder, and thus should be excluded. *Taber*, 642 F. App'x at 812.

And to be sure, the alternatives Watts ignored were not hypothetical. They were identified under oath, at depositions he attended, by the parties with personal knowledge. Wilhite testified that he called the numbers that sent the messages, that he deleted the texts after they were printed for an archive the three men had discussed, and that he regularly deleted messages on the advice of his IT department. SOF ¶ 28. His wife testified that she compiled and printed the messages and saw a message arrive from an unknown number. SOF ¶ 29. The author of the messages testified that Wilhite did not know who wrote them. SOF ¶ 26. Watts's own report concedes that "[i]ndividually, each deletion may have an innocent explanation." Ex. 4, Watts Report at 66. These are precisely the "obvious" alternatives, "identified by the adverse party," that an expert must objectively exclude. *Price*, 2026 WL 2715954, at *3. Watts excluded none of them.

Finally, Watts did more than fail to exclude one of these explanations—he said it had no support at all. His report states that Wilhite "has produced no evidence" that he received the Today's

Word messages from unknown numbers. Ex. 4, Watts Report at 33; SOF ¶ 22. The record says otherwise. Wilhite testified that the messages came from numbers he tried to call without answer. SOF ¶ 28. His wife saw one arrive on his phone from an unknown number. SOF ¶ 29. Silanskas admitted sending the messages from TextFree numbers that he changed almost every day. SOF ¶ 26. Watts's own report shows that the Pinger account tied to Silanskas "was assigned a new phone number almost daily" with "no pattern with regard to area code." Ex. 4, Watts Report at 29; SOF ¶ 22. And Kristy Adams even told Watts during his interview with her that Wilhite was receiving the messages "through random numbers" that she could not find when she tried to "look them up." SOF ¶ 15. Moreover, the message database on Wilhite's phone showed it had been in contact with 290 of the numbers in the Pinger account tied to Silanskas. SOF ¶ 22. An expert who overlooks the evidence supporting an alternative explanation has not "adequately accounted for" it. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

**C. Watts could not have excluded those alternatives without making the credibility determinations *Hill* forbids.**

Watts's failure was not merely an omission from his report. The alternatives concerned what Wilhite believed, what he noticed, and why he deleted messages, and they were supported by sworn testimony from Wilhite, Julia, and Silanskas. SOF ¶¶ 26–31. Watts identified no objective evidence that refuted those explanations or made them "highly improbable." *Bitler*, 400 F.3d at 1238; SOF ¶¶ 20–22. Without such evidence, rejecting the explanations required Watts to decide that the witnesses were not telling the truth.

And that is exactly what Watts did when pressed. When he was asked at his deposition why his report omitted Silanskas's testimony that Wilhite did not know who wrote the messages, he answered: "I don't have any verification." SOF ¶ 26. When asked why he omitted Wilhite's explanation for not noticing the forwarding indicators, he answered: "Because I didn't think Mr. Wilhite's statement was credible." SOF ¶ 10. And he conceded that if Wilhite believed the messages, "it would

be different." SOF ¶ 9. Rejecting an explanation because the witness is not credible is not an "objective reason[] for eliminating" it. *Bitler*, 400 F.3d at 1237. It is a credibility determination reserved for the jury. *Hill*, 749 F.3d at 1263.

Watts's opinions thus fail either way. If he did not weigh the Wilhites' explanations, his opinions fail Rule 702(d) because they do not account for obvious alternatives. *Taber*, 642 F. App'x at 811–12. If he did weigh them, he did so by deciding whom to believe, and his opinions fail Rule 702(a) under *Hill*, 749 F.3d at 1263.

