IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

O. GENE BICKNELL,

Plaintiff,

-vs- Case No. 25-cv-383-SH

RICHARD M. SILANSKAS, JR.,
LARRY K. WILHITE and
STEPHEN D. HEDRICK,

Defendants.

VIDEO DEPOSITION OF JEFF WATTS

TAKEN ON BEHALF OF THE DEFENDANTS

ON AUGUST 12, 2026, AT 9:06 A.M.

IN TULSA, OKLAHOMA

EXHIBIT
1

REPORTED BY: Karen Dauphin Albert, CSR, RPR

Jeff Watts 8/12/2026 2

APPEARANCES

On behalf of the PLAINTIFF

Sagar K. Ravi
Rachel Peltzer
Michael Nadel (Via Zoom)
Theresa Babendreier (Via Zoom)
McDERMOTT WILL & SCHULTE
500 North Capitol Street, N.W.
Washington, D.C. 20001
205.756.8000
mnadel@mcdermottlaw.com
sravi@mcdermottlaw.com
rpeltzer@mcdermottlaw.com

On behalf of the DEFENDANT LARRY K. WILHITE

Deric J. McClellan
CROWE DUNLEVY
222 North Detroit Avenue, Suite 600
Tulsa, Oklahoma 74120
918.592.9800
chris.davis@crowedunlevy.com
deric.mcclellan@crowedunlevy.com

Galen N. Thorp
CROWE DUNLEVY
Braniff Building
324 North Robinson Avenue, Suite 100
Oklahoma City, Oklahoma 73102
galen.thorp@crowedunlevy.com

On behalf of the DEFENDANT STEPHEN K. HEDRICK

Jennifer Jackson
LAW OFFICE OF LIZ GEORGE
8101 South Walker, Suite F
Oklahoma City, Oklahoma 73139
405.689.5502
jennifer@georgelawok.com

Also present: Benedict Ovel, Videographer

A Good morning.
**Q Please state your name.**
A Jeff Watts.
**Q You are being offered as an expert witness in this case. Have you ever served as an expert witness before?**
A I have not.
**Q What is your relevant field of expertise?**
A Law enforcement, investigations, leadership, training, and private investigations.
**Q And which of those expertises are you using for purposes of this case?**
A All of them.
**Q Please state the opinions that you have formed and intend to offer as an expert witness at trial.**
A I will need to see my expert report, please.
**Q We'll get to the report in a minute. I would just like you to state your general understanding of the opinions you're offering as an expert in this case.**
MR. RAVI: Objection. I think the witness has requested his report.
MR. THORP: We'll get to it.

that I was retained as an expert.

**Q Did you serve in another role before being retained as a testifying expert?**

A Yes.

**Q What was that role?**

A As an investigator.

**Q When were you retained as an investigator?**

A January of this year, 2026.

**Q And at some point in the process, your role changed to being a testifying expert? Is that what you're explaining to me?**

A Yes.

**Q What were you asked to do that led to you forming the opinions contained in your expert report?**

MR. RAVI: Objection.

THE WITNESS: I was asked to investigate the American Heartland Project involving Mr. Bicknell, Mr. Silanskas, Mr. Wilhite, and Mr. Hedrick and to form an opinion on that investigation.

**Q (By Mr. Thorp) The lawsuit had already been filed at this point; right?**

A It had.

**Q So you knew the facts and narratives that**

A Well, I'm thinking how to best answer the question. I'm sorry for the delay.

**Q No problem.**

A But I don't want to be inaccurate. It was as I was coming to conclusions that the discussion of me providing my expert opinion began to emerge. I can't give you an exact timeline.

**Q Separate from being offered as an expert witness, are you also expecting to offer testimony as a fact witness in this case?**

A If called to do so, I will.

**Q Are you familiar with the distinction between a fact and expert witness?**

A To some extent, yes.

**Q What's your understanding of the distinction?**

MR. RAVI: Objection.

THE WITNESS: That an expert witness is testifying to their opinions based on their training and experience and background, where a fact witness is testifying to the facts that they uncovered during the investigation.

**Q (By Mr. Thorp) If I further explained that a fact witness is generally limited to their personal knowledge and observations, does that fit**

**in with your understanding?**

MR. RAVI: Objection.

THE WITNESS: I don't know how to answer that question. Sorry.

**Q (By Mr. Thorp) So as a fact witness, what do you personally know or observe that you can testify about in this case?**

A I would be able to testify to my investigation, my investigative findings, and any facts or relevant information related to the case that I had knowledge of.

It would be incredibly broad and impossible for me to explain here exactly what all I would testify to because I don't know what questions would be asked, and I don't know what information would be requested from me as far as what information that I have reviewed, investigated, or have knowledge of.

**Q You spoke of being retained as an investigator in January of 2026. Did you have any role in investigating the American Heartland Project on behalf of anyone else before that point?**

A Prior to January of 2026?

**Q Yes.**

A So I want to make sure I understand your

question. Are you asking if I was involved in investigating the --
**Q The American Heartland Project.**
A Prior to --
**Q For any entity before January of 2026.**
A Okay. Thank you. No, I was not.
**Q And you were retained by McDermott, Will & Schulte on behalf of the Plaintiff in this case; correct?**
A Correct.
(Exhibit 106 marked for identification)
**Q (By Mr. Thorp) I'll introduce an exhibit as Wilhite Exhibit 106. Do you recognize this document?**
A I do.
**Q Does this document list all of the documents that you reviewed to form your opinions stated in your report?**
A It does.
**Q Did you review any documents other than those listed here?**
A I don't recall if there were other documents that I reviewed related to this investigation. These are documents that I know I reviewed for sure.

**Q In preparing this, did you draw a distinction between documents you reviewed as an investigator and documents you reviewed for purposes of preparing the expert report?**

A I did not.

**Q Were you provided access to all of the documents produced in discovery in this case?**

A I don't know what all documents were produced in discovery. I know what documents I was provided access to or what databases, but not knowing what was produced in discovery, I think I would probably be inaccurate to say that I know they were all available to me. I don't know.

**Q Okay. So you had access to a database containing a volume of documents produced in discovery?**

A Two databases.

**Q Did you review every document in those databases?**

A No, I did not.

**Q How did you locate the documents within the databases you decided to consider?**

A In the OneDrive folder that I was provided initial access to, I focused on all of the documents that seemed to have the most relevance to the

investigation, the involved persons, and in relativity, I was -- with both databases I was giving -- I was given unrestricted access to all of the documents that were in those databases.

And so most of the time I would review the documents that I felt would provide the most information related to my investigation, and at other times I would look to see if there were documents that maybe a person that wasn't the center focus of my investigation, that there might be documents in those folders that would somehow provide additional information.

So sometimes I would just go off of my normal routine and look in different places for different information, but most of the time, I focused my research on the areas where I felt would be most fruitful for the investigation.

**Q Does that mean you were running keyword searches in the databases, looking for things that would be useful?**

MR. RAVI: Objection.

THE WITNESS: Correct.

**Q (By Mr. Thorp) As one of the ways that you reviewed them?**

A That's correct.

**Q Did you speak with anyone who provided you information that you used to form your opinions?**
A Are you asking in the context of legal at McDermott, or are you asking in the context of --
**Q So let me break it down first.**
A Please.
**Q Did Plaintiff's counsel provide you any assumptions to use in forming your opinions?**
MR. RAVI: Objection.
THE WITNESS: No.
**Q (By Mr. Thorp) Okay. Separate from counsel, did you speak to anyone who provided you information that you used to form your opinions?**
A Yes. I spoke with Mr. Bicknell and Kelly Holman and Kristy Adams.
**Q And I think your report also mentions that you spoke briefly with Cindy Morris?**
A Thank you. That is correct.
**Q Did any other person provide you information that you used to form your opinions?**
A I don't recall speaking to anyone else.
**Q Are there any authorities you relied on in forming your opinions?**
A What does that mean?
**Q Some external treatise, authority,**

**Q Did you learn anything from your conversation with Cindy Morris that you included in your report?**

MR. RAVI: Objection.

THE WITNESS: I would have to review my report to know for sure if I included anything in there. As you know, it's a lengthy report with a lot of information, but I can't recall exactly what I included in my report that might have been related to my conversation with Cindy Morris.

**Q (By Mr. Thorp) Did you take notes about your conversation with Cindy Morris?**

A No. I only noted her phone number and contact information.

**Q Did you take notes about your interview with Gene Bicknell?**

A No. I did not take notes at the time that I interviewed him.

**Q Was there a reason that you didn't record or take notes of the Gene Bicknell interview but you did with the other -- but the Kristi Adams and Kelly Holman interviews were recorded?**

A Yes.

MR. RAVI: Objection.

THE WITNESS: I'm sorry. Yes.

Mr. Bicknell confirmed what I learned from reviewing the depositions.

**Q (By Mr. Thorp) Each of the four people we've talked about is an individual aligned with or who works for Plaintiff; correct?**

A Correct.

**Q Did you seek to interview anyone else for purposes of your investigation?**

A No, I did not.

**Q Why not?**

A I -- the relevant involved folks were either being deposed, had been deposed, had counsel, which I would have felt as a -- I guess, working for McDermott would have been inappropriate for me to reach out to any of the Defendants or their, you know, involved family members. So I did not reach out to any of those folks.

**Q That limited your investigation; correct?**

MR. RAVI: Objection.

THE WITNESS: I wouldn't say it limited my investigation. It has been my experience in this investigation that counsel often obtains significantly more information during a deposition than I do when conducting an interview. I believe the depositions improved and enhanced my

deposition. I reviewed Mr. Silanskas' video deposition; I believe both of them. Mr. Hedrick, I don't remember if I viewed his deposition or if I just -- or if I read the transcript. Cindy Morris, I reviewed her video deposition.

