IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

O. GENE BICKNELL, )
)
Plaintiff, )
)
v. ) No. 25-cv-00383-SH
)
RICHARD M. SILANSKAS JR., )
LARRY K. WILHITE, AND )
STEPHEN D. HEDRICK, )
)
Defendants. )

Video Deposition of Larry Wilhite

June 10, 2026

Reporter: Jude Arndt, CSR, CCR, RPR
CSR No. 084-004847
CCR No. 1450

EXHIBIT
2

Deposition of Larry Wilhite, taken pursuant to Notice of Taking Deposition, before Jude Arndt, a Certified Shorthand Reporter and Certified Court Reporter, at Crowe & Dunlevy, P.C., 222 North Detroit Avenue, Suite 600, Tulsa, Oklahoma, on June 10, 2026.

APPEARANCES OF COUNSEL

On Behalf of Plaintiff:
McDermott Will & Schulte LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
202-756-8000
By: SAGAR K. RAVI
RACHEL M. PELTZER
MICHAEL S. NADEL
THERESA M. BABENDREIER (via Zoom)
sravi@mcdermottlaw.com
rpeltzer@mcdermottlaw.com
mnadel@mcdermottlaw.com
tbabendreier@mcdermottlaw.com

On Behalf of Defendant Larry K. Wilhite:
Crowe & Dunlevy, P.C.
222 North Detroit Avenue, Suite 600
Tulsa, OK 74120
918-592-9800
By: DERIC J. MCCLELLAN
J. CHRISTOPHER DAVIS
deric.mcclellan@crowedunlevy.com
chris.davis@crowedunlevy.com

Crowe & Dunlevy, P.C.
324 North Robinson Avenue, Suite 100
Oklahoma City, OK 73102
405-235-7700
By: GALEN N. THORP
galen.thorp@crowedunlevy.com

APPEARANCES OF COUNSEL
(continued)

On Behalf of Defendant Stephen D. Hedrick:
Liz George & Associates
8101 South Walker, Suite F
Oklahoma City, OK 73139
405-689-5502
By: JENNIFER JACKSON

Also present: Jeff Watts
Mary Hill
Caroline Sherrard (via Zoom)
Nathan Arndt, videographer

Do you see that?
A. Yes.
Q. Are you familiar with that distinctive subject line that Rick Silanskas used in his e-mails?
A. Not really. I don't -- you know, I didn't pay much attention to it at all.
Q. You didn't pay much attention to the subject lines of e-mails that were sent to you?
A. No, I just usually looked at the name that was sent and read the e-mail.
Q. Do you know what a subject line, sir, of an e-mail is?
A. Yes.
Q. Okay. And you're saying you never looked at the subject lines of e-mails?
MR. MCCLELLAN: Object to form. You can answer, Larry.
A. Yes, I looked at them, but I didn't -- not at first. I usually looked at the name and read the e-mail.
BY MR. RAVI:
Q. But eventually when you're looking at an

has the forward and then it has "To Gene Bicknell/Larry Wilhite from Ron Logan, great meeting."

Do you see that?

A. Yes.

Q. And that's the same distinctive subject line that Rick Silanskas has used in his other e-mails with you?

MR. MCCLELLAN: Object to the form.

BY MR. RAVI:

Q. Correct?

A. Again, yes, I don't -- I didn't pay any attention to it.

Q. You didn't pay attention to the subject line of the e-mail?

MR. MCCLELLAN: Object to the form.

A. Again, I looked at who sent it and read the e-mail.

BY MR. RAVI:

Q. Rick Silanskas testified at his deposition --

Sir, were you at his deposition?

A. No.

A. Correct.
Q. So if you believe that he had the ability to fund it, then you believed that he had access to $2 billion.
Is that right?
A. I guess, yes.
Q. Did Gene Bicknell ever tell you how much money he had?
A. No.
Q. And you also understood that at some point, Gene Bicknell intended to give you an ownership stake in the project when it was completed.
Is that right?
MR. MCCLELLAN: Object to the form.
A. He said he would give shares to me, and he wanted to give them to Rick, to Gene McComb, Kristy, Jordi. He mentioned Jordi -- you know, that he wanted to give shares.
BY MR. RAVI:
Q. When did Gene Bicknell tell you that he wanted to give you a share?
A. I don't remember.

Q. Do you remember approximately when?
A. No.
Q. Was it the beginning of the project, the middle, the end?
A. If I was guessing, I would say the middle.
Q. And was that a conversation that took place in-person?
A. Yes.
Q. Describe with as much specificity as you can what Gene told you.
A. He just said he wanted to get it built and he wanted to reward -- give me a share, Kristy, Gene McComb, Rick, and Jordi.
Q. So did he say all of that in the same conversation, or in different conversations?
A. Just throughout the whole project, he would bring that up.
Q. So how many conversations did you have with him about who would get an ownership stake?
A. I don't recall.
Q. So let me ask you about your conversation about your ownership stake.

How many times did you speak with Gene Bicknell about that?

A. I don't -- I don't recall.

Q. What size of an ownership stake did you understand you were going to get?

A. I didn't. He never said.

Q. Did you believe it would be a third?

A. No.

Q. A third because you're part of the Triune?

MR. MCCLELLAN: Object to the form.

A. No.

BY MR. RAVI:

Q. You didn't believe that?

A. Gene owned it all, and I figured whatever he gave me, he told me in the past with other projects that he would give me a share of something, and I just trusted him for what he said he would do.

Q. Let's talk about where you said that Gene told you in the past with other projects he would give you a share.

When did those conversations take place?

A. Early on in other things that were going

A. Yes.
BY MR. RAVI:
Q. And that -- and describe what Gene said during that conversation.
A. The same thing. He said, "I want to get this up and running, I want to give you shares." I think, again, he repeated, "I want to give Kristy and others."
Q. So during that same conversation with you and Gene and Rick, Gene also mentioned giving ownership stakes to Kristy and others in the same conversation?
A. Yes.
Q. Did you have other conversations with Gene and Rick where he talked about giving you and Rick ownership stakes only?
MR. MCCLELLAN: Object to the form.
A. I don't recall any. He was usually general on everybody.
BY MR. RAVI:
Q. So it's your testimony, sir, that whenever Gene referenced giving an ownership stake, he mentioned all of the people we have discussed which includes you,

Gene McComb, Kristy, Jordi, and Rick Silanskas?
MR. MCCLELLAN: Object to the form.
A. Yes.
BY MR. RAVI:
Q. The answer is yes?
A. Yes.
Q. And were those other people present for the conversations?
A. No, I don't remember them.
Q. Let's talk about Gene McComb.
What ownership stake did you understand Gene Bicknell had promised to Gene McComb?
A. Just shares.
Q. Was Gene McComb present for that conversation?
A. No, not in Branson.
Q. Your testimony is that you heard Gene Bicknell specifically promise an ownership stake to Gene McComb, even though he wasn't even there at the conversation?
A. I don't know -- he didn't say promised, but he said, "I want to give everybody a share."

Correct?
A. Yes.
Q. And so is it possible that Gene Bicknell was funding the park because of those religious messages?
MR. MCCLELLAN: Object to the form.
MS. JACKSON: Object to form.
A. I guess it's possible.
BY MR. RAVI:
Q. You said you believed those religious messages. Right?
A. I do.
Q. And you still do. Right?
A. Yes.
Q. And Gene Bicknell believed those religious messages. Right?
A. Yes.
Q. So when Gene testified at his deposition that you were at and said it was only because of the Today's Word and Sister Catherine's message that he put money into the American Heartland project, you agree with that. Right?

MR. MCCLELLAN: Object to the form.
MS. JACKSON: Object to form.
A. I don't -- I can't agree that that's the only reason.
BY MR. RAVI:
Q. But you agree it was part of the reason that he put money into the park?
A. I could see that, yes.
Q. So let's talk about those religious messages.
Sir, what is the Today's Word?
A. It was a devotional-type message that came, a daily devotional.
Q. And what do you mean by daily devotional?
A. Inspirational messages.
Q. Who did you believe was sending these devotional messages?
A. I didn't know. I just -- I started getting them on a daily -- on Today's Word. I thought it -- I thought it might be an app or something, a ministry sending them out.
Q. When did you start receiving the Today's

Word?
A. I got some in 2020, I believe.
Q. And so you initially believed that you were put on some sort of list to receive these messages?
A. Yes.
Q. Then eventually did your belief change?
A. What do you mean by change?
Q. Well, did you eventually believe that the messages consisted of guidance from God?
A. Yes.
Q. Directly from God?
MR. MCCLELLAN: Object to the form.
A. Eventually, yes.
BY MR. RAVI:
Q. Sir, if you could turn to Page 14 of Exhibit 229. Oh, sorry. Put that aside.
Turn to Exhibit 216. 216, which is your answer in this case. I think it's the other document next to you.
A. Oh.
Q. If you could turn to Page 7.

And at the bottom of Page 48, you wrote, "Wilhite admits that he sent messages to plaintiff upon plaintiff's request. At the time he first started receiving the Today's Word text messages, he believed he had somehow been added to the distribution list for general Christian devotional messages, written by an unidentified person.

"Over time, as the Today's Word text messages became more specific, Wilhite believed that the messages were guidance from God, but had no opinion regarding how they were being drafted or who the author was. Wilhite denies that he had any knowledge regarding the creation of the messages." End quote.

So sir, is that an accurate statement of what you admit?

A. Yes.

Q. Okay. Now, when you said that the Today's Word text messages became more specific, what do you mean by that?

A. I interpreted it became more about what was going on in my life.

Q. And what was going on in your life that

you think it became more about?

A. Just the daily things that were happening, you know, with -- in the project.

Q. The American Heartland project?

A. Yes.

Q. So you came to believe that the Today's Word messages were referring to the American Heartland project. Correct?

A. Yes.

Q. And you understood that they were written to appear as if they were coming from God.

Is that right?

A. Yes.

Q. And so, sir, you're an ordained minister. Right?

A. Yes.

Q. And you -- did you believe that --

Well, did you believe that God was sending these messages?

A. I believed they were inspired. I don't know who was sending them.

Q. So you believed -- you knew a person was

sending the messages. Right?

MS. JACKSON: Object to form.

A. I didn't know.

BY MR. RAVI:

Q. Well, how were you receiving the messages?

A. They came in on text.

Q. Did you also get them in other ways?

A. Only text, that I remember.

Q. Okay. Did you believe that God communicated via text message?

A. I believe he could if he desired to.

Q. Have you experienced God sending text messages to you before?

MR. MCCLELLAN: Object to the form.

A. I received text messages from other ministries and things.

BY MR. RAVI:

Q. Those were being sent from people at ministries. Correct?

A. Yes.

Q. So who did you believe was sending the Today's Word to you?

MR. MCCLELLAN: Object to the form.
A. I didn't know.
BY MR. RAVI:
Q. You had -- you wrote in your answer that you had no opinion regarding how they were being drafted or who the author was. Right?
A. Uh-huh.
Q. So you believed you were receiving specific guidance from God and had no opinion as to how they were being drafted?
MR. MCCLELLAN: Object to the form.
BY MR. RAVI:
Q. That's your testimony?
A. As far as how they were being drafted, I don't know.
Q. You weren't at least even curious as to who was drafting them or how you were getting text messages from God?
A. I --
MR. MCCLELLAN: Object to the form.
A. The phone numbers -- I would try to call those phone numbers, and there was nothing, no answers.

BY MR. RAVI:
Q. When would you call the phone numbers?
A. Just when I first started getting them -- not when I first, but as they kept coming, I wondered where they were coming from. And I would call the number that was on there.
Q. So these would come from different phone numbers to your cell phone?
A. Yes.
Q. Were the phone numbers, did they -- did the same message ever come from the same phone number?
A. I don't remember ever -- there were so many different phone numbers.
Q. And how often did you try calling back the phone number that sent you the text message?
A. A couple of times, three times, maybe. I don't know.
Q. When approximately did you call the phone numbers that sent you the text messages?
A. I don't recall.
Q. Would you just try calling three times?
A. Again, I don't recall exactly how many. I

would try it periodically, but I don't know an exact number.

Q. What would happen when you called that phone number that sent you the Today's Word message via text?

A. Nothing. It was just -- there was nothing. There was no answer, nothing.

Q. Did it ring?

A. No, I -- hmm. Some of them may have rung. I don't remember all of -- I don't -- they would ring through, and then there was just no answer.

Q. It would just ring until you hung up?

A. No, it would ring, and then just quit.

Q. Was there a voicemail?

A. No.

Q. What were you planning on saying if there had been an answer?

A. I would ask --

MR. MCCLELLAN: Object to the form.

A. Ask who this is, and try to find out.

BY MR. RAVI:

Q. And you said that it may have rung.

Do you specifically recall the an -- the -- that there was ringing when you called?

A. Some of them rang, and some of them were just like nothing. I mean, there was just -- there was no answer of anything.

Q. And you're testifying that you only tried calling approximately three times?

A. I couldn't say exactly how many.

Q. What happened to the copies of the original messages that you believed you were getting from God?

A. What do you mean, happened to them?

We -- I printed them off.

Q. Okay.

A. My wife did.

Q. So you had copies, you received text messages to your phone that you believe were messages from God.

Is that correct?

A. Yes.

Q. What happened to the text messages on your phone that had the messages from God?

MR. MCCLELLAN: Object to the form.
A. I deleted them.
BY MR. RAVI:
Q. You -- you deleted messages that you believed were coming from God?
MR. MCCLELLAN: Object to the form.
A. Yes. I -- I sent them to my wife to print off so we would have them archived, a discussion that Gene and Rick and I had, and Gene even mentioned it would be great to compile them. So we did, and I figured once I had them printed off, I don't need them on my phone.
BY MR. RAVI:
Q. When did that happen?
A. When?
Q. When did you decide to delete the messages you believed came from God?
MR. MCCLELLAN: Object to the form.
A. I deleted my texts and e-mails all the time.
BY MR. RAVI:
Q. When do you decide whether to delete a

A. No, I just deleted them.

MR. RAVI: I'm about to start a segment that has to do with a bunch of text messages. It might make sense to take a break here.

MR. MCCLELLAN: You want to eat? Yeah, sounds good.

THE VIDEOGRAPHER: We are going off the record at 12:43 PM.

[A recess was taken.]

THE VIDEOGRAPHER: We are back on the record at 1:32 PM.

A. You had asked me if I believed that the word was from God, and I said yes, I believe it, and then you asked me again, and I don't know if I made myself clear.

I think you asked me if I still believed it, or something like -- sitting here today, I don't.

BY MR. RAVI:

Q. Okay. So your testimony is that -- let me ask you a different question.

When did you stop believing that the messages were from God?

A. After seeing some of the things in the case, pointed -- you know, that -- believed that things weren't coming from God.

Q. So that your belief changed after this lawsuit was filed?

A. Yes.

Q. It did not change before this lawsuit was filed?

A. No.

Q. Sir, before we broke for lunch, we talked about how, to your knowledge, it was you and Gene Bicknell that were receiving the Today's Word messages from God.

Is that right?

A. Yes.

Q. Okay. I want to show you what has been marked as Plaintiff Exhibit 230.

[Exhibit 230 marked for identification.]

BY MR. RAVI:

Q. Sir, the first page of this reflects conversations between a number belonging to you, is that 417-335-1460, is that your phone number?

A. I don't recall. I mean, I would have to --
BY MR. RAVI:
Q. You don't know whether you produced them?
A. If I got them, I did, but I don't -- don't remember.
Q. Well, you also mentioned that you did delete messages on your phone. Correct?
A. Yes.
Q. And did you delete messages with Gene Bicknell on your cell phone?
A. Yes, I deleted my cell phone.
Q. Sorry, say that again?
A. Yes, I deleted a lot of texts and things on my phone.
Q. Why did you delete text messages with Gene Bicknell?
A. Because that was -- I just deleted texts.
Q. Did you specifically delete text messages with Gene Bicknell?
MR. MCCLELLAN: Object to the form.
A. I would say guess yes. I mean, if I had

them, because I deleted to clean my phone up.
BY MR. RAVI:
Q. Showing you what's been marked as Plaintiff Exhibit 231.
[Exhibit 231 marked for identification.]
BY MR. RAVI:
Q. Sir, these are text messages that you gave us that were produced from your phone between yourself and Gene Bicknell.
Do these look familiar to you?
A. Without seeing the e-mail, I don't know.
Q. You mean without seeing the text message?
A. The text message.
Q. Okay. Well, if you go to the last page, Bates-stamped 6065, that's the first message of substance that is in Plaintiff Exhibit 231.
Do you see that?
A. Yes.
Q. And it's a message from you to Gene Bicknell on December 25th, 2024, where you state, "Wishing you a merry Christmas. Hope you're doing well."

Q. But before you had -- did have your laptop forensically imaged for this case?

A. Yes.

Q. And that forensic image included e-mails you had kept from your Mansion Theatre account?

MR. MCCLELLAN: Object to form.

A. I guess so. I haven't seen what came off of it.

BY MR. RAVI:

Q. You don't know whether or not you kept Mansion Theatre e-mails on your laptop?

MR. MCCLELLAN: Object to form.

A. I deleted them as I went through the course of time. Our IT department told me it was best to keep -- don't let everything fill up, so that's the reason I deleted e-mails and texts, so my -- so it would run good. I had an older laptop.

BY MR. RAVI:

Q. But the production -- well, the e-mails you provided from your Mansion Theatre account did not include any of the e-mails from Sister Catherine.

Do you know why?

Q. Showing you what has been marked as Exhibit 248.

[Exhibit 248 marked for identification.]

BY MR. RAVI:

Q. This is another Sister Catherine e-mail?

A. Uh-huh.

Q. And this is the same one we spoke about earlier, except you're forwarding it to the account of Mary Jean McDuffey. Is that right?

A. Yes.

Q. Who is Mary Jean McDuffey?

A. My mother-in-law.

Q. Why are you sending this e-mail to your mother-in-law's account?

A. Because that's an account that Julia had in taking care of her mother's business until she passed, and then she kept it.

Q. Why are you not sending this to -- well, when you sent this e-mail, was -- had Mary Jean McDuffey passed away?

A. Yes.

Q. So why are you sending this Sister

Catherine e-mail to an account in the name of your deceased mother-in-law?

MR. MCCLELLAN: Object to form.

A. Because Julia's e-mail was full. From what I understand, the Google -- I am not familiar with all of that, but she said it was full and wouldn't receive any more e-mails, so she said just start sending it to that e-mail address.

BY MR. RAVI:

Q. And your wife Julia had a number of e-mail accounts. Right?

MR. MCCLELLAN: Object to the form.

A. Yeah, I believe so.

BY MR. RAVI:

Q. So she had juliawilhite2459@gmail.com. Right?

A. Yes.

Q. She had juliawilhite79@gmail.com?

A. I believe so.

Q. She also used an account "omascoupons"?

A. Yes.

Q. Why didn't you send it to one of those

BY MR. RAVI:
Q. Showing you what has been marked as Plaintiff Exhibit 252.
[Exhibit 252 marked for identification.]
BY MR. RAVI:
Q. This is an e-mail where Rick Silanskas is forwarding you Gene's response to a Sister Catherine e-mail.
Do you see that?
A. Yes.
Q. Do you know how Rick Silanskas received a copy of Gene Bicknell's response to Sister Catherine?
A. I assume that Gene sent it to him.
Q. Why do you assume that?
A. Because Gene was sending them to us.
Q. Do you see in this Plaintiff Exhibit 252 Gene forwarding his response to Rick?
MR. MCCLELLAN: Object to the form.
A. No.
BY MR. RAVI:
Q. So here it looks like it's Rick sending you directly Gene's response to Sister Catherine. Is

responses to Rick. Is that right?
A. Yes.
Q. And so Gene then therefore knew that Rick had his responses to Sister Catherine. Is that right?
A. I believe so.
MR. MCCLELLAN: Object to form.
BY MR. RAVI:
Q. Did you ever discuss Gene's responses to Sister Catherine with Gene?
A. No.
Q. Did you ever forward the responses Rick sent you to Gene?
A. No.
Q. Why not?
A. I thought Gene sent them to Rick.
Q. Did you think Gene didn't want you to see his responses?
MR. MCCLELLAN: Object to the form.
A. I never thought that.
BY MR. RAVI:
Q. It's your testimony, sir, that you never discussed Gene's responses with him. Correct?

C E R T I F I C A T E

I, Jude Arndt, a Certified Shorthand Reporter and Certified Court Reporter, do hereby certify that LARRY WILHITE, prior to the commencement of the examination, was sworn by me on June 10, 2026, to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

________________________________

JUDE ARNDT, CSR, CCR, RPR
CSR NO. 084-004847
CCR NO. 1450