IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| O. GENE BICKNELL, | ) | |
| | ) | Case No. 25-cv-00383-SH |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD M. SILANSKAS JR., | ) | |
| LARRY K. WILHITE, and | ) | |
| STEPHEN D. HEDRICK, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION TO EXCLUDE THE OPINIONS OF ROGER HEARTSNER**

Amelia A. Fogleman
Joseph W. Lang
GABLEGOTWALS
110 N. Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120
(918) 595-4800

Michael S. Nadel
Sagar K. Ravi
Jennifer B. Routh
Rachel M. Peltzer
Theresa M. Babendreier
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

Attorneys for Plaintiff O. Gene Bicknell

## TABLE OF CONTENTS

Plaintiff's Motion To Exclude the Opinions of Roger Heartsner ..... 1

Background ..... 2

Standard ..... 6

Argument ..... 8

I. Heartsner is not qualified to offer his opinions. ..... 8

II. Heartsner's opinions are not reliable. ..... 10

A. Heartsner's Opinion 1 ..... 12

B. Heartsner's Opinion 2 ..... 12

C. Heartsner's Opinion 3 ..... 16

Conclusion ..... 17

**TABLE OF AUTHORITIES**

Cases

*Boone v. State Farm Fire & Cas. Co.*, No. 21-cv-00432-GKF-SH,
2023 WL 8470623 (N.D. Okla. Dec. 7, 2023) .......... 6

*Boulac v. SMG*, 736 F. Supp. 3d 1101 (N.D. Okla. 2024) .......... 11

*City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576 (10th Cir. 1998) .......... 8

*Claar v. Burlington N. R. Co.*, 29 F.3d 499 (9th Cir. 1994) .......... 11

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .......... 1, 2

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) .......... 11

*Dodge v. Cotter Corp.*, 328 F.3d 1212 (10th Cir. 2003) .......... 7, 8

*LifeWise Master Funding v. Telebank*, 374 F.3d 917 (10th Cir. 2004) .......... 8

*Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276 (10th Cir. 2018) .......... 7

*United States v. Nacchio*, 555 F.3d 1234 (10th Cir. 2009) .......... 7

*United States v. Pablo*, 696 F.3d 1280 (10th Cir. 2012) .......... 16

Rules

Fed. R. Civ. P. 26 .......... 17

Fed. R. Evid. 702 .......... 7

Fed. R. Evid. 702 advisory committee notes .......... 2, 7, 10, 11, 12

**PLAINTIFF'S MOTION TO EXCLUDE THE OPINIONS OF ROGER HEARTSNER**

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Plaintiff O. Gene Bicknell respectfully moves to exclude the opinions of Roger Heartsner, who has been designated as a purported expert by Defendant Stephen D. Hedrick.

Heartsner opines (1) that Hedrick had the right training, experience, and background for his role leading the design and development of the American Heartland Theme Park (the "Project"), (2) that Hedrick was capable of assembling a qualified team and delivered a good design, and (3) that Hedrick's compensation was in keeping with industry practice. But Heartsner is unqualified to offer expert testimony on any of those subjects. He is Hedrick's longtime close friend. More than a quarter of a century ago, he worked for Hedrick for three years, from 1998 to 2001. That is the extent of his purported qualifications. Heartsner worked for Disney for many years on live entertainment, not theme park design or development. Heartsner never played a role like the one Hedrick had on the Project. He has never hired someone for such a role. He has never designed a theme park or hired a theme park design firm. He has never assembled a team to do so or evaluated such a team. And he has no experience or skill evaluating compensation.

Beyond that, Heartsner's opinions are unreliable. His report is devoid of any meaningful analysis. At his deposition, he explained that he began his engagement with the conclusion that Hedrick had done nothing wrong and set out to prove it. He is not a neutral expert:

> Q. Mr. Heartsner, you said you didn't think Steve Hedrick did anything untoward, but you wanted to evaluate whether he did. Is that right?
>
> A. I wanted to prove the assumptions that I entered this—entered this effort with.

> Q. So you entered this effort with the assumption that Steve did not do anything untoward, correct?
>
> A. I did.
>
> Q. And then you wanted to prove that your assumption was correct. Is that right?
>
> A. Yes.
>
> Q. And you undertook your expert engagement with that goal in mind, correct?
>
> A. Yes. To do analysis to hopefully—yes, at the end of the day prove my assumption to be correct.

Ex. 2 at 318:21-319:17. And his analysis did not involve any objective methodology. Instead, he simply opined off the top of his head based on his personal impression of Hedrick formed at Disney 25 years ago, supplemented by what Hedrick told him.

In *Daubert*, the Supreme Court warned against being "overly pessimistic about the capabilities of the jury and of the adversary system generally." 509 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* And Bicknell recognizes that, after *Daubert*, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note (2000). But even in its most sparing application, the Court's gatekeeping function must bar the opinion testimony of Heartsner, which seeks to disguise essentially character-witness testimony by a non-expert friend as expert testimony. Hedrick asked Heartsner to "represent" him, and Heartsner did. But not within the strictures of Rule 702.

**BACKGROUND**

Bicknell's unjust enrichment claim against Hedrick arises from Hedrick's active and willing participation in the campaign to defraud Bicknell and coerce him into sinking more than

$60 million into the design and construction of the American Heartland Project. Rather than alerting Plaintiff to the fraud or even simply walking away from the scheme, Hedrick advanced the activities of the enterprise and reaped its benefits, taking at least $1.5 million of Bicknell's money for himself and his family members. Hedrick has money in his hands that, in equity and good conscience, he should not be allowed to retain. Bicknell brings a claim of unjust enrichment to hold Hedrick accountable and require disgorgement of his ill-gotten gains.

Hedrick, however, has litigated a different claim from the one Bicknell pled. He recently told the Court: "Whether [Hedrick] was unjustly enriched turns on the compensation he received and the value of his services—not on the religious-manipulation, impersonation, and fraud allegations that dominate the claims against Silanskas and Wilhite." (Dkt. No. 198 at 3.) And he asserts that "the proof on the unjust-enrichment claim against Mr. Hedrick is narrow—his role, his compensation, and the value of his services." (*Id.* at 5.) Consistent with that mistaken view of the claim against him, Hedrick engaged Roger Heartsner to provide expert testimony.

Heartsner's opinions, however, do not reliably address even that erroneously narrow framing. And Heartsner is not an independent expert. Heartsner is Hedrick's longtime close friend. Ex. 2 at 30:13-18. They became friends through Hedrick's wife in the mid-1990s. *Id.* at 21:2-22:15, 25:16-26:1, 29:16-30:1. Heartsner has known Hedrick's sons, whom Hedrick employed on the Project, since they were young. *Id.* at 211:7-19; 221:4-10. In 1998, Hedrick hired Heartsner to work for Disney, reporting to Hedrick. *Id.* at 24:14-25:15; Ex. 1 at 2. Until 2001, Heartsner worked for Hedrick. Ex. 2 at 27:3-6. Then Hedrick left Disney under circumstances Heartsner claims not to know or have inquired about because he "didn't want to pry, especially if it was unfavorable" to Hedrick. *Id.* at 27:5-28:22. Heartsner remained at Disney for another 24 years, focusing on live entertainment. Ex. 1 at 2; Ex. 2 at 68:18-69:5. When

Heartsner retired from Disney in 2025, Hedrick congratulated him on Facebook. Heartsner responded: "THANK YOU Steve. None of this was possible without you. Thanks for taking a chance. We did amazing things together!!" Ex. 3; Ex. 2 at 291:13-293:19.

Heartsner learned about the Project from Hedrick, when they discussed the possibility of Heartsner working on it. Ex. 2 at 12:10-21. Later, after the Project collapsed and this lawsuit was filed, Hedrick called Heartsner and asked if he "would be willing to represent him from a historical perspective, experience, background, skills, et cetera." *Id.* at 11:8-12:2. Heartsner agreed to be an expert for Hedrick because, as he testified: "I know Steve well, having worked for him, having both of us worked for the Walt Disney Company for a period of time. And I believe that he was executing the Project in earnest and wanted to help out if I could." *Id.* at 17:20-18:4.

Hedrick served Heartsner's expert report on July 23, 2026. Ex. 1. Heartsner summarizes his three opinions as follows:

1. Steve's Education, training, experience and background

    - Steve was trained, and is experienced, in theatrical and the entertainment arts; dance, acting, theater, music composition, writing, design assessment and direction including space planning, layout and design dependencies for a variety of scaled applications.
    - Steve possesses demonstrated skill and ability to manage and lead highly complex, large-scale projects specifically within the entertainment world as well as the specific niche community of themed environment(s) / theme park design and execution.
    - Steve possesses a resume of diverse work – with The Walt Disney Company / Parks & Resorts / Walt Disney Imagineering being the predominant focus of his career.

2. Specific work in coordinating and working on the American Heartland Project itself

    - Steve was the leader of the entire effort from visioning to leading design and development of the preliminary site formation to land improvements and literal form and function of the site and the park thereon. This is a massive

undertaking with great responsibility for which Steve is very qualified.

- Steve is highly capable of assembling expert multi-disciplinary teams as well as vendors and individual experts in order to support a design development effort of this magnitude for the development of a world-class theme park.
- The design of the park as seen in materials presented is well thought through and laid out creating a well-rounded, all-encompassing full day experience based on the overall design and the guiding thematic principals.

3. Steve's compensation on the American Heartland Project

- Steve's compensation as a 'day rated' consultant is customary and in keeping with current industry practice and is reflective of the role which he accepted; leader of the overall design and development effort.

Ex. 1 at 4.

Heartsner was deposed on September 9, 2026. Heartsner admitted that he did not approach his expert role as a neutral. His opinions were formed before he even started. Ex. 2 at 295:1-296:17. He entered his engagement with the assumption that Hedrick did not do anything untoward, he wanted to prove his assumption was right, and he undertook his expert engagement with that goal in mind. *Id.* at 319:5-17.

Heartsner spent approximately 20 hours working on the case, which includes preparation for his own deposition and watching the depositions of other experts. Ex. 2 at 15:12-16:13. Yes, his report lists 124 "Sources of Information." Ex. 1 at 5-14. That list was provided by counsel, and Heartsner could not verify that he even received all the material. Ex. 2 at 39:20-40:10. Some documents on the list he skimmed. Others he did not review at all. *Id.* at 36:9-17, 40:16-41:21; 310:20-311:3. Heartsner also testified that he considered material *not* identified in his report. *Id.* at 46:16-47:15. There is no way to know what he actually considered in forming his opinions, or what source purportedly supports which specific opinion, because his report cites no sources. Ex. 1 at 15-22.

Early in the deposition, Heartsner was asked: "Did any other person supply language for your report?" He testified unequivocally: "No. Counsel reviewed for format, but no language was provided." Ex. 2 at 33:17-20. Later, however, he admitted this testimony was false: The third paragraph on page 15 was provided to him by counsel, and he does not know from where the language was sourced. *Id.* at 160:1-163:16. In that paragraph of the report, Heartsner stated that Hedrick "work[ed] alongside some of the best minds in the industry." Ex. 1 at 15. Heartsner conceded that this language also was supplied by counsel. Heartsner did not know—and he did not ask—what "best minds" the report was referencing. Ex. 2 at 164:1-166:6.

When Heartsner's initial testimony was revealed to be false, the following exchange occurred:

> Q. And is there other language in your expert report that was similarly copied from email provided by counsel and pasted into your expert report?
>
> A. No.
>
> Q. This is the only paragraph, you're saying?
>
> A. Correct.

*Id.* at 163:17-22. Then, *that* testimony turned out to be false, too. In fact, Hedrick's counsel provided the *entire* description of Hedrick's training and experience, which comprises the core of the report's "analysis" on pages 15 and 16. Heartsner does not know where Hedrick's counsel obtained the purportedly biographical information. *Id.* at 164:16-169:10. But Heartsner adopted and incorporated it wholesale into his report as his opinion.

**STANDARD**

This Court summarized the *Daubert* standard in *Boone v. State Farm Fire & Casualty Co.*, No. 21-cv-432-GKF-SH, 2023 WL 8470623, at *2 (N.D. Okla. Dec. 7, 2023). The Court begins with Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 "imposes on a district court a gatekeeper obligation to 'ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 589). This requires the Court to first determine "whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion." *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (internal quotation marks and citation omitted). The Court must then determine "whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* at 1283 (quotation omitted). The Court must find the testimony is not only helpful to the trier of fact, but also that it meets the other three requirements in the rule—a sufficient basis of facts or data, reliable principles and methods, and a reliable application of those principles and methods to the facts. Fed. R. Evid. 702, advisory committee's note (2023) ("The amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000 ...."). The party offering the expert testimony bears the burden of showing its admissibility. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

## ARGUMENT

The purpose of a *Daubert* inquiry is "always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Dodge*, 328 F.3d at 1222-23 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Heartsner has applied *no* intellectual rigor. He has merely recited his preconceived opinions about Hedrick and parroted what Hedrick told him.

### I. HEARTSNER IS NOT QUALIFIED TO OFFER HIS OPINIONS.

To qualify as an expert, a proposed witness must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (internal quotation marks omitted). Heartsner asserts that he is qualified to be an expert "based on what I know of [Hedrick's] background and what I've seen him do in person." Ex. 2 at 69:17-22. That is insufficient, however. The fact that Heartsner worked at Disney for 27 years is also, alone, insufficient. Heartsner's opinions are specific to Hedrick's qualifications to lead the Project, the work Hedrick performed, and the compensation Hedrick received. Ex. 1 at 4. Heartsner lacks the skills, experience, and knowledge to opine on any of those areas. An expert who "possesses knowledge as to a general field" but "lacks specific knowledge does not necessarily assist the jury." *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998).

1. Heartsner is unqualified to assess whether Hedrick had the requisite training, education, and background for his role on the Project. Heartsner has never led something of the magnitude of the American Heartland Project. Ex. 2 at 178:15-17. He has never played the role

that Hedrick had with the Project. *Id.* at 71:2-74:9, 138:14-17. Moreover, Heartsner has never hired someone for the role Hedrick played or even been involved in making such a selection. *Id.* at 64:19-65:18. When asked about how he would weigh certain factors if he were hiring someone to lead the development of a $2 billion theme park from conception to opening, Heartsner testified: "I don't think I would be in that position." *Id.* at 89:1-21.

2. Likewise, Heartsner lacks the qualifications to assess whether Hedrick assembled the right team for the Project or performed his role well. In forming his "opinion," Heartsner relied on his "experience working on comparable projects" and his "knowledge of the standards, customs, and practices applicable to the design, development, and construction of theme parks." Ex. 1 at 1. But Heartsner has never designed or developed a theme park, or even a theme park ride. Ex. 2 at 71:2-8. He never assembled a team of firms to design or develop a theme park or supervised someone who did. *Id.* at 194:14-19, 290:16-21. Heartsner has never been involved in the master planning of a theme park, other than providing input from an entertainment facility perspective. *Id.* at 145:1-11. Heartsner has never been directly involved with the food and beverage side of developing a theme park, or the design or creation of a hotel itself, or a water park, or an RV park. *Id.* at 72:17-74:9. He has only been involved once in hiring an architectural firm, *i.e.*, when he served on a committee in 1997 and 1998 that selected a theater designer. Even then, he was not a decision maker. *Id.* at 65:21-68:6. Heartsner has never hired a design firm for a theme park or an engineering firm. *Id.* at 68:15-69:11.

Heartsner's degree is in music. *Id.* at 53:14-19. Throughout his whole career, Heartsner's focus has always been on live entertainment, not theme park development leadership. *Id.* at 68:18-69:5; Ex. 1 at 2-3. He has no pertinent professional licenses or certifications. Ex. 2 at 54:5-12. He is not an architect, an engineer, an accountant, a valuation analyst, a construction manager, a

land use planner, or an economist. *Id.* at 54:13-55:15. He is not certified in feasibility analysis, has never performed a feasibility analysis, and has never requested that anyone else perform one. *Id.* at 55:19-56:5. In short, nothing in Heartsner's own background and experience qualifies him to offer the expert opinions in his report.

3. Heartsner also has no qualifications to opine on Hedrick's compensation. Heartsner has never authored a compensation study or even read a pertinent compensation study. *Id.* at 58:15-59:11. Heartsner has never published or taught any method for determining reasonable compensation. *Id.* at 61:4-6. He has published no articles or books on any topic. *Id.* at 60:4-9. And although he worked at Disney, his knowledge of executive compensation at Disney "isn't extensive." *Id.* at 266:22-267:1.

Ultimately, Heartsner's friendship with Hedrick and his experience working under him for three years a quarter-century ago are insufficient to qualify Heartsner as an expert in the subject matter of his opinions.

## II. HEARTSNER'S OPINIONS ARE NOT RELIABLE.

The advisory committee's note states: "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note (2000). Standing alone, Heartsner's report fails to meet this standard. The report supplies conclusions, not principles or methods. The report contains no meaningful analysis. It explains neither how reliable principles or methods were applied to the facts nor how Heartsner's experience supports his conclusions. It is pure *ipse dixit*. It discloses no reliable methodology behind any of his opinions.

At his deposition, Heartsner admitted that he did essentially nothing beyond reciting his pre-existing opinions. Heartsner began with the assumption that Hedrick was working on the Project in earnest. Ex. 2 at 18:5-17. Before looking at any materials, Heartsner also assumed that Hedrick's background was appropriate for the Project. *Id.* at 52:13-53:3. Hedrick's counsel attempted to rehabilitate Heartsner by casting his assumption as a "hypothesis." *Id.* at 307:2-308:4. But a hypothesis requires a test that could validate or disprove it. Heartsner neither identified a reliable method for testing that hypothesis nor performed any such test.[1] He merely put his preconceptions to paper.

A "reliability finding is a prerequisite for all expert testimony in areas beyond the knowledge and experience of lay jurors, not just technical or scientific evidence." *Boulac v. SMG*, 736 F. Supp. 3d 1101, 1107 (N.D. Okla. 2024). Rule 702 "rejects the premise that an expert's testimony should be treated more permissively simply because it is outside the realm of science. An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist." Fed. R. Evid. 702 advisory committee's note (2000). As set forth below, each of Heartsner's opinions "is based on subjective belief or unsupported speculation" and is thus not based on sufficient experience, facts or data, nor reliably applied. *Boulac*, 736 F. Supp. 3d at 1108. Each must be excluded.

[1] *Cf. Claar v. Burlington N. R. Co.*, 29 F.3d 499, 503 (9th Cir. 1994) ("Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method."); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995) ("If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'").

**A. Heartsner's Opinion 1**—regarding Hedrick's education, training, background, and experience—is based on his general knowledge of Hedrick's background and their work together at Disney from 1998-2001. Ex. 2 at 75:3-77:9; *see also id.* at 77:16-20 (discussing first bullet of opinion 1), 80:13-81:12 (discussing second bullet of opinion 1). Heartsner did not even consider Hedrick's *curriculum vitae*. *Id.* at 102:21-103:7. Indeed, during his work as an expert, Heartsner learned nothing about Hedrick's experience that he didn't know before. *Id.* at 74:17-75:2. And he has only vague knowledge of Hedrick's career. *Id.* at 103:20-109:16, 167:3-6. Hedrick's counsel provided the whole description of Hedrick's career to Heartsner, who pasted it into his report with no knowledge of its source. *Id.* at 160:1-169:10.

Heartsner applied "no metrics" to determine whether Hedrick was qualified, or to compare his qualifications to others. *Id.* at 82:2-5, 82:22-83:4. Heartsner did not compare Hedrick's experience with a job description of a theme park executive role. *Id.* at 186:4-9. Nor did he consider the fact that Hedrick had not been employed—much less led any projects—in the theme park industry for two decades prior to the Project. *Id.* at 88:5-12; 187:14-188:10.

Heartsner's report fails to explain how his experience supports his conclusion, and his deposition testimony makes clear that there *is* no explanation. This Court cannot simply take his word for it. Fed. R. Evid. 702, advisory committee's note (2000) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.")).

**B. Heartsner's Opinion 2** is that Hedrick assembled a good team and they did a good job. To reach that conclusion, Heartsner performed no analysis. Heartsner's understanding of

Hedrick's role is based on a single breakfast conversation while the Project was ongoing and "some agendas where Steve was positioned as the … creative lead." Ex. 2 at 62:9-63:18, 64:13-18.

Heartsner opined that Hedrick fulfilled his "responsibility in a manner consistent with industry best practices." Ex. 1 at 17. But Heartsner could not define "industry best practices" or explain how he applied them. Ex. 2 at 226:8-228:5. Rather, Heartsner admitted that he merely reviewed some of the designs that were created for the Project, and based on those designs, he concluded that Hedrick was "very qualified" to lead the Project. *Id.* at 109:17-110:12, 118:5-9, 129:11-130:3. Notably, Heartsner did not even review the complete work product of The Hettema Group, which he understood to be the "primary creative source engine" for the Project, nor did he ask to do so. *Id.* at 198:7-9, 235:11-236:11.

Moreover, Heartsner did not apply any objective criteria. *Id.* at 110:13-112:4. He confirmed this:

> Q. … Now we're talking about your opinion that Steve Hedrick was very qualified for the role he had with the American Heartland Project.
>
> A. I think he is—was very qualified for that project.
>
> Q. Did you apply an objective standard in making that determination?
>
> A. An objective standard? No. Other than comparison of what I've seen him do versus what other people have done.

*Id.* at 124:21-125:8. Heartsner testified: "I'm not using a scale." *Id.* at 112:6-12. His approach is not peer-reviewed. *Id.* at 136:14-18. He undertook no study to determine the standard education of a theme park executive. *Id.* at 158:21-159:2.

Heartsner's methodology for determining whether Hedrick assembled the "right team" was no more legitimate. Heartsner looked at who Hedrick selected, and, based on Heartsner's knowledge of them, concluded whether they were capable of supporting the project. *Id.* at 192:13-

193:12 ("So if you go back to the aforementioned—it's the ledger . . . that all has names above companies and individuals. I know a lot of those. I know that Steve tapped most of those, if not all of them, especially the individuals. I recognize almost every name—not entirely, but close—as people that we've worked with in the past. So that's how I came up with that."). He didn't do anything else. *Id.* at 210:13-20. He did not use an objective measure to support his conclusion that Hedrick engaged "recognized leaders within the themed entertainment industry." *Id.* at 196:1-197:8.

Heartsner opined: "Nothing about the selection of consultants or subject matter experts reflected poor judgment, inexperience, or a lack of understanding of how to assemble a qualified project team. Based on my review, the consultant selections were reasonable and consistent with accepted industry practice for a project in its concept development phase." Ex. 1 at 16. But Heartsner does not know how Hedrick selected the consultants. Ex. 2 at 210:21-211:3. For example, Heartsner does not know how Hedrick hired the architect for the project. He does not know whether another firm was considered. He acknowledges that hiring an architectural firm, design firm, and construction firm without a bidding process would "usually" not be accepted industry process, but he does not know whether Hedrick ran a bidding process for any of those vendors. *Id.* at 202:2-206:5. Heartsner's use of "accepted industry practice" is subjective and utterly empty:

> Q. Well, you said that the consultant selections were consistent with accepted industry practice. What is the accepted industry practice?
>
> A. People who know what they're doing and people that are educated and practiced and experienced, and that's what I meant.
>
> …

> Q. How could the Court check your assertion of what the accepted industry practice for a project in its concept development phase is?
>
> A. Yeah, this is worded I think in a way that might be confusing. But the consultant section—selections were appropriate and were good choices. That would be what I'm saying is accepted industry practice, is you don't hire people that don't know how to do this for those projects. …
>
> Q. Is there any objective methodology to determine whether or not a consultant selection is appropriate?
>
> A. I'm just going to answer by saying success record and experience ….
>
> Q. And did you go through when you were preparing your report each of the consultants and perform some methodology based on their success record or experience to determine whether or not their selection was appropriate?
>
> A. It's based on my experience with them or knowledge of them.
>
> Q. So it was your methodology just to look at the list of names and compare it with your prior experience with or knowledge of those vendors?
>
> A. I reviewed the list, and it all seemed reasonable to me that those were good selections.
>
> Q. Is there anything else you did to determine that those were good selections?
>
> A. No.

*Id.* at 207:20-208:4, 209:5-210:20. This analysis cannot survive the most liberal scrutiny, particularly given that Heartsner himself has never assembled a team like the one Hedrick assembled.

Heartsner also sees "no issue with the selection of Aaron Hedrick," Hedrick's son, to serve in a project coordination role. Ex. 1 at 16-17. Heartsner didn't recall reading Aaron Hedrick's deposition, didn't list it among his sources of information, didn't speak with him, and doesn't

know what he did on the project. Ex. 2 at 212:5-213:1; Ex. 1 at 5. He doesn't know the process Hedrick used to hire his son. Ex. 2 at 216:17-19. He cannot articulate any methodology he employed to reach his conclusion. He only (1) knew Hedrick hired Aaron Hedrick, (2) knew generally what the "project coordinator" position was, (3) knew Aaron Hedrick, and (4) formed an opinion. *Id.* at 218:15-219:14 ("Q. What methodology did you employ when considering whether it was correct for Steve Hedrick to hire his son, Aaron Hedrick? . . . A. I can't—I can't answer that.").

Additionally, Heartsner opined that Hedrick provided progress updates throughout the course of the Project. Ex. 1 at 21. But Heartsner is merely parroting what Hedrick told him. He was "taking Steve at his word." Ex. 2 at 253:11-255:15. Likewise, Heartsner wrote about "an accelerated timeline as requested by the benefactor/originator, Mr. Bicknell." Ex. 1 at 21. Again, Heartsner is parroting Hedrick. Ex. 2 at 257:12-258:7. That is not admissible expert opinion, and Rule 703 does not permit an expert to act as a conduit for hearsay. *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012) ("If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court statement for its substantive truth; the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement.").

**C. Heartsner's Opinion 3**—that Hedrick's daily rate of compensation was reasonable—is not supported in his report by any analysis whatsoever. Beyond the summary of opinions, the only mention of Hedrick's compensation is in the conclusion of the report, which states: "Steve's compensation in a day rate manner was appropriate and within industry standards. Rates of $1,200 a day up to $2,000 a day are not excessive or outside the industry standard." Ex.

1 at 22. Heartsner provides no basis for his opinion, no methodology, no analysis, and no facts or data. All such information must be disclosed in an expert's report. Fed. R. Civ. P. 26(a)(2)(B).

As it turns out, Heartsner did not perform an analysis based on facts or data. Heartsner referenced "industry standard," but his opinion is based only on his own experience. Ex. 2 at 262:15-263:3. And even his experience does not support his opinion. Heartsner is unaware of any executive working on any theme park anywhere in the world being paid on a per-day rate. *Id.* at 263:18-264:19. In fact, Heartsner cannot identify any theme park anywhere in the world where the person who helmed it was a consultant rather than an employee. *Id.* at 273:4-8. Heartsner does not know what rate Hedrick was paid prior to his work on the Project. *Id.* at 271:22-272:17. Although not reflected in Heartsner's report, Heartsner claimed at his deposition that he compared Hedrick's aggregate compensation to "what senior executives are making at Disney." *Id.* at 266:2-12. But Heartsner didn't use any particular executive's compensation to make that comparison. He just used his "knowledge of salaries, which isn't extensive, but the bit of knowledge [he] did have about salaries of certain individuals." *Id.* at 266:16-267:3. Heartsner's opinion cannot be confirmed using data, and he did not use data. *Id.* at 267:4-21.

Additionally, Heartsner formed his opinion of Hedrick's compensation without knowing how many hours Hedrick worked. *Id.* at 274:10-19. Nor did he even know whether Hedrick had to work a particular number of hours to charge his daily rate. *Id.* at 275:19-22. Heartsner only reviewed "a few" of Hedrick's invoices. *Id.* at 276:3-7. Heartsner's cursory compensation opinion cannot survive the most relaxed *Daubert* scrutiny.

**CONCLUSION**

For the reasons stated above, Bicknell respectfully requests that the Court preclude Roger Heartsner from offering expert testimony. Heartsner is not qualified by knowledge, skill, training,

or education to render the opinions disclosed in his expert report. And Heartsner's opinions are not reliable because they lack a sufficient basis of facts or data, reliable principles and methods, and a reliable application of those principles and methods to the facts.

If the Court does not exclude the testimony on the present record, Bicknell respectfully requests a *Daubert* hearing before Heartsner testifies.

Respectfully submitted,

/s/ *Michael S. Nadel*

Amelia A. Fogleman
Joseph W. Lang
GABLEGOTWALS
110 N. Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120
(918) 595-4800

Michael S. Nadel
Sagar K. Ravi
Jennifer B. Routh
Rachel M. Peltzer
Theresa M. Babendreier
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

Attorneys for Plaintiff O. Gene Bicknell

**CERTIFICATE OF SERVICE**

I certify that on October 7, 2026, I caused a copy of the foregoing to be filed using the CM/ECF system, thereby providing notice to all counsel of record and pro se parties, including:

Counsel for Defendant Stephen D. Hedrick:

Lysbeth George, Esq.
Jennifer Jackson, Esq.
Liz George and Associates
8101 S. Walker, Suite F
Oklahoma City, Oklahoma 73139

Counsel for Defendant Larry K. Wilhite:

J. Christopher Davis, Esq.
Deric McClellan, Esq.
Crowe & Dunlevy, P.C.
222 N. Detroit Avenue, Suite 600
Tulsa, Oklahoma 74120

Evan G.E. Vincent, Esq.
Galen Thorp, Esq.
Crowe & Dunlevy, P.C.
Braniff Building
324 North Robinson Avenue, Suite 100
Oklahoma City, Oklahoma 73102

Defendant Richard M. Silanskas, Jr.:

Richard M. Silanskas, Jr.
1338 Peace in the Valley Road
Blue Eye, Missouri 65611

/s/ *Michael S. Nadel*
Michael S. Nadel