## III. Watts Is Not Qualified to Offer These Opinions and Would Serve as a Summary Witness.

### A. Watts lacks qualifications in the subjects of his opinions.

"[B]ecause a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13 (citing *United States v. Roldan–Zapata*, 916 F.2d 795, 805 (2d Cir.1990)). Watts's experience is in general policing. Most of his own caseload was violent crime, he has never led an elder-exploitation investigation that went to trial, his elder-abuse training is less than one percent of his total and he cannot describe it, and no court has admitted him as an expert. SOF ¶¶ 2, 24. Nothing in that background qualifies him to read meaning into e-mail silence, to distinguish deliberate from routine deletion without forensic analysis, or to determine another person's state of mind. SOF ¶ 21.

### B. Watts is simply Plaintiff's investigator testifying as an expert.

In *United States v. Mejia*, the government called a gang task-force officer as an expert on MS-13. He testified about the gang's structure, but also about its specific crimes, including the number of murders it had committed on Long Island. 545 F.3d 179, 194–96 (2d Cir. 2008). The Second Circuit vacated the convictions. *Id.* at 183. It explained that an officer expert who "strays beyond the bounds of appropriately 'expert' matters" becomes "a chronicler of the recent past whose pronouncements

on elements of the charged offense serve as shortcuts to proving guilt." *Id.* at 190. Such an expert "transforms into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt." *Id.* at 190–91. Testimony is properly "expert" only if "it concerns matters that the average juror is not capable of understanding on his or her own." *Id.* at 194.

Watts fits that description. He was Plaintiff's investigator before he was Plaintiff's expert. SOF ¶ 3. His key interview was conducted by Plaintiff's counsel, and he deferred to counsel's knowledge of the case. SOF ¶ 13. His report spends forty pages narrating the parties' conduct before offering any opinion. SOF ¶ 4. It then supplies conclusions on the elements Plaintiff must prove: trust, vulnerability, agreement, and intent. SOF ¶ 5. That is the "chronicler of the recent past" the *Mejia* court describes and forbids. A jury can read e-mails and texts without a guide.

*United States v. Kamahele,* 748 F.3d 984 (10th Cir. 2014) does not change the analysis. There, the Tenth Circuit upheld a gang expert's testimony because "the average juror is often innocent of the ways of the criminal underworld." *Id.* at 998 (quoting *United States v. Garcia*, 635 F.3d 472, 477 (10th Cir. 2011)). In that case, the officer explained the structure, insignia, and practices of a closed criminal organization, drawing on information from "multiple sources" gathered over years that he "filtered and analyzed" through his expertise. *Id.* at 998–99. Watts offers nothing like that. He does not explain the inner workings of an organization jurors could not otherwise understand. He simply tells them what to make of conduct they see every day, i.e., an email forwarded without comment, a message left unanswered, or old texts deleted from a phone. Jurors do not need an expert to understand those things. And Watts's sources were not years of specialized study, but interviews with four witnesses aligned with Plaintiff and documents located through keyword searches of the production. SOF ¶ 4. *Kamahele* allows an officer to explain an underworld the jury does not know, but it does not allow him to tell the jury how to interpret ordinary conduct by the people on trial.

### C. Watts would pass hearsay to the jury and testify beyond his personal knowledge.

An expert "may not . . . simply transmit [ ] hearsay to the jury." *Mejia*, 545 F.3d at 197 (citing *United States v. Dukagjini,* 326 F.3d 45, 54 (2d Cir.2003)). In *Mejia*, the officer repeated what he had learned from interviews and reports without explaining how he analyzed it, which violated Rule 703. *Id.* at 197–98. Watts's report does the same with his interviews. Sixteen of its footnotes cite nothing but "Interview of K. Adams." SOF ¶ 16. Others rest on his unrecorded interview of Plaintiff and his interview of Kelly Holman. Ex. 4, Watts Report at 53 n.332, 65 n.401; SOF ¶ 4. Those footnotes are not analysis. They simply pass along what the witnesses told him, including Adams's account of Plaintiff's reaction, which the report offers as evidence against Wilhite. Ex. 4, Watts Report at 13 & n.61; Ex. 1, Watts Dep. 183:3–184:4. Watts also says that all of his opinions are "set forth on my own personal knowledge." SOF ¶ 4. But that is not so. His investigation began after this suit was filed, and he knows the events of this case only through documents he's reviewed and interviews he's conducted. SOF ¶ 3. Although Rule 703 may permit him to rely on those materials in forming an admissible opinion, it does not permit him simply to repeat them to the jury or present them as matters within his personal knowledge.

## IV. Rule 403 Independently Requires Exclusion.

Even relevant expert testimony may be excluded if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. That balance deserves particular care with experts, as "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," so a judge "exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. Watts's testimony has little probative value. The jury can read the messages, e-mails, and texts itself, and it can listen to the people who sent and received them along with those who were around the parties during the events at issue. Watts adds only his view of what that evidence means and whom to believe.

The risk of unfair prejudice, by contrast, is substantial. In *Nimely*, for instance, the Second Circuit held that an expert's credibility assessments should have been excluded under Rule 403 even if Rule 702 allowed them, because the expert gave the jury "a series of rationales" for believing one side where credibility "lay at the heart of this trial." 414 F.3d at 398. Credibility likewise lies at the heart of Plaintiff's case against Wilhite. A retired police chief telling jurors that Wilhite's conduct matches "elder exploitation," a crime under Oklahoma law, and the conduct of a "co-conspirator[]" carries weight that jurors cannot easily discount. SOF ¶¶ 5, 18; Ex. 1, Watts Dep. 75:1–7. That is the danger the *Hill* court identified with "impressively qualified experts." 749 F.3d at 1258. The report adds to the risk by repeatedly saying the messages "were used" to manipulate Plaintiff without saying who used them, which invites the jury to attribute Silanskas's conduct to Wilhite. SOF ¶ 9. Because Watts would add little the jury cannot assess on its own while creating a real risk of misleading it, Rule 403 independently requires exclusion.

## V. Alternative Relief

If the Court does not exclude Watts entirely, Wilhite asks that it bar Watts from (1) testifying about any witness's credibility, belief, knowledge, or intent; (2) describing Wilhite's conduct as "elder exploitation," "co-conspirator" conduct, "deliberate" deletion, or fraud; (3) narrating the record or his timeline as a summary witness; (4) relaying statements from his interviews; and (5) offering fact testimony beyond his personal knowledge.

## CONCLUSION

Watts's opinions depend on his own judgments about whom to believe, and he has not shown that his method can be tested, measured, or reliably replicated. The Court should exclude his testimony under Federal Rules of Evidence 702 and 403.

*/s/ Deric J. McClellan*
J. Christopher Davis, OBA #16639
Deric J. McClellan, OBA #32827
CROWE & DUNLEVY, P.C.
222 North Detroit Ave., Suite #600
Tulsa, OK 74120
(918) 592-9800
(918) 592-9801 (Facsimile)
chris.davis@crowedunlevy.com
deric.mcclellan@crowedunlevy.com

-and-

Evan G. Vincent, OBA #22325
Galen N. Thorp, OBA #36847
CROWE & DUNLEVY, P.C.
Braniff Building
324 North Robinson Ave., Suite #100
Oklahoma City, OK 73102-8273
(405) 235-7700 | (405) 239-6651 (Facsimile)
evan.vincent@crowedunlevy.com
galen.thorp@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT LARRY K. WILHITE**

CERTIFICATE OF SERVICE

☒ ☐ I hereby certify that on this 7th day of October, 2026, I electronically transmitted the attached document to the Court Clerk using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Ameilia A. Fogelman
Joseph W. Lang
Michael S. Nadel
Rachel M. Peltzer
Jennifer B. Routh
Theresa M. Babendreier
**Attorneys for Plaintiff**

Lysbeth L. George
**Attorney for Defendant Hedrick**

Rick Silanskas

*/s/ Deric J. McClellan*
Deric J. McClellan