I could have missed someone in there. Some of those I watched the video deposition, and then others I read the transcripts. It was based on what was available to me at the time. So I could be -- I could be missing some folks in there.

**Q Why did you review the video for some and just the transcript for others?**

A When video was available to me, I preferred to view the video because I was able to hear the deposed witness or Defendant or whatever or victim in their own words and able to observe body language and get a better understanding of the context of their answers.

**Q And what use did you make of that additional context?**

A I don't know that I specifically noted anything related to the video depositions that varied from the value that I received from the transcripts.

**Q And does that same conclusion apply to the**

**depositions you attended live?**

MR. RAVI: Objection.

THE WITNESS: I don't know. That's a question that I have not thought about. So there wasn't anything particular about being present that seemed significantly different than what I learned watching video depositions of other individuals or from reading transcripts.

**Q (By Mr. Thorp) Did you view part of your role in observing the Larry and Julia Wilhite depositions as assessing their credibility?**

MR. RAVI: Objection.

THE WITNESS: Yes.

**Q (By Mr. Thorp) In your meeting with Gene Bicknell and your review of Gene Bicknell's video depositions, did you view your role as assessing his credibility?**

MR. RAVI: Objection.

THE WITNESS: Yes.

**Q (By Mr. Thorp) What is your hourly rate for work in this case?**

A $100 an hour.

**Q How much have you been paid to date?**

A I don't know for sure. Somewhere around $20,000, maybe up to $25,000. I don't know for

**that you brought with you this morning.**

A Thank you.

**Q So let's talk about 107. Is this your expert report in this case?**

A Yes, sir.

**Q Okay. And now let's talk about 108. This is the document you brought with you this morning. Tell me what it is.**

A This is a document of my report corrections for my expert report.

**Q How did this document come to be created?**

A With the assistance of counsel, as I reviewed the report of Mr. Easter and then also conducted a review of my report and confirming that footnotes and other information was correct when I just found an error or some -- an issue that needed to be addressed, then I brought it to counsel's attention, and we drafted a report corrections document.

**Q Okay. If any of these corrections come up as we go along, I'm happy to talk about them.**

A Okay.

**Q But I don't think we need to deal with it right now.**

**If you would, turn to page 3 of your**

**report. The second full paragraph on page 3 says, "In reaching my opinions set forth herein, I employed the same methodology I used during more than 30 years of law enforcement investigations."**

**Does this paragraph describe the methodology you used to reach all of your opinions in this case?**

MR. RAVI: Objection.

THE WITNESS: So I understand the question correctly, are you asking did I use this methodology on each in particular opinion?

Okay. Yes.

**Q (By Mr. Thorp) Is there anything that this paragraph does not capture about the methodology you used to form your opinions in this case?**

A I don't know. It's possible there are other considerations from 33, 34 years' experience that I could have used subconsciously or just from experience or -- I can't say for sure.

**Q I'm just going to take a moment to go back. On page 5 you offer a summary of the opinions you're offering in this case.**

**Is that right?**

A Yes, sir.

**Q And there's three bullets here, and there are kind of three opinion sections in your report.**

**Is that correct?**

A Yes, sir.

**Q The first opinion concerns elder exploitation, which you've already described; right?**

MR. RAVI: Objection.

THE WITNESS: It contains that statement from earlier.

**Q (By Mr. Thorp) What is your second opinion that you're offering in this case?**

A "Based on my training and my experience in other cases involving co-conspirators engaged in coordinated conduct that I have investigated throughout my career, Silanskas' forwarding of Bicknell's responses to 'Sister Catherine' to Wilhite without any message, and Wilhite's lack of any response to these messages, is consistent with patterns of communication in such cases where co-conspirators who send and receive such messages without any additional content already understand why they are being sent and what they mean."

**Q So that's an opinion based on -- strike that.**

**And then your third opinion is stated in**

**the last bullet on this page; is that correct?**
A In my summary?
**Q Yes.**
A Yes.
**Q Okay. And that concerns that the behavior is more consistent with deliberate deletions than with ordinary technology turnover or routine deletions or incidental gaps in production?**
MR. RAVI: Objection.
THE WITNESS: "Based on my training and my experience in other cases I have investigated throughout my career, including those involving fraud, the pattern of missing, deleted, and selectively produced communications by the Defendants is more consistent with deliberate deletions than with ordinary technology turnover, routine deletions or incidental gaps in production."
**Q (By Mr. Thorp) Okay. So these are your three main opinions in the case; is that correct?**
A Correct.
**Q Are you offering any other opinions as an expert in this case?**
A Other than what's in my report, I'm offering no other opinions.
**Q Some of what's contained in your report is**

THE WITNESS: I believe the way it's laid out in the report is that I would include the statement or information provided and then provide the relevant information that opposed that.

**Q (By Mr. Thorp) Did you explain in your report how you resolved any tension between the statements and the objective record?**

MR. RAVI: Objection.

THE WITNESS: I don't -- I didn't resolve them. It was these, I think -- or the way it was laid out in my report is these are statements that were made, and this is evidence that was either provided or recovered and contradictory to that statement. So I don't know that it resolved it. It was just opposing.

**Q (By Mr. Thorp) So you left implicit in your report when you were disregarding or discrediting particular statements?**

MR. RAVI: Objection.

THE WITNESS: Could you explain what you mean by that?

**Q (By Mr. Thorp) So this methodology we're talking about here, it says, "Comparing statements made by targets and witnesses against objective records."**

A Yes.
**Q I hear you explaining that in your report you were trying to include both the statements and the objective record that might contradict it.**
**Is that correct?**
A Correct.
**Q But your report doesn't say, "I discredit this statement because it's contradicted by this piece of objective evidence."**
MR. RAVI: Objection.
**Q (By Mr. Thorp) Is that right?**
A Correct.
**Q Your report doesn't do that?**
A It doesn't. It shows -- the report reflects my findings based on my investigation, and if those findings were contradictory to what a statement was given, then it does explain that.
**Q Explicitly or implicitly?**
MR. RAVI: Objection.
THE WITNESS: Explicitly.
**Q (By Mr. Thorp) Your next aspect to your methodology is "Evaluating the chronology of a factual record and identifying what inferences can reasonably be drawn."**
**Is it important to include all relevant**

is the -- so phones.

**Q I mean, almost all of the documents in the case are electronic rather than paper. So is that all you mean?**

MR. RAVI: Objection.

THE WITNESS: No. What the source of the -- where the source came from. So if the source was an electronic media so that's where it came from, then, yes, but as in depositions and things of that nature, that's different.

**Q (By Mr. Thorp) Your next item is "Considering alternative explanations."**

**Why is it important to consider alternative explanations?**

A To ensure that I'm conducting a neutral investigation and looking at plausible reasons as to why things may have occurred that were not -- not unlawful or fraudulent, I should say.

**Q Did you pick one explanation as your working theory?**

A I want to make sure I understand that question. Did I pick an explanation in that --

**Q In your investigation, did you pick one explanation as your working theory and then compare alternatives to it?**

A Not --

MR. RAVI: Objection.

THE WITNESS: Not initially.

**Q (By Mr. Thorp) Really? Because they gave you a Complaint that set out their theory, and your report copies language and the theme of the Complaint almost verbatim. So it seems pretty clear that Plaintiff's theory was your working theory for the case.**

A No.

MR. RAVI: Objection.

**Q (By Mr. Thorp) Tell me why not.**

A The theory that is outlined in the claim -- or in the Complaint is a fraud, an allegation of fraud. My findings are elder abuse with -- perpetrated by fraud, but my findings are different in that they focus on the elder abuse portion, not on what is in the initial Complaint by McDermott.

**Q So going back to alternatives, was it important to you to address alternative explanations in your report?**

A No.

**Q Why not?**

A I focused on what the findings were

after reviewing all of the information and the alternatives and focused on what my findings were, not on all of the processes that went into place to formulate those findings.

**Q So it wasn't important to you to explain why you rejected alternative explanations in your report?**

MR. RAVI: Objection.

THE WITNESS: Correct.

**Q (By Mr. Thorp) Your last item here says, "In the context of elder exploitation and financial crime investigations, comparing observed conduct to patterns repeatedly encountered in training and in similar types of investigations."**

**Where do the patterns come from?**

MR. RAVI: Objection.

THE WITNESS: The patterns are explained in my opinions in the report.

Would you like for me --

**Q (By Mr. Thorp) Yeah. I think you -- we'll come to those in a minute. You have like four themes or patterns; right?**

A (Nods head)

**Q And I'm asking where those patterns come from.**

MR. RAVI: Objection.

THE WITNESS: From training and experience. I spent, as I said, over 32 years of law enforcement, investigated thousands of various types of crime, and during those investigations would commonly see patterns of certain conduct.

**Q (By Mr. Thorp) Looking at this methodology as a whole, are these actions or elements of your methodology ever in tension with each other?**

MR. RAVI: Objection.

THE WITNESS: I assume they could be.

**Q (By Mr. Thorp) What do you do if different tools point in different directions?**

A If -- I'm sorry. Can you, like, narrow that down a little bit for me so I can fully understand?

**Q Yeah. So we talked about, I think, seven aspects of your methodology in this paragraph; right?**

A Yes, sir.

**Q And you said that these methods could be in tension with each other.**

MR. RAVI: Objection.

**Q (By Mr. Thorp) So I'm asking what you do**

**if these different methods or tools point in different directions.**

MR. RAVI: Objection.

THE WITNESS: I follow both paths of whatever the contention is and resolve that or do my best to resolve which one is correct and which one is not.

**Q (By Mr. Thorp) For purposes of this report, most of that resolution work is implicit; right?**

**You don't say -- you don't say -- lay out in your report, "This fact points in this direction, but I'm going this other direction because this fact is stronger or more clear"?**

MR. RAVI: Objection.

THE WITNESS: My report does not state that.

**Q (By Mr. Thorp) So how does your performance of this method, these analytical steps, differ from that of an informed layperson?**

MR. RAVI: Objection.

THE WITNESS: When you interact with people and investigate crimes and conduct thousands of investigations and interview thousands of witnesses, victims, suspects, analyze, I mean,

**should be believed and who should not be believed?**

MR. RAVI: Objection.

THE WITNESS: No. I'm providing my opinions of consistent patterns and things that I have seen in my career of over 32 years of investigative experience that the layperson wouldn't have.

**Q (By Mr. Thorp) So the gist of the expertise that you bring to bear is pattern identification?**

MR. RAVI: Objection.

THE WITNESS: No. It's beyond that. It is experience in exploitation, experience in investigations as far as they relate to my opinions that are laid out in the report. So it's significantly more than that.

**Q (By Mr. Thorp) Would anyone with your experience reach the same conclusions as you reach in your report?**

MR. RAVI: Objection.

THE WITNESS: I don't know what they would reach. Each investigator has their own processes.

**Q (By Mr. Thorp) Do you view the methodology you use as consistent with the methodology used by other police officers?**

A It was a consistent methodology in my training and in my experience working with police officers and detectives and other investigative resources.

MR. RAVI: Galen, could we just take a quick bathroom break?

MR. THORP: Sure.

THE VIDEOGRAPHER: Off the record, 10:13.

(Break from 10:13 a.m. to 10:19 a.m.)

THE VIDEOGRAPHER: Back on the record, 10:19.

**Q (By Mr. Thorp) How would one determine whether your methodology was reliable?**

MR. RAVI: Objection.

THE WITNESS: You would conduct an investigation using the same methodology, and I guess you could use a different methodology and see if you reached similar conclusions, and as long as that methodology was a proven and sound methodology, you might be able to replicate it, but that methodology has served -- served me throughout 30-plus years in law enforcement and has always held up to be a sound methodology.

**Q (By Mr. Thorp) Does your methodology have an error rate?**

A I don't know.
**Q Do you have any sense of the frequency of false positives or false negatives --**
MR. RAVI: Objection.
**Q (By Mr. Thorp) -- of your conclusions using this methodology?**
THE WITNESS: No.
**Q (By Mr. Thorp) So how do you know that your methodology has always held up?**
MR. RAVI: Objection.
THE WITNESS: Because it has been widely accepted in the legal system in which I work.
**Q (By Mr. Thorp) So I'm a little puzzled because the methodology you're describing is the methodology of an investigator, but that's not a fact finder; right?**
**As a police officer, you gather evidence and present a case, but it's not the actual decision about what's true or false; correct?**
MR. RAVI: Objection.
THE WITNESS: Correct.
**Q (By Mr. Thorp) So a widely accepted investigative methodology of exploring factual questions seems different than drawing definitive conclusions about the facts?**

THE WITNESS: If it can be determined, then I would agree with that, but my methodology used here is used to formulate an opinion, not a finding.

**Q (By Mr. Thorp) To your knowledge, has your methodology been peer-reviewed in some academic publication?**

A I don't know.

**Q Are you aware of any person using your particular methodology who has been qualified as an expert by a court?**

MR. RAVI: Objection.

THE WITNESS: No.

**Q (By Mr. Thorp) You describe your methodology as widely accepted and widely used by police officers and investigators.**

**Is that right?**

A Yes.

**Q Is there a reason that those individuals are not routinely qualified as experts by courts in criminal cases?**

MR. RAVI: Objection.

THE WITNESS: From my experience, the methodology has never been an issue of qualification of expertise. It has always been the specific

subject matter. I don't recall a case where methodology required an expertise.

**Q (By Mr. Thorp) Okay. Let me rephrase the question a little differently.**

**One of your analyses is about the pattern of elder exploitation. Are you aware of any police officer being qualified as an expert witness by a court to describe the pattern of elder exploitation?**

MR. RAVI: Objection.

THE WITNESS: That's a good question. I don't know.

**Q (By Mr. Thorp) Are you aware of anyone not qualified as an expert on methodology but using this methodology and being qualified as an expert on the basis of the methodology that you're using?**

MR. RAVI: Objection.

THE WITNESS: Okay. I'm sorry. Say that question again.

**Q (By Mr. Thorp) Yeah. Let me break that down a little bit.**

**If the methodology that you're laying out is so widely accepted and widely used, one would expect that an investigator or a police officer who uses your similar experience and training would then, on your theory, be admitted to testify in**

**court with an expert opinion based on their long experience and observations.**

**Have you seen that happen?**

MR. RAVI: Objection.

THE WITNESS: Are they testifying to the methodology or to --

**Q (By Mr. Thorp) Testifying in the nature of opinion using these methods.**

A Law enforcement is constantly or regularly qualified as experts in various areas. I don't know if that includes their methodology, if that's the question.

**Q Have you ever been admitted as an expert in a case?**

A No, sir.

**Q You have testified in, I think you said, hundreds of cases, and that's essentially as a fact witness; right?**

A Yes.

**Q Why haven't you been an expert, based on your methodology?**

MR. RAVI: Objection.

THE WITNESS: No one in any of the cases that I have ever testified in have ever questioned the expertise of the methodology. It was the

investigation.

**Q (By Mr. Thorp) Did you offer opinion testimony in any of your criminal cases in which you testified?**

A No.

**Q And you're not aware of any person who has offered opinion testimony in court on the basis of this methodology?**

MR. RAVI: Objection.

THE WITNESS: No.

**Q (By Mr. Thorp) The back of your report has your CV attached. Let's go there. It's the back three pages.**

**You are currently a private investigator?**

A Yes, sir.

**Q Are you licensed as a private investigator in Oklahoma?**

A I am.

**Q In Missouri?**

A No, sir.

**Q Kansas?**

A No, sir.

**Q Did you conduct any of your investigation in this case in Missouri or Kansas?**

A No.

to six officers per day that I worked. I was responsible for responding to major calls in which they were assigned. I was responsible for ensuring their work product and oversight of any investigations that they conducted.

I was responsible for reviewing the reports for accuracy and content and investigative processes and responsible for their evaluations and ensuring their payroll was updated.

I had numerous, you know, numerous responsibilities in that role.

**Q We probably don't need to go in quite that level of detail, but thank you.**

A Okay.

**Q What year did you become a detective sergeant?**

A 2005.

**Q Okay. So in the 14 years from your entry into the Stillwater Police Department until you became a detective sergeant, were you ever the lead investigator for an elder abuse or exploitation case that was prosecuted?**

A That was a long time ago. I don't recall.

**Q Okay. During those 14 years, were you ever the lead investigator for a white collar crime**

**such as fraud, embezzlement, or financial schemes that were prosecuted?**

A It would be highly unlikely that I wasn't, but my ability to recall a specific case with specific details, I can't at this time.

**Q Okay. During those 14 years, did you ever receive training on identifying crimes against the elderly?**

A I would have to go back and review my training log to answer that, and it's extensive. So I can't recall particularly.

**Q Okay. What year did you become a lieutenant?**

A 2017.

**Q And you were a lieutenant for three years?**

A Yes.

**Q During those three years as lieutenant over the investigations division, were you ever the lead investigator for an elder abuse or exploitation case that was prosecuted?**

A No.

**Q During those three years, were you ever the lead investigator for a white collar crime such as fraud, embezzlement, or financial schemes that were prosecuted?**

A I don't -- I don't recall.
**Q During your time as a lieutenant, were you ever -- were you the lead investigator on anything?**
A Yes.
**Q Okay. Then police chief, does that mean you were police chief 2020 to 2025?**
A 2019 to 2025 -- or 2024. Sorry.
**Q The first item on your bio says "Private Investigator March 2025 to Present."**
**Is that a typo?**
A No.
**Q Should it be March 2024?**
A No. I retired in March of 2024, and it took several months to get my private investigator's license, to come up with a business plan, just -- typically, starting a new business when you don't have any experience was a little time consuming.
**Q During your time as chief of police, were you a lead investigator on anything?**
A Yes.
**Q Were you a lead investigator for an elder abuse or exploitation case during those five years?**
A No.
**Q Were you a lead investigator for a white collar crime such as fraud, embezzlement, or**

**financial schemes that were prosecuted?**

A No.

**Q Okay. Let's talk about your training and experience as it relates to elder abuse, exploitation, and white collar crime.**

**Is this CV the only version of your CV that you have produced in any case since retiring from the police department?**

MR. RAVI: Objection.

THE WITNESS: No.

**Q (By Mr. Thorp) How many different versions of your CV do you have?**

A Two, maybe three. I'm always updating it. So I can't say for sure.

**Q Do the other versions of your CV contain references to training and experience with regard to elder abuse and exploitation and white collar crime?**

A I believe so. I believe they're just modifications of that CV, but like I said, it has been a continual -- I continually update it. So I can't say what all -- what I'm changing and what I'm not.

**Q Okay. During your time as detective sergeant, you did list elder abuse and exploitation as -- and white collar crimes as investigations you**

**Q Do you know how many elder abuse and exploitation cases were investigated by the Stillwater Police Department during the ten years you oversaw the criminal investigations division?**
A No.
**Q Do you know how many -- do you have a sense of how many elder abuse and exploitation cases you conducted?**
A No.
**Q Five?**
A I don't know. It was -- as the supervisor and involved in everything, I don't -- yeah. I don't know. There were -- yeah. I can't give an answer on that.
**Q What's the maximum number it could have been?**
A I'm just guessing. I mean, it's not anything that I would feel comfortable saying, "This is factual," but maybe 20. I don't know.
**Q What about white collar crimes, fraud, forgery, embezzlement, financial schemes, like you posted here?**
A We worked literally thousands of those.
**Q And on this bullet point you said "Conducted and oversaw investigations."**

**detective sergeant, do you know how many times you were lead investigator on a case that met the elements for the Oklahoma statute for elder abuse and exploitation?**

MR. RAVI: Objection.

THE WITNESS: No, I don't.

**Q (By Mr. Thorp) Your estimate of an outer limit of elder abuse cases that you guys investigated was about 20?**

A Yes.

**Q Do you have a sense of how many of those you found abuse versus not?**

A I don't have a number.

**Q Did you recommend some of those investigations for prosecution?**

A There were a number of those cases that were sent to the prosecutor's office with arrest affidavits.

**Q Do you know whether any of those resulted in a guilty plea or verdict?**

A No, I don't.

**Q Do you know whether you or one of the six detectives under you ever testified in any of those cases?**

A Yes.

**Q Tell me more about that.**
A One of our detectives testified regularly in white collar crimes.
**Q I was speaking in particular to elder abuse and exploitation. Do you know whether anybody testified in one of those -- well, any of your detectives testified in one of those cases?**
A Yes. He would have.
**Q So if somebody testified, he would have been the one to do it?**
A No.
**Q Is that what you're saying?**
A Well, no, not always, but he would have been the most common.
**Q Are you specifically recalling that he did testify in an elder abuse or exploitation case?**
A I can't recall a specific case.
**Q But do you know whether there was a specific elder abuse case in which he testified?**
A I can't recall a specific case.
**Q So you've also written that you have 4000-plus hours of professional training. Does that include your time as a police cadet?**
A Yes.
**Q And it includes all of your continuing**

education over the course of your career?
A Yes.
Q So if we divide 4,000 hours by an eight-hour day, that's over 500 days of training or about 500 days of training?
A It's at least two years.
Q And you would agree that's a lot of training?
MR. RAVI: Objection.
THE WITNESS: Yes. That's a lot of training.
Q (By Mr. Thorp) And with over 500 days of training or two years of training, you highlighted four course titles for us; correct?
A Can you point to where we're talking so I make sure?
Q Yeah. Right here.
A Okay. Right here. Yes. Got you.
Q My question was of the 4,000 hours of professional training, you have highlighted four courses for us; correct?
A Correct.
Q And you selected these because you thought they were relevant to the opinions offered in this case?

A I thought they were relevant to my investigation in this case, yes.

**Q So let's talk about the "Taking Investigations into the Courtroom." Do you recall whether this course was online or in person?**

A It was in person.

**Q Where did you take it?**

A Stillwater Police Department.

**Q How many hours?**

A I don't know. I would have to look at the CLEET record on that. I know it was at least a full day, maybe two. I don't recall for sure.

**Q Did the course cover elder abuse and exploitation or white collar crime?**

A I don't think so.

**Q Did you have to take a test to demonstrate your proficiency at the end of the course?**

A No. I believe it was a mock-trial-type ending or you were interviewed as a -- examined as a witness for the state.

**Q Did you receive a certificate for completing the course?**

A I don't -- I don't recall.

**Q In 2013 you took a course titled "Deceptive Detection"?**

A Yes.
**Q Was that course online or in person?**
A In person.
**Q Where was it given?**
A I don't recall where I went for that one.
**Q Do you know how many hours it was?**
A It was at least a day.
**Q Do you know who taught it?**
A I don't.
**Q Did that course cover elder abuse and exploitation or white collar crime?**
A I don't recall.
**Q Did you have to take a test to demonstrate your proficiency afterwards?**
A I do not remember.
**Q Did you get a certificate for completing the course?**
A I don't know.
**Q Why is this course relevant to your investigation?**
MR. RAVI: Objection.
THE WITNESS: Because it gives me insight into observing interviews and looking for deceptive behavior.
**Q (By Mr. Thorp) Did you conclude that any**

**of the Defendants in this case displayed deceptive behavior?**

A Yes.

**Q Who?**

A Mr. Silanskas.

**Q Anyone else?**

A I didn't come to a conclusion on any of the other folks as far as whether I believed or whether I had -- I don't know. I didn't -- I wasn't focused on that, I guess.

**Q Next we have a 2016 course, "Vulnerable Adult Abuse."**

A Uh-huh.

**Q Is that correct?**

A Yes.

**Q In 2016, you were now the lieutenant over the investigations division; correct?**

A No. I was still a sergeant in 2016.

**Q Okay.**

A It was right in that transitional period, I believe.

**Q Was this course online or in person?**

A It was in person, I believe.

**Q Where did you take it?**

A I don't recall.

**Q How many hours?**
A I don't recall either how many hours it was.
**Q Is it possible it was just like a one-hour course?**
A I don't remember. I'm sorry.
**Q Do you recall anything about who taught it?**
A No.
**Q Can you describe anything you particularly learned from this course?**
A I'll have to think back to the course now. I can't remember. I believe it might have been taught by Adult Protective Services, but I'm not sure. Yeah. I can't tell you exactly what the curriculum was.
**Q So you don't know whether the curriculum contained the four themes that you have discussed in your report?**
A Correct.
**Q Did you take a test to demonstrate your proficiency afterward?**
A I don't know.
**Q Did you receive a certificate for completing the course?**

A I don't know whether we -- in all the courses, you sometimes got a certificate and sometimes you just -- you received a -- your CLEET number was sent to the Council on Law Enforcement Education & Training to have the -- you completed the course, and it was added to your record.

So sometimes you received a certificate; sometimes you didn't. And so I can't remember when -- which ones got certificates or not, but they were all sent to CLEET for addition to your training record because it didn't get sent if you didn't complete it.

**Q And CLEET is the Council on Law Enforcement Education & Training?**

A Yes.

**Q Which is an Oklahoma state entity?**

A Correct.

**Q Let's talk about the 2018 course you have listed here, "Financial Crimes Against the Elderly."**

**In 2018 you were a lieutenant; right?**

A Correct.

**Q Were you a lead investigator on cases at that point?**

A I did have some cases that I worked, yes.

**Q But you primarily were supervising other**

**people?**

A Yes.

**Q Was this course, the 2018 course here, in person or online?**

A I don't recall. I'd have to look at the training outlined.

**Q Do you know who taught it?**

A I don't.

**Q Do you know how long it was?**

A I do not recall.

**Q Do you recall anything about the curriculum taught during this course?**

A Just that it was focused to financial exploitation of elderly, but I don't remember the specifics of it.

**Q Did you have to take a test to demonstrate your proficiency?**

A I don't recall.

**Q And you would have received a certificate or confirmation to add it to your training record?**

A Correct.

**Q Do you have any other training or experience related to elder abuse that you did not include in your CV?**

A Yes. I had, you know, 4,000 hours of

training, and I can't recall what training had elements of elderly in it, but, you know, some of the training was on investigations and included a whole host of different types of crime.

I can't really narrow down to say that that's all the training that I had related to elder abuse, but I can also say that I know that this course or this course over here had an element of elder abuse to it.

**Q So you looked through your CLEET record and pulled out the examples that clearly referenced elder abuse.**

**Is that what you're telling me?**

A Yes.

**Q So you would agree that you have never been the lead investigator in a case of elder abuse and exploitation that went to trial; correct?**

A Yes -- well -- correct. Yes.

**Q And the training you've singled out for us has to be less than one percent of your total law enforcement training?**

MR. RAVI: Objection.

THE WITNESS: The training that I pointed out, yes.

**Q (By Mr. Thorp) Okay. Let's now go back**

to your opinions, and let's go to page 44.

Here on page 44, you summarize your first opinion as, "The Defendants' Conduct Toward Bicknell Was Consistent with the Typical Elements of Elder Exploitation."

Right?

A Yes.

Q And you write that, "Elder exploitation cases typically include many of the same characteristics."

It's in that first sentence.

A Yes.

Q And you list four elements: Abuse of trust, victim vulnerability, social isolation, and financial benefits.

Right?

A Correct.

Q Where did these four elements come from specifically?

A Some of the elements are from state law, and some of them are from experience and training that elder exploitation cases typically have -- include these same characteristics.

Q Is there any one location that includes the list of these four items?

MR. RAVI: Objection.
THE WITNESS: I don't recall if the government resources that are cited in my report, what all they have versus what state law has versus the other resources versus what APS teaches.
So I don't -- I don't know if they're all in one location that I -- I can't point to one location they're all at.
**Q (By Mr. Thorp) Got it. So these -- so this is your own synthesis of various sources?**
A These are the common characteristics that are seen in elder exploitation and abuse cases.
**Q According to whom?**
A According to training and experience.
**Q That's just -- training and experience just sounds like that's what you've synthesized from many sources.**
A Well, and --
**Q So is there --**
A And laws and publications.
**Q Are these all of the common characteristics?**
MR. RAVI: Objection.
THE WITNESS: These are the most common characteristics, but not all characteristics.

**Q (By Mr. Thorp) It looks to me like this warning sign section is intended for other people to observe and ask questions about whether someone might be subject to elder abuse.**

**Is that right?**

MR. RAVI: Objection.

THE WITNESS: I don't know what the reasoning is for that particular section.

**Q (By Mr. Thorp) So why did you single out the four terms that you have talked about from this page?**

MR. RAVI: Objection.

THE WITNESS: I didn't single them out from this page. I singled them out from an overview of all of the laws, training, and experience related to elder exploitation. Those are common themes.

**Q (By Mr. Thorp) When did you synthesize those four themes into a list?**

A I don't know when that would have been. That's --

**Q Ten years ago?**

A I can't say.

**Q Did you refer back to any particular training you had and get the list from there?**

MR. RAVI: Objection.

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com

THE WITNESS: No. I focused on what we commonly saw as the most common characteristics related to elder exploitation.

**Q (By Mr. Thorp) So these are just in your head as a synthesis of all of the -- your observation and the training you've attended?**

A Yeah. Training and experience.

**Q What other characteristics would you include?**

MR. RAVI: Objection.

THE WITNESS: In elder abuse and exploitation, usually there would be some type of physical or sexual abuse. If it was related to those types of characteristics, then some things might change.

The most common are either exploiting for financial gain or physical abuse, neglect, and sexual abuse. Those are the most common characteristics that we encountered or were trained on in any type of elder abuse and exploitation case.

There wasn't much outside of those common denominators.

**Q (By Mr. Thorp) And so what's the purpose of these four characteristics? If you have all four, then you're sure you've got an elder**

A Correct.
**Q And so you're not offering an opinion about whether the elements of the statute were met in this case?**
A I'm not offering an opinion in my report whether they were met.
**Q So I think we've covered this, but you're not relying on any peer-reviewed clinical or forensic literature for these characteristics?**
A Correct.
**Q And you didn't apply any validated instrument or checklist from elder abuse forensic literature in identifying these characteristics?**
A Correct.
MR. RAVI: Object.
THE WITNESS: Sorry.
**Q (By Mr. Thorp) Does the presence of these four characteristics guarantee that elder exploitation is occurring?**
MR. RAVI: Objection.
THE WITNESS: No.
**Q (By Mr. Thorp) Let me just give you an example. If an elderly woman with dementia -- or an elderly woman with dementia might already be vulnerable and isolated from much of her family. If**

**her daughter works to maintain her trust and receive some financial benefit, such as continuing to live in her house rent-free, does that mean elder exploitation is occurring?**

MR. RAVI: Objection.

THE WITNESS: That's a really different set of circumstances. In that case, I mean, I'm not -- I'm offering an opinion in this case.

**Q (By Mr. Thorp) Yes.**

A If you're asking me for an opinion in a completely separate type of case with different circumstances --

**Q I'm just trying to understand how your characteristics fit together, and so it's common to ask an expert witness hypotheticals based on their scenario. So I was just offering, trying to offer a particular example.**

A Right.

**Q You said you could have all of these elements met and not have elder exploitation; right?**

A It's possible.

**Q Okay.**

A I don't -- I can't -- I'm not giving you a, you know, like, "Hey, if this was the case, this would not be elder exploitation," but I can't say

scenario where you would explain it out, and I would go, "Okay. That makes sense."

But I can't -- I can't say that just if those are met that it's always 100 percent going to be elder exploitation. I don't know. I've only focused on this case.

**Q (By Mr. Thorp) In your methodology section back on page 3, you say you compared "observed conduct to patterns repeatedly encountered in training and in similar types of investigations."**

**That's the bottom of that paragraph.**

A It's the bottom? Thank you.

Okay. I'm here.

**Q Yeah. So I said, "Observed conduct to patterns repeatedly encountered in training and in similar types of investigations."**

**Can you name any one specific comparison case from your experience that you were comparing the scenario, this case, to?**

MR. RAVI: Objection.

THE WITNESS: Yes. But I cannot think of the name of the case, but it was a family member, trusted friend, who became a caretaker for a vulnerable adult, an elderly person, and she exploited -- she had complete control over him. The

family was not involved, and she used his money for -- beyond personal needs, like buying cars and other material things for herself that were not part of her taking care of this individual.

**Q (By Mr. Thorp) Do you recall when in your career you investigated that, that case was investigated?**

A It was when I was a sergeant, but I can't tell you a year.

**Q Okay. And you were the lead investigator on it?**

A No. I was the supervisor.

**Q Supervisor. Do you recall the outcome of that case?**

A I don't.

**Q So at the time you were a supervisor, the police department believed that she was improperly exploiting -- that she was exploiting the individual?**

A Well, my investigative team, yes.

**Q Yeah. But you don't know whether that was found to be so?**

A I don't know what -- I don't recall the outcome of the case.

**Q Do you recall any other specific instance**

**that you were comparing for a pattern?**

A Well, it's such a common pattern, I don't -- I don't recall like specific cases.

**Q Do you know how many exploitation schemes targeting elderly individuals you have personally investigated?**

A No. I mean, I had one recently, but that's the only one I can think of.

Going back, I've worked so many cases, I can't remember what -- how many or what I did.

**Q You referenced one recently. Was that in your role as a private investigator?**

A Yes.

**Q Is that recent case a comparison you were using as part of your analysis?**

A It had comparable --

MR. RAVI: Objection.

THE WITNESS: It had comparable components.

**Q (By Mr. Thorp) Did that inform your opinion in this case in any way?**

A Yes.

**Q Then, go ahead and describe that case.**

A It was an elderly female who had met an individual online, developed trust, a trusting

relationship with that individual. He exploited her for money.

She believed that he was a real person and that they were going to have a romantic relationship, and then after the financial exploitation, all of the -- he or an accomplice accessed her computer, wiped it, and -- according to her, and all of his contact information was not legitimate that she had for him. He was using fake phone numbers and social media.

**Q And how did that case compare to this one, in your mind?**

MR. RAVI: Objection.

THE WITNESS: You have the component of trust. She was vulnerable because she was an elderly, single woman, who was trusting in somebody else. She was exploited for money. And the digital evidence in the case was either deleted or based on an untraceable or somewhat untraceable platform that the communications came through.

**Q (By Mr. Thorp) Is it important to consider your four characteristics separately for each individual who could be engaged in exploitation?**

MR. RAVI: Objection.

THE WITNESS: I don't think I quite understand the question. I'm sorry.

**Q (By Mr. Thorp) Did you separately analyze whether Wilhite, Silanskas, or Hedrick met each element?**

MR. RAVI: Objection.

THE WITNESS: I don't know. I think it was a culmination of. I don't know that I specifically broke it down.

I mean, the components are all there for all four -- or all three, you know. So I don't know that I specifically -- I didn't single out each one and then go through a checklist, if that is what you're asking.

**Q (By Mr. Thorp) So it seems that your opinions operate on the conclusion that at least Wilhite and Silanskas were operating in coordination.**

**If a court or a fact finder found that there was actually -- they were not coordinating, in coordination, would that impact your conclusion that each of them had acted consistent with the typical elements of elder exploitation?**

MR. RAVI: Objection.

THE WITNESS: I'm not -- my opinion is

**motive?**

MR. RAVI: Objection.

THE WITNESS: I'm having a hard time following the question. Can you ask it differently?

**Q (By Mr. Thorp) Okay. Larry Wilhite had worked for Gene Bicknell for 20 years. It seems pretty likely that you would find that most any 20-year employee with a close working relationship is in a position of trust.**

**Is that fair?**

MR. RAVI: Objection.

THE WITNESS: In most cases, yeah.

**Q (By Mr. Thorp) Yeah. Is that enough to check this, the box for the trust characteristics?**

MR. RAVI: Objection.

THE WITNESS: In an exploitation or a fraud or an elder exploitation type case, trust is a component of that --

**Q (By Mr. Thorp) Yeah.**

A -- and a very prevalent component, but it has to be in concert with other components.

**Q So for your purposes, the mere fact that Larry was in a position of trust from his 20 years of working with Gene Bicknell is enough to meet that characteristic for Larry?**

related to how Mr. Bicknell interpreted the message, not how I interpreted it.

**Q (By Mr. Thorp) But do you recall any message that expressly threatened damnation, like, "You're not going to heaven unless you do this"?**

MR. RAVI: Objection.

THE WITNESS: Using those words, not those words.

**Q (By Mr. Thorp) Let's look at page 52. The last sentence before the next heading, "Based on my training and experience in similar cases, Wilhite's statements regarding the Today's Word messages as someone Bicknell trusted had the effect of reinforcing Bicknell's belief in the messages, which is consistent with a pattern of leveraging a position of trust to gain advantage of a victim's vulnerability that is typical of elder exploitation schemes."**

**Do you see that?**

A I do.

**Q So the first part of this says that Wilhite made statements regarding the Today's Word messages, and those statements had the effect of reinforcing Bicknell's belief in the messages; right?**

A Okay.
**Q Is that right?**
A Yes.
**Q But the second half seems to go farther. You say, "That's consistent with a pattern of leveraging a position of trust to gain advantage."**
**Did you consider the alternative that Wilhite made statements reinforcing Bicknell's belief in the messages because Wilhite, too, believed the messages?**
MR. RAVI: Objection.
THE WITNESS: Yes.
**Q (By Mr. Thorp) Did you discount that alternative possibility?**
MR. RAVI: Objection.
THE WITNESS: I -- yeah. I guess I did.
**Q (By Mr. Thorp) On what basis did you discount that possibility?**
A That it was the totality of every -- everything that went into the investigation, not just that particular statement in a box by itself.
**Q So sitting here today, you disbelieve -- you do not believe that Larry Wilhite believed the Today's Word messages?**
MR. RAVI: Objection.

THE WITNESS: I don't know what he believed.

**Q (By Mr. Thorp) But you discount the possibility that he believed the messages as not credible?**

MR. RAVI: Objection.

THE WITNESS: Correct.

**Q (By Mr. Thorp) The second half of this sentence here, "Consistent with a pattern of leveraging a position of trust," depends on Larry Wilhite not believing the Today's Word messages; right?**

MR. RAVI: Objection.

**Q (By Mr. Thorp) Because if he believed the messages, then reinforcing them, it just flows from his belief, not leveraging a position of trust to take advantage.**

**Right?**

MR. RAVI: Objection.

THE WITNESS: If that were the case, then it would be different, yes.

**Q (By Mr. Thorp) Does your report explain your consideration of the possibility that Larry Wilhite really believed the messages and explained the basis on which you rejected that alternative?**

MR. RAVI: Objection.
THE WITNESS: No.
**Q (By Mr. Thorp) If you look back on page 31 -- I'm going to jump around a little bit. Sorry -- you note that Larry Wilhite claimed to have received Today's Word messages from unknown numbers that changed frequently and appeared random.**
**Right?**
A Yes.
**Q But on page 33, at the top of the page, the second sentence, you say --**
A Top of page what -- I'm sorry?
**Q Yeah. Top of page 33.**
A Yeah.
**Q The end of the second line has a sentence that starts, "Wilhite therefore has produced no evidence of his receipt of the Today's Word messages from unknown numbers and he 'no longer has the original' that he received."**
**Isn't Wilhite's own detailed interrogatory response and testimony evidence that he received the messages from unknown numbers?**
MR. RAVI: Objection.
THE WITNESS: That's his statement, yes.
**Q (By Mr. Thorp) Is it evidence?**

A It would be --
MR. RAVI: Objection.
THE WITNESS: It would be considered.
**Q (By Mr. Thorp) So here you meant no documentary evidence?**
A Of the --
**Q That he received it from unknown numbers?**
A Correct.
**Q Have you reviewed Michael Easter's report and supplemental report?**
A I have.
**Q Does that change your opinion on this point?**
A No.
**Q Silanskas acknowledged using a Pinger account that was assigned over 300 phone numbers over a two-and-a-half-year period; correct?**
A Are you referring to a specific place?
**Q No. I'm asking for facts that I think are within your knowledge.**
**So you're aware from Silanskas' deposition that he acknowledged using the Pinger account associated with mountainfreshmusic@gmail.com; correct?**
A Yes.

**Q And you're aware from the Pinger deposition that that account had over 300 phone numbers assigned to it?**
A I don't remember the number, but --
**Q Okay. Pages and pages of numbers?**
A Okay.
**Q Right?**
A Yeah.
**Q Yet, in your report you ignored Silanskas' testimony that he sent Wilhite Today's Word messages using that Pinger account and that Wilhite did not know Silanskas was the author; correct?**
MR. RAVI: Objection.
THE WITNESS: Ask the question again. I'm sorry.
**Q (By Mr. Thorp) You ignored Silanskas' testimony in his deposition -- you didn't mention it anywhere in this report -- that Silanskas sent Wilhite Today's Word messages using the Pinger account?**
MR. RAVI: Objection.
THE WITNESS: There was no -- I don't have any verification that he received those messages from the Pinger numbers.
**Q (By Mr. Thorp) Okay. Do you dispute**

**Michael Easter's evidence that both Wilhite and Bicknell received contacts from Silanskas' Pinger account?**

MR. RAVI: Objection.

THE WITNESS: I don't know. I didn't analyze his report to see if there was validity to it.

**Q (By Mr. Thorp) So you don't particularly dispute it because you haven't factored it into your own analysis?**

MR. RAVI: Objection.

THE WITNESS: I haven't researched whether it's accurate or not.

**Q (By Mr. Thorp) Let's assume that what Easter says is accurate. Would that change your statement here?**

MR. RAVI: Objection.

THE WITNESS: I would have to see what -- what is accurate and make a determination. I would need to see the information.

**Q (By Mr. Thorp) Did you read the report?**

A I reviewed it, yes.

**Q Okay. So let me just -- the hypothetical I'm posing to you is, assuming Michael Easter's report is entirely accurate in what it states, would**

THE WITNESS: If I knew what their -- what their belief in this was, then it would -- then it would go toward making that assessment, but I don't know how they -- how they interpreted these messages and what it meant to them and what their belief of it was and...

**Q (By Mr. Thorp) Okay. You also seem to have discounted Larry and Julia Wilhite's explanation that they were compiling the Today's Word and Sister Catherine messages and printing them to paper.**

**Is that right?**

A Can you point me to that in my report, please?

**Q I don't remember exactly where it is.**

**Do you recall them explaining that they were compiling -- trying to compile the Sister Catherine and Today's Word messages on paper?**

MR. RAVI: Objection.

THE WITNESS: I remember that in the depositions.

**Q (By Mr. Thorp) And according to Julia Wilhite, it played a role in why she was using her mother-in-law's email account as a means of collecting the messages; right?**

**Did you view the deletion as evidence that he did not believe they were from God?**

MR. RAVI: Objection.

THE WITNESS: I viewed this as, if God is speaking to you, it seems unusual that you would delete that message.

**Q (By Mr. Thorp) Did you consider the fact that Gene Bicknell believed that God was speaking to him through these messages?**

MR. RAVI: Objection.

THE WITNESS: Yes.

**Q (By Mr. Thorp) And that he also deleted text messages?**

A Yes.

**Q In fact, you're aware that the September and October 2023 Today's Word messages that Gene Bicknell received by text messages were recovered from a deleted folder; right?**

MR. RAVI: Objection.

THE WITNESS: I don't recall that.

**Q (By Mr. Thorp) If Gene Bicknell was also deleting these messages, would that play any role in factoring the unusualness of it for Larry Wilhite?**

A It would depend --

MR. RAVI: Objection.

THE WITNESS: Sorry.
It would depend on the circumstances around him deleting them, whether it was an auto deletion or accidental or other explanation.
**Q (By Mr. Thorp) Larry Wilhite's explanation that you heard at his deposition and in his written discovery responses was that he didn't need them on his phone anymore because he had forwarded them along to his wife and they had printed them to paper, which they believed was a more reliable way to preserve this important record.**
**Did you give any credibility to that testimony?**
MR. RAVI: Objection.
THE WITNESS: As I stated earlier, I found it unusual that somebody would say they are receiving direct communication with God and then dispose of it, the original.
**Q (By Mr. Thorp) Did the Wilhites' efforts -- but you didn't find it unusual for Gene Bicknell to delete the same kinds of messages?**
MR. RAVI: Objection.
THE WITNESS: I don't recall the circumstances around his deletions.
**Q (By Mr. Thorp) You didn't investigate the**

**circumstances around his deletions?**

A I just don't recall them.

**Q In fact, Michael Easter has developed evidence that 70 phone numbers from Rick Silanskas' Pinger account contacted Gene Bicknell's phones. That's in his supplemental report.**

A Okay.

**Q And yet Plaintiffs have only produced text messages from 19 of those numbers. So there is, apparently, so much deletion, we don't even have copies of what was sent.**

**Did the Wilhites -- you don't dispute that the Wilhites compiled Today's Word and Sister Catherine messages on paper; right?**

MR. RAVI: Objection.

THE WITNESS: I don't dispute that they compiled them.

**Q (By Mr. Thorp) Okay. Would you agree that it took a lot of effort to compile them after they were -- after the fact, after they were transmitted and save them -- Julia saving them in her Notes app and Larry forwarding them to Julia? That took a lot of effort; right?**

MR. RAVI: Objection.

THE WITNESS: I believe it would take

effort.

**Q (By Mr. Thorp) In fact, most of the Today's Word messages that you have to review are in this case because Larry and Julia compiled and saved them?**

MR. RAVI: Objection.

**Q (By Mr. Thorp) Right?**

A I have the records because they were produced. I don't -- I mean, they were in those email accounts.

**Q And produced from paper from the Wilhites' house?**

A I don't recall the process of the production, but I know they came from their account.

**Q So do the compilation efforts undermine your conclusions, the conclusion that Larry Wilhite engaged in selective deletion?**

MR. RAVI: Objection.

THE WITNESS: No.

**Q (By Mr. Thorp) Why not?**

A Can you point me to that section in my report? Because I believe it's laid out there what we're talking about.

**Q I'll come back to that. It's under one of the other opinions.**

my involvement.

**Q (By Mr. Thorp) Has any witness stated an understanding that Gene Bicknell planned to give Silanskas or Wilhite one-third ownership of the completed project?**

A I don't recall a witness stating that.

**Q So we've talked through the four characteristics that support your first opinion; right?**

A Yes.

**Q Did you consider whether Larry Wilhite himself could meet the criteria for being a victim of elder exploitation?**

A I was not asked to investigate whether Larry was potentially a victim or not, but I didn't -- so I didn't take it into consideration to look at him as a victim.

**Q Okay. Well, Wilhite is over 62, which is the threshold for an elder under the Oklahoma statute; right?**

A Yes.

**Q Silanskas took steps to build Wilhite's trust, sending him emails throughout 2020, volunteering ideas that could assist The Mansion Theatre?**

A Okay.

**Q The meetings with Ron Logan that vouch for Silanskas could have been intended to build trust with both Wilhite and Bicknell.**

**Fair enough?**

MR. RAVI: Objection.

THE WITNESS: Okay.

**Q (By Mr. Thorp) On vulnerability, Silanskas claims that he sent the Today's Word text messages to Wilhite without Wilhite's knowledge; right? That's what he said at his deposition?**

A I think I recall that.

**Q Which could be understood to prey on Wilhite's deeply held religious beliefs like Gene Bicknell's religious beliefs; right?**

MR. RAVI: Objection.

THE WITNESS: If Wilhite believed those were direct words from God and he was following God's command, then I guess it could be.

**Q (By Mr. Thorp) Have you reviewed the Today's Word messages that had like three sections that said, "To the one assigned resources, to the one assigned administration, to the one with many other responsibilities"?**

**Do you remember seeing that pattern?**

**Q (By Mr. Thorp) His salary and the project he wanted to spend money on before the American Heartland Project came out of Big Time Production assets?**

MR. RAVI: Objection.

THE WITNESS: I don't know how to answer that. I'm sorry.

**Q (By Mr. Thorp) Okay. The fact of the matter is that you really, simply didn't consider that Larry Wilhite could have been a victim of elder abuse, of elder exploitation, alongside Gene Bicknell throughout this period?**

MR. RAVI: Objection.

THE WITNESS: Correct.

**Q (By Mr. Thorp) Let's turn to your second opinion on page -- it starts on page 57, I believe. This opinion really turns on communications about Sister Catherine messages; right?**

A Give me just a moment, please. It is the focus of the lower half of that page.

**Q I mean, the whole basis for your opinion about the pattern of communication is about communication about Sister Catherine messages; right?**

MR. RAVI: Objection.

**did not explain to Wilhite."**

**Do you see that in that paragraph?**

A I've got it.

**Q "Silanskas did not explain to Wilhite in writing how he obtained Bicknell's private replies to 'Sister Catherine,' and Wilhite never asked."**

**Do you see that?**

A I do.

**Q Did you consider alternative explanations for the fact that Wilhite didn't ask?**

**One alternative is Larry testified that he simply didn't notice the lack of email forwarding indications in Rick's messages.**

**Why didn't you mention that in your report?**

MR. RAVI: Objection.

THE WITNESS: Because I didn't think Mr. Wilhite's statement was credible.

**Q (By Mr. Thorp) So you assumed that an individual over 60 years old couldn't lack understanding of how email forwarding is commonly documented or simply not pay attention to such details?**

MR. RAVI: Objection.

THE WITNESS: It's not a matter of a

**Q (By Mr. Thorp) And his wife explained that she was using it because her inbox was full.**

MR. RAVI: Objection.

**Q (By Mr. Thorp) Right?**

A We don't have any evidence that her inbox was full.

**Q You did say in your report on page 40 that Julia did not produce any documentation that Julia's account was full at this time. So I give you that, but you're mistaken as -- I'll show you with the next exhibit.**

MR. THORP: February 3, 2024.

Okay. What exhibit are we up to?

Mr. McCLELLAN: 115.

(Exhibit 115 marked for identification)

**Q (By Mr. Thorp) Okay. Exhibit 115 is a document with Bates number LW_048571. This is a chat message between Julia Wilhite and Betty Winkle, Larry's mother, from February of 2024, in which Julia states that her Julia -- jwilhite2495@gmail.com, which was Julia's primary email account, "The only thing is it is 99 percent full and I sometimes don't get emails. I have reverted to mjmcduffey@gmail.com. It's mom's email that is still active."**

**Have you seen this document before?**
A I don't recall seeing this document.
**Q Did you run a search through the document production database for references to mjmcduffey@gmail.com to see if there was any support for Julia's position?**
A I did not.
**Q Have you reviewed all of the Sister Catherine emails?**
A I don't know.
**Q Are you aware that the first Sister Catherine email Larry Wilhite received came directly from Gene Bicknell?**
A I may have referenced that in my report on -- let's see. Do you know where at in my report? Can you point me to it?
**Q I don't believe you did.**
A Okay.
**Q But I'll show it to you.**
A Okay.
(Exhibit 116 marked for identification)
**Q (By Mr. Thorp) This is Exhibit 116.**
MS. PELTZER: Counsel, can you please provide us a copy?
MR. THORP: Yeah. They're coming. Sorry.

**Q Your Opinion 3 is about your observations that are consistent with patterns of deliberate evidence loss; correct?**

A It is related to that, yes.

**Q And let's go down to your observations about Mr. Wilhite. Starting on page 68, you begin by noting that the Wilhites compiled a bunch of Today's Word messages; right?**

A I do.

**Q And, in fact, they continued to collect and compile the Today's Word messages after they were sent; right? Julia had a Notes app full of them, and they were passed along by Larry to Julia by text message; correct?**

A Correct.

MR. RAVI: Objection.

**Q (By Mr. Thorp) Isn't that the opposite of a pattern of deletion but a pattern of preservation?**

MR. RAVI: Objection.

THE WITNESS: Not when -- no, it's not.

**Q (By Mr. Thorp) Why not?**

A Because you move the evidence from a primary device to a secondary location. That's not an uncommon trait in attempting to conceal evidence.

**Q Have you seen emails where Julia then**

device.

Q (By Mr. Thorp) Mr. Wilhite?

A I'm sorry. Wilhite.

**Q Mr. Wilhite offered you a primary reason that he deleted things from his phone; right?**

A He -- during his deposition, he did talk about it.

**Q And, in fact, his wife also confirmed that he routinely deletes things from his phone; right?**

MR. RAVI: Objection.

THE WITNESS: She did state that.

**Q (By Mr. Thorp) And, in fact, very few messages between Larry and Julia were still on Larry's phone; right?**

A I don't know what messages, but -- I don't recall what messages between them were still on the phone.

**Q Did you review Mr. Pochron's expert report?**

A I have not seen that.

**Q Okay. If Larry deleted most of his messages with his wife along with most of his messages with other people, would that support the explanation that Larry and Julia gave that it was just his practice to clear things off his phone**

**messages?**

MR. RAVI: Objection.

THE WITNESS: I guess he could be.

Q **(By Mr. Thorp) Did you personally perform a forensic analysis of Larry Wilhite's phone backups?**

A I did not.

Q **Did you examine all of the messages produced from Larry Wilhite's phone?**

A I'm not -- I can't answer that for sure. I viewed thousands of data. So I don't -- I can't say for sure.

Q **Have you ruled out the alternative explanations that would allow you to distinguish between deliberate and routine deletion?**

A My involvement in this was to come up -- was to view it and then, based on my investigation, was to put together a report with my opinions, not determine that, not to answer that question.

Q **So your conclusion in this is that the deletion is consistent with pattern of deliberate evidence loss; right?**

A Correct.

Q **Does your opinion offer how likely it is that it is deliberate rather than routine, like**

**deliberately selective rather than routine deletion?**

MR. RAVI: Objection.

THE WITNESS: Help me with that question.

**Q (By Mr. Thorp) Yeah. So I'm trying to make sure I understand the word "consistent." Consistent with, does that indicate how likely? Does it make it a 51 percent chance likely? 75 percent chance likely?**

**What does "consistent" mean there?**

A It means that it's consistent with patterns that I have observed in other investigations.

**Q And you're offering that so that a fact finder can conclude that, in fact, it was deliberate; right? It's intended to move the needle toward a finding that it was intentional?**

A I'm offering it as an expert opinion.

**Q But what does "consistent" mean? If you found there was only a 30 percent chance that -- if you could quantify it and you found there was a 30 percent chance that this matched the deliberate pattern, the pattern of deliberate deletion, would that be consistent with?**

MR. RAVI: Objection.

THE WITNESS: That's a hypothetical

question.

**Q (By Mr. Thorp) Yeah.**

A I'm not sure how to answer that.

**Q So do you have to have a degree of confidence to reach the conclusion that the patterns match?**

A If it's consistent with what I have seen in other investigations that during those investigations it showed a pattern of conduct between co-conspirators and that is consistent with what I have regularly seen, then it would be consistent with that.

**Q But how much does it have to match to be consistent? Because every circumstance varies to some degree; right?**

A That's the answer I would get, that every circumstance varies.

**Q So how do you know that you can put a stamp of "this is consistent" on it?**

A Because it was consistent. As I put in my report, it was consistent with patterns that I have seen in other investigations.

**Q But "consistent" just means there is enough overlap. It matches enough; right?**

MR. RAVI: Objection.

**Q (By Mr. Thorp) Is that what "consistent" means?**
A It means that it is consistent with what I have seen in other investigations involving --
**Q So you're using "consistent" to mean --**
MR. RAVI: Can you let the witness finish his answer, please?
Thank you.
THE WITNESS: I mean, I've conducted thousands of investigations. I've been involved in so much investigative work, and patterns of deletion, patterns of partial deletions -- I don't know -- that is something that we look for in any kind of digital evidence.
So if I see a pattern that is consistent with my training, experience, and background, then I look at that and say, "That is a pattern worth noting," and that's what I did in this report.
**Q (By Mr. Thorp) But the degree of overlap sounds like it's just you know it when you see it?**
A Well, it's consistent with your experience and training. No training I've ever attended said that you have to have 93 percent consistency for it to be reliable. It's a piece of the puzzle that you're putting into the four corners of the puzzle

to help give you a bigger picture of what's going on.

**Q Let's go to page 13 of your report. On page 13 you rely repeatedly on your interview with Kristy Adams; right?**

A I reference my interview with Kristy Adams several times.

**Q Oh, that's right. So the last sentence in the second paragraph from the bottom about information about Silanskas' involvement in prior failed theme parks.**

A The last sentence of the second paragraph?

**Q Yeah. So Wilhite does not appear.**

A Okay.

**Q Do you see that?**

A I do.

**Q "Wilhite does not appear to have shared this information with Bicknell. When Adams referenced Silanskas' past to Bicknell in approximately July of 2023, Bicknell looked surprised."**

A I see that.

**Q Kristy told you that in the interview?**

A Correct.

**Q How did that fact influence your opinions**

**in this case?**
A It was just one of hundreds, if not thousands, of pieces of information that I took into consideration when forming my report.
**Q But it's possible that Bicknell had been informed years earlier about these instances and had simply forgotten; correct?**
A I don't have any evidence of that.
**Q It's possible that Ron Logan talked about the failed projects?**
A I don't have any evidence of that.
**Q But the evidence you chose to highlight is a surprised look on someone's face in July of 2023.**
MR. RAVI: Objection.
**Q (By Mr. Thorp) Correct?**
A That is a piece of information that I did have.
**Q Did you review Marty Bicknell's depositions in this case?**
A I did.
**Q Did you notice how he talked about how he grew frustrated because his dad couldn't keep facts straight about the family trust and had to be repeatedly told the same things?**
MR. RAVI: Objection.

THE WITNESS: I don't recall.

Q (By Mr. Thorp) **Did you consider the possibility that Gene Bicknell just repeatedly forgot things that didn't matter that much to him?**

MR. RAVI: Objection.

THE WITNESS: I don't know what his memory status was at this point. So...

Q (By Mr. Thorp) **But you didn't factor that possibility in? You just considered this evidence against Larry Wilhite?**

A I noted what Ms. Adams stated during her interview.

Q **Ms. Adams' recorded interview also included her statement that Wilhite appeared to generally believe the Today's Word and Sister Catherine messages were real; correct?**

MR. RAVI: Objection.

THE WITNESS: I believe that's right.

Q (By Mr. Thorp) **Did you put that in your report?**

A No.

Q **Why not?**

A I don't know.

Q **She also stated that Wilhite lacked the technical skill to have compiled the Today's Word**

**messages into the organized document she found; correct?**

MR. RAVI: Objection.

THE WITNESS: I believe so.

**Q (By Mr. Thorp) And you didn't include that in your report?**

A What she said?

**Q Yeah.**

A About his technical capabilities?

**Q Yes.**

A Correct.

**Q But she observed him for years, and you didn't find that relevant to include in your report?**

A No.

**Q Why didn't you conduct the interview of Ms. Adams?**

A It was scheduled by counsel prior to -- I believe it was scheduled by counsel. I don't know. It was scheduled by counsel prior to my having contact with her.

**Q But it was an interview that you used for your investigation where the lawyers asked most of the questions?**

A Correct.

**Q In conducting that interview, were you**

**attempting to assess Kristy Adams' credibility?**
A I was.
**Q Did you find her credible?**
A She sounded credible.
**Q Page 42 of your report has a section titled "Wilhite DocuSigns as Bicknell," and this appears to be the primary section that you provided some factual corrections for your report.**
**Is that right?**
A That is correct.
**Q Wilhite didn't financially benefit from the items he DocuSigned for Bicknell, did he?**
MR. RAVI: Objection.
THE WITNESS: I don't know.
**Q (By Mr. Thorp) You have no reason to believe that he did benefit from the contracts he DocuSigned for Bicknell, do you?**
A I've seen no evidence that he obtained any funding or anything from them.
**Q Okay. And you begin this section by describing what you learned from interviewing Kristy Adams, and she told you that Gene himself signed some contracts in person; right?**
A Correct.
**Q She also said that she sometimes did ink**

**So is your new version merely to say that the authorization on December 11th couldn't have been for the November 6th signing? Is that what you mean?**

MR. RAVI: Objection.

THE WITNESS: This is related to the -- to the signing on December 11th.

**Q (By Mr. Thorp) Okay. So on December 11th, you still believe that Rick Silanskas' email came after Larry Wilhite DocuSigned a document on December 11th?**

A No. That I believe it is before.

**Q So you now believe, based on Mike Easter's explanation, that Rick Silanskas sent the authorization email before Larry Wilhite signed any documents that day?**

A On that date, yes.

**Q On that date?**

A (Nods head)

**Q Okay. But your corrected version says, "After Wilhite used DocuSign to sign Bicknell's name to at least one vendor contract, Silanskas emailed Wilhite a statement that purported to be Bicknell's authorization."**

**What is the "at least one vendor contract"**

**in that sentence, in that revised sentence?**

A I believe it's referring to this --

**Q November 6th?**

A Yeah.

**Q So you are not disputing Michael Easter's explanation that the timestamps require the conclusion that all the signatures on December 11th came after 2:58 p.m. Central Time?**

MR. RAVI: Objection.

THE WITNESS: My review of those records are that Mr. Silanskas sent that authorization before Mr. Wilhite signed those contracts on December 11th.

**Q (By Mr. Thorp) Okay. So how did you get it wrong?**

**So this is a fact that was asserted in the Complaint, and you put it in your report. So how did you get that fact wrong?**

MR. RAVI: Objection.

THE WITNESS: When documents come in, they are converted to Central Time, which is the time zone that all of this occurred in, and then you take in the coordinated Universal Time minus the time -- Daylight Savings Time, and I incorrectly had the times because I didn't convert all of it correctly.

**email came in?**

MR. RAVI: Objection.

THE WITNESS: That Rick sent the contracts --

**Q (By Mr. Thorp) No. That Larry sent the DocuSigns --**

A Oh, I'm sorry.

**Q -- forwarded all of the DocuSigns to Rick at 2:07 p.m. before the confirmation came back from Rick at 2:58 p.m.?**

A I don't know if I recall seeing that information.

**Q Is it possible, whether Rick was being truthful or not, that Larry had reason to believe that Gene was, in fact, authorizing him to sign the contracts --**

MR. RAVI: Objection.

**Q (By Mr. Thorp) -- on December 11th?**

A I can't answer that question.

**Q But your analysis relies on the idea that it's implausible that Larry actually thought that Gene was authorizing the signatures; right?**

A That was --

MR. RAVI: Objection.

THE WITNESS: That was Gene's words as

well.

**Q (By Mr. Thorp) So Gene in 2025 says, "I never authorized Larry to sign contracts"?**

A Correct.

MR. RAVI: Objection.

**Q (By Mr. Thorp) Did you consider that recollection of Gene's in 2025 to be in tension with what Kristy said about Gene authorizing Kristy during this period to sign things on his behalf?**

MR. RAVI: Objection.

THE WITNESS: But Kristy, if I recall correctly, never said that Mr. Silanskas -- or I mean, Mr. Wilhite was signing on Gene's behalf; that she always signed them.

**Q (By Mr. Thorp) So you believe she always signed the contracts on Gene's behalf?**

A No.

MR. RAVI: Objection.

THE WITNESS: What I believe is that she signed them when she was authorized to do so.

**Q (By Mr. Thorp) Do you have any working theory as to why Gene Bicknell would authorize Kristy to sign contracts in this period but not authorize the person he described as the CEO to sign contracts on his behalf?**

MR. RAVI: Objection.
THE WITNESS: That's a question for Mr. Bicknell.
**Q (By Mr. Thorp) But you didn't consider those factors to decrease your confidence in Mr. Bicknell's assertion that he never authorized Larry to sign contracts?**
MR. RAVI: Objection.
THE WITNESS: Mr. Bicknell stated that he never authorized it.
**Q (By Mr. Thorp) It seems that throughout your analysis, you took what Mr. Bicknell said as the baseline and discounted what other people said when compared to what Mr. Bicknell said.**
MR. RAVI: Objection.
**Q (By Mr. Thorp) Is that right?**
A No.
**Q Are there any instances where you concluded in your analysis that what Mr. Bicknell said was likely not true?**
MR. RAVI: Objection.
THE WITNESS: I don't recall.
**Q (By Mr. Thorp) Did you weigh the factor that Mr. Bicknell may have simply forgotten a lot of things that he once knew by the time he was deposed**

opinions in your report; is that correct?
A It is.
Q Now, if you were asked today to summarize or state your opinions about a reference to your report, is a full and accurate statement of your opinions set forth in your report, which is Wilhite Exhibit 107?
A It is.
Q Now, Mr. Wilhite's counsel asked some questions about whether you assessed credibility when you attended the depositions of Larry and Julia Wilhite.
Do you recall that?
A I do.
Q And he asked you questions about findings you may have made as to their credibility; correct?
A Yes.
Q Now, to be clear, the three opinions you are offering in your report do not rely on any finding that any Defendant is credible or not credible; correct?
MS. JACKSON: Object to form.
THE WITNESS: Correct.
Q (By Mr. Ravi) Do the three opinions in your report offer any conclusion as to whether any

Defendant is credible?

MS. JACKSON: Object to form.

THE WITNESS: No.

Q (By Mr. Ravi) Do the three opinions in your report depend on any assessments of credibility that you may have made?

MS. JACKSON: Object to the form.

THE WITNESS: No.

Q (By Mr. Ravi) Do the three opinions in your report rely on you making any finding as to a Defendant's intent or mental state to defraud?

MS. JACKSON: Object to the form.

THE WITNESS: No.

Q (By Mr. Ravi) Rather, in coming up with opinions in this case, you were comparing the facts of this case and providing an opinion about whether they are consistent with other cases that you have investigated in your training and experience?

MS. JACKSON: Object to the form.

Q (By Mr. Ravi) Is that correct?

A Correct.

Q Now, you were asked some questions about your involvement in certain types of cases including elder exploitation and fraud; correct?

A I was.

**Q And Mr. Wilhite's counsel focused on asking you questions about when you acted as a lead investigator?**

A Yes.

**Q Now, you were also involved in supervising cases involving elder exploitation; correct?**

A I was.

**Q And you were also involved in supervising cases involving fraud; correct?**

A I was.

**Q Approximately how many elder exploitation and fraud cases were you involved in supervising?**

A Elder exploitation, probably ten to 20; fraud cases, thousands.

**Q Now, Mr. Wilhite's counsel asked you some questions about whether you considered whether Larry Wilhite was a victim of the fraud in this case.**

**Do you remember that?**

A I do.

**Q I think that you answered no. Is that correct?**

A Correct.

**Q Now, you reviewed Mr. Wilhite's motion to dismiss in this case; correct?**

A I did.

**Q And in that motion, he stated that he was not involved in any wrongdoing; is that right?**

A He did.

**Q And so while you might not have considered Mr. Wilhite a victim, did you consider that he was not involved in the fraud alleged in this case?**

MR. THORP: Object to form.

THE WITNESS: I did.

**Q (By Mr. Ravi) And did you also consider the fact that he could also be engaged in innocent behavior?**

A Yes.

**Q And while it is not part of one of the opinions you were offering in this case at trial, did you come to a conclusion as to whether Mr. Wilhite engaged in fraud in this matter?**

A I did.

**Q And what is the conclusion?**

A I believe he did.

MR. RAVI: No further questions.

REDIRECT EXAMINATION

BY MR. THORP

**Q Mr. Watts, you just went along with your counsel's suggestion that the assessment of credibility of my client and other witnesses played**

CERTIFICATE

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Karen Dauphin Albert, Certified Shorthand Reporter within and for the State of Oklahoma, do hereby certify that the witness, JEFF WATTS, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 24th day of August, 2026.

Karen Dauphin Albert, CSR, RPR