# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| O. GENE BICKNELL,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD M. SILANSKAS JR., LARRY K. WILHITE, AND STEPHEN D. HEDRICK,<br><br>Defendants. | Case No. 25-cv-00383-SH |

Video Deposition of Roger Heartsner

September 9, 2026

Reporter: Mark Arndt, CSR, CCR, CRR
CSR No. 084-004711
CCR No. 1398

Deposition of Roger Heartsner, taken pursuant to Notice of Taking Deposition, before Mark Arndt, a Certified Shorthand Reporter and Certified Court Reporter, at 499 West Sheridan Avenue, Suite 2200, Oklahoma City, Oklahoma, on September 9, 2026.

APPEARANCES OF COUNSEL

On Behalf of Plaintiff:
McDermott Will & Schulte LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000
By: Michael Nadel
mnadel@mcdermottlaw.com
Sagar Ravi (via videoconference)
sravi@mcdermottlaw.com
Rachel Peltzer
Theresa Babendreier (via videoconference)

On Behalf of Larry K. Wilhite:
Crowe & Dunlevy, P.C.
222 North Detroit Avenue, Suite 600
Tulsa, OK 74120
918-592-9833
By: Galen Thorp (via videoconference)
galen.thorp@crowedunlevy.com

On Behalf of Stephen D. Hedrick:
Liz George and Associates
8101 South Walker, Suite F
Oklahoma City, OK 73139
405-689-5502
By: Jennifer Jackson
jennifer@georgelawok.com

Also present:
Stephen Hedrick (via videoconference)
Peter Arndt, videographer

INDEX OF INTERROGATION

Examination by Mr. Nadel Page 6
Examination by Ms. Jackson Page 306
Examination by Mr. Nadel Page 318

INDEX OF EXHIBITS

Exhibit 350 Page 32
Heartsner expert report

Exhibit 351 Page 291
Facebook post

Exhibit 352 Page 292
Facebook comments

Exhibit 353 Page 294
Facebook comments

(All exhibits are attached.)

[9:02 a.m.]

THE VIDEOGRAPHER: We are now on the record. This is the videotaped deposition of Roger Heartsner in the matter of O. Gene Bicknell versus Richard M. Silanskas Junior, et al. This deposition is being held in Oklahoma City, Oklahoma, on September 9th, 2026, at 9:02 AM, Central Time.

My name is Peter Arndt. I'm the videographer.

The court reporter is Mark Arndt.

Will all counsel please introduce yourselves?

And the witness will be sworn.

MR. NADEL: Mike Nadel for plaintiff. With me is Rachel Peltzer and on Zoom Theresa Babendreier.

MS. JACKSON: Jennifer Jackson on behalf of defendant Stephen Hedrick.

MR. THORP: Galen Thorp from Crowe Dunlevy on behalf of defendant Larry Wilhite, and with me is Deric McClellan.

THE VIDEOGRAPHER: We are off the record at 9:03 AM.

[Discussion off the record.]

THE VIDEOGRAPHER: We are back on the record at 9:05 AM.

The witness, ROGER HEARTSNER, first having been duly sworn, testified as follows:

EXAMINATION

BY MR. NADEL:

Q. Good morning, sir.
A. Good morning.
Q. Please state your name.
A. Roger Heartsner.
Q. And what is your home address?
A. [redacted] California, [redacted]
Q. And what's your business address?
A. Same.
Q. Are you employed?
A. Retired. An individual consultant, independent consultant.
Q. You understand that your testimony today is subject to the penalty of perjury?
A. Yes.

Q. What did you do to prepare for your deposition today?

A. I reviewed my report. I met with counsel briefly. Reviewed some notes.

Q. When was that?

A. That was all yesterday.

Q. Other than those things yesterday, did you do anything to prepare for your deposition?

A. Other than the work in crafting the report. That was all.

Q. Last week you attended the depositions of Michael Easter and Donald Payne.

Is that correct?

A. Correct.

Q. Why did you attend those depositions?

A. It was the advice of counsel that I listen in to understand process.

Q. Were those the first depositions that you had attended in some way?

A. Yes.

Q. There's a protective order in this case, correct?

A. A protective order? Please define.
Q. Well, was a copy of a protective order or confidentiality order given to you at some point during your expert engagement?
A. No.
Q. I take it then that you have not agreed to comply with and be bound by a protective order, to your knowledge.
Is that correct?
MS. JACKSON: Object to form.
A. That is correct, although if it's about confidentiality, it has been kept confidential.
BY MR. NADEL:
Q. Did you sign a certification reflecting your agreement to be bound by the protective order?
A. No.
Q. What's your understanding of what this case is about?
A. In short, a fraud case.
Q. What is the alleged fraud?
A. Defrauding Mr. Bicknell out of money.
Q. What's your understanding of how Mr.

Bicknell was allegedly defrauded?
A. My understanding loosely is that he did not agree to fund the project that he was funding, and that he was being defrauded. That's really the basis of my understanding.
Q. When you say "he did not agree to fund the project that he was funding," what do you mean by that?
A. That's the stipulation by he and counsel, as I understand it.
Q. What do you mean by "the stipulation between he and counsel"?
A. That's the -- that's what's being brought forward, is that he was defrauded out of money for this project.
Q. Do you know who allegedly defrauded Mr. Bicknell?
A. I believe it's the defendants or -- being assigned with that charge.
Q. Do you know who the defendants are?
A. By name?
Q. Yes.
A. Anthony Silanskas, Larry Wilhite, and

Stephen Hedrick.

Q. And are all of those individuals charged with or alleged to have defrauded Mr. Bicknell?

A. I'm not sure.

Q. Do you know how the defendants allegedly defrauded Mr. Bicknell?

MS. JACKSON: Object to form.

A. No.

BY MR. NADEL:

Q. How did you come to your understanding of what the case is about?

A. I read the complaint. I spoke with Mr. Hedrick briefly. And I spoke with counsel.

Q. Having read the complaint, were you -- when you read the complaint, were you able to understand the narrative in the complaint about what allegedly happened to Mr. Bicknell?

A. I think in spirit, but not necessarily detail.

Q. Do you have an understanding of the role that religious messaging allegedly played in the alleged fraud in this case?

MS. JACKSON: Object to form.
A. I understand that that's -- that exists, but I don't have any knowledge of it directly.
BY MR. NADEL:
Q. Have you read any of the religious messages that were sent?
A. Unless they were in a deposition, no.
Q. How did you become an expert in this case?
A. Steve Hedrick asked if I would mind speaking with his counsel, and I said yes, and spoke with Liz George & Associates.
Q. When was that?
A. That was in early to mid-July.
Q. Did he call you on the phone?
A. Yes, he did.
Q. What did he tell you that the case was about?
A. He said there was a case against him for the American Heartland Project. He didn't go into any detail.
He asked if I would be willing to represent him from a historical perspective, experience, background,

skills, et cetera. And if so, I could talk to his counsel.

Q. When you say "represent him," what do you mean by that?

A. Represent experience or speak to his experience, his background, his abilities.

Q. Was that the first time you had heard about this lawsuit?

A. Yes.

Q. Was that the first time you had heard about the American Heartland Project?

A. No.

Q. How had you heard previously about the American Heartland Project?

A. Steve and I had a brief conversation back I think in 2022 about the project, and he was looking for team members.

So we had a casual conversation about perhaps coming on board to the project, which did not happen.

Q. Why didn't it happen?

A. I was employed and happy where I was.

Q. What did he tell you about the project

back in 2022?
A. It was a theme park project that had been passed on to him by Ron Logan that was located here in Oklahoma.
And that the theme had been changed from a movie theme park to more of an American values and heartland type of park.
Q. Did he tell you how that change in theme came about?
A. No. He did not.
Q. Did he tell you how the project had been passed on to him by Ron Logan?
A. That Ron had recommended him -- as I understand it, as I recall, Ron had recommended him to take on the project when Ron could no longer support it.
Q. When you had your conversation with Steve Hedrick about the American Heartland Theme Park in 2022, was that by telephone?
A. That was in person.
Q. Where?
A. That was in Pasadena, California.

Q. Where in Pasadena?
A. It was at a restaurant in Old Town (ph).
Q. Did you have a follow-up conversation with Steve about the American Heartland Project?
A. Actually, we did not.
Q. How did you let Steve know that you would not be working on the American Heartland Project?
A. Well, to be clear, an offer wasn't made. It was just a discussion about what it was. And we left it at that.
Q. Okay. So Steve Hedrick asked you if you would speak with his counsel, and you said yes.
And then who did you speak with?
A. I spoke with Jennifer Jackson.
Q. And what did you speak with Ms. Jackson about?
A. That they would like to engage me as an expert witness to speak to Steve's experience, his ability to run a project of this scope, and his compensation.
Q. And did you agree on that call to be an expert?

A. Yes.
Q. And then what happened?
A. Then we discussed the scope, and I started the preparation of --
Well, then documentation came through to evaluate, and I started crafting a report with my opinion based on what I was reviewing.
Q. What's your understanding of the claims brought against Steve Hedrick in this case?
A. I don't know exactly what's being brought against him per se. I don't know exactly.
Q. How many hours have you worked in this case?
A. I would say maybe 20.
Q. And that includes your preparation yesterday?
A. Approximately, yes.
Q. And over how many days -- leaving aside yesterday, over how many days have you worked on this case?
A. I'd have to look at the log I keep, but it's been a little bit of time scattered -- or over

about July 10th through yesterday.

Q. Where do you keep your log that you refer to?

A. I keep it on my computer.

Q. Was that 20 hours all spent --

So starting on July 10th and then through when you served your expert report, and then yesterday preparing for your deposition?

A. Essentially, yes.

Q. Does that 20 hours include the time you spent watching the depositions of Michael Easter and Mr. Payne?

A. It does.

Q. Did you watch those whole depositions?

A. I did not. Partials.

Q. What's your hourly rate?

A. $175.

Q. Have you submitted a bill?

A. I have not yet submitted an invoice.

Q. Do you expect to submit an invoice for all the time that you have worked?

A. Yes, I do.

Q. Do you expect to be paid in full on that invoice?
A. Yes, I do.
Q. Who do you understand is going to pay you?
A. It will come through Liz George & Associates.
Q. Whose money will it be?
A. I do not know.
Q. So is your engagement with Liz George & Associates, or is it with Mr. Hedrick?
A. It's with Liz George & Associates.
Q. When do you expect to submit your invoice?
A. Shortly after this, I would assume.
Q. Other than Ms. Jackson, have you spoken to any lawyers for Steve Hedrick?
A. Briefly to Liz, and that's all.
Q. When was it that you spoke to Liz George?
A. I think Liz was present briefly in one phone call and yesterday for about four minutes.
Q. Why did you agree to be an expert in this case?
A. Because I know Steve well, having worked

for him, having both of us worked for the Walt Disney company for a period of time.

And I believe that he was executing the project in earnest, and wanted to help out if I could.

Q. When you agreed to be an expert before you had looked at the materials that you were sent, how did you know that he had been executing the project in earnest?

A. Well, it was my assumption having known him.

Q. So when you were engaged as an expert before looking at material, you started with the assumption, having known Steve Hedrick, that he was working on the American Heartland Project in earnest.

Is that correct?

A. I would say yes, pending the review of information.

Q. How was your $175-an-hour rate set?

A. It was set based on previous income and also knowledge of the market and what people charge.

Q. Which market is that?

A. The market for entertainment consulting.

That's primarily what I do.

Q. Have you previously consulted at a rate of $175 an hour?

A. Yes.

Q. For whom?

A. For a company called Ovations Live out of Las Vegas.

Q. Anyone else?

A. No.

Q. And how many hours have you spent consulting for Ovations Live at a rate of $175 an hour?

A. I'm not sure. I'd have to look.

Q. Can you approximate?

A. Oh, maybe 90 hours. I'd have to go look. I don't really know.

Q. And what consulting do you provide for Ovations Live?

A. I consult as an executive producer, helping them guide project development for a specific client.

Q. Which client?

A. I can't mention.

Q. Have you provided consulting at a different rate?

A. I have not.

Q. Ovations Live is the only company for whom you've consulted before you did this matter for Liz George & Associates?

A. That's correct.

Q. This is your first deposition, correct?

A. Correct.

Q. Other than the 1981 wrongful termination trial testimony described in your report, have you ever testified under oath?

A. No.

Q. Have you ever been an expert in any lawsuit?

A. No.

Q. Have you ever submitted an expert report?

A. No.

Q. What is your expertise?

A. My expertise is in live entertainment development, project leadership, and themed entertainment, mostly for theme parks, cruise ships,

that realm.

Q. When did you first meet Steve Hedrick?

A. Let's see. I think I first met Steve in the mid-'90s while he was working for Disney and I was working for Universal.

Q. How did you meet him?

A. I actually met through his wife. His wife was putting together a company, if you will, an events company, as I recall, and I was asked to participate or consider participating in that.

Q. And did you participate in that?

A. No. It really never got off the ground, or at least I was never engaged formally in any of that, as I recall.

Q. And was it Steve Hedrick's wife who asked you to participate in that company?

A. Yes.

Q. And is that Diane Hedrick?

A. Yes, it is.

Q. And how did her invitation for you to participate in that company result in you meeting Steve Hedrick?

A. As I recall -- I'm not sure -- I'm a little fuzzy of whether or not Diane had actually worked for Universal for a period of time and that's where we met. I believe that's how we became known to each other.

Q. That's how you and Diane became known to each other?

A. Correct.

Q. And how did you end up meeting Steve Hedrick?

A. And then I met Steve socially and got to know him basically socially.

Q. And that was before you and Steve started working together?

A. That's correct.

Q. When did you and Steve begin working together at Disney?

A. I had left Renaissance Entertainment I believe in July of '98.

And one of Steve's direct staff asked me to come on board to help them in a temporary capacity on the Tokyo DisneySea Project.

Q. Who was that?
A. His name was Cliff Warner.
Q. When Cliff Warner asked you to come on board to help with the Tokyo DisneySea Project, was he doing that at Steve Hedrick's direction?
A. I don't know, actually.
Q. Did you agree to come on board in a temporary capacity to work on the Tokyo DisneySea Project?
A. Yes.
Q. So you were working with Steve Hedrick on that project?
A. Yes.
Q. And is it correct that Steve Hedrick was the senior show producer and project director and you were the senior producer?
A. I wasn't the senior producer at that time. I was a consultant. Steve later hired me to be a producer on the project.
Q. So you started as a consultant?
A. Correct.
Q. When you were a consultant, were you

working for Steve?

A. I wasn't working directly -- I worked with Steve, but I was working directly for Cliff Warner at that point.

Q. And Cliff Warner worked for Steve?

A. Correct.

Q. And you were also Steve's friend socially at that time?

A. Correct.

Q. And also Diane Hedrick's friend socially at that time.

Is that right?

A. Yes. Yes.

Q. And then after you were a consultant working for Cliff Warner who was working for Steve Hedrick, Steve Hedrick hired you directly as an employee for Disney.

Is that correct?

A. As a temporary employee through a third-party payroller and then -- yes, as a temporary employee through a third-party payroller. That's how Disney hired certain staff at that time.

Q. And were you reporting directly to Steve Hedrick at that time?
A. Yes.
Q. And were you then hired as a permanent employee?
A. I was not hired as a permanent employer -- as a Disney employee until we had to deploy to Tokyo for installation and show mounting.
So I became an employee at that time.
Q. When was that?
A. That was approximately -- that would have been sometime in 2000.
Q. And you were still working for Steve Hedrick at that time?
A. Correct.
Q. How did your social relationship with Steve Hedrick manifest itself?
A. Manifest itself --
Q. What would you do as friends?
A. Oh. It was an occasional dinner or drinks.
Q. Would that be with Steve and his wife?

A. It could have been, yes. It often was.
Q. At that time, were you married?
A. No.
Q. Or were you in a relationship where it would be like a double date with you and a partner and Steve and his wife?
A. Not necessarily, but I was in a relationship, yes.
Not necessarily my partner attending any of those.
Q. Did you and your partner socialize with Steve and his wife?
A. No, not as a couple. No.
Q. While you were working as a Disney employee on the Tokyo project, was Steve Hedrick supervising your work?
A. Yes.
Q. And was Steve Hedrick directing your work?
A. Yes. I mean, he didn't direct every aspect of it. He let me do my job. But I did report to him and was responsible to him.
Q. Did Steve Hedrick control budget or

staffing with respect to your work?
A. He approved budget and staffing.
Q. For how long did you work for Steve Hedrick?
A. I worked for Steve until -- I believe it was November of 2001, late 2001.
Q. And what happened then?
A. Steve left the company.
Q. Why did Steve leave the company?
A. I don't know the details or the circumstances.
Q. What do you know generally about why Steve left the company?
MS. JACKSON: Object to form.
A. I really have no idea.
BY MR. NADEL:
Q. How did you find out that Steve Hedrick was leaving Disney?
A. He told me.
Q. What did he tell you?
A. He told me he was leaving, and he left.
Q. He didn't tell you why he was leaving?

A. No.
Q. You didn't ask him why he was leaving?
A. No.
Q. Why didn't you ask him why he was leaving?
A. It was personal, and I didn't want to pry, especially if it was unfavorable. I have no idea.
Q. Have you subsequently or at the time heard why Steve Hedrick was leaving Disney?
A. No. I actually never have.
Q. Was there gossip about why Steve Hedrick was leaving Disney?
MS. JACKSON: Object to form.
A. I'm sure there was, but not with me.
BY MR. NADEL:
Q. So you never heard any gossip about why Steve Hedrick was leaving Disney?
A. I did not.
Q. Your testimony is you have no idea why Steve Hedrick left Disney?
A. The circumstances, no, I do not.
Q. Do you know whether he was asked to leave?
A. I don't. I do not know.

Q. When Steve Hedrick told you that he was leaving Disney, where did that occur?
A. That occurred in Glendale.
Q. Where in Glendale?
A. At the offices, the Disney offices.
Q. In a particular office?
A. Somewhere in that building. I don't know exactly where we were.
Q. Was it just the two of you?
A. I -- yes.
Q. What did you say when he told you that he was leaving Disney?
A. That I was sorry to hear that, and I thanked him profusely for the opportunity. And that was pretty much it.
Q. Did you remain in touch after Steve Hedrick left Disney?
A. Yes.
Q. How so?
A. We kept in touch on new business ventures that he was involved in, as he started to spin up a business -- a consulting business.

So we saw each other from time to time.

Q. What business ventures do you recall Steve Hedrick being involved in after he left Disney?

A. Park -- theme park development and many other things, I'm sure. I'm not sure exactly how broad his scope was, but I was certain that he was trying to get into theme park development.

Q. Do you know of any theme parks in whose development --

Do you know any theme parks that Steve Hedrick developed?

A. I do not.

Q. You consider Steve Hedrick a friend, correct?

A. Yes.

Q. Fair to say you consider him a close friend?

A. Pretty close friend, yes.

Q. Has Steve Hedrick ever recommended you for employment besides when he hired you to work at Disney first --

A. He -- he may have. I'm not sure.

Q. Have you asked Steve Hedrick to recommend you for employment?
A. I have not.
Q. Fair to say Steve Hedrick helped your career?
A. Absolutely.
MS. JACKSON: Object to form.
BY MR. NADEL:
Q. Is it fair to say that none of your Disney career would have been possible without Steve Hedrick?
A. Steve allowed me to get foot in the door.
The rest of it was me, but the opportunity to expose myself to Disney was via Steve.
Q. So it is fair to say that none of your Disney career would have been possible without Steve Hedrick?
A. It's hard to be that matter-of-fact about it.
Q. Who is Michael LeFleur (ph)?
A. Michael LeFleur is a creative consultant out of Las Vegas.
Q. Is he mutual friends with you and Steve

Hedrick?

A. We're business acquaintances and friends. We worked together on the Tokyo DisneySea Project, and Steve and he have I think a long history together.

Q. What sort of history?

A. I'm not sure exactly their literal history. I think they -- they may have performed together. I don't know.

Q. Sir, I'd like to hand you what's been marked Plaintiff's Exhibit 350.

[Heartsner Exhibit 350 marked for identification.]

BY MR. NADEL:

Q. This is your expert report, correct?

A. It appears to be.

Q. What is your understanding of what an expert report is?

A. An expert report would be to render opinion after a scope is defined. Render an opinion on scope as requested by whoever requested it.

Q. What's your understanding of what the purpose of an expert report is?

A. The purpose of this expert report was to provide opinion on Steve's experience, background, his management of the project, and his compensation.
Q. Do you have an understanding of how an expert report is used in a lawsuit?
A. Directly, no, as this is my first one.
But I would assume that it is provided as information from one side to the other.
Q. Have you been told that this is a disclosure of the opinions that you formed in this case that you would offer if you testified?
A. Yes. I believe that to be the case.
Q. Who drafted your expert report?
A. I did.
Q. Did anyone else draft it?
A. No.
Q. Did any other person supply language for your report?
A. No. Counsel reviewed for format, but no language was provided.
Q. In what way did you work with Steve Hedrick while you were putting together your expert

report?

A. I didn't work closely with Steve on it. I really reviewed all materials. I wanted to do an evaluation of where the project seemed to be at the time that it stopped and what had been done up to that date.

That's what I did.

Q. How many drafts of your report were there from your first draft to the final draft?

A. I don't recall. I think two.

Q. And did you send those drafts to Ms. Jackson for comment?

A. Review and comment, yes.

Q. Did you send them to Steve Hedrick for review and comment?

A. No.

Q. Did you use any artificial intelligence tool in writing your report?

A. I did not.

Q. Sometimes in the report you refer to Mr. Hedrick, and other times you refer to Steve.

Why is that?

A. Oh, that -- a form problem probably on my part. I should have been consistent. But I know him as both and refer to him as both.

Q. What was Big Time Production, LLC?

A. I do not know.

Q. What was Mansion Entertainment Group, LLC?

A. Mansion Entertainment Group -- Steve said that he was working for them at some point. This was prior to our discussion about American Heartland.

And that's all I knew, that he was working for them.

Q. You say it was prior to your discussion about American Heartland he said he was working for Mansion Entertainment Group?

A. Yes.

Q. When approximately was that?

A. I can't recall. Within probably 12 months of our conversation, maybe.

Q. Do you know what Mansion Entertainment Group was or is besides something that Steve Hedrick was working for?

A. No. I don't know exactly what their

purpose and function was.

Q. Is there a connection between Mansion Entertainment Group, LLC and the American Heartland Project?

A. I believe there is.

Q. Do you know what that connection would be?

A. No. I don't know how the business was structured.

Q. In your report you list, starting on Page 5, 124 sources of information.

Did you actually read each of these 124 sources of information?

A. I did open them. I skimmed -- I read some of them in great detail. I skimmed others. This was a tremendous amount of information -- this is --

So yeah, it was a combination of quick review and intense review.

Q. Did you make this list of sources of information?

A. I did not. I was provided with this list.

Q. The first item is the transcript of Peter Alexander's videotaped deposition.

Who was Peter Alexander?
A. Peter Alexander crafted the feasibility study for the project.
Q. And did you read his deposition?
A. Yes, I did.
Q. The next item is Anthony Silanskas's videotaped deposition.
Who was Anthony Silanskas?
A. One of the three defendants.
Q. And what do you remember from reading his deposition?
A. I don't recall much from his deposition.
Q. Do you recall anything from his deposition?
A. Not of note for my purposes.
Q. And the next item is the transcript of Anthony Blatt's deposition.
Did you read that?
A. I skimmed that quickly, but I did look at his company's information --
Q. When you say you looked at his company's information, what do you mean?

A. Scopes of work, work product, containing the materials that I received.

Q. The next item is the videotaped deposition of Steve Hedrick.

Did you read the transcript of that deposition?

A. I did.

Q. Have you watched the video of that deposition?

A. I have not watched the video.

Q. Did you read it --

A. Just read it.

Q. Did you read it in its entirety?

A. I read in its entirety.

Q. Then the next three items are Steve Hedrick invoices.

Did you review those invoices?

A. I did.

Q. You don't discuss the invoices in your report.

Why is that?

A. I don't address the invoices in that they're pretty straight-ahead. They're for fee and

reimbursables. It all makes total sense to me.

He has a fee set on a day rate, and the rest -- the rest of the expenses were reimbursement.

So I didn't see a need to address that.

Q. Did you read any other depositions beyond the ones that are listed here?

A. Beyond what are listed?

Q. Yes.

A. No, not to my knowledge.

Q. How were the 124 sources of information transmitted to you?

A. They were transmitted I believe via Dropbox link, if I'm not mistaken.

Q. Did you download them onto your computer?

A. I downloaded some but not all.

Q. Which ones did you download?

A. I downloaded some financial information, some schedule information, some creative information. That information.

Q. You said that the list in your expert reports of materials considered was developed by Mr. Hedrick's counsel.

Is that correct?

A. Correct.

Q. Did you double-check to see if all of this material was actually sent to you?

A. I did start that process to make sure that both tied together. I did not complete that process, but I started that.

Q. How far did you get?

A. I got through quite a bit of it. I don't recall where I dropped off.

Q. Item 18 here is Memorandum NTP, Lazy Hawk Predevelopment.

What was Lazy Hawk?

A. Lazy Hawk was the code name for the project.

Q. And Item 21 is Hedrick Answer and Counterclaim.

Did you read that?

A. I don't recall.

Q. Do you know whether Steve Hedrick has brought counterclaims in this case?

A. I'm not certain.

Q. Item 22 is the Gill expert report.
Did you read that?
A. I do not recall.
Q. Do you know who Reagan Gill is?
A. I do not.
Q. Do you know what Reagan Gill's expertise is?
A. I do not.
Q. Item 23 is the Jeff Watts expert report.
Did you read the Jeff Watts expert report?
A. I can't recall. This was a tremendous amount of information. I tried to go through as much of it as I could.
Q. Were you given a limit of how much time you could work on this case?
A. No.
Q. Were you asked to provide any sort of budget for how much time you could work on this case?
A. No.
Q. Do you know who Jeff Watts is?
A. I do not.
Q. Do you know what his expertise is?

A. I do not.
Q. The next item is the Joseph Pochron expert report.
Did you read that?
A. What's the number of the item, sorry?
Q. 24.
A. 24.
I tried to look at everything, but I don't recall.
Q. Do you know who Joseph Pochron is?
A. I do not.
Q. Do you know what his expertise is?
A. No.
Q. Did you read any expert report prepared by a law enforcement officer or former law enforcement officer?
A. I vaguely recall, but I'm not certain.
Q. Did you read any report prepared by a doctor?
A. I believe I did.
Q. What was that report about?
A. I think it was about Mr. Bicknell, if I'm

not mistaken.

Q. What about him?

A. Mental capacity and condition.

Q. What did it determine?

A. I --

MS. JACKSON: Object to form.

A. -- do not recall.

BY MR. NADEL:

Q. Did it include any opinions that you recall?

A. No.

Q. Do you know who Donald Fancher is?

A. I did read the Fancher report, but I don't recall exactly what his scope was.

Q. Do you know what he was opining about?

A. I do not recall.

Q. The next item is the MEG/THG agreement fully executed.

What is that?

A. That's The Hettema Group contract as stated with Mansion Entertainment Group.

Q. Did you review that contract?

A. I did.
Q. Did you review it in its entirety?
A. I did.
Q. About how many hours did you spend reviewing the 124 sources of information included in your report?
A. I can't recall. I'd have to look.
Q. What would you look at?
A. My tracking log.
Q. But we know that you spent, to this point, about a total of 20 hours working on this case --
A. If that's accurate. I'd have to verify that. But keep going.
Q. Well, that was your testimony, approximately 20 hours.
Is that accurate?
A. I'd have to double-check to confirm.
Q. And that would be on your log?
A. Yes.
Q. And your log is on your computer?
A. Yes.
Q. And where is your computer?

A. With me.

Q. Okay. How was it decided what documents you would be provided to complete your assignment as an expert here?

A. Could you repeat the question? Sorry.

Q. How was it decided what documents you would be provided to complete your assignment as an expert here?

A. I do not know other than a couple of things that I asked for I was provided with everything.

Q. What were --

A. Somebody else's decision.

Q. What were the things that you asked for?

A. I asked for some financial information and scheduling information.

Q. What financial information?

A. I asked for accruals of project -- project total cost forecasting.

And communication related to that.

And I asked for schedule information -- project schedule and how that laid out.

Q. Were you provided with that information

that you asked for?
A. I was provided with the information toward those goals, yes.
Q. Did you say you were provided with information toward those goals?
A. Yes.
Q. What do you mean by that?
A. Well, I received whatever they provided me. I don't know if it was completely comprehensive, but I asked for financial information and received what I was given, and the same thing for schedule.
Q. Do you know who Debbie Lindquist (ph) is?
A. I do not.
Q. Do you know who Kale Height (ph) is?
A. No.
Q. Did you read Gene Bicknell's deposition testimony?
A. I did.
Q. So that isn't listed among the 24 sources -- 124 sources of information?
A. No, it's not.
Q. Do you know why?

A. No. My apologies. I thought I did, but maybe I didn't.
Q. Do you remember anything from Gene Bicknell's testimony?
A. I believe I received it, and I believe I read it.
And I believe it was -- it was Q and A about where funding was coming from, et cetera, et cetera.
Q. What do you remember about what Mr. Bicknell said funding was coming from?
A. It was coming from -- oh, I don't -- within the deposition I don't know. I don't recall.
Q. How many depositions of Mr. Bicknell did you review?
A. I thought it was one.
Q. Did you interview Gene Bicknell?
A. No.
Q. Why not?
A. I hadn't thought to.
Q. Did you interview Steve Hedrick for your work on this report?
A. I asked Steve a couple of questions about

some of the information that I had received.
Q. When was that?
A. Oh, some -- sometime in July.
Q. Before you did your report?
A. Correct.
Q. What were the questions that you asked Steve Hedrick?
A. I asked Steve for clarification on a couple of documents as to meaning of -- mostly timing of funding. Timing of funding requests.
Q. What do you mean by "funding requests"?
A. Just what was the communication back and forth about what the project needed to continue going forward and how that was done.
Q. Communication between Steve Hedrick and whom?
A. It would be project leadership, I would think, which would be Silanskas, Hiltite (ph), and Bicknell, I assume.
Q. How were those communications between you and Steve Hedrick requesting clarification on the documents accomplished?

A. It was a quick phone call.
Q. Did you read Larry Wilhite's deposition testimony?
A. I did not.
Q. Did you interview Larry Wilhite?
A. I did not.
Q. What is your understanding of Larry Wilhite's role in the American Heartland Project?
A. I don't have a clear understanding of the management structure, but I believe Steve was reporting to Larry from a senior leadership perspective.
Q. What is your understanding of Mr. Silanskas's role in the American Heartland Project?
A. I -- other than being one of the principals in terms of wanting to do the project, I didn't understand what his role was in the day-to-day of what Steve was executing.
Q. Do you know Mr. Silanskas?
A. I do not.
Q. Had Mr. Hedrick previously spoken to you about Mr. Silanskas?
A. No.

Q. Did you interview any of the witnesses who have been identified in this case by plaintiff's counsel?
A. No.
Q. Did you speak with anyone from any of the vendors who worked on the American Heartland Project?
A. I did not.
Q. Did you speak with any of the consultants who worked on the American Heartland Project?
A. I did not.
Q. Did you visit Vinita, Oklahoma?
A. No.
Q. Prior to today, have you ever been to Oklahoma?
A. No.
Q. In your work on this matter, did you speak with anyone besides Steve Hedrick and Steve Hedrick's counsel?
A. No.
Q. Did you identify any information that weighs against Steve Hedrick?
A. Could you repeat that, please?

Q. Did you identify any information in all the documents you looked at and facts you considered that weighs against Steve Hedrick?

A. No.

Q. How did you go about your work in this case?

A. I focused on aligning to the scope that I'd been asked to provide.

I reviewed the documents really about project execution, who were the -- who were the principals from a project development standpoint, who are the consultants.

I looked at the feasibility study. I looked at the financials, and schedule, trying to get a picture of where that project had -- how that project had progressed from inception to cutoff.

Q. And then you looked at those things, and you wrote a report stating your opinions?

A. Correct.

Q. Did you discuss with counsel for Mr. Hedrick what opinions you had formed before you wrote them down?

A. I did give some initial observations, yes.
Q. What observations did you give?
A. The observations were that, from what I could tell --
Well, first of all, my -- two things -- actually, three things.
Steve's background was appropriate for the project.
From what I could tell from documentation, the project had been managed appropriately, properly, and in earnest.
And that Steve's compensation was reasonable.
Q. When you began your work before you looked at any of the material that you were provided, you already had the assumption that Steve Hedrick's background was appropriate for the project, correct?
A. I did.
Q. And when you were engaged in this matter before you had looked at any of the material, you also began with the assumption that the project had been managed appropriately, properly, and in earnest, correct?

A. That was an assumption I entered into my evaluation with, but wanted to make sure that the review of the material confirmed that assumption.
Q. And you also entered into the expert engagement with the assumption that Steve Hedrick's compensation was reasonable, right?
MS. JACKSON: Object to form.
A. I didn't know what it was when I entered in. I had to learn what that was.
BY MR. NADEL:
Q. How did you learn what it was?
A. By the financials, the invoicing, and the ledger of all paid consultants, firms, et cetera.
Q. Could you please identify any undergraduate or graduate degree you have that is relevant to your opinions in this case.
A. Well, my degree on the surface may not be relevant -- my degree is in music from the Eastman Conservatory University of Rochester.
It was my way into -- my education in music was my way into the business.
So it's more my musical roots and my training

post-education in the workplace that make me relevant.
Q. So not your degree.
Is that right?
A. Not my degree in specificity, no.
Q. Do you have any professional licenses that qualify you to render your opinions in this case?
A. No.
Q. Do you have any professional certifications that qualify you to render your opinions in this case?
A. Certifications. I don't have any professional certifications.
Q. Are you a licensed architect?
A. I am not.
Q. Are you a professional engineer?
A. No.
Q. Are you an accountant?
A. No.
Q. Are you a valuation analyst?
A. Evaluation analyst? No.
Q. Are you a construction manager?
A. No.

Q. Have you ever been a construction manager?
A. No.
Q. Have you ever been a land use planner?
A. No.
Q. You're not an economist, correct?
A. No.
Q. Did you study economics in college?
A. I did not.
Q. Did you study economics in high school?
A. No.
Q. Have you ever been a market research professional?
A. No.
Q. Are you certified in project finance?
A. Certified, no.
Q. Have you ever worked in project finance?
A. Other than being -- other than managing my own project budgets up to $300 million, no.
Q. Are you certified in feasibility analysis?
A. Certified, no.
Q. Have you ever performed a feasibility study for a theme park?

A. I never performed one, no.

Q. Have you ever requested that someone else perform a feasibility study for a theme park?

A. No. It was always part and parcel of our work, especially in our corporate environment.

Q. What do you mean by that?

A. It was something that was always done. Feasibility studies have to be done for projects like this.

So it was part of normal business to make sure one was completed.

Q. When you say "feasibility studies have to be done for projects like this," what projects are you referring to?

A. Greenfield (ph) theme park build projects.

Q. And could you explain what a greenfield theme park build project is?

A. Greenfield is a project that comes out of dirt, really a site or piece of property that has not improved in any way, and you start from scratch to build a park, instead of renovating an existing property or upgrading an existing property.

Q. And which greenfield theme park build projects have you been involved in?
A. Tokyo DisneySea, Hong Kong Disneyland, Shanghai Disney Resort, and also an R, D, and E theatrical project in Thailand.
Q. And there were feasibility studies for each of those projects?
A. Yes.
Q. And were you involved in obtaining the feasibility studies for those projects?
A. I was responsible for providing input to but not developing the actual study.
Q. So you provided input to the people doing the feasibility studies?
A. Correct.
Q. And what people or entities who worked on feasibility studies did you provide input to?
A. Project management, project finance. Largely those two groups.
Q. So you provided input to those two groups within Disney?
A. Yes.

Q. And then they provided input to people doing the feasibility studies?
A. Or they did the feasibility studies.
Q. So those were internal feasibility studies at Disney?
A. Correct.
Q. Did you ever audit or validate a feasibility study?
A. I did not.
Q. Other than providing input to Disney's project management and project finance groups, have you had any role throughout your career in feasibility studies?
A. Not directly, no.
Q. Have you ever authored a compensation study?
A. I have not.
Q. Have you ever read a compensation study?
A. I have.
Q. When?
A. I reviewed compensation studies for hourly workforce in China in preparation for Shanghai Disney

Resort.
Q. When was that?
A. That would have been in 2012, 2013.
Q. And that was a study to determine the compensation for the hourly workforce of the people who would work in the park in Shanghai Disney?
A. Correct.
Q. Other than the compensation studies for hourly park workers in China in 2012 and 2013, have you ever read a compensation study?
A. No, I have not.
Q. Your report says you have a certificate in continuous quality improvement.
A. Uh-huh.
Q. Who issued that certificate?
A. It was a subcontractor to Universal Studios Hollywood that put several of us through that program.
Q. When was that?
A. That would be '94. '93, '94.
Q. And what was the program?
A. The program was continuous quality

improvement through process management.

It was not necessarily adopted by the company, but the training was given to several of us.

Q. Have you published any articles or books on the topics listed in your report?

A. I have not.

Q. Have you ever published articles or books on any topic?

A. No.

Q. Have you ever had a blog?

A. No.

Q. Do you have an account on X, formerly known as Twitter?

A. Yes.

Q. What is your handle?

A. What is it? PMA Enter.

Q. PMA Enter?

A. Yes.

Q. So is that PMA E-N-T-E-R?

A. That's correct.

Q. And what does that mean?

A. Oh, it's a -- it's just a name I came up

with long ago.

Q. What does the PMA stand for?

A. It doesn't.

Q. Have you ever published or taught any method for determining reasonable compensation?

A. No.

Q. Is it correct that your role with Disney focused on live entertainment, entertainment program development, venue design, production, and execution?

A. Could you repeat? I'm sorry.

Q. Sure.

Is it correct that your role with Disney focused on live entertainment, entertainment program development, venue design, production, and execution?

A. Correct.

Q. And that's also true of the roles that Steve Hedrick had at Disney, correct?

A. I'm not sure of all of his roles during his time, but yes, he was responsible for much of that in different projects, I'm sure.

Q. The roles you're aware of that he had focused on live entertainment, entertainment program

development, venue design, production, and execution, correct?

A. Yes, that I was aware of.

Q. And your positions with Marriott, Knott's Berry Farm, Universal, and Renaissance also focused primarily on live shows, events, and entertainment production, correct?

A. That is correct.

Q. How would you describe Steve Hedrick's role with the American Heartland Theme Park?

A. I would describe Steve as the creative lead guiding all creative development, as well as the executive producer.

I would say that he did two roles actually in one.

Q. What does it mean to be the executive producer?

A. Usually projects split themselves into three different leadership buckets. Creative, production, and project management.

What my sense of what Steve was doing was that he was certainly the creative lead. He was also

leading the project I think from an executive producer perspective. I believe he had project management below him.

Q. What does the creative lead do?

A. Creative lead guides the creative from inception to completion, actually guiding the entire development of the park.

So I believe when they switched to the American Heartland concept, Steve led that effort creatively and was the final say in creative.

Q. And what do you base that on?

A. I base that on my conversation with him over breakfast in '22 when he described his role, and what I saw in the documentation.

Q. When you're referring to what you saw in the documentation, what do you mean?

A. I believe there were some agendas where Steve was positioned as the -- as the creative lead.

Q. The second bucket you mentioned was production.

What's that?

A. Production is how one gets at -- or how

one executes on a design.

So an executive producer helps the project or helps lead the project from inception all the way through. And production is different than creative design. It's the execution of that. And they guide that.

Q. And what's project management?

A. Project management is literally that. It's the nuts and bolts of making sure the project is properly staffed from a construction, civil engineering perspective, land use, how packages are developed for construction, and overall management or project budget.

Q. And your understanding that all of that fell within Steve Hedrick's responsibility is based on the documents you reviewed and the conversation that you had with him in 2022.

Is that right?

A. Yes.

Q. Was Steve Hedrick responsible for master planning from site selection through opening as the person with ultimate responsibility?

A. Master planning, yes. Site selection, I'm

not sure.

Q. Was he responsible for master planning and then seeing the park through to opening as the person with ultimate responsibility?

A. Yes.

Q. How many theme parks have you had that role for?

A. I've not had that role for any theme park. I've had that role within entertainment, but not with a park overall.

Q. Have you ever hired somebody to be responsible for seeing an amusement park or theme park through from master planning to opening?

A. I have not.

Q. Have you ever been involved with the hiring or selection of someone to be the person to see a amusement park or theme park through from master planning to opening?

A. No.

Q. As part of your professional career, how many times have you made the decision to hire an architectural firm?

A. I've had input to that two or three times, as I recall.

Q. What do you mean by "input"?

A. Selection committee, looking at different groups.

Q. You were on a selection committee looking at different architecture groups?

A. Yes.

Q. And what were those two or three times?

A. I think we did that for our -- project with Renaissance Entertainment.

Where else did we do that?

I can't recall.

Q. And you worked with Renaissance Entertainment in 1997 and 1998?

A. Correct.

Q. And during that time, you recall being on a committee to select an architect.

Is that right?

A. Yes.

Q. That's the only time you remember being involved in the selection of an architect during your

career.
Is that correct?
A. That I can recall, yes.
Q. How many people were on the committee?
A. I think there were three or four of us.
Q. Who was in charge?
A. I believe it was the company owner and head of technical development for the company.
Q. Who made the ultimate selection?
A. I believe it was the company owner.
Q. Were there multiple architects considered, or was there only one architect considered?
A. It was -- by the time it got to me, there was one finalist.
Q. So you were providing input on whether or not to select that one finalist?
A. Yes.
Q. Have you been involved in a process choosing between multiple architects?
A. No.
Q. How did you weigh in on whether or not to select that one finalist in the 1997-1998 period?

A. I think it was looking at the company's project r sum and project roster and what they had done and whether or not they were theatrically savvy.

Q. What was it that they were being asked to design?

A. A theater.

Q. As part of your professional career, how many times have you made the decision to hire a design firm?

A. I've hired many design firms for live shows. They range in size and scale. They can be individuals, and they can be companies.

But that was -- that's almost exclusively for live entertainment show development.

Q. Have you ever hired a design firm for a theme park?

A. No.

Q. Is it fair to say your professional career since joining Disney has been almost exclusively for live entertainment show development?

MS. JACKSON: Object to form.

A. Not since joining Disney, but yeah, my

focus has -- yes, my focus has always been live entertainment.

BY MR. NADEL:

Q. Throughout your whole career?

A. Yes.

Q. As part of your professional career, have you made the decision to hire a civil engineering firm?

A. No.

Q. Have you been involved in the decision to hire a civil engineering firm?

A. No.

Q. What qualifies you to render an expert opinion on Mr. Hedrick's education, training, experience, and professional background?

A. It's really --

Wait. Repeat the question, please.

Q. I guess I should ask first, are you qualified to render an expert opinion regarding Mr. Hedrick's education, training, experience, and professional background?

A. I think I am based on what I know of his background and what I've seen him do in person.

Q. Would the same be true of everyone who was on your team working with Mr. Hedrick?

MS. JACKSON: Object to form.

A. I don't understand the question, sir.

BY MR. NADEL:

Q. Well, you said that -- you said that you believed you were qualified to render an expert opinion regarding Mr. Hedrick's education, training, experience, and professional background based on what you know of his background and what you've seen him do in person.

So I'm asking whether that would also be true of everyone else who worked on your team in Disney.

Would they all be qualified to render that type of opinion?

MS. JACKSON: Object to form.

A. Oh, I don't know. I wouldn't be able to answer that.

BY MR. NADEL:

Q. Are you qualified to provide expert opinion in the design and development of theme parks?

A. I believe so from an experience

perspective.

Q. Have you designed a theme park?

A. I have not.

Q. Have you developed a theme park?

A. No. Just entertainment programs for.

Q. Have you ever designed a ride at a theme park?

A. I have not.

Q. Have you been involved in developing the proposed layout of a theme park?

A. I get deeply involved in that from a land use application from an entertainment perspective. It's a highly collaborative business. Lots of people playing (ph) in lots of different areas.

Responsible for -- you'd have to re-ask the question.

But I've been involved in land design, yes.

Q. What would you say are the limits on your ability to opine on someone's training, experience, and professional background for a top theme park executive role?

MS. JACKSON: Object to form.

A. What are the limits?
BY MR. NADEL:
Q. Meaning are there areas that you feel you're not qualified to opine on?
A. Well, perhaps, but I'm not sure I understand the context of the question.
Q. Okay.
Have you ever been involved in the design of a ride at a theme park?
A. I have not.
Q. Have --
A. Except for -- except for how a ride will interface with certain guest areas that might affect entertainment or circulation for entertainment, and that has an impact on the ride.
But the design of the ride, no.
Q. Have you ever been involved in the food and beverage side of a theme park?
A. Yes, from a combined experience, meaning food and beverage and entertainment, layout of spaces, development of experiences with food and beverage, like dinner theater or that type of thing.

But food and beverage directly, no.
Q. What about the selection of food that would be served at a theme park outside of the dinner theater setting?
A. No.
Q. Have you ever been involved in working with a theme park's executive chef?
A. No, I have not.
Q. Have you been involved in the creation of a hotel?
A. I have been involved in creation of hotel, yes.
Q. When was that?
A. Entertainment is an integral part of hotel design in most cases. So we were brought in to consult on space planning, venue development within hotels.
Q. Meaning the theater within a hotel?
A. Theater within a hotel or space for any kind of entertainment activation.
Q. What about designing or developing the hotel itself?
A. Itself, no.

Q. Have you been involved in the creation of a water park?
A. No.
Q. Have you been involved in the design of a water park?
A. No.
Q. Have you been involved in the design of an RV park?
A. No.
Q. When you formed your opinions in this case, the ones that you're going to testify about to the jury, did you know everything about Steve Hedrick's training and experience that you know now?
MS. JACKSON: Object to form.
A. No.
BY MR. NADEL:
Q. What did you learn about Steve Hedrick's training and experience during your work on this case that you didn't know before?
A. That I didn't know before?
I've kept up with Steve's positions that he's held.

But did I learn anything new? No, not necessarily.

Q. So when you rendered your first opinion in this case on Steve Hedrick's education, training, experience, and background, what work did you do as part of your expert engagement to form that opinion?

A. That's based on my knowledge of Steve, his background, and also how he -- how I've seen him handle himself on large-scale projects -- the Tokyo DisneySea Project.

That's how I developed that.

Q. Aside from your work with Steve on the Tokyo DisneySea Project and your knowledge of his background and your friendship with him, did you do anything to form your Opinion 1 in this case?

MS. JACKSON: Object to form.

A. Ask again, please.

BY MR. NADEL:

Q. Let me ask it differently.

A. Okay.

Q. Did you perform any work in this case to form your Opinion 1 about Steve's education, training,

experience, and background besides just recalling your work with him on the Tokyo DisneySea Project and your knowledge of his background from your friendship with him?

MS. JACKSON: Object to form.

A. Don't quite know how to answer that. Sorry.

BY MR. NADEL:

Q. Is your Opinion 1 about Steve's education, training, experience, and background just based on your knowledge of Steve Hedrick from working with him on the Tokyo DisneySea Project and your knowledge of his background from your friendship with him?

MS. JACKSON: Object to form.

A. Not necessarily from my friendship, but I don't know his -- I don't have great detail on his background, but I generally know what his training was and I know what his experience was with Disney.

And then I've of course witnessed it firsthand for a while.

So that's my -- that's the basis of my knowledge and opinion.

BY MR. NADEL:

Q. Okay. So let me take the friendship part out of it so that we have it clean.

Is your Opinion 1 about Steve Hedrick's training, experience, and background just based on your knowledge of Steve Hedrick from working with him on the Tokyo DisneySea Project and your general knowledge of what his training was and his experience with Disney?

A. Yes.

Q. One of the opinions you disclosed is "Steve was trained and is experienced in theatrical and the entertainment arts, dances, acting, theater, music composition, writing, design, assessment, and direction including space planning, layout, and design dependencies for a variety of scaled applications."

When you formed that opinion, were you just relying on the general knowledge you had of Steve coming into the expert engagement?

A. My knowledge and witness of his skill, yes.

Q. Have you witnessed Steve Hedrick dancing?

A. Not to -- not professionally, but --

Or did I see video?

But I know that's what he was originally schooled in, and I have seen him dance, but that was informally.

Q. Where have you seen him dance?

A. Oh. It might have been at a party or a function or something. He and his wife are both dancers.

Q. How do you know that he was trained in dancing?

A. He told me.

Q. Have you seen Steve Hedrick act?

A. I have not seen him act.

Q. What do you know about his music composition?

A. I know that he writes lyrics, and I -- I'm not sure exactly what his book of work is on song composition. But he's very musical and contributes greatly to music, and I know him to be a lyricist.

Q. What does "design dependencies for a variety of scaled applications" mean?

A. Can -- where is that exactly?

Q. So I am on the summary of opinions page, which is --

MS. JACKSON: 4.

BY MR. NADEL:

Q. -- Page 4, thank you, of your report.

A. Thank you.

And you're citing bullet --

Q. The second -- the first bullet.

A. Oh, the first bullet. Right. Yes. (Reads to self.)

Everything we do in entertainment and in theme park development includes use of space, use of land, building design, and all of us have a certain degree of skill in that area -- space planning, layout, and design dependencies.

What is the design dependent upon? What kind of space planning do you need? What's the layout? What's the flow through? How are those spaces used, et cetera, et cetera.

And a variety of scaled applications means they can be outdoor venues, indoor venues, specific purpose-built venues, or they could be general-use

venues. Lots of different applications.

Q. And when you say "all of us have a certain degree of skill in that area," who is "all of us"?

A. Well, "all of us" is a general reference to those in the theme park development business and entertainment as well.

Q. So generally if you're in the theme park development business or entertaining, you have a certain degree of skill in layout and design dependencies for a variety of scale applications?

A. You acquire that -- if not specifically trained in it, you acquire it based on experience.

Q. Then you wrote, "Steve possesses demonstrated skill and ability to manage and lead highly complex large-scale projects specifically within the entertainment world as well as the specific niche community of themed environments/theme park design and execution."

Is that opinion -- that's based on your work with Steve at Disney and your general knowledge of his background.

Is that correct?

A. That's correct.
Q. What methodology did you employ to determine whether or not Steve Hedrick possesses the demonstrated skills and abilities that you have discussed in your report?
A. It's really firsthand witnessing of it. The Tokyo DisneySea Project was highly complex, a lot of moving parts and pieces for which he was responsible.
So I got to see him firsthand deal with that.
Q. And that was in 2000 and 2001?
A. Yes.
Q. When you determined whether Steve Hedrick possessed and demonstrate -- possessed the demonstrated skills and abilities that you've discussed in your report, did you apply an objective standard, or is that just your subjective opinion?
A. Objective standard in that I compared -- I've worked for many, many people, and Steve always -- if you put him in a palette of different people who do the same thing, I've been able to compare his abilities with many other people, and he stands out as a skilled

individual.
Q. Using what metrics did you do that comparison?
A. No metrics. It's opinion based on observation and performance.
Q. So -- so it's not an objective standard? It's a subjective standard.
Is that right?
A. I think it's objective, especially in a comparative sense.
Q. Okay. Well, so what are the objective criteria?
A. The objective criteria in his skill and ability to do so. Leadership skills. Problem -- conflict resolution. Decision-making. All of that.
Q. How do you measure leadership skills objectively?
A. Are you successful? Does your team succeed?
Is there an esprit de corps?
It's success. It's based on success.
Q. And have you compared Steve Hedrick's

performance under any particular metrics to reach the conclusion that he possesses the demonstrated skills and abilities that you've discussed in your report?

A. Not use of metrics.

Q. Have you used any objective criteria to measure whether Steve Hedrick possesses the demonstrated skills and abilities that you have discussed in your report?

MS. JACKSON: Object to form.

A. One more time for me, please.

BY MR. NADEL:

Q. Have you used any objective criteria to measure whether Steve Hedrick possesses the demonstrated skills and abilities that you have discussed in your report?

MS. JACKSON: Object to form.

A. I -- I think it is objective. I don't think it's subjective. I don't think it's because I'm friendly with him.

I think it's because I've compared him to several leadership models. Some have been successful, some of which have been not successful. And I find

Steve to know how to obtain success.
BY MR. NADEL:
Q. What are the leadership models that you've compared Steve Hedrick to?
A. Oh. I've worked for many people in his capacity, but also within theme park development, management capacity from a project perspective.
And I've seen very good, and I've seen not-so-good.
Q. And where on that scale of people ranging from very good to not-so-good does Steve Hedrick fit?
A. Steve approaches the top of the list as his ability to effectively manage and lead something of great complexity.
Q. And that's based on your personal observation in 2000 and 2001?
A. Yes.
Q. Anything else?
A. Also I think knowing where he's gone since, the fact that he was on this project, that he was recommended to lead it, his work with the symphony in Mobile.

Yeah, I'd say that.

Q. You said you'd worked for many people in Steve's capacity, but also within theme park development, management capacity from a project perspective. "I've seen very good, and I've seen not-so-good."

Who are the very good?

A. Oh, I'm -- I'm not going to say names, if that's what you're asking.

Q. That is what I'm asking.

A. Uh-huh.

Q. Why are you not going to say names?

A. I don't feel comfortable doing that. Sorry.

Q. Who are the not-so-good?

A. I definitely don't feel comfortable saying that.

Q. Without the names of those people, how could another expert validate whether your conclusions about Steve Hedrick are correct?

MS. JACKSON: Object to form.

A. I don't know if I find that relevant.

Sorry.
BY MR. NADEL:
Q. Okay. You don't get to decide whether you find a question relevant or not.
Could another expert validate whether your conclusions about Steve Hedrick are correct?
MS. JACKSON: Object to form.
A. I would assume so. I don't know.
BY MR. NADEL:
Q. How would they go about doing that?
A. I don't know how they would do it.
Q. How would somebody who hadn't worked with Steve Hedrick go about evaluating whether he was qualified to have the role he had on the American Heartland Project?
MS. JACKSON: Object to form.
A. I think that would be up to the individual.
BY MR. NADEL:
Q. Well, how would a court determine whether Steve Hedrick was qualified to have the role he had on the American Heartland Project?

MS. JACKSON: Object to the form.
A. I'm not sure I know how to answer that.
BY MR. NADEL:
Q. Is there any objective criteria that someone could apply to determine whether Steve Hedrick was qualified to have the role he had on the American Heartland Project?
MS. JACKSON: Object to form.
A. I would -- I would say they could evaluate his positions that he's held, the success of the projects that he's led.
I would assume they could do all of that.
BY MR. NADEL:
Q. When you refer to "the success of the projects that he's led," what are you referring to?
A. Was a project successful or not, and what are the conditions for that success or non-success?
Q. Right. I mean, which projects has he led that you're referring to?
A. I would refer to Tokyo DisneySea.
Q. Are there any projects in the last 20 years that Steve Hedrick has led that have been

successful?
MS. JACKSON: Object to form.
A. I can't quantify or qualify that.
BY MR. NADEL:
Q. Other than the American Heartland Project, are there any projects in the last 20 years that Steve Hedrick has led at all?
MS. JACKSON: Object to form.
A. I don't have a roster of that information.
BY MR. NADEL:
Q. Are you aware of any?
A. No, not specifically.
Q. If you were hiring somebody to take the lead from conception to opening the theme park that was going to cost $2 billion, would it weigh into your consideration that a candidate had not successfully led any project to completion in the last 20 years?
MS. JACKSON: Object to form.
A. I can't -- I can't say.
BY MR. NADEL:
Q. Why can't you say?
A. Repeat the question, please.

Q. If you were hiring somebody to lead from conception to opening a theme park that was going to cost $2 billion to build, would it weigh into your consideration that a candidate had not successfully led any project to completion in the last 20 years?

MS. JACKSON: Object to form.

A. I don't think I would be in that position.

And yes, I think it's conceivable that you could select somebody who hasn't -- who fits that description. I think you could.

BY MR. NADEL:

Q. Sure.

A. Depends on who they are.

Q. So my question was not whether you could. My question is whether it would weigh into consideration.

A. That'd be a criteria, sure.

Q. And you said you don't think you'd be in that position.

Why wouldn't you be in that position?

A. No one has asked me to do it quite yet.

Q. Would you be qualified to do that?

A. I think I would be qualified to do that or certainly render opinion towards it.
Q. So you think you would be qualified to select someone to lead the construction of a $2 billion theme park from conception to opening?
A. I think so.
MS. JACKSON: Is this a good time for a break?
MR. NADEL: Sure.
A. Yeah.
THE VIDEOGRAPHER: We are off the record --
MR. NADEL: Before we go off the record --
BY MR. NADEL:
Q. During the break, could you look at your computer and determine how many hours you've worked, sir?
A. Sure.
THE VIDEOGRAPHER: We are going off the record at 10:34 AM.
[A recess was taken.]
THE VIDEOGRAPHER: We are back on the

record at 10:53 AM.
BY MR. NADEL:
Q. Sir, I believe you testified earlier that in preparation for your deposition you reviewed some notes.
What were the notes you reviewed?
A. Oh, notes that I had taken as I reviewed materials.
Q. Were those notes that you took when you reviewed the materials, and then you used that note -- those notes to put together your expert report?
A. Those notes were used to validate my opinions and my assumptions.
Q. You testified that Steve Hedrick had explored with you the possibility of coming to work for the American Heartland Project.
Is that right?
A. Loosely.
Q. And at the time you were working for Disney?
A. Correct.
Q. Why did you not want to leave Disney to

work for the American Heartland Project?

A. I had a large scope of work for Disney and was happy doing that and knew that I was approaching probably my last window before retirement, and I wanted to see that through.

Q. Earlier this morning, you testified about Steve Hedrick telling you that he was going to be leaving Disney.

How quickly after that conversation did he actually leave Disney?

A. I think he left within the week, as I recall. It's a little fuzzy. Long time.

Q. When you spoke with Steve Hedrick about the American Heartland Project, did you take notes on that conversation?

A. I did not.

Q. When you spoke with him during your work as an expert where you said you had some clarifying questions for him, did you take notes on that conversation?

A. I believe I did.

Q. And you still have those notes?

A. Yes.
Q. And do you still have the notes that I just asked you about a few minutes ago that you said you used to validate your opinions and assumptions?
A. Yes.
Q. Those are on your computer?
A. No. Those are actually paper.
Q. Okay. Were you able during the break to determine how many hours you've worked on this engagement?
A. Yes. It was 18. Approximately 18, 19, somewhere in between the two.
Q. Through today?
A. No. That was through the two depositions, so it was all prior to Monday of this week.
Q. Okay. So prior to Monday of this week, you had spent between 18 and 19 hours working on this engagement.
Is that right?
A. Yes.
Q. Okay. And that includes your attendance at Michael Easter's deposition last week.

Is that right?
A. Yes. Partial.
Q. And also your attendance at Mr. Payne's deposition last week, correct?
A. Correct. Partial.
Q. Could you turn to Exhibit 350, your expert report.
And if you could, please turn to Page 9, which is part of your list of sources of information.
Item 58 is Lazy Hawk Full-Service Proposal.
What do you remember about that?
A. It's a proposal from FORREC for their services. I don't remember specifics. I'd have to review it. I took a look at it, yes.
Q. Do you remember anything about it?
A. Architectural proposal, I believe.
Q. And Item 59 is FORREC team invoicing cash flow.
Do you remember anything about that?
A. I think I skimmed that, yes.
Q. Did you get any information from that that you relied on in your -- forming your opinions in this

case?
A. Yes. From both of them.
Q. What information?
A. Basically, what was their scope of work. Not that I can recite it. But what was their scope of work and how they were going to be compensated for that work.
Q. What do you know, if anything, about the cigar lounge Mr. Hedrick currently operates?
MS. JACKSON: Object to form.
A. I don't. I don't know anything about it actually, other than that it exists.
BY MR. NADEL:
Q. Since your engagement as an expert in this case, have you exchanged text messages with Steve Hedrick?
A. I think I have -- just -- it was trying to arrange a call. I think that's all I have.
Q. When was that?
A. Oh, a month ago, month-and-a-half ago.
Q. And since your expert engagement in this case, have you exchanged email with Steve Hedrick?

A. I have not.
Q. You wrote in your expert report that "Steve Hedrick has experience leading and managing highly complex large-scale projects."
What are the highly complex large-scale projects that Steve Hedrick has managed or led?
A. Other than the projects at Disney, including Tokyo DisneySea, there was his leadership of the Mobile Symphony Orchestra, I believe, which is not necessarily a complex project but a complex organization to run.
He did work in China on theater development and perhaps theme park development. I don't know the details.
And of course American Heartland.
Q. What theme park development did Steve Hedrick do in China?
A. I don't have any of the details. I just know that he was working on, I believe, venue development, if not park development in China.
Q. How do you know that?
A. He told me.

Q. You said projects at Disney, including Tokyo DisneySea.
What were the other projects at Disney that Steve Hedrick managed or led that you would call highly complex large-scale projects?
A. He was responsible for -- he worked on Paris, the Paris gate or the Paris first park.
And I'm not sure what the roster.
He did many things.
He also started -- I believe he was in the beginnings of the theatrical development team that became Disney theatricals.
He did a whole variety of things I can't even list. He did quite a bit while he was at the company.
Q. Did he manage or lead Disney Paris?
A. I don't know exactly what his role was, but he did create shows for Paris.
Q. Okay. So I'm interested in your statement that he's managed and led highly complex large-scale projects, not for these purposes interested in other things that he might have worked on or been part of a team for.

When you say he managed or led highly complex large-scale projects, what are the highly complex large-scale projects that he's managed or led?

A. Mostly what he did with Disney, whether they be special events, singular shows, participation in park development projects. He did quite a bit.

And he was also -- I perceived him, because of the roster of projects, to be somebody that Ron would focus on things that other people maybe weren't able to do, but Steve was better suited to do.

Steve did quite a few things that I think were somewhat out of the norm based on his abilities.

Q. Could you provide me with the list of highly complex large-scale projects that you're referring to in your report when you say that Steve Hedrick managed or led highly complex large-scale projects?

MS. JACKSON: Object to form.

A. I can't.

BY MR. NADEL:

Q. Can you identify any besides your identification of Tokyo DisneySea?

A. I'll answer this way.
That in observing Steve lead a 12-program -- live entertainment program for TDS -- it was clear and evident that he had led projects of similar scale, probably not to that scale, but large complex projects that would lead him to ultimately do Tokyo DisneySea in the way that he did it.
Q. So your opinion that Steve Hedrick has led highly complex large-scale projects is based on your observation of his work for Tokyo DisneySea.
Is that correct?
A. Yes. And conversation with him about things that he had achieved for Disney.
Q. And other than Tokyo DisneySea, you can not identify any highly complex large-scale project that Steve Hedrick managed or led while working for Disney.
Is that right?
MS. JACKSON: Object to form.
A. I don't have a list in front of me, but I'm sure I could assemble one.
BY MR. NADEL:

Q. Well, when you formed your opinion that Steve Hedrick led highly complex large-scale projects, what highly complex large-scale projects beyond DisneySea in Tokyo did you have in mind?
A. Things that he had told me about that I can't recall directly. I mentioned a few of them.
Not to mention the American Heartland Project.
That's not an easy endeavor. It's a difficult, complex, highly collaborative effort that somebody needs to have a skill in leading.
So I assume he was doing that, and by all evidence of what I've read, he was doing just that.
Q. On the American Heartland Project?
A. Correct.
Q. But your opinion was that he had the experience to be selected to lead the American Heartland Project based on his history of leading highly complex large-scale projects, correct?
A. Yes.
Q. And Tokyo DisneySea is the only highly complex large-scale project that, as you sit here today, you can identify that he managed or led.

Is that right?
A. That I -- that I witnessed.
Q. Or that you can name, correct?
A. Other than the other things I mentioned.
Q. Well --
A. I believe I mentioned something in Paris. I did mention Disney Cruise Line.
Q. Well, sir, when you mentioned Paris, we went back and we clarified that you don't know what his role was with respect to Disney Paris.
Is that right?
A. Well, I do know that he had -- he created I believe the first arena show for -- I forget the specific venue name.
So I know he had at least that involvement, but I don't know if he had involvement beyond that with Paris first gate (ph).
Q. What is Paris first gate?
A. I'm sorry. The original Paris park.
Q. The original Paris Disneyland?
A. Yes.
Q. He was involved in creating a show for it?

A. Yes.
Q. Was he in charge of creating that show?
A. I believe he was, yes.
Q. What was the show?
A. I don't remember the title of it.
Q. When you refer to highly complex large-scale projects, are you counting single shows among that?
A. Yes. Shows can be incredibly complex.
Q. So your opinion is that in part Steve Hedrick was qualified to lead the $2 billion American Heartland Project because he had previously managed and led shows?
MS. JACKSON: Object to form.
A. I would say that yes, I think he could achieve that based on my witnessing of his work at Disney and the knowledge I had of his -- basically his CV and what he had achieved. Yes, he would be suitable for that.
BY MR. NADEL:
Q. You referred to his CV.
Is that something that you considered in

preparing your report?

A. No. That would all be verbal for me in my experience with him.

Q. Before your expert engagement in this case.

Is that right?

A. Yes.

Q. You wrote in your report that the Walt Disney company parks and resorts, Walt Disney engineering has been the predominant focus of Steve Hedrick's career.

How did you determine what the predominant focus of his career was?

A. I am assuming that his longest employment was with Disney, based on my knowledge.

So I think the biggest chunk of his -- of his work history was with Disney.

Q. How long was he employed by Disney?

A. I don't know specifically.

Q. Do you know when he began working for Disney?

A. In the '80s, I believe, but I don't know

of specifics.
Q. Was it the early '80s or the late '80s?
A. I believe it was early '80s.
Q. Do you know what position he started with at Disney?
A. He may have started in stage management, but I don't recall.
Q. What other positions did he hold at Disney?
A. Show producer, project director. I'm not sure of the others.
Q. What shows did he produce?
A. It's probably a very long list. I don't have that.
Q. Do you know any of them?
A. He produced a show for the cruise line and I --
Yeah, we have talked about it. I just can't recall the specific shows.
We usually do quite a bit of that work. I've produced over a hundred shows for the company. So it gets foggy.

Q. You said he was a project director.
What projects did Steve Hedrick direct?
A. He was project director on Tokyo DisneySea.
Q. Anything else?
A. Not that I'm aware of.
Q. And to be clear, when you say it's a pretty long list of shows that he was a producer of, you're not referring to an actual physical list, are you?
A. No. I'm sure he has one, but --
Q. You just don't know what it is?
A. Correct.
Q. Okay. So you know he was a show producer, and you are unable to identify any shows that he produced, correct?
MS. JACKSON: Object to form.
A. I can't recite them, no.
BY MR. NADEL:
Q. You can't identify any of them, right?
A. Oh, I've told you at least two, but I'm sure he's done many more.

Q. What are the two?
A. The Paris arena show.
Q. What was that called?
A. I don't remember the name.
Q. When was it?
A. Paris -- I forget. When did Paris open? It was probably in the mid-'90s, early '90s. I forget when Paris opened.
Q. How long did it last?
A. It lasted a long time. I don't have specific dates.
Q. Do you know generally?
A. No.
Q. And you know he was project director of DisneySea.
You're not sure of any other projects that he was the director of.
Is that right?
A. That's correct.
Q. You know he served in stage management at Disney. But you don't recall any other positions he held at Disney.

Is that correct?
A. That's correct.
Q. So your knowledge of Steve Hedrick's work at Disney consists of him being a stage manager, him being a show producer, and him being a project director.
Is that right?
A. Those are the titles I'm aware of.
Q. Anything else?
A. No.
Q. Before he worked at Disney, did Steve Hedrick have any jobs in your view that contributed to his qualifications for the role he had with the American Heartland Project?
A. Before Disney? Say again, please.
Q. Before Disney, did Steve Hedrick have any jobs that contributed to his qualifications for the American Heartland Project, in your view?
A. I think all of his experience compiled made him a good choice, but no, I don't have specifics on what he did pre-Disney.
Q. When you refer to "all his experience

compiled," what besides his work for Disney are you referring to?

A. All of his entertainment work. I'm sure he did -- he was schooled in performance, and I'm -- has always worked in entertainment of some form. But I don't have a specific list.

Q. Do you know of any jobs he held other than the jobs for Disney?

A. I don't recall what he did pre-Disney.

Q. What has Steve Hedrick's career consisted of since Disney?

A. He's been a consultant. Worked for the Mobile Symphony Orchestra, I think.

He was an independent consultant in China.

I think that was for -- I believe that was for himself. I'm not sure.

Q. For whom did he consult in China?

A. I don't -- I don't know who his clients were.

Q. What did he consult on?

A. I believe it was theatrical venues, and it may have been beyond that.

But theatrical venues, I believe.
Q. Did he have clients in China?
A. Yes, I believe he did.
Q. How do you know that?
A. He told me.
Q. When?
A. 2013, '14.
Q. Was he paid for the work that he did in China?
A. I don't know. I assume so.
Q. Why do you assume so?
A. I don't know why you'd do work without getting paid for it.
Q. Do you know what the Dream Vision Project was?
A. I do not.
Q. In your second opinion, you wrote that it's your opinion that "Steve is very qualified for his role with the American Heartland Project."
What methodology did you employee to reach the conclusion that Steve was very qualified for his role?
A. I base that largely on what I reviewed in

terms of the creative of the park and also kind of the breakdown of how they were moving through the process.

But basically the creative of the park. The park is an impressive, very impressive work. Six lands. World-class theme park. Great design, from what I can tell from the package.

And he led that effort.

Q. So you concluded, based on the results of the design effort, that Steve Hedrick was very qualified to lead it.

Is that correct?

A. That he -- yes.

Q. What do you mean by "very qualified"?

A. It's not easy to develop a theme park. It's a big puzzle. It's a highly collaborative effort that has to be led.

Many, many people play in that space. And again, it's not easy to create an escapist, immersive experience, which is a theme park, and do it well, but -- the creative indicates that it's a pretty spectacular effort.

Q. Is there a difference in your expert

opinion between "very qualified" and "qualified"?
A. I think he's very qualified based on his longevity in the business and his style and approach.
Q. So when you're using the term "very qualified," you're distinguishing that between someone who is merely qualified.
Is that right?
A. Yes.
Q. And how do you determine whether someone is very qualified or only qualified?
A. Again, it's witnessing and experiencing the individual leading teams. So that's the basis for that.
Q. Is there an objective criteria that distinguishes between someone who is very qualified and someone who is only qualified?
A. An objective criteria? No, not necessarily.
Q. Is there a rank above "very qualified" on the scale that you're using?
A. No.
Q. So is there only very qualified,

qualified, and unqualified, or are there degrees of unqualified?

MS. JACKSON: Object to form.

A. I don't know how to answer that.

BY MR. NADEL:

Q. Well, what scale are you using to make the determination that Steve Hedrick is very qualified versus qualified?

MS. JACKSON: Object to form.

A. I'm not using a scale. I'm using my experience and Steve's -- and my experience with Steve within my experience.

BY MR. NADEL:

Q. Are there people in the theme park industry more qualified than Steve Hedrick for the type of role that he had with the American Heartland Project?

MS. JACKSON: Object to form.

A. More qualified? Equally as qualified, more qualified? I don't think so. Equally as qualified, perhaps.

BY MR. NADEL:

Q. So you think there are people equally as qualified, but nobody more qualified?
A. There may be.
Q. There may be people who are more qualified?
A. Maybe.
Q. What about --
Let me ask it this way.
Are there people who have successfully led a theme park from conception through opening?
A. Certainly.
Q. Would those people be more qualified than Steve Hedrick?
MS. JACKSON: Object to form.
A. It's hard for me to say.
BY MR. NADEL:
Q. Why is that?
A. More qualified? I'd say equally qualified.
Q. So your testimony is that Steve Hedrick, who has never successfully led a theme park from conception through opening, is equally qualified to

someone who has led a theme park from conception through opening?

A. You can be.

Q. Who are examples of people who have successfully led a theme park from conception through opening?

MS. JACKSON: Object to form.

A. I mean, there -- there are many people. I don't know how that's relevant to this.

BY MR. NADEL:

Q. Can you identify any person who has successfully led a theme park from conception through opening?

A. Yes.

Q. Who?

A. Well, there are several people at Disney. There's several people outside of Disney. I mean, there are several people who have done it.

Q. Let's start with the people at Disney.

Who at Disney has successfully led a theme park from conception through opening?

A. You want a list of names?

Q. Yes.
A. I could provide that. I guess I prefer to provide that in writing. I don't know if I want to rattle through a list of names --
Q. Well --
A. -- without giving it some thought.
Q. Well, when you formed your opinions in this case --
A. Uh-huh.
Q. -- had you thought of anyone within Disney who had successfully led a theme park from conception through opening and compared their qualifications to Steve Hedrick's qualifications?
A. Yes.
Q. Who?
A. Let's see.
Bob Weiss (ph).
Tom Morris.
I mean, there's a long list of people.
Q. What theme park did Bob Weiss successfully lead from conception through opening?
A. Shanghai Disney Resort.

Q. And what theme park did Tom Morris successfully lead from --
A. Hong Kong Disneyland.
Q. You got to let me finish my --
A. Oh, sorry.
Q. What theme park did Tom Morris successfully lead from conception through opening?
A. Hong Kong Disneyland.
Q. Anyone else?
A. Those are two examples.
Q. Is Steve Hedrick as qualified as Bob Weiss to play the role that Steve Hedrick played with the American Heartland Project?
A. I think in terms of the results that I see on American Heartland Project, yes.
Q. So you're judging someone's qualifications to be hired based on the results of their hiring.
Is that correct?
MS. JACKSON: Object to form.
A. I am basing it on what I deem to be a successful design package and what appears to be a successful creative conceit.

BY MR. NADEL:
Q. What do you mean, "what appears to be a successful creative conceit"?
A. I think the creative on American Heartland is strong. I think it's well-thought-out. I think it's diverse.
And Steve led that effort.
Q. So let's go back to 2022, when Steve was hired.
At that point, would you say that Steve was as qualified as Bob Weiss was to play the role Steve Hedrick played with the American Heartland Project?
A. That's tough to answer in that I don't know Bob's complete background and CV.
But -- restate your question, please.
Q. My question was, let's go back to 2022, when Steve Hedrick was hired.
At that point, would you say that Steve Hedrick was as qualified as Bob Weiss was to play the role that Steve Hedrick played with the American Heartland Project?
MS. JACKSON: Object to form.

A. Based -- I'm going to say based on the results of what I see the creative to be for American Heartland, yes.
BY MR. NADEL:
Q. So again, you are basing your opinion about Steve Hedrick's qualifications on the job that you believe that he did.
Is that right?
A. Correct.
Q. Set aside the job that Steve Hedrick did after he was hired and consider only his qualifications as of the time that he was hired.
Would you say he was qualified to play the role that he played?
A. Yes.
Q. Compare his qualifications to those of Bob Weiss.
MS. JACKSON: Object to form.
A. I can't really.
BY MR. NADEL:
Q. Why not?
A. I don't know Bob's entire history.

Q. So how do you weigh the fact that Bob Weiss had overseen the creation of a Disney park from conception to opening, whereas Steve Hedrick had never done that?

A. Again, based on what I see from the design work, I think it's great creative work and on par with a Disney-level park.

Q. My question was, how do you weigh the fact that Bob Weiss had overseen the creation of a Disney park from conception to opening while Steve Hedrick had never done that?

A. I don't -- I really don't understand the connection.

Q. When you are making a determination of whether Steve Hedrick was qualified for the job he was hired for at the time he was hired, are you taking into account the fact that he had never done that before?

MS. JACKSON: Object to form.

A. Yes.

BY MR. NADEL:

Q. And how do you weigh the fact that he had never done it before when you're making a decision as

to whether or not he was qualified?
A. I think he was qualified to take on the work, and I think the evidence of the actual creative work substantiates that.
Q. Other than Bob Weiss and Tom Morris, when you formed your opinions in this case, had you considered anyone within Disney who had successfully led a theme park from conception through opening and compared their qualifications to Steve Hedrick's qualifications?
MS. JACKSON: Object to form.
A. I mean, it's a long list.
BY MR. NADEL:
Q. Who is on it?
A. I guess I'm struggling with the relevance of it.
Q. Yeah, that's okay.
Who's on the list?
A. Of people that have successfully done that?
Q. That you considered when you were making your opinion that Steve Hedrick was qualified.

A. Yeah. That's a -- it's a -- it's a list.
Art Kishiyama.
Craig Russell (ph).
John Berry (ph).
I've got a whole list of names of people who I've seen do this.
Q. Okay. What theme park did Craig Russell lead the development of from conception through opening?
A. Craig was primary on Tokyo DisneySea and then moved on eventually to Run Imaginary (ph).
Q. Did Steve Hedrick report to Craig Russell on Tokyo DisneySea?
A. I don't -- No. We had a great deal of responsibility towards Craig, but I don't -- no, Steve did not report to him.
Q. Who did Steve report to on Tokyo DisneySea?
A. Oh, I think he reported to a few people -- went through the process.
Q. Who were the few people?
A. He reported to Ron Logan, but then he

reported to Doug Strong.

And I forget who he ended up reporting to. It might have been -- it might have been Jim Thomas.

Q. Did Ron Logan report to Craig Russell?

A. No.

Q. Did Doug Strong report to Craig Russell?

A. No.

Q. So Steve Hedrick reported to people who themselves didn't even report to the person who ran Tokyo DisneySea?

MS. JACKSON: Object to form.

A. Correct.

BY MR. NADEL:

Q. How many layers down in responsibility was Steve Hedrick on Tokyo DisneySea?

A. I think Steve was -- he wasn't a vice president, but he was directly below them running the entire entertainment program.

Q. He was below the vice presidents of Tokyo DisneySea?

A. Of the VPs that were running that, yes.

Q. And then those VPs reported up to what

level position?

A. I don't recall. They reported up largely within Walt Disney Imagineering.

Q. Was Tokyo DisneySea the project at Disney, to your knowledge, that Steve Hedrick had the greatest level of responsibility?

A. I can't say for sure, but he had a significant level of responsibility for that.

Q. Are you aware of any other project at Disney that Steve Hedrick had a greater level of responsibility than he had at Tokyo DisneySea?

A. I am not.

Q. And his level of responsibility at Tokyo DisneySea involved reporting to someone who reported to someone who reported to Craig Russell, who led the development of the park.

Is that right?

MS. JACKSON: Object to form.

A. The reporting relationships are pretty complex, so it's hard to just speak about them.

You'd actually need an org chart to figure that out.

But it's complex.

BY MR. NADEL:

Q. Are there people in the theme park industry who are less qualified than Steve Hedrick for the type of role he had with the American Heartland Project?

MS. JACKSON: Object to form.

A. I would assume so.

BY MR. NADEL:

Q. Who are examples of that?

A. Oh. I don't have examples.

Q. Are you qualified for the role that Steve Hedrick had with the American Heartland Project?

A. I could -- I believe I could do that, yes.

Q. Did you apply an objective standard in determining whether Steve Hedrick was qualified for the role he had with the American Heartland Project?

A. An objective standard? I think we covered this earlier.

Q. Earlier we were talking about a different opinion. Now we're talking about your opinion that Steve Hedrick was very qualified for the role he had

with the American Heartland Project.

A. I think he is -- was very qualified for that project.

Q. Did you apply an objective standard in making that determination?

A. An objective standard? No. Other than comparison of what I've seen him do versus what other people have done.

Q. Did you apply any objective criteria in determining whether Steve Hedrick was qualified for the role that he had with the American Heartland Project?

A. Yes. The ability to actually play in all arenas, which is largely on the creative side.

How to work with designers.

How to create lands.

How to lead that effort.

Did I answer your question?

Q. Aren't all of those subjective, meaning a matter of someone's opinion, as opposed to objective?

MS. JACKSON: Object to form.

A. No, I think it's objective, not subjective.

BY MR. NADEL:
Q. How do you objectively determine whether someone knows how to work with designers?
A. Watching them do it directly.
Q. You just watch them do it directly and decide for yourself whether they have the ability to do it or not.
MS. JACKSON: Object to form.
BY MR. NADEL:
Q. Is that right?
A. Essentially.
Q. The second thing you said was "How to create lands."
What lands had Steve Hedrick created prior to working for the American Heartland Project?
A. I don't -- I don't know. I believe he had some involvement in the land development within Tokyo DisneySea. By the time I had gotten there, that had been largely complete or completed.
But I don't know if he had any previous experience in land development.
Q. And what do you mean by "create lands and

land development"?
A. So creating of a theme park experience is really all about how you apply an overall creative, like American Heartland as the example. And how you create different experiences that flow from one to another. How you create reveals. How you create critical mass of attractions versus live shows.
And I think Steve has the inherent ability to help lead teams, figure that out.
Again, it takes a village to do these things. It's highly complex.
So you have to know how to lead and inspire design teams.
Q. And do you objectively determine whether somebody knows how to create lands by watching them do it directly?
A. Yes. And by the results.
Q. And you haven't watched Steve Hedrick create lands directly, right?
MS. JACKSON: Object to form.
A. I did not see him do that on American Heartland, no. But I did look at the creative results.

BY MR. NADEL:
Q. Right. You haven't watched Steve Hedrick create lands prior to working for the American Heartland Project, correct?
A. No.
Q. So how did you apply the objective criteria of whether someone knows how to create lands, when that's something you said you determined by watching them do it directly, if you hadn't watched Steve Hedrick do it directly?
A. Complex question, but what I'll say is that Steve I think possesses the inherent skills and the experience to be able to lead design teams in the development of lands.
Q. Right. So I had asked you whether you applied any objective criteria in determining whether Steve Hedrick was qualified for the role he had with the American Heartland Project, and you said yes and listed how to create lands.
Then I asked you how you determined whether somebody can do that, and you said "watching them do it directly."

Then I asked you what lands Mr. Hedrick had created prior to working for the American Heartland Project.

You said you didn't know.

How did you apply that objective criteria in determining whether Mr. Hedrick was qualified for the role that he had?

A. So I'll amend my answer by saying it's largely driven by the results of that creative package and what I see as the results of that effort.

Q. So you're saying that you are determining whether Steve Hedrick was qualified for the role that he had by looking at the results of his efforts?

MS. JACKSON: Object to form.

A. I say it proves that he was qualified for the role.

BY MR. NADEL:

Q. It proves that he was qualified for the role because he actually did the role?

A. Yes.

Q. And the role, as you described it, was seeing the park from conception through opening,

correct?

A. Well, yes. Seeing the project through to its pause or cancellation.

Q. Right. All that exists of the American Heartland Project is a gravel road and a construction fence, right?

MS. JACKSON: Object to form.

A. I don't know.

BY MR. NADEL:

Q. How much of the American Heartland Project was completed?

A. Oh, quite a bit from the design perspective. I believe they paused its schematic design. And they were ready to go toward -- they were ready to wrap that up and go into construction documentation.

That's -- that's a large asset in itself. That entire package, and all of that work is a significant asset.

But no, they hadn't started construction yet. That I know.

Q. How much money had they spent?

A. I don't know exactly. I believe there's the $60 million number that's out there, and the 2.2 overall expense of the project at full fruition.

Q. You said $60 million number that's out there.

Is that right?

A. I believe so.

Q. Six zero?

A. Yes.

Q. And what do you mean by "it's out there"?

A. Isn't -- wasn't the $60 million cited as the amount that is alleged of -- Mr. Bicknell being defrauded?

Q. Yeah. So that's what you're referring to?

A. That's what I'm referring to.

Q. And how much of that was for the land?

A. Oh, I don't know.

Q. So the project was going to cost $2.2 billion, and as far as you know, somewhere around $60 million was spent.

Is that right?

A. I don't know what the exact cost to date

was, but I believe it was around $60 million. That's just my assumption.

Q. As part of your -- forming your opinions in this case, did you consider how much of the American Heartland Project was completed?

A. I considered -- yes. I mean, I considered how far it had gotten through design.

Q. You don't know whether any of it was constructed?

A. I'm fairly certain that none of it was constructed except what may have been done with relation to early phases of land prep for the RV park.

Q. Was Steve Hedrick -- if the project hadn't been paused, was Steve Hedrick qualified to see it through construction?

A. Yes.

Q. And how would we determine that given that we don't have any results to look at?

A. They were prepared for that. They had prepared scopes of work for construction, construction management.

They had estimates for all of that work.

And I believe they were ready to move in -- construction drawings.

Q. Right. What would we -- what criteria would we use to determine whether Steve Hedrick was qualified to see the American Heartland Project through construction?

A. He had seen it through design, and he's been involved in construction. I don't believe Steve's an expert in construction, but he's been involved in a lot of construction, as many of us have.

But certainly believe he's capable of seeing the project through to fruition from that point forward.

Q. What construction was Steve Hedrick involved in?

A. We all -- I'm going to use the "we" note again.

All of us who are certainly in entertainment or any kind of theme park development get involved in construction from a review-and-comment perspective. We don't actually construct.

But we're -- we're involved with designers and construction companies in the erection of facilities.

Q. What facilities have you been involved in the erection of?

A. Any theater that went into Hong Kong Disneyland. Any theater that went into Shanghai Disney Resort. And also Tokyo Disney resort.

Q. And what was your involvement with the construction of those theaters?

A. My involvement was in the design of the facility. I had a lot of input into that.

And then as construction -- we monitored construction as it went -- as facilities would go up. And helped with any problems that would ensue, especially with regard to schedule.

Q. And what projects was Steve Hedrick involved in the construction of?

A. Tokyo DisneySea for sure.

What else?

I'm not sure about what else.

Q. Were there any aspects of Tokyo DisneySea constructed that Steve Hedrick was primarily in charge of?

A. All entertainment facilities we were

responsible for, which is significant.

Q. Steve was principally responsible for that?

A. Ultimately responsible for the success of the program, which included interface with construction that was led by the Japanese.

And yes, we watched the facilities come out of the ground.

Q. Did he engage the construction firm with respect to Tokyo DisneySea?

A. He did not.

Q. Did he manage the construction firm with respect to Tokyo DisneySea --

A. He did not, no.

Q. Did he -- what was his role with respect to the construction firms that worked on Tokyo DisneySea?

A. We actually -- so that was subcontracted to local construction. Managed by our partners, our Oriental Land Company partners, the owners of Tokyo Disney Resort.

But we would be involved in monitoring

construction, like I said, in making sure that if there were any problems ensued -- ensued especially due to schedule -- that we would be part of the remedy.

Q. When you say "we," do you mean you and Steve?

A. Yes. And not just the two of us. There were several people involved.

Q. Has the approach that you employed to determine whether Steve Hedrick was qualified for the role that he had on the American Heartland Project ever been peer-reviewed?

A. Restate the front end of that question, please.

Q. Has the approach that you employed to determine whether Steve Hedrick was qualified for his role on the American Heartland Project ever been peer-reviewed?

A. No.

Q. You opined that the design of the park as seen in the materials presented is well-thought-through and laid out.

What standard did you apply to determine whether

it was well-thought-through and laid out?

A. My knowledge of theme park design, land development, guest flow, relationship of facilities to each other. That's what we learned within the business.

Q. Have you previously examined theme park materials that you concluded were not well-thought-through and laid out?

A. Certainly.

Q. When?

A. Oh, within Disney. I mean, there will be multiple iterations of land design and a lot of stops and restarts.

Again, it's not -- it's not an easy process. It takes many attempts to come up with the right space planning or land development.

Q. Was it part of your job within Disney to examine materials for the design and development of theme parks and conclude whether they were well-thought-through?

A. One more time, please.

Q. Was it part of your job within Disney to

examine materials for the design and development of theme parks and conclude whether or not they were well-thought-through?

A. Yes. As to my actual application and involvement, yes.

Q. What do you mean as to whether -- "as to my actual application and involvement"?

A. What I mean is if we're working within a land -- theater entry, theater exits.

Different space allocations for land activations. If that wasn't well-thought-through, I would make a comment of such and ask for a redraw or a rethink.

Q. You haven't held the role within any Disney park that Steve Hedrick held with respect to the American Heartland Project, correct?

A. I -- I have not.

Q. What's the closest you've come to that role?

A. I was project director for the Hong Kong and the Shanghai parks for entertainment development. That's the closest I've come.

Q. And what was the title of the person ultimately in charge of the design and development of the Hong Kong and Shanghai parks?

A. Title would have been -- what did we call them? They were usually VPs of creative development or executive producers -- and/or executive producers.

Q. And did you report directly to those people?

A. No, I had great responsibility towards them, but I reported up through an entertainment chain of responsibility similar to how it was for Steve.

I reported to an entertainment -- Global Entertainment Group.

Q. So which of those parks is the most recent you worked on?

A. Shanghai Disney Resort.

Q. And that was in 2016.

Is that right?

A. That's when we opened. Correct. That's when we opened. Yes.

Q. And were you the project director for entertainment development for Shanghai Disney?

A. Yes. For entertainment development, yes.

Q. And who did you report to?

A. I reported to a variety of people, but I ended up reporting to VP of production -- vice president of production for Disney Live Entertainment.

Q. And who did that person report to?

A. That person reported to the global vice president of entertainment.

Q. How would you compare the design and development of theme parks in Asia to the design and development of theme parks in the United States?

A. There's no difference. There are different preferences based on cultural input.

There are some local statutory requirements, regulatory and statutory requirements.

But otherwise the concept is the same, or the approach is the same.

Q. Are there theme parks in the United States as to which you've been involved in the design and development?

A. Let me think.

No. Asia was my focus.

Q. Are there theme parks in the United States as to which Steve Hedrick has been involved in the design and development, leaving aside the American Heartland Project and Dream Vision?
A. I'm not sure.
Q. You don't know of any?
A. No. Maybe within his Disney career, but I'm not sure.
Q. Is theme park design and development a niche industry within the design and construction world?
A. I would say it is.
Q. Can you quantify that?
A. I can elaborate.
Q. Okay.
A. It's a -- you're developing an experience as opposed to -- I mean, you can call anything an experience, I presume.
But instead of an individual theater or individual restaurant, this is an all-encompassing, full-service immersive experience. And I think that's different as the end result is really its own small

city, if you will, or about how it operates and how it functions for guests, if that makes sense.

Q. How many theme park design firms are there in the United States?

A. Oh, I -- I can't quantify.

Q. Can you approximate?

A. No.

Q. Who are the leading theme park designers in the United States?

MS. JACKSON: Object to form.

A. I don't know who the leading are.

BY MR. NADEL:

Q. Do you know who the leading theme park design firms are?

A. I know some of them.

Q. Who are they?

A. Well, The Hettema Group, for one.

Thinkwell Design.

Let's see. Mycotoo.

There are many, actually. Obviously.

Q. That last one you mentioned. Can you spell that?

A. M-Y-C-O-T-O-O.
Q. Do you know any designers who work for those firms?
A. Yes.
Q. Who?
A. Oh, there's -- again, I can rattle off a list, but --
Q. Okay. Well, tell me the names you can name.
A. For those firms -- well, a lot of people float.
Scott Sinclair.
Again, Tom Morris.
Tim Kirk.
Who else?
Sylvia Hassa (ph).
Steve Bass.
I mean, there's a plethora of people.
Q. Do theme park design firms differ from theme park development firms?
A. I don't think so.
Q. So those firms that you mentioned -- would

those also be considered theme park development firms?
A. Yes. Development and design, yeah.
Q. What is R, D, and E?
A. Retail, dining, and entertainment.
Q. How many theme parks have included RV parks as part of their master planning?
A. Oh, a good question.
I don't know. I can't quantify that.
Q. You wrote in your report, "Hotels, recreational acreage, alternative lodging facilities such as an RV park are often included as part of the master planning process."
A. Yeah. Or I should have probably said RV park and campgrounds.
Q. Which theme park have included campgrounds as part of their master plan?
A. Disney Orlando has.
Who else does campgrounds?
I know Orlando does.
Q. Was that included as part of its master planning?
A. Yes.

Q. Have you been involved in the master planning of a theme park?

A. Only in so much as input to -- master planning is usually large land-use specifications.

And I've had input to that from an entertainment facility perspective.

That's how that works for me.

Q. Other than providing input from an entertainment facility perspective, have you been involved in the master planning of a theme park?

A. Not directly, no.

Q. What is the source of your knowledge about theme park master planning?

A. The source of my knowledge?

Q. Yeah.

A. Other than witnessing it happen. What is it?

Q. Yes.

A. Master planning is overall use of acreage and how it fits into the municipality or the county and how you ultimately determine land use and create the parcel that contains improvements.

But transportation, circulation, all of that in and around those parcels.

And then you figure out how those parcels are divvied up for their varied uses.

Q. You wrote, "Most people in this business who are doing this level of work don't obtain degrees in theme park design necessarily."

Who are the people that are doing what you refer to as "this level of work"?

A. Who are the -- I mean, the people that are actually employed to do this work.

Q. Right. And you said they don't obtain degrees in theme park design necessarily.

So I'm saying, who are the they? What people?

A. Well, let me answer it this way.

Until recently, there really hasn't been a degree in theme park design. That's evolved over the years and over the last 20 years. Those courses have come into being.

Whether or not one can get a degree, I'm not quite sure.

So I'm just saying that the rest -- those of us

who are in this business, as I indicate in my report, come from usually some form of creative background.

There's also non-creative, but generally speaking to what is germane to the topic is we all come from some kind of creative background, and a lot of us are assimilated -- I'm sorry -- assimilated into this business.

Q. When you say "this level of work," are you referring to the level of work that Steve Hedrick was doing on the American Heartland Theme Park?

A. Yes.

Q. So you wrote, "Rather they originate from some creative design, direction, or performative art such as design, art direction, stage and media direction, music, dance, design, live entertainment, et cetera."

And you're referring to the people who are doing the level of work that Steve Hedrick was doing.

A. Correct.

Q. So what people are those? Who?

A. I'm sorry. What people are those?

Q. Identify them.

A. Identify them how?
Q. By name.
A. I don't understand.
Q. So I am trying to test your proposition that people doing the level of work Steve Hedrick was doing originate from these particular fields.
To do that, we need to know who you're talking about, and then we'll figure out where they originated. By doing that, we'll determine whether or not your opinion is valid.
So who are the people doing this level of work that you're talking about?
A. A lot of them are indicated actually on the project itself, American Heartland Project.
And I don't know their -- I don't know their specific backgrounds. I just know everyone comes from a variety of different backgrounds.
And many of the people that are on the fee registers, compensation registers that I reviewed, I believe they come from a wide diverse background, but not specifically know where they come from, if that makes sense.

Am I answering your question?

Q. Well, maybe you're starting to.

When you refer to "most people in this business who are doing this level of work," meaning the work that Steve Hedrick was doing on the American Heartland Project, are you able to identify by name --

A. Uh-huh.

Q. -- any of those people?

A. Sure.

Q. Okay. Please do that.

A. And they're actually on the -- we don't have it, but they're on the log.

So I'm talking about people like John Sorenson.

Oh, God, what's that list?

John Sorenson.

Tom Turley (ph).

Dave Vermeil (ph).

It's the whole list that was -- if you recall the fees. That's where I captured all of these names and many of those people I know.

Q. Meaning the list of people who were paid to work --

A. Correct.
Q. -- on the American Heartland Project?
A. That's correct.
Q. Okay. Let's start with John Sorenson.
A. Uh-huh.
Q. Where -- where did he originate from?
By that I mean, you said, "These people originate from" --
A. He comes from Disney. And I believe his background is landscape architecture and perhaps architecture, but I don't know what his time was before Disney.
Q. Are you -- are you considering landscape architecture -- well, are you considering architecture to be creative design, direction, or performative art?
A. Design, yes.
Q. What about Tom Turley?
A. Tom Turley was an operations development specialist. And he probably -- I don't know Tom's history, but I believe he came out of park operations and probably worked for Disney the majority of his life, but not in a design capacity.

Although industrial engineering does have a design component to it, and that was one of his specialties.

Q. What people who were doing the level of work that Steve Hedrick was doing on the American Heartland Project came out of the field of stage and media direction?

MS. JACKSON: Object to form.

A. Oh, I don't know.

BY MR. NADEL:

Q. Do you know, are there any who did?

A. Yes, I'm sure as evidenced by some of the vendors that were engaged.

But I don't know any other specifics.

Q. Were any of the vendors that were engaged doing the level of work that Steve Hedrick was doing on the American Heartland Project?

A. Well, yes.

Q. Well, the level of work Steve Hedrick was doing you said was overseeing the project from conception to opening, right?

A. Uh-huh.

Q. So who has overseen construction of a theme park from conception or opening with a background originating in stage and media direction?

MS. JACKSON: Object to form.

A. Yeah, I think I know where you're going, but it's a tough question to answer.

BY MR. NADEL:

Q. Can you identify anyone?

A. No. No, not under the structure of that question.

Q. What about the structure of the question do you object to?

A. I believe you said -- you asked who has the same level of experience or ability as Steve in architecture that comes from the stage? Something like that?

Q. I said who has overseen construction of a theme park from conception to opening with a background in stage and media direction?

A. I don't -- I'm going to say I don't know.

Q. Who has overseen the construction of a theme park from conception to opening with a background

in art direction?
MS. JACKSON: Object to form.
A. Lots of people. Specifically I can't speak to that, but yeah, lots of people come from an art direction background for that.
BY MR. NADEL:
Q. So your testimony is that lots of people who have overseen the conception of a theme park from conception to opening have come from an art direction background?
A. Can come from an art direction background.
Q. Let's --
A. What I'm saying is a lot of people come from different disciplines and ascend to that level of work. That's my point.
Q. Sure. I get your point. I'm testing the point.
A. Uh-huh.
Q. So let's back up.
Because there aren't that many theme parks in the United States.
So what people are you aware of who have

performed the role that's Steve Hedrick had with the American Heartland Theme Park?

A. Well, there's a list -- some of the list of names that I gave you with regard to Disney.

But again, it's a big business, and there's a lot of people out there and they all come from a variety of different backgrounds.

Q. So I don't think any of the names you gave me -- correct me if I'm wrong.

I don't think you've given me any name of someone who has overseen a U.S. theme park from conception to opening.

A. A U.S. theme park, sorry.

Who was on -- I don't recall the individuals.

I'm trying to figure out who did California Adventure.

Yeah. Sorry.

Q. Do you know who played the role that Steve Hedrick played on the American Heartland Theme Park with respect to Disney's Magic Kingdom?

A. I do not.

Q. Do you know who played the role that Steve

Hedrick played on the American Heartland Theme Park with respect to Disney's EPCOT?

A. No, I do not.

Q. Do you know who played the role that Steve Hedrick played on the American Heartland Theme Park with respect to Disney's Hollywood Studios?

A. That may have been Bob Weiss.

Q. And what was Bob Weiss's background?

A. Bob Weiss's background may have been coordination and graphics and art direction as he moved into more senior roles. I don't want to speak for him directly, but I think that's my perception.

Q. Do you know who played the role that Steve Hedrick played on the American Heartland Theme Park with respect to Disney's Animal Kingdom?

A. Joe Rhode.

Q. And what was Joe Rhode's background?

A. Joe Rhode's background is art, direction, design.

Q. And how do you spell Rhode?

A. R-H-O-D-E, I believe. I can confirm.

Q. There are four Universal Studios theme

parks in Orlando.

Do you know who played the role that Steve Hedrick played on the American Heartland Theme Park with respect to any of them?

A. I'm trying to figure out -- I've got the name in the back of my head for Epic, which is the latest park that Universal opened last year.

But I can't recall off the top of my head.

Q. Do you know who played the role that Steve Hedrick played on the American Heartland Theme Park with respect to SeaWorld in Orlando?

A. I do not.

Q. Do you know who played the role that Steve Hedrick played on the American Heartland Theme Park with respect to Six Flags Hurricane Harbor here in Oklahoma City?

A. I do not.

Q. Do you know who played the role that Steve Hedrick played on the American Heartland Theme Park with respect to any Six Flags park in the United States?

A. No. I know people involved in that, but I

don't -- I don't remember the specific leader. I don't know of the specific leaders for those.

Q. Other than Bob Weiss and Joe Rhode, do you know the name of anyone who played the role that Steve Hedrick played on the American Heartland Theme Park with respect to any theme park in the United States?

MS. JACKSON: Object to form.

A. No -- no. I mean, I do know of -- I can't recall at the moment.

BY MR. NADEL:

Q. When you made the statement in your report that people who do the level of work that Steve Hedrick was doing originate from within some creative design direction or performative art such as design, art direction, stage and media direction, music, dance, design, live entertainment, et cetera, what steps did you take to validate that opinion?

A. The knowledge of my background --

Sorry. The knowledge of the background of certain people.

And it's mostly from my experience with Disney, where people can really come out of anywhere, but it's

mostly from art direction. Sometimes architecture. But it's mostly art direction is usually where people rise to a level of creative oversight from that. That was the intent of my note.

MS. JACKSON: Is this a good time for a break?

MR. NADEL: Sure.

MS. JACKSON: Just like a lunch break, or --

MR. NADEL: Yeah. 20 minutes? Is that good?

MS. JACKSON: That works.

About 12:30.

Oh, sorry.

THE VIDEOGRAPHER: We are going off the record at 12:07 PM.

[A recess was taken.]

THE VIDEOGRAPHER: We are back on the record at 12:34 PM.

BY MR. NADEL:

Q. Did you undertake any study to determine what the standard education of a theme park executive

is?
A. I did not.
Q. Do you know Ron Logan?
A. Yes.
Q. How did you know him?
A. When I first joined Disney, we all reported up to Ron through Steve until his departure.
Q. Until Steve's departure?
A. No. Until Ron's departure. Sorry.
Q. When was Ron's departure?
A. I don't -- I don't recall when exactly that happened.
Q. Was it before or after Steve's departure?
A. I believe it was before, but I'm not certain of that.
Q. You wrote that Ron Logan began his career as a Disney trumpet player.
How do you know that?
A. Many of the executives for a period of time came out of the music program. It was well-known within the company that Ron had started as a musician and came up through the ranks.

Q. You wrote, "In his last role at Disney, Ron was executive vice president, executive producer for Walt Disney Entertainment.

"He was responsible for creating, casting, and producing all live entertainment products for the Walt Disney Company, including Disneyland Resort, Walt Disney World Resort, Tokyo Disney Resort, Disneyland Paris, the Disney Institute, Disney Business Productions, Disney Cruise Line, Disney Entertainment Productions, and Walt Disney Entertainment Worldwide.

"Ron was also executive vice president of the Walt Disney Special Events Group and the executive vice president of Disney Special Programs, Inc.

"He produced all live entertainment shows for the Disney parks worldwide as well as five Super Bowl halftime shows."

How do you know that any of that is true?

A. Page, please. Oh, 15?

Q. Yes.

A. That is the -- that is the prevailing knowledge of everybody who knows Ron, that he did all of those things.

I don't know why we would think he didn't do those things.

He was head of global entertainment up until his departure, so he was responsible for everything that -- pretty much everything that had "entertainment" in its title or name or group.

Q. What do you mean by "it's the prevailing knowledge of everyone who knows Ron"?

A. Well, everybody who knew Ron at the time pretty much knew his history, and I don't see any reason to doubt any of it.

Q. What is the original source of this information?

A. This information actually comes from my knowledge and Steve's knowledge as well, two of us.

Q. Who wrote this language of this paragraph?

A. This was actually provided to me by counsel.

Q. And where did counsel get it from?

MS. JACKSON: Object to form.

A. I'm not certain. It's -- since it was historical information, I'm not certain.

BY MR. NADEL:
Q. What -- what did -- how did counsel provide this to you?
A. In the drafting, we looked at a draft of this, and it included it.
Q. So counsel inserted this language into your report?
MS. JACKSON: Object to form.
A. No, I inserted it into the report.
BY MR. NADEL:
Q. Counsel sent you a document with this language?
A. I think we talked through it. I forget.
Q. This language was directly cut and pasted from something you found on the internet, wasn't it?
A. No.
Q. Well, what was it cut and pasted from, sir?
MS. JACKSON: Object to form.
A. I don't know exactly where it was sourced.
BY MR. NADEL:
Q. Well --

A. But I did not clip it from the internet. No.

Q. Did you clip it from a document provided to you by someone who clipped it from the internet?

A. I don't know where it was found, but I was provided with the information.

Q. By whom?

A. By counsel.

Q. Do you mean Ms. Jackson?

A. Yes.

Q. And in what form did she provide it?

A. I believe it was -- I think it was by email.

Q. And did you copy it from the email and paste it into your report?

A. I did.

Q. And is there other language in your expert report that was similarly copied from email provided by counsel and pasted into your expert report?

A. No.

Q. This is the only paragraph, you're saying?

A. Correct.

Q. Did you independently validate that Ron Logan had any of those positions other than the one you mentioned?

A. I knew him to have these positions.

Q. And you wrote, "Steve had the opportunity to work for Logan where he continued to refine his acumen for not only music and entertainment development, but also overall theme park design and development while working alongside some of the best minds in the industry."

Is that your words, or did somebody else provide you with that language?

A. No, those are not my words.

Q. Who provided you with that language?

A. Counsel.

Q. Okay. I just asked you earlier whether the language we read was the only paragraph that you copied and pasted into your report, and you said it was.

And now you're saying there's another paragraph.

A. It is the paragraph that starts with "Steve mentored" through the end of this section.

Q. That whole paragraph was written by counsel or provided to you by counsel and pasted into a document?

A. Correct.

Q. Do you know who provided that language to counsel?

A. I do not.

Q. When it says that, "Steve had the opportunity to work alongside some of the best minds in the industry," who is it referring to?

A. Oh, it's -- I think it's referring to -- I believe it's referring to those people at Disney from both internal and external consultants, creative consultants, designers.

I'm sure that's what that refers to.

Q. How do you know that's what it refers to?

A. That was the -- I mean, the business model for Disney was to use internal resources and external resources, especially in the area of music development, design, choreography direction.

So we worked with a whole variety of different people from the outside world within the industry but

not direct employees at Disney.

Q. When you pasted that sentence into your expert report, did you ask counsel who it was referring to when it talked about some of the best minds in the industry?

A. No, I did not.

Q. How do you know who it was referring to?

A. I think it was a general statement, based on the shows that we created, that we tried to look for the best people and did achieve in finding the best people.

So there's a variety of strong talent that we worked with.

Q. How long did Steve Hedrick work for Ron Logan?

A. I'm not sure of total duration.

Q. Do you know how many years?

A. No, not specifically.

Q. Was it more than two years?

A. Oh, yes.

Q. How do you know that?

A. By the time I met Steve, he had been

working for Ron for quite a long time, but I don't know the actual duration.

Q. What overall theme park design and development did Steve Hedrick work on?

A. I only know of -- I only know of Tokyo DisneySea.

Q. The next paragraph says, "Steve's core expertise centered on the creative and production developments, strategic planning, spatial engineering, and operational design of live entertainment environments. Across five Disney theme parks in North America, Europe, and Asia, he led the development of performance venues engineered to support highly complex productions, balancing technical infrastructure, theatrical storytelling, performer operations, audience circulation, and high-capacity guest experience within a single integrated environment."

Are those your words, sir?

A. They are not.

Q. Who wrote that language?

A. I was provided.

Q. By counsel?

A. Yes.

Q. What are the five Disney parks it refers to?

A. The five Disney parks in North America, Europe, and Asia.

So Tokyo Disneyland, DisneySea, Disneyland Paris. Three I think of the parks in North America -- I'm sorry -- in Orlando and the two parks in California.

But I think it was mostly -- sorry -- Paris, Tokyo Disneyland, and the Orlando parks.

Q. Which Orlando parks?

A. Magic Kingdom, EPCOT.

I don't think Animal Kingdom.

What am I missing?

Yikes.

EPCOT and Magic Kingdom, primarily.

Q. The next paragraph says, "As part of Walt Disney creative entertainment, Steve directed the creative and physical development of entertainment spaces supporting a wide spectrum of world-class productions including," and then there's a list.

Did you write that paragraph?
A. I did not.
Q. That was also provided to you by counsel?
A. Correct.
Q. Do you know who wrote it and provided it to counsel?
A. I do not.
Q. Do you know whether Steve Hedrick himself wrote that language?
A. I do not.
Q. Now we've identified three paragraphs that were written by counsel or provided to you by counsel.
Is there any other language in this report that was provided to you by counsel rather than a result of your own work?
A. No.
Q. How do you know what Steve Hedrick did at Disney other than the time that you worked with him?
A. Mostly conversation with Steve directly, him telling me what his background was --
Q. During --
A. -- and what he had done.

Q. During the time that you worked with him?
A. Yes. And a little bit before, but mostly when I worked with him.
Q. So this -- so your knowledge about what Steve Hedrick did at Disney other than the time that you worked with him on Tokyo Sea is based on confirmation -- conversations that you had with Steve Hedrick in 2001 and earlier.
Is that right?
MS. JACKSON: Object to form.
A. Throughout my time with him or knowing him.
BY MR. NADEL:
Q. Did you have conversations after 2001 with Steve Hedrick about the work that he did at Disney?
A. I'm sure it came up at certain points. Specifically I don't recall, but I'm sure it came up.
Q. Did you have any conversations with Steve Hedrick about the work that he did at Disney while you were engaged in preparing this expert report?
A. No.
Q. Can you compare Steve Hedrick's experience

at Disney with the experience at Disney of the person who designed Magic Kingdom at Walt Disney World?

A. I can't in that I can't recall who designed Magic Kingdom.

Q. Can you compare Steve Hedrick's experience at Disney with the experience of the person who played the role at EPCOT equivalent to the role Steve Hedrick played with respect to the American Heartland Theme Park?

MS. JACKSON: Object to form.

A. I can't recall who that was.

BY MR. NADEL:

Q. Can you compare Steve Hedrick's experience at Disney with the experience of anyone who played an equivalent role at any other U.S. theme park?

MS. JACKSON: Object to form.

A. No, not off the top of my head. No.

BY MR. NADEL:

Q. Can you compare Steve Hedrick's experience at Disney with the experience of anyone who played an equivalent role at any other theme park anywhere in the world?

MS. JACKSON: Object to form.

A. Other than what we mentioned earlier. We mentioned the few --

BY MR. NADEL:

Q. When we were talking earlier, we were talking about where those people came from in terms of whether they originated in art design, et cetera.

Now we're talking about comparing Steve Hedrick's experience at Disney with the experience of anyone who played an equivalent role at a theme park anywhere in the world.

A. We mentioned Bob Weiss and Tom Morris.

There's also Jon Binkowski, who created the Hard Rock Park in Myrtle Beach.

We talk -- we didn't talk about John, but we talked about the other two.

Q. Okay. So let's start with Bob Weiss.

Can you compare Steve Hedrick's experience at Disney with Bob Weiss's experience at Disney?

MS. JACKSON: Object to form.

A. No, not directly.

BY MR. NADEL:

Q. And which theme park did Bob Weiss play a role equivalent to the role Steve Hedrick played with American Heartland Theme Park?
A. Shanghai Disney Resort, and I believe he may have started Tokyo DisneySea and then diverted off to something else.
And I believe he was the principal on the studio's park in Orlando, the one I forgot earlier.
Q. And which U.S. theme park did Tom Morris play a role --
Sorry. Which theme park did Tom Morris play a role equivalent to Steve Hedrick's experience at Disney -- or the American Heartland --
A. He was instrumental in --
Q. Sorry, I asked the question wrong.
A. Sorry, sir.
Q. Which theme park did Tom Morris play a role equivalent to Steve Hedrick's role at the American Heartland Theme Park?
A. I believe Disneyland Paris and certainly Hong Kong Disneyland.
Q. Okay. And can you compare Tom Morris's

experience with that of Steve Hedrick?
A. I can in terms of watching Tom do -- or actually execute Hong Kong Disneyland, working closely with him.
So yes, I can compare that.
Q. Okay. Please compare it.
A. Meaning that they were -- I think they were similarly skilled. Tom was a little bit stronger in an art direction standpoint, but the overall development of the park was his responsibility.
And I think Steve demonstrates similar qualities and abilities.
Q. What was Tom Morris's experience prior to being put in charge of the design and development of Hong Kong Disneyland?
MS. JACKSON: Object to form.
A. I don't know specifically. I believe he was deeply involved in -- if not led -- the Paris Disneyland effort.
BY MR. NADEL:
Q. So Tom Morris was put in charge of Hong Kong Disneyland having previously led the Paris

Disneyland effort.

A. I believe.

Q. And Steve Hedrick was put in charge of the American Heartland Theme Park not having previously led any theme park design development effort.

Is that right?

MS. JACKSON: Object to form.

A. To my knowledge.

BY MR. NADEL:

Q. And then you also mentioned the creator of the Hard Rock Park in Myrtle Beach, first name Jon.

Who was that?

A. Jon Binkowski.

Q. What was Jon Binkowski's experience prior to leading the creation of the Hard Rock Park in Myrtle Beach?

A. Jon led entertainment at SeaWorld. I'm not sure exactly when.

And he was one of the co-owners of Renaissance Entertainment, which was a theme park development company.

Q. So when --

A. When, sorry?
Q. So when he was placed in charge of the creation of the Hard Rock Park in Myrtle Beach, he had owned a theme park development company.
Is that right?
A. Correct.
Q. Steve Hedrick never owned a theme park development company, did he?
A. I'm not sure. I don't believe so, but he did consult in that capacity immediately after Tokyo DisneySea.
Q. For whom?
A. Himself, but I don't know the size of his organization.
Q. For whom did he consult?
A. I don't know his client list.
Q. Did he have any clients?
A. I believe he did, yes.
Q. Why do you believe that?
A. I believe he told me.
Q. What did he tell you?
A. That he had potential clients or clients,

but I don't know the specifics.
Q. Do you know any theme parks he consulted on?
A. I do not.
Q. And that was right after he left Disney in 2001?
A. Correct.
Q. As to the American Heartland Theme Park, you write that Steve Hedrick led the overall effort from both a project visioning and creative leadership standpoint.
A. Uh-huh.
Q. Did you write that language, or was that provided to you by counsel?
A. No, I wrote that.
Q. How do you know that he led the overall effort from a project visioning and creative leadership standpoint?
A. He had told me that -- in the reconceiving of the creative from the film-based park, he had led the effort and conceived of the American Heartland concept, and then led that effort into execution from a

design perspective.
Q. That was the conversation that you had in 2022?
A. Correct.
Q. So at that point there hadn't been any execution into a design perspective, had there?
A. For American Heartland? Yes, I think they were in design.
Q. In 2022 when he had that conversation with you?
A. I believe so, yes.
Q. When in 2022 was it?
A. I don't recall. It might have been the fall. I'm not sure.
Q. Have you ever led a project of the magnitude of the American Heartland Theme Park?
A. No.
Q. Can you compare the magnitude of the projects you've led to that of the American Heartland Theme Park?
MS. JACKSON: Object to form.
A. No.

BY MR. NADEL:
Q. Why not?
A. I'm sorry. Repeat the question for me again, please.
Q. Can you compare the magnitude of the projects you've led to the magnitude of the American Heartland Project?
A. Yes, I can certainly compare.
Q. Please do.
A. My efforts on the two parks that I led -- directly led the efforts for on entertainment, they're smaller in scale from my scope compared to leading the overall effort. I haven't done that.
But that's how I would compare it. You're comparing the entertainment programmatic piece to an overall park.
Q. And what are the other pieces besides the entertainment programmatic piece?
A. Oh, there's many pieces.
So there's the actual design, land design.
Attractions roster, what attractions that you're going to do.

Landscape architecture.

Decompression zones.

Food and beverage.

Sanitary and restroom work.

Back-of-house work is huge.

I mean, it's all of those pieces and more.

Q. So you led one piece?

A. I led a piece.

Q. You led a piece, whereas Steve Hedrick was leading all of the pieces.

Is that right?

A. Yes.

Q. Can you compare the magnitude of the projects that Steve Hedrick previously led to that of the American Heartland Project?

A. Only --

MS. JACKSON: Object to form.

A. Only in earnest or literally would be Tokyo DisneySea, since I witnessed it.

BY MR. NADEL:

Q. Okay. So compare the magnitude of Steve Hedrick's responsibilities on Tokyo DisneySea to his

responsibilities on the American Heartland Project.

A. He was responsible for entertainment, so he was responsible for a specific discipline, as I was on those other two parks that I mentioned, as opposed to leading the overall effort.

Q. In Page 16 of your report, you wrote about Steve Hedrick's work on nighttime spectaculars.

What is the source of your information for what Steve Hedrick did with respect to nighttime spectaculars?

A. Know -- I mean, he told me that he had developed nighttime spectaculars. Most all of us have that worked for Disney at that level.

So I'm sure it came up in conversation.

Q. What venue infrastructure did Steve Hedrick design?

A. Well, we're responsible for design, infrastructure design. We don't actually do that work. But we're responsible for making sure that it's done.

So that can be a wide variety of design disciplines, but it's mostly technical in nature -- technical makeup of a venue, and all the components

that go into it to achieve your creative intent.

Q. Right. For which venues did Steve Hedrick design the infrastructure?

A. I would assume from this that they were fireworks launch zones, fountain systems.

I mean, I don't disbelieve any of this.

Projection work, fireworks, fountain system, pyrotechnics, and multimedia production.

Q. Well, this is your report, sir, it's your opinion. So the question is not whether you believe it or not, but what you're referring to when you say these things.

MS. JACKSON: Object to form.

A. I'm referring to Steve's experience, and I have no reason to doubt it.

BY MR. NADEL:

Q. Do you have any reason to affirmatively believe that Steve Hedrick designed any venue?

MS. JACKSON: Object to form.

A. Yes, I do believe he had a lot to do with venue design.

BY MR. NADEL:

Q. Which venue?
A. I can't cite them individually.
Q. Can you cite any of them?
A. Other than those that we did at Tokyo DisneySea.
Q. Which ones at Tokyo DisneySea?
A. All of the entertainment venues. There were many of them.
Q. Do you remember the names of any of them?
A. Sure. Mermaid Lagoon Theater, Lost River Delta Theater, Dockside Stage, the Broadway Music Theater, Mediterranean Harbor, which is a nighttime and daytime water carnival and nighttime spectacular venue.
What am I forgetting?
Atmosphere performance areas.
I'll stop there, but that's the majority of them.
Q. You wrote that Steve Hedrick planned and integrated flexible entertainment zones.
Which ones?
MS. JACKSON: Object to form.
A. I'm not -- I'm not aware of the specifics

of that, but this is all tied to atmosphere and entertainment, and this description is what we do when we develop atmosphere and entertainment.

BY MR. NADEL:

Q. Did Steve Hedrick plan and integrate flexible entertainment zones?

A. I assume he did, yes, from his description of his work.

Q. His description of his work in conversations in 2001?

MS. JACKSON: Object to form.

A. And before, yes.

BY MR. NADEL:

Q. Does Steve Hedrick have any professional licenses?

A. Not that I'm aware of. He may, but I don't know of any.

Q. Does Steve Hedrick have any experience hiring architects before the American Heartland Project?

A. I'm not aware.

Q. Did Steve Hedrick have any professional

certification in architecture prior to the American Heartland Project?
A. I don't believe so, but I'm uncertain.
Q. Did Steve Hedrick have any professional experience in engineering?
A. I don't believe so, but not certain.
Q. Does Steve Hedrick have any professional experience in construction?
A. In actual construction, I'm not sure. But like I said, we're all very integrated into construction when it happens within the theme park environment.
Q. Did Steve Hedrick have any professional experience as the direct manager of construction companies?
A. No, not that I'm aware of.
Q. Did Steve Hedrick have any experience selecting construction companies?
A. I do not know.
Q. Did Steve Hedrick have any professional experience in land development?
A. Yes. I know he had a lot of input into

land development in Tokyo DisneySea, and I believe that's borne of having done that previously for other parks, but I don't have specifics.

Q. Did you compare Steve Hedrick's experience against a job description for a role as a theme park executive when you prepared your opinions?

A. I did --

MS. JACKSON: Object to form.

A. I did not.

BY MR. NADEL:

Q. In your report, you call Steve Hedrick the leader of the entire effort.

Who was the chief executive officer of the American Heartland Project?

A. By leader of the entire effort, I meant that he was leading the creative visioning and execution via design and continuing through the process.

Above him, I don't know how that was structured.

Q. Are you aware that the chief executive officer of the American Heartland Project was Larry Wilhite?

A. I've not been told that specifically, but I'm not surprised to hear that. That makes sense.

Q. Did you consider Larry Wilhite's qualifications in forming your opinions in this case?

A. I did not.

Q. Who hired Steve Hedrick for his job on the American Heartland Project?

A. I'm unclear. I believe it was -- I would presume it's Larry, but I'm not sure.

Q. The American Heartland Project was Steve Hedrick's first opportunity to lead a project of this magnitude, correct?

A. I believe so, to my knowledge.

Q. You wrote that there was nothing in Steve Hedrick's work history or performance that suggested he was unprepared for this responsibility.

Did you consider the fact that he hadn't been employed in the theme park industry for two decades?

MS. JACKSON: Object to form.

A. Did I consider it? I did not know that for a fact verbatim.

But did I consider it? I just considered his

entire experience more than what he had been doing specifically for the last 20 years.

BY MR. NADEL:

Q. Do you believe that the fact that he hadn't been employed in the theme park industry for two decades should affect whether or not he was prepared for his responsibility on the American Heartland Project?

A. I can't say.

Did I consider it? No.

Q. Do you know about the Dream Vision Project?

A. I do not.

Q. Can you cite an example of anyone being selected for a role comparable to the role Steve Hedrick had with the American Heartland Project who hadn't been employed in the theme park industry for the prior two decades?

A. I --

MS. JACKSON: Object to form.

A. I can't answer, no.

BY MR. NADEL:

Q. You say you can't answer.
You mean you can't cite any example, correct?
A. Correct.
Q. How was Steve Hedrick selected for his role with the American Heartland Project?
A. I -- I presume Ron Logan made the introductions and suggested that Steve take on the project.
Q. Why do you presume that?
A. I believe -- I believe I read that, and I think -- and Steve and I had a discussion about that in the '22 conversation, about how that all came to be.
Q. Did Steve tell you that Rick Silanskas came to his house in 2022 and asked him to become involved in the project?
A. I may have read that in the deposition. I don't know Steve ever told me that.
Q. Did Steve tell you that Rick Silanskas came to his house in 2021 and asked him to be involved in the project?
A. I may have read that in the deposition, but no, Steve did not mention that.

Q. What were the respective roles of Rick Silanskas and Anthony Silanskas in the American Heartland Project?
MS. JACKSON: Object to form.
A. I do not know.
BY MR. NADEL:
Q. What did you take away from the deposition testimony of Anthony Silanskas that you read?
A. My takeaway was that he was involved. I didn't quite understand the role or his participation or contribution.
I believe there was something about the media, the studios, the MEG studios.
I believe there was something about that and him.
But I'm very vague on what his role was.
Q. In Steve Hedrick's role with the American Heartland Project, what deliverables was he responsible for producing?
A. Project deliverables at the high level would be the phase deliverables for the different phases of work, blue sky concept, feasibility of

schematic.

And then if the project had continued, they would be more.

But it was those deliverables.

Q. And how do you know that?

A. That is the process that one follows. And in my evaluation of what I saw, that's what this project -- this project was following the same process going through those different phases.

Q. Did Steve Hedrick have a contract to do the work that he was doing?

A. I'm not aware of one.

Q. Is that typical?

A. Employment arrangements or engagement arrangements vary from project to project.

So I don't know if I can say it's typical or untypical.

Q. Are you aware of any theme park where the person in the role Steve Hedrick had was not an employee associated with the theme park?

MS. JACKSON: Object to form.

A. No.

BY MR. NADEL:

Q. Are you aware of any theme park where consultants have consulted without a contract?

MS. JACKSON: Object to form.

A. I'm not aware.

BY MR. NADEL:

Q. You write, "One of the most important responsibilities of any project executive is assembling the right team. In my opinion, Steve did exactly that."

Did -- were those your words?

A. Yes.

Q. What methodology did you employ to determine whether Steve Hedrick assembled the right team for the American Heartland Project?

A. So if you go back to the aforementioned -- it's the ledger, if you will, of what people were paid, both firms and individuals, that all has names above companies and individuals.

I know a lot of those. I know that Steve tapped most of those, if not all of them, especially the individuals. I recognize almost every name -- not

entirely, but close -- as people that we've worked with in the past.

So that's how I came up with that.

Q. So your methodology was to look at who the team was and --

A. And the companies, yes.

Q. Your methodology was to look at who the team individuals and companies were, and based on your knowledge of them, conclude whether or not that was the right team?

A. If they were capable of supporting the project in the right way, yes.

Q. Were there any especially strong components of the team that Steve Hedrick assembled?

A. Strong components? Most all of them were extremely strong components.

Q. Were there any standouts?

A. Oh, I'd have to look at the list. But I've mentioned some of them before.

Other than the companies that were hired --

Yes. Ron Rodriguez.

Michael LeFleur, as we mentioned.

Jordan Peterson from an entertainment perspective.

And then John Sorenson, Tom Turley, Dave Vermeil.

That list of individuals and more.

Q. Did Michael LeFleur work on the American Heartland Project?

A. I believe he did. He is listed as having worked on it. I don't know exactly what he did, but I presume it was entertainment-related.

Q. Were there components of the team that were not as strong?

A. I don't know.

Q. Have you ever assembled a team to design a theme park?

A. To design an entire theme park? No.

Q. Have you ever assembled a team to develop a theme park?

A. Entire theme park? No.

Q. What are your qualifications to assess whether Steve Hedrick assembled the right team to develop a theme park?

A. I think it's a combination of disciplines. Do you have all of the right disciplines covered?

And then my knowledge of the individuals.

Had I not known the majority of them, I don't know if I would be able to -- without doing the research into who they were -- be able to answer that.

But I know the majority of the people that are on that list, and they're all strong candidates or strong performers.

Q. What recognized leaders within the theme park industry did Steve Hedrick engage to work on the American Heartland Project?

A. Leaders? You mean exceptional in their field of expertise?

Q. Well, you wrote, "Steve sought out and engaged recognized leaders within the themed entertainment industry."

A. Uh-huh. So yes, that's what I meant. Just exceptional in their areas of experience and focus.

And like -- I mentioned a few of them.

But there are some heavy hitters in that list.

Q. Right. So I know you've mentioned a number of names today, but I'm asking specifically here where you say, "Steve sought out and engaged recognized leaders within the themed entertainment industry."
Who are you referring to?
A. I would be referring to some of those names that I mentioned before.
Q. Which ones?
A. Dave Vermeil and Tom Turley.
I'd have to look at the list.
Q. By whom are they recognized as leaders?
MS. JACKSON: Object to form.
A. By whom? I can't say by whom. But I think within the industry -- within a large swath of the industry they're known.
BY MR. NADEL:
Q. How does someone determine, who's not in the industry, whether or not someone is recognized as a leader?
A. If they're not in the industry, they wouldn't have that information.
Q. What metrics apply to determine whether

someone qualifies as a recognized leader within the themed entertainment industry?

A. From my perspective, their experience, the success of the projects that they've been involved with.

Q. Are there any objective metrics that apply?

A. Not that I'm aware of.

Q. You write, "Firms such as THG Hettema are widely regarded as among the premier companies in the world with extensive experience in planning and development of world-class themed destinations."

Did you write those words?

A. I did.

Q. Okay. Let's break that down.

You write "firms such as THG Hettema."

What are the other firms?

A. I mentioned some of them before.

Bob Rogers.

Who else?

Well, Peter Alexander did a lot of development work in his day.

There's Thinkwell Design.
There's -- Tate's getting into that business. Tate Towers.
Amongst others.
Q. None of those others that you mentioned worked on the American Heartland Project, did you?
A. No. Hettema was the primary creative source engine, as I understand it, for American Heartland.
Q. Okay. So you wrote, "Firms such as THG are widely regarded as among the premier companies in the field with extensive experience in the planning and development of world-class themed destinations. Steve Hedrick's decision to retain firms of that caliber" -- and you went on.
It was only one firm, The Hettema Group, correct?
MS. JACKSON: Object to form.
A. Well, I'm using Hettema as a cited example.
BY MR. NADEL:
Q. Okay. What other firms of that caliber

did Steve Hedrick engage?
A. The project engaged -- and I presume that Steve was involved in all those decisions -- FORREC.
Oh. ProFun.
That list of other vendors that supported.
Visual Terrain.
Electrosonic.
I mean, those are all known names within the business.
Q. Are those recognized leaders within the themed entertainment industry?
A. Yes.
Q. What world-class themed destinations has The Hettema Group planned and developed?
MS. JACKSON: Object to form.
A. I don't have a list. One of the latest examples would have been One World Trade.
BY MR. NADEL:
Q. One World Trade?
A. Uh-huh.
Q. What is that?
A. They did a visitor center observation deck

at the top of the facility.

Q. At the top of the World Trade Center?

A. Yes.

Q. The World Trade Center that was destroyed on --

A. No. The -- One World Trade is the replacement.

Q. Ah.

You write, "The decision to utilize an Oklahoma-based architectural firm was entirely appropriate."

Why did you write that?

A. I think I had read that there was a question why -- why was an architectural firm without theme park experience engaged, and this is my response to that.

Q. So you're saying that it was important to engage an Oklahoma firm even though that firm didn't have theme park experience?

A. There were other architectural firms that were on the project that had the background and experience.

But having a local firm on hand is a good idea for the reasons I cite.

Q. Did the Florida Disney parks principally rely on a Florida architect?

MS. JACKSON: Object to form.

A. I do not know.

BY MR. NADEL:

Q. As we mentioned at Universal Studios Orlando, there are four separate parks.

How many of them principally used a Florida architect?

A. I do not know.

Q. There are theme parks in Oklahoma right now, correct, sir?

MS. JACKSON: Object to form.

A. I presume there are. I don't know if there are.

BY MR. NADEL:

Q. Do you know whether any of the theme parks in Oklahoma used an Oklahoma architectural firm?

MS. JACKSON: Object to form.

A. Cannot answer.

BY MR. NADEL:
Q. What was the Oklahoma-based architectural firm that was used in this case?
A. AD -- is it ADG Blatt?
Q. You're referring to ADG Blatt there?
A. I am.
Q. How was ADG Blatt selected as the architectural firm for the American Heartland Project?
A. I do not know.
Q. Were other firms considered?
A. I do not know.
Q. Would there be a standard bidding process in developing a large theme park for selecting the principal architecture firm?
A. One would assume so, but I do not know if they went -- what kind of bid process they went through.
Q. Or if they went through one at all, right?
A. Correct.
Q. You wrote, "Prior theme park work experience is beneficial but not a prerequisite for producing competent architectural work."

Who were the main architectural design firms for the U.S. Disney parks?

MS. JACKSON: Object to form.

A. Oh, I'm not sure.

BY MR. NADEL:

Q. Which theme parks in the United States had a principal architect who did not have prior theme park work experience?

MS. JACKSON: Object to form.

A. I do not know.

BY MR. NADEL:

Q. Which theme park in the world had a principal architect who did not have prior theme park work experience?

MS. JACKSON: Object to form.

A. I cannot answer that.

BY MR. NADEL:

Q. You wrote, "Nothing about the selection of consultants or subject matter experts reflected poor judgment, inexperience, or a lack of understanding of how to assemble a qualified project team. Based on my review, the consultant selections were reasonable and

consistent with accepted industry practice for a project in its concept development phase."

Has anyone in this case opined that the selection of consultants or subject matter experts reflected poor judgment, experience, or a lack of understanding of how to assemble a qualified project team?

MS. JACKSON: Object to form.

A. I don't know specifically, but I believe the genesis of this statement is in response to Steve didn't know what he was doing and didn't know whom to hire.

BY MR. NADEL:

Q. Is it accepted industry practice to hire vendors without a bidding process?

MS. JACKSON: Object to form.

A. Yes, it can be. It depends on what the discipline is.

BY MR. NADEL:

Q. Is it accepted industry process to hire an architectural firm without a bidding process?

MS. JACKSON: Object to form.

A. Usually not.

BY MR. NADEL:

Q. Is it accepted industry practice to hire a theme park design firm without a bidding process?

MS. JACKSON: Object to form.

A. It depends. It depends on what specific focus and experience you're looking for.

But usually not.

BY MR. NADEL:

Q. Is it accepted industry practice to hire a construction firm without a bidding process?

MS. JACKSON: Usually not.

BY MR. NADEL:

Q. As far as you know, was there a bidding process to hire a construction firm with respect to the American Heartland Project?

A. I do not know how they handled their contracting.

Q. Was there a bidding process to hire a theme park design firm for the American Heartland Project?

A. I do not know.

Q. And you already said you don't know if there was a bidding process to hire an architectural firm for the theme park process.
Is that correct?
A. I do not know.
Q. So how can you opine that the processes that were used were consistent with accepted industry practice?
A. Let's look at the exact language.
Where's the -- which paragraph are we?
Q. Page 16, second paragraph from the bottom.
"Based on my review, the consultant selections were reasonable and consistent with accepted industry practice for a project in its concept development phase."
A. So what am I saying there? Is that the question?
Q. I'm saying how can you opine that the practices for vendor selection were consistent with accepted industry practice when you don't know what the selection process was?
MS. JACKSON: Object to form.

A. I am actually specifically speaking to the selections. How they got there, I don't know. But the choices are reasonable and consistent.

BY MR. NADEL:

Q. How can you opine that selecting an architect with no prior theme park experience is within accepted industry practice when you can't identify any theme park for whom the architect had no prior industry experience?

MS. JACKSON: Object to form.

A. I don't think it's a prerequisite that every architectural firm engaged in a project would have to have experience building a park.

BY MR. NADEL:

Q. What is the accepted industry practice for consultant selection?

MS. JACKSON: Object to form.

A. I don't know if I understand the question.

BY MR. NADEL:

Q. Well, you said that the consultant selections were consistent with accepted industry practice.

What is the accepted industry practice?
A. People who know what they're doing and people that are educated and practiced and experienced, and that's what I meant.
Q. So when you say "the accepted industry practice," you just mean that it's the accepted industry practice to hire people who know what they're doing and people who are engaged and experienced.
Is that right?
A. Yes.
Q. What do you mean by "subject matter experts"?
A. Where do I have that phrase?
Q. At the beginning of the paragraph you say, "Nothing about the selection of consultants or subject matter experts."
A. Oh, okay.
Yeah, so the individuals and their specific disciplines.
Q. Who are you referring to there?
A. I believe they're all consultants for the most part, but the subject matter expert -- a good

example, Tom Turley is an operations development expert. John Sorenson is a master planning expert.

That's what I mean by "subject matter." Disciplines.

Q. How could the court check your assertion of what the accepted industry practice for a project in its concept development phase is?

MS. JACKSON: Object to form.

A. Yeah, this is worded I think in a way that might be confusing.

But the consultant section -- selections were appropriate and were good choices.

That would be what I'm saying is accepted industry practice, is you don't hire people that don't know how to do this for those projects.

So I apologize for maybe some confusion on that.

BY MR. NADEL:

Q. Is there any objective methodology to determine whether or not a consultant selection is appropriate?

MS. JACKSON: Object to form.

A. I'm just going to answer by saying success

record and experience -- or other way around. Experience and success record.

BY MR. NADEL:

Q. And did you go through when you were preparing your report each of the consultants and perform some methodology based on their success record or experience to determine whether or not their selection was appropriate?

MS. JACKSON: Object to form.

A. It's based on my experience with them or knowledge of them.

BY MR. NADEL:

Q. So it was your methodology just to look at the list of names and compare it with your prior experience with or knowledge of those vendors?

A. I reviewed the list, and it all seemed reasonable to me that those were good selections.

Q. Is there anything else you did to determine that those were good selections?

A. No.

Q. Do you know how Steve Hedrick went about selecting the consultants?

A. Specifically, no, I don't, other than based on his knowledge base and experience with those individuals from the past.

Q. Then you say, "Similarly, I see no issue with the selection of Aaron Hedrick to serve in a project coordination role."

Aaron Hedrick is Steve Hedrick's son, correct?

A. Correct.

Q. Do you know Aaron Hedrick?

A. I do.

Q. How long have you known him?

A. I've known him since I knew or met Steve. I know of his sons. I've met his sons. I don't know them well, but I know them.

Q. When you worked with Steve, he was a small child, right?

A. Yes.

Q. So you've known Aaron Hedrick since he was a small child?

A. Young, yes.

Q. What was his project coordination role?

A. Just that, project coordination. So the

management of information on behalf of the team, as it's quite intense, the amount of paperwork and design packages, correspondence, et cetera. A project coordinator usually manages all of that.

Q. Did you read Aaron Hedrick's deposition?

A. I don't recall reading that, no.

Q. Is your knowledge of what Aaron Hedrick did on the project just based on the fact that his title was project coordinator?

A. Correct.

Q. So you don't actually know what he did. Is that right?

MS. JACKSON: Object to form.

A. I don't know exactly what he did, but if he was hired to be a project coordinator, I know what that role does.

BY MR. NADEL:

Q. Have you talked to Aaron Hedrick about this case?

A. I have not.

Q. Have you talked to Aaron Hedrick about his work on the American Heartland Project?

A. No.
Q. How much was he paid?
A. I think I saw $550 a day, if I'm not mistaken, on one invoice or on the ledger.
Q. Your opinion is that project coordination is an entry-level role?
A. Yes. In project management, yes.
Q. Okay. He was paid $65 an hour.
Are you telling the jury that $65 an hour is a salary for an entry-level role?
MS. JACKSON: Object to form.
A. It can be.
BY MR. NADEL:
Q. And over the period of project development, Steve Hedrick's son, Aaron Hedrick, was paid $265,000 in total.
Were you aware of that?
A. Over the course of three years?
Q. Where do you get three years from?
A. Or 30 months, whatever the duration of the project was.
Q. Well, over the course of his time working

on the project, he was paid $265,000 in total.

A. Okay.

Q. Were you aware of that?

A. I probably read that because I think it's totalled up on the ledger.

Q. Is that appropriate for someone in an entry-level role?

MS. JACKSON: Object to form.

A. It depends. I don't think it's unreasonable.

BY MR. NADEL:

Q. Is it appropriate in your view that Steve Hedrick's son, Aaron Hedrick, was paid $265,000 for his work in an entry-level role on the American Heartland Project?

MS. JACKSON: Object to form.

A. Please -- in my opinion, what?

BY MR. NADEL:

Q. In your opinion, is it appropriate that Steve Hedrick's son, Aaron Hedrick, was paid $265,000 for his work in an entry-level role on the American Heartland Project?

A. It is not inappropriate.
Q. Every dollar that Steve Hedrick paid to his son was ultimately from Gene Bicknell, right, sir?
MS. JACKSON: Object to form.
A. I believe so.
BY MR. NADEL:
Q. What qualifies you to opine on whether it was appropriate for Steve Hedrick to hire his son for $65 an hour?
MS. JACKSON: Object to form.
A. Say it one more time. I'm sorry.
BY MR. NADEL:
Q. What qualifies you to opine on whether it was appropriate for Steve Hedrick to hire his son for $65 an hour?
MS. JACKSON: Object to form.
A. I -- that was Steve's decision, but I don't -- I understand Aaron's experience in restaurant management to have been acceptable training and background for him to take on project coordination. He's smart. It is an entry-level role and he can do it in my opinion.

BY MR. NADEL:
Q. Right. My question was, what qualifies you to opine on that as an expert?
A. Because I know what the role does.
Q. You've worked with project coordinators before?
A. Absolutely.
Q. Have any of them been paid $65 an hour?
A. Yes.
MS. JACKSON: Object to form.
BY MR. NADEL:
Q. In an entry-level role?
A. Yes.
Q. Were other candidates considered for Aaron Hedrick's role?
A. I do not know.
Q. What process did Steve Hedrick used to hire his son Aaron Hedrick?
A. I do not know.
Q. What was Aaron Hedrick's experience with organizing information prior to his work on the American Heartland Project?

A. Restaurant management, as I think we all can presume, is not easy. That was his background.

As far as I knew, he may have had additional experience, but he did work his way up in that.

My opinion is if you can work in that industry, you can certainly manage project information and coordination.

Q. How do you know that Aaron Hedrick's background was in restaurant management?

A. My knowledge of the family and being told that he was doing that.

Q. Through your friendship with the family, right, sir?

MS. JACKSON: Object to form.

A. Through my conversations with Steve, yes.

BY MR. NADEL:

Q. And your conversations with Steve after 2001 were all part of your friendship with Steve, right?

MS. JACKSON: Object to form.

A. Yes. Professional and friendship, yes.

BY MR. NADEL:

Q. Did you have a professional relationship with Steve after 2001?

A. Well, I think in general, yes. We were both in the same industry.

Did we work together? No.

Q. But you were just friends, right?

A. We were also friends.

Q. What experience did Aaron Hedrick have in facilitating communication prior to his work on the American Heartland Project?

A. Again, I believe it's based on my assumption that his working his way up in restaurant management, he would have had the organizational and administrative skills necessary.

Q. What methodology did you employ when considering whether it was correct for Steve Hedrick to hire his son, Aaron Hedrick?

MS. JACKSON: Object to form.

A. I can't -- I can't answer that.

BY MR. NADEL:

Q. Is that -- the methodology was just that you learned of the fact that it happened, and you said

in your opinion, whether it was right or wrong, fair?
MS. JACKSON: Object to form.
A. I didn't see any issue with having him fulfill the role of a project coordinator, based on my knowledge of the role and my knowledge of him.
BY MR. NADEL:
Q. Yeah, right.
So reaching that determination, you just knew Steve Hedrick hired Aaron Hedrick. "I know what this role is, and I know Aaron Hedrick."
And then you formed an opinion on whether that was right or wrong, right?
MS. JACKSON: Object to form.
A. Essentially, yes.
BY MR. NADEL:
Q. Do you have children, sir?
A. I do not.
Q. You write, "Success in that role depends primarily on organization, communication, and coordination skills, all of which Mr. Hedrick possessed."
How do you know that Aaron Hedrick possessed any

of those skills?

A. As I said before, I don't think you rise in corporate restaurant management without having those skills.

Q. Any other way?

A. Any other -- there are many other ways, I suspect.

Q. I'm saying, is there any other basis for your opinion that Aaron Hedrick possessed organizational, communication, and coordination skills other than the fact that he had become manager of a restaurant?

A. That was the --

MS. JACKSON: Object to form.

A. -- basis of my statement, yes.

BY MR. NADEL:

Q. Then you write, "Additionally, Nathan Hedrick was utilized in a small scope in the project, which directly related to his industry experience consulting on the pirates stunt show and Electropolis (ph) stunt show. Nathan worked as an actor stuntman for over a decade. Specifically, Nathan worked as a

WaterWorld performer and supervisor with the show being performed at Universal Studios Hollywood, as well as having worked as a live performer at Disneyland."
Do you know Nathan Hedrick?
A. Yes.
Q. How do you know him?
A. I've met him, and I know him as a performer and everything I've mentioned here.
Q. You know him since he was a child?
A. Young, yes.
Q. How do you know him as a performer?
A. I know that he was within the cast of WaterWorld, and that he had worked his way up into helping manage that when Universal especially converted that to an offshore third-party management company.
And that I do know he was a performer at Disneyland, but I'm not sure doing -- he might have been doing the Fantasmic show as a stunt performer, but I'm not certain. But I know he worked there.
Q. Have you seen him perform?
A. Yes, I did see him at WaterWorld.
Q. What he was he doing in WaterWorld when

you saw him perform?
A. I think he was the villain, if I'm not mistaken. I've forgotten his exact role.
Q. How much was Nathan Hedrick paid to work for the American Heartland Project?
A. I do not recall.
Q. Are you aware, sir, that Steve Hedrick's son, Nate Hedrick, was paid $100 per hour?
A. I may have read that, but I don't remember.
Q. Are you aware that during the course of the American Heartland Project, Steve Hedrick's son, Nate Hedrick, was paid $141,000 in total?
A. I don't recall.
Q. And there never were any performances associated with the American Heartland Project, right, sir?
MS. JACKSON: Object to form.
A. Correct.
BY MR. NADEL:
Q. And no performance venues were ever built, right?

MS. JACKSON: Object to form.

A. Designed, but no, not built.

BY MR. NADEL:

Q. Tell the jury whether you think it was appropriate that Steve Hedrick's son, Nate Hedrick, was paid $141,000 for his work on the American Heartland Project.

MS. JACKSON: Object to form.

A. I can't say that it was inappropriate.

BY MR. NADEL:

Q. Was it appropriate?

A. Yes, I can say -- yeah.

Q. Why do you think that?

A. I don't think it's unreasonable, over a period of time in developing a theme park, that somebody can participate in live show development and make that amount of money over time.

Q. You think it's appropriate that someone can earn $141,000 developing a live show to be performed in a venue, construction for which never started?

MS. JACKSON: Object to form.

A. Absolutely.

BY MR. NADEL:

Q. Every dollar that Steve Hedrick paid to his son, Nate Hedrick, was Gene Bicknell's money ultimately, right, sir?

MS. JACKSON: Object to form.

A. I presume, yes.

BY MR. NADEL:

Q. What is Nate Hedrick doing now?

A. I'm not sure exactly what Nate's doing now.

Q. When you were working for Disney, was there a nepotism policy?

MS. JACKSON: Object to form.

A. I was not -- I'm not aware of a nepotism policy.

BY MR. NADEL:

Q. When you formed your opinions in this case, did you consider whether Steve Hedrick's relationship with Aaron Hedrick was disclosed to the leadership of the American Heartland Project above Steve Hedrick on the chain?

MS. JACKSON: Object to form.

A. I don't know if that happened. I presume it was disclosed, but I don't know for a fact.

BY MR. NADEL:

Q. Why do you presume it was disclosed?

A. I don't see any reason not to disclose it.

Q. If it wasn't disclosed, would that affect your opinion on the propriety of Steve Hedrick hiring his sons and paying them over $400,000 to work on the American Heartland Project?

MS. JACKSON: Object to form.

A. Not necessarily. Hard to answer.

BY MR. NADEL:

Q. What would it depend on?

A. What would it -- sorry. Rephrase.

Q. Right. You said not necessarily.

Would not necessarily affect your opinion of Steve Hedrick's hiring of his sons and paying them over $400,000 to work on the American Heartland Project that wasn't disclosed.

So what do you mean by "not necessarily"?

MS. JACKSON: Object to form.

A. I think what I said -- you probably have it right there.

But I think what I said is that I don't know if it was a problem not disclosing that, but I don't necessarily see a problem in those two doing the roles that they did and receiving the pay they received.

BY MR. NADEL:

Q. You write that, "Steve Hedrick fulfilled his responsibility in a manner consistent with the industry best practices."

What do you mean by "industry best practices"?

A. Industry best practices is borne of the review of the creative and the strength of the creative. That's what I was referring to.

Q. Okay. So I was quoting from Page 17 of your report --

A. Right.

Q. -- where you're talking about the hiring of the professionals who worked on the project.

And you say that that was done in a manner consistent with industry best practices.

When you say "industry best practices," what do

you mean?

A. Yes. Industry best practices is, did you hire the right people, the right experience level, the right expertise. That is what I meant.

The practice of how one hires, I'm not referring to.

Q. Where would somebody go to find out what industry best practices are?

A. It's mostly results and achieving success with design and execution.

Q. So industry best practices for hiring -- there must be some criteria for best practices other than, are the people I hire going to ultimately succeed?

Would you agree with that?

MS. JACKSON: Object to form.

A. Well, it's not -- are they set up to succeed by their experience and their demonstrated application of their skill, and therefore is it appropriate to engage them?

That's -- that's what I meant, I believe.

BY MR. NADEL:

Q. Are industry best practices written down anywhere?

A. I think it's more common industry practices or industry standard practices is probably the better way to phrase that.

Q. When you concluded that Steve fulfilled his responsibility in a manner consistent with industry best practices, did you apply any objective criteria?

MS. JACKSON: Object to form.

A. It's my evaluation of the creative, the phase deliverables, and the team assembled.

BY MR. NADEL:

Q. The next section of your report is under "The heading the following is a common phase of work breakdown of the workflow within themed entertainment design and development."

Why did you include this section of your report?

A. I think there's a bit of a misunderstanding or lack of knowledge about how parks are designed, so I did this to help educate readers as to the process.

Q. Why do you think there's a

misunderstanding or lack of knowledge as to how parks are designed?

A. I would refer to the fact that there's a statement about there's nothing created or nothing delivered in physical form other than gravel and a fence -- or whatever that phrase is -- as opposed to the design effort that has been extensive and does exist as an asset. That's what I'm referring to.

Q. When you say the design effort exists as an asset, what do you mean by that?

A. That design package could be taken today and a park could be built from it, if I mean, once it's completed. But there's enough work that if they were to pick up again, they could complete the schematic designing and go into construction drawings and build a park.

Q. Are you aware that the United States Bankruptcy Court for the Western District of Missouri has concluded that there are no material assets held by Mansion Entertainment Group?

MS. JACKSON: Object to form.

A. Including -- including work product?

BY MR. NADEL:

Q. No material assets at all.

MS. JACKSON: Object to form.

A. No.

BY MR. NADEL:

Q. The line in the complaint that you're referring to says, "And after years of conning Gene out of more than $60 million and spending all of that money, including on themselves and their family members, defendants constructed nothing more than a fence and a gravel road."

Is that what you're referring to?

A. Yes, sir.

Q. That's true, isn't it? Defendants constructed nothing more than a fence and a gravel road.

MS. JACKSON: Object to form.

A. I believe that's true from what I've read, but the project wasn't in construction yet.

BY MR. NADEL:

Q. It never got to construction, right?

A. Correct.

Q. On Page 19 of your report you write, "Another important consideration during concept and design development is the physical proximity of the core project team. Having Steve and a majority of the creative consultants based in the Los Angeles area, where much of the themed entertainment industry's creative talent is concentrated, facilitated efficient collaboration, rapid decision making, and frequent face-to-face coordination. That proximity accelerated the creative process, streamlined reviews and approvals, and improved overall project efficiency."

How do you know that?

A. That's actually based on my experience. And it's my opinion that all of these are actually true in my experience, and indeed this does facilitate and can accelerate the process rather than being remote and not proximate to each other.

The best way to develop a project is to be as proximate as possible.

Q. Did it help in this case?

A. I believe it did, yes.

Q. And based on what do you say that?

A. Well, having Steve present near Hettema and in Los Angeles to help guide the process was better than doing that remotely from Arizona.

Q. How do you know that the end result was better having Steve there than having him being in Arizona?

A. It's my presumption.

Q. Based on what?

A. Based on that's I believe the best way to develop a project, and that's what Steve -- I believe that's what Steve was after.

Q. So your opinion is that close proximity is the best way to develop a project, and this project was developed in close proximity, so therefore your opinion is that the project benefitted from the proximity, correct?

MS. JACKSON: Object to form.

A. Yes.

MS. JACKSON: Is this an okay stopping point?

MR. NADEL: Sure.

MS. JACKSON: Sorry.

THE VIDEOGRAPHER: We are going off the record at 1:47 PM.

[A recess was taken.]

THE VIDEOGRAPHER: We are back on the record at 1:59 PM.

BY MR. NADEL:

Q. Did Aaron Hedrick have qualifications for a role in government relations with the American Heartland Theme Park?

MS. JACKSON: Object to form.

A. I'm not aware.

BY MR. NADEL:

Q. Did you know that Aaron Hedrick was initially hired to work in a government relations role for the American Heartland Theme Park?

MS. JACKSON: Object to form.

A. That might have been -- I don't know if that was in the depo or not. I don't know.

BY MR. NADEL:

Q. If Aaron Hedrick was hired to work on government relations and he had no qualifications for a role in government relations, would that affect your

opinion of whether or not it was proper for Steve
Hedrick to hire his son Aaron Hedrick?
MS. JACKSON: Object to form.
A. Depends on what specifically the role was
and what the tasks were, which I'm not aware of.
BY MR. NADEL:
Q. You said that Aaron Hedrick worked in
corporate restaurant management.
What corporation did he work for?
A. I'm trying to -- I used to know the name.
I believe it was a global organization that he
started with in Japan, if I'm not mistaken, but I can't
remember the name of the parent.
Q. At the time he was hired to work for the
American Heartland Theme Park, he was working as a
restaurant manager.
Were you aware of that?
A. No, I was not.
Q. Does that affect your opinion of whether
or not he was qualified for his role?
A. No.
Q. Have you ever worked in corporate

restaurant management?
A. I have not.
Q. Have you ever worked in restaurant management?
A. No, I have not.
Q. Have you ever hired restaurant managers?
A. No, I've not.
Q. Have you ever had restaurant management as part of the portfolio of things you're responsible for?
A. No.
Q. Did you review the complete work product of The Hettema Group?
A. I did not.
I reviewed scopes of work. I reviewed design packages.
I did not see -- to my knowledge, I did not see any drawing packages per se.
Q. Did they produce drawing packages?
A. I believe they were scoped to do that, but I don't believe -- I don't recall seeing any.
Q. Did you ask to see them?
A. I did not ask to see them.

Q. Wouldn't that be something you would want to see in trying to determine whether Steve Hedrick ultimately produced the deliverables he was tasked with producing?

MS. JACKSON: Object to form.

A. Ideally, yes.

BY MR. NADEL:

Q. So why didn't you ask to see it?

A. I felt -- I think I felt confident from your scope description what they were doing, what they were asked to do, and that they would do it.

Q. Did they do it?

A. I believe they fulfilled their contractual terms up to the point where the project was turned off or where they stopped received receiving payment.

Q. And what is that belief based on?

A. Looking at their invoice structures, I believe.

Q. So they invoiced for certain things, but did they actually do them?

A. If they invoiced, they did the work, but I'm not sure exactly where they ended up. I'd have to

go back and look.

Q. Isn't it your experience that sometimes firms invoice for work that they actually didn't do?

MS. JACKSON: Object to form.

A. Usually not. They may invoice in advance in preparation to be paid in a timely manner, but they usually don't invoice for work that they haven't done.

BY MR. NADEL:

Q. You say "usually not."

Sometimes firms do invoice for work that they haven't done?

A. They may, but I've not experienced that.

Q. Several times you've referred to the work product that was produced as part of the American Heartland Project as an asset.

Who would the buyers of that asset be?

A. Someone who wanted to pick up the project and continue with it.

Q. So if Mansion Entertainment Group decided that it wanted to sell this asset, how would it go about doing that?

A. I'm not --

MS. JACKSON: Object to form.
A. Yeah. I'm not an expert in that area. I just know that there's a theme park design to a certain state sitting out there, and there's no reason why it can't be picked up if somebody was so interested.
BY MR. NADEL:
Q. Is there a market for that type of asset?
MS. JACKSON: Object to form.
A. Not a market per se, but if somebody wanted to continue the project, they would need that to do so.
BY MR. NADEL:
Q. Are you aware of any theme parks that have been built by somebody picking up the design of another theme park that was never built and then building it somewhere else?
MS. JACKSON: Object to form.
A. I am not.
BY MR. NADEL:
Q. In your report you say, "Site selection goes beyond finding available land. It requires a detailed topographical and environmental analysis."

How was Vinita, Oklahoma, selected as the site for the American Heartland Theme Park?

A. How was it selected?

Q. Yes.

A. I'm not aware of the actual selection criteria.

Q. Was there a detailed topographical analysis of the site?

A. I presume there was.

Q. Why?

A. Because one would need to do that to qualify it as a site.

Q. Have you seen a topographical analysis of the site?

A. No, I've not.

Q. Have you seen any facts suggesting that there was a topographical analysis of the site?

A. Not that I recall.

Q. So you're presuming that there was a topographical analysis of the site because it would be best practice to have a topographical analysis of the site.

Is that right?

MS. JACKSON: Object to form.

A. Yes.

BY MR. NADEL:

Q. Were there any environmental analyses of the site?

A. I can't confirm.

Q. You don't know one way or the other, right?

MS. JACKSON: Object to form.

A. Correct.

BY MR. NADEL:

Q. Why did you include the sentence that site selection requires a detailed topographical and environmental analysis?

A. Because I believe it does.

Q. And who is ultimately responsible for making sure that that occurs on a project like this?

A. The project team, the design team, the master planning team, essentially.

Q. So that would ultimately be Steve Hedrick's responsibility, right?

MS. JACKSON: Object to form.

A. Ultimately, to ensure that it's done if they choose to do so.

BY MR. NADEL:

Q. And what are the implications if no topographical analysis was performed with respect to the American Heartland Project?

A. You just want to make sure your site can be prepped to receive what you want to build upon it.

So again, I'm assuming that that would have to be done in order to qualify the space for the project.

Q. Right. Because that's required for appropriate site selection, correct?

MS. JACKSON: Object to form.

A. In my opinion.

BY MR. NADEL:

Q. So if a topographical analysis was not done, then there was not appropriate site selection, right?

A. I can't say that.

Q. Well, you just said that topographical analysis was required for appropriate site selection.

A. In my opinion, it would be common.
Whether or not a project does it is up to that project, but that's my -- that's my opinion.
Q. Okay. But your opinion is that site selection requires it, right?
MS. JACKSON: Object to form.
A. In my opinion, yes.
BY MR. NADEL:
Q. And site selection also requires detailed environmental analysis, correct?
A. Yes.
Q. And as far as you know, neither topographical analysis nor environmental analysis were done with respect to the American Heartland Project, right?
A. I can't speak --
MS. JACKSON: Object to form.
A. I can't speak to that specifically, but I assume it was.
BY MR. NADEL:
Q. You assume it was because you've started with the baseline assumption that everything that was

proper was actually done.

Do you have any facts other than that presumption to base your assumption that it was done?

MS. JACKSON: Object to form.

A. I do not.

BY MR. NADEL:

Q. Are you offering an opinion on whether Vinita, Oklahoma, was a financially feasible location for the American Heartland Project?

A. I am not. No.

Q. What is the population of Vinita, Oklahoma?

MS. JACKSON: Object to form.

A. I've read it, but I can't really recall what it was -- what it is.

BY MR. NADEL:

Q. Do you know approximately what it is?

A. Is it -- no, I don't.

Q. Did you know what it was when you formed your opinions in this case?

A. I believe I did. I just can't remember what it was.

Q. What's the major transport hub nearest to Vinita, Oklahoma?
A. Transport hub? Major metro, or --
Q. Well, did you write this paragraph, sir, about site selection and analysis? "Site selection goes beyond finding available land."
A. I did.
Q. Those are your words?
A. Yes.
Q. So when it says, "accessibility to major transport hubs," that's what I'm talking about when I say, "major transport hubs."
A. Oh, I'm sorry.
Q. What's the nearest major transport hub to Vinita, Oklahoma?
A. I believe what I was referring to is the nearest metro, which I believe is Tulsa.
Q. Are there any other major transport hubs proximate to Vinita?
A. I'm not aware.
Q. What is the population of Tulsa?
A. I do not know the population of Tulsa.

Q. What is the population of the area within an hour of Vinita, Oklahoma?
A. I don't know.
Q. What is the population of Oklahoma City?
MS. JACKSON: Object to form.
A. I don't know.
BY MR. NADEL:
Q. What is the population of Oklahoma?
MS. JACKSON: Object to form.
A. I do not know.
BY MR. NADEL:
Q. What cities other than Tulsa are proximate to Vinita, Oklahoma?
MS. JACKSON: Object to form.
A. I'm not sure. I don't know.
BY MR. NADEL:
Q. If someone were opening a theme park in Vinita, Oklahoma, what geographic areas would one expect to derive visitors from?
A. You would want an income-qualified base within a two-hour drive has been my experience.
Q. What do you mean by "income-qualified

base"?

A. Those that can afford the economics, those that can afford the ticket price and the per cap.

Q. So you want a certain number of people who form an income-qualified base to be within two hours of your park?

A. Generally speaking, yes.

Q. And what are the population centers within two hours of Vinita, Oklahoma?

A. Other than Tulsa, I'm not -- I don't recall.

Q. Do you know the nearest state to Vinita, Oklahoma, other than Oklahoma?

A. Is it Missouri? Or is it -- I've forgotten.

Q. What comparable parks supported a 4.5 million person annual attendance assumption for the American Heartland Theme Park?

MS. JACKSON: Object to form.

A. Repeat the first part of that question.

BY MR. NADEL:

Q. What comparable parks can you look at to

support an assumption that the American Heartland Theme Park would have four-and-a-half million annual visitors?

MS. JACKSON: Object to form.

A. I don't know. I believe they did case studies on that, but I don't recall specifically what they were.

BY MR. NADEL:

Q. Who did case studies?

A. I believe the project did case studies.

Q. What daily complement of employees would have been required for the American Heartland Theme Park?

A. I don't have that figure. They did do a -- I believe a staffing plan, but I don't remember what the figure was.

Q. Well, you've seen all of the designs for the theme park, and you've spent your life in the theme park industry.

What approximate employee complement would a park like that require daily?

A. I can't say off the top of my head.

Q. Why not?
A. Because I haven't done that study.
Q. What is the income-qualified base within two hours of Vinita, Oklahoma?
A. I --
MS. JACKSON: Object to form.
A. I don't know.
BY MR. NADEL:
Q. Do you know what the daily complement of employees is at Universal Studios in California?
A. I do not.
Q. Do you know what the daily complement of employees is approximately at Universal Studios in California?
A. I do not.
MS. JACKSON: Object to form.
BY MR. NADEL:
Q. Could it be 10,000 employees daily?
A. I don't believe so.
Q. What is the daily complement of employees for any of the Disney parks? Do you know?
A. The daily?

Q. Yes.
A. I don't know the daily at Disneyland.
Q. Okay. What about any of the Disney parks in the United States?
A. I don't know the dailies.
Q. How many visitors would have to attend the American Heartland Theme Park each year for it to have been economical viable?
MS. JACKSON: Object to form.
A. I believe the feasibility study indicated 4.5 over -- that was when they reached stabilization after three years.
BY MR. NADEL:
Q. How many months each year would the American Heartland Theme Park be able to be open in Vinita, Oklahoma?
MS. JACKSON: Object to form.
A. I don't know what their operating plan was.
BY MR. NADEL:
Q. Are you familiar with the weather patterns for Vinita, Oklahoma?

A. I am not.

MS. JACKSON: Object to form.

BY MR. NADEL:

Q. Did Vinita, Oklahoma, have the necessary infrastructure to support the American Heartland Theme Park?

MS. JACKSON: Object to form.

A. I do not know specifically.

BY MR. NADEL:

Q. You wrote, "Ultimately, the success of a destination theme park is driven less by the immediate population of its host community than by the strength of the guest experience and the project's ability to generate sufficient regional and national demand to justify travel."

Did you write those words?

A. I did.

Q. What is your basis for that statement?

A. That its immediate population of its host community isn't -- it's a key factor, but you're going to attract employees from a broader radius.

More important is the project's ability to

generate sufficient regional and national demand to justify travel.

Q. Right. That's -- that's what you've written.

I'm asking what are you relying on when you make that statement.

Is that just based on your general experience in the industry?

A. That's, yes, based on general experience.

Q. You write, "The final feasibility study for the American Heartland Project, based on higher-end rides and updated information analyzing the primary and secondary market, estimated attendance levels of 4.5 million, and financial forecasts deemed it to be financially feasible despite any previous concerns or misgivings on location."

Are you referring there to the feasibility study by Peter Alexander?

A. I am.

Q. Do you know Peter Alexander?

A. I do not.

Q. You read his deposition?

A. I did.
Q. Did you find him to be credible?
A. Yes.
Q. Did you have any reason to doubt that the testimony he gave in his deposition was true?
MS. JACKSON: Object to form.
A. No, I had no reason to doubt it.
BY MR. NADEL:
Q. The feasibility study that Pete Alexander produced was based on inputs that Steve Hedrick gave him, and he reached the conclusion that Steve Hedrick paid him to reach. Right, sir?
MS. JACKSON: Object to form. Misstates testimony.
A. No, I wouldn't agree with that.
BY MR. NADEL:
Q. Isn't that what he said at his deposition?
MS. JACKSON: Object to form. Misstates testimony.
A. No, I'm not aware of him saying that in his deposition.
BY MR. NADEL:

Q. Okay. You wrote, "Steve provided progress updates throughout the course of the project, including reliable capital and cash flow projections. It's very clear what they needed to create the park at a $2.2 billion investment.

"It was clear that it would -- what it would cost or how much the money would flow and time needed for capital expenditures all encompassed within an accelerated timeline as requested by the benefactor/originator, Mr. Bicknell."

What is your basis for saying, "Steve provided progress updates throughout the course of the project"?

A. So there are updates that were given to me within the package of information that I received.

And Steve and I did have a quick conversation about timing of communication, that -- the total cost of the park was communicated, and that regular updates were provided.

Q. So Steve told you that the total cost of the park was communicated and that regular updates were provided?

A. Correct.

Q. Did you see evidence that regular updates were provided?

A. I've seen some dated updates, meaning with dates on them, over the course of '22 and '23, I think, and into '24, that provided information on forecast of cost.

Q. To whom were those updates provided?

A. I don't know the exact audience list, but Steve did share that it was shared with the senior leadership team.

Q. Steve told you that?

A. Yes.

Q. Have you seen any evidence that it was shared with the senior leadership team?

MS. JACKSON: Object to form.

A. I don't have direct evidence, no.

BY MR. NADEL:

Q. So your opinion that Steve provided progress updates throughout the course of the project is based solely on what Mr. Hedrick told you.

Is that right?

MS. JACKSON: Object to form.

A. What he told me and the documents that I saw.

BY MR. NADEL:

Q. And the documents that you saw did not include any evidence that they were actually sent to anyone, right?

MS. JACKSON: Object to form.

A. They do not.

BY MR. NADEL:

Q. So how is that evidence that progress updates were provided throughout the course of the project?

MS. JACKSON: Object to form.

A. Taking Steve at his word that he provided those.

BY MR. NADEL:

Q. You write about a $2.2 billion investment.

Where does that number come from?

A. That comes from the feasibility study, I believe, and also on a cash flow document.

Q. You said, "It was very clear what they needed to create the park at a $2.2 billion

investment."

To whom was it clear?

MS. JACKSON: Object to form.

A. I saw the document that has a cash flow curve over the course of the project. That was very clear, what was required to get to the full 2.2.

BY MR. NADEL:

Q. So you're saying it was clear in the document that you saw?

A. Clear in the document.

Q. And you don't know whether that document was provided to Larry Wilhite, correct?

MS. JACKSON: Object to form.

A. I don't know for a fact.

BY MR. NADEL:

Q. And you don't know whether that document was provided to Gene Bicknell, correct?

MS. JACKSON: Object to form.

A. I don't know for a fact, other than Steve telling me that he did keep them updated on total cost.

BY MR. NADEL:

Q. And this statement, "Steve provided

progress updates throughout the course of the project" is based on what Mr. Hedrick told you, correct?

A. That is correct.

Q. What was included in the $2.2 billion figure?

A. What was included?

Q. Yes.

A. That was total project cost. So that would have been the entire front end of the project, which is design, and it would have been full construction, full build-out to preopening and opening.

Q. You write about an accelerated timeline as requested by the benefactor/originator, Mr. Bicknell.

What do you mean by that?

A. I read -- I read -- and I think Steve and I discussed that briefly -- but I read I believe that they wanted to stay on target for their opening date of '26. And it would need to -- the project would need to accelerate in order to make that date.

Q. That statement, again, is just based on what Mr. Hedrick told you.

Is that correct?

MS. JACKSON: Object to form.
A. I believe so, and/or his depo.
BY MR. NADEL:
Q. So it's either based on what Mr. Hedrick told you or what he testified to at his deposition.
Is that right?
A. Yes.
MS. JACKSON: Object to form.
MR. NADEL: What's the objection?
MS. JACKSON: Calls for speculation and misstates the evidence testimony of numerous deposition statements.
MR. NADEL: Okay. I'm going to put a comment here on the record. We can go back and talk about it later.
The question that you just objected to was: "So it's either based on what Mr. Hedrick told you or what he testified to in his deposition?"
And the witness has affirmed that.
Your objection to form, as the transcript will show throughout the day, is based on you either not liking a question or not liking the answer that you

know the expert is going to give, which is not a valid objection.

And in this case, the transcript will reflect that it is being used to coach the witness, who has never testified at a deposition before. He can tell when you object to form, he is not supposed to agree with what he is being asked. That is an improper use of objections that we will address after the deposition.

MS. JACKSON: That is completely inappropriate to state on the record, and that is completely inappropriate based upon what has occurred today, and based upon the course of conduct of your office objecting to nearly every question for their experts that were presented.

BY MR. NADEL:

Q. Sir, you write, "In conclusion, I have reviewed the complaint and it is not consistent with the work provided."

What in the complaint are you talking about?

A. I'm referring to, I believe, the fact that there is no park and there couldn't be a park because

construction had not started. I believe that's what I am referring to.

Q. Well, there is no park, right?

A. Correct.

Q. So how is the complaint not consistent with the work provided?

A. I think the complaint ignores the design work that's been done.

Q. What's the value of the design work that's been done?

A. The value in dollars, or the value of the work?

Q. Well, what value would there be other than in dollars?

A. Well, there's a design package. So that's valuable.

But the -- I mean, it's the money spent to date to create the deliverables thus far --

Q. Okay.

A. -- and I felt the complaint was ignoring that.

Q. Well, the complaint talks quite a bit

about the money that was spent on the theme park, correct?

A. On the project.

Q. On the project.

You said, "There's a design package, so that's valuable."

To whom is it valuable?

A. It's a valuable -- it's valuable work product, and again, as I mentioned before, it would be necessary to restart the project or have someone else pick it up.

Q. Do you have any reason to believe that anybody either wants to restart the project or pick it up?

A. I don't know.

Q. So that's no, you don't have a reason to believe that?

A. No, I don't know if I have a reason to believe it or not. I'm just saying I don't know if there's anyone out there who's interested in that.

Q. Okay. Well, tell me every fact that would lead you to believe there is anyone out there who

either wants to restart the project or purchase the design material so the project can be built somewhere else.

A. Tell you what? Sorry, the first part.

Q. Tell me any fact you know that would lead you to believe that there's anyone who wants to purchase the design material or restart the project.

A. I don't know if there is, but if it were put out there that it was a possibility, that's what I'm alluding to.

Q. How would it be put out there? What do you mean by "put out there"?

A. That someone could, in essence, purchase the package that exists and continue with the effort.

Q. You wrote, "Steve's compensation in a day rate manner was appropriate and within industry standards. Rates of $1,200 a day up to $2,000 a day are not excessive or outside the industry standard."

Did you write that?

A. I did.

Q. What industry standards are you referring to?

A. I'm referring to what I've experienced as day rate compensation for similar work, mostly in the design and/or leadership work.

Q. What compensation are you comparing Steve Hedrick's compensation with when you say it was appropriate?

A. If you take this over a 30-month period and break it down into essentially a salary per year, it's not out of line in what a senior executive would be making if they were doing this for Disney or Universal or the like.

Q. Are you aware of anyone working on any Disney park being paid on a day rate at all?

MS. JACKSON: Object to form.

A. Yes. Many people were paid on a day rate, but -- yes, many people were paid on a day rate.

BY MR. NADEL:

Q. Are you aware of any executive working on a Disney park being paid on a day rate?

A. No.

Q. Are you aware of any executive working on a Universal park being paid on a day rate?

A. I'm not aware.

Q. Are you aware of any executive working on any theme park anywhere in the world being paid on a day rate?

MS. JACKSON: Object to form.

A. I'm not aware.

BY MR. NADEL:

Q. Looking back over your entire career in the theme park industry, are you aware of any executive working on any theme park anywhere in the world at a day rate?

A. I believe that -- my experience is mostly from a corporate perspective, where people are employees. There are many other models, though, where people could be on day rates.

Am I aware? No. Of any specifics.

Q. What person in the industry with a role comparable to Mr. Hedrick's was paid a day rate?

A. I don't know of any.

Q. What methodology did you use to assess whether Steve Hedrick's compensation was appropriate?

A. As I mentioned previously, I compared it

to what someone might be making at Disney, for example, in the same role from a salary perspective, and this is in line with that.

Q. What salary did you attribute to Mr. Hedrick when you made that comparison?

A. I took the amount of money that I believe he made after expenses and spread that out over a 30-month period to come up with an annual rate, roughly figured.

Q. Okay. And it's not in your report that you did that, right, sir?

A. I don't write that, no.

Q. Did you do that before you signed your report or after?

A. I did it before.

Q. Okay. What was the annual rate that you came up with?

A. I think it was about $500,000 per year.

Q. Did you keep notes when you performed that comparison?

A. Yes.

Q. And do you still have those notes?

A. I may.
Q. So you said, "If I take Steve Hedrick's $1,200 to $2,000 a day rate and I annualize it, he's making about $500,000 a year, which is comparable to what somebody in a comparable role at Disney or Universal would be making."
Is that right?
A. I would say -- I removed -- I believe I removed reimbursable expenses. Sorry. And then took that spread, and yes, that came out to about half a million a year, which is certainly in line with what senior executives are making at Disney.
Q. Senior executives generally, or someone in a role comparable to Mr. Hedrick's role?
A. Both.
Q. Okay. What senior executive at Disney did you use when making that comparison?
A. I didn't use anybody in particular. I just used the range of pay.
Q. What information did you rely on for the range of pay?
A. I based that on my knowledge of salaries,

which isn't extensive, but the bit of knowledge I did have about salaries of certain individuals. I used that as my basis.

Q. If somebody wanted to double-check your analysis --

A. Uh-huh.

Q. -- to see whether $500,000 is comparable to what somebody in a like position at Disney would make, what data would they rely on to do that?

A. Good question.

I don't know how they would confirm that necessarily.

Q. Did you confirm it?

A. Based on my knowledge of salaries. Yeah, if they worked within the structure, I think someone could confirm that. They would have to work within the business and within one of those corporate structures.

Q. So when you determined for yourself somebody at Disney in a comparable role would make $500,000, did you do anything to check that assumption?

A. No -- no.

Q. What is your basis for stating that day

rates of $1,200 a day to $2,000 a day are not excessive or outside the industry standard?

A. Because we've -- I've paid that on -- many of us have paid those figures to different people.

Q. Who did you pay a day rate of $2,000 a day to?

A. I can't recall, nor would I want to reveal that private information.

Q. Can you identify anybody that you ever stated a day -- that you ever paid a day rate of $2,000 a day?

A. I believe --

MS. JACKSON: Object to form.

A. I believe I paid a choreography team that much money on a project, I believe, once. I'd have to go back and look.

BY MR. NADEL:

Q. That was the whole team?

A. It was two people.

Q. Two people? So that was $1,000 a day per person.

A. Right, but they came as a pair.

Q. Right. So can you identify any individual that you ever paid a day rate of $2,000 a day?

A. Not off the top of my head, no.

Q. Have there been any?

A. I believe so.

I've certainly paid between -- and -- yeah. I've certainly paid between $1,200 and $2,000. I can't come up with cited examples.

Q. To whom?

A. Well, mostly to design. Not to production executives. But mostly to designers and artists on the creative side.

Q. How many designers have you paid $2,000 a day as a day rate?

A. I can't -- I don't know.

Q. Can you identify any of them?

A. No, not off the top of my head.

Q. How many artists have you paid $2,000 a day as a day rate?

A. I think one, but I'm not certain.

Q. Who is that?

A. An individual I don't want to name.

Q. Okay. But I would like you to name the individual.
A. It's -- it's private confidential information. I really don't want to do that.
Q. How is it private or confidential information?
A. That's their business.
Q. Do you have a confidentiality agreement with them?
A. No, I do not.
Q. Are you refusing to identify the person you claim to have paid a day rate of up to $2,000 a day?
A. I want to validate that it's true. And yes, I don't want to identify the individual by name.
Q. Okay. And what did the individual do?
A. It was an artist.
Q. And what project was that on?
A. It was several projects, actually.
Q. What projects?
A. Several for Disneyland, and did I do anything with her? And I think I did a little bit of

work with her in Asia.

Q. You said you paid $2,000 a day mostly to designers and artists on the creative side.

So far, you've been able to say there was actually one artist who you won't identify by name.

Is that right?

A. Yes.

Q. Is there anybody else to whom you ever paid $2,000 a day as a day rate?

A. Not to my knowledge.

Q. On what basis do you say it's within the industry standard to pay $2,000 a day as part of a day rate?

A. Again, it's based on my reverse calculation of annual income, but I didn't -- I did not see it outside of norms to be paid that much.

Q. Well, okay.

You said it's not outside the industry standard to be paid $2,000 a day.

You're referring there to executive salaries?

A. Yes.

Q. Had Steve Hedrick been paid a rate like

that before on any theme park project?
A. I don't know.
Q. Had Steve Hedrick ever been paid to consult on any theme park project?
A. I presume, yes.
Q. Why do you presume that?
A. As he told me he did. I mean, his work in China specifically, I think.
Q. Other than projects Steve Hedrick worked on with Rick Silanskas, had he ever been paid to consult on any theme park project?
A. I -- I assume he has. I don't know specifically.
Q. How much was he paid?
A. I don't know.
Q. Did you ask him?
A. No.
Q. And it's correct that you're unable to identify any theme park project ever that was helmed by a consultant as opposed to a salaried employee, correct?
A. I have worked on a few projects at Disney

where consultants were brought in and they were paid in that neighborhood of $2,000 a day or $10,000 a week. Yes.

Q. Right. Can you identify any theme park in the world where the person who helmed it from conception to opening was a consultant as opposed to a salaried employee?

A. No.

Q. Can you identify any theme park project in the United States in the last 40 years that was led by someone who had never designed a theme park before?

MS. JACKSON: Object to form.

A. No.

BY MR. NADEL:

Q. Can you identify any theme park project in the United States in the last 40 years that was led by somebody who had never designed a theme park ride?

A. No.

Q. What total compensation did Steve Hedrick receive?

A. I believe Steve received somewhere between 900 and a million after expenses.

Q. And how many days did he bill?
A. I don't have a total on that.
Q. And how many hours did he work on the days that he billed?
A. I'm not certain.
Q. Would you agree --
Did you know that when you put together your report?
A. Did I know what?
Q. When you formed your opinions in this case, did you know how many hours Steve Hedrick had worked on the American Heartland Project?
A. Not hours per se, no.
Q. Did you know, when you formed your opinions in this case, how many days Steve Hedrick had billed on the American Heartland Project?
A. Generally speaking through -- I didn't see all invoices; I saw some invoices. But no, I'd have to reverse that out from his total.
Q. If you take a reasonable rate and you multiply it by an unreasonable number of days, that can produce excessive compensation, correct?

MS. JACKSON: Object to form.
A. Unreasonable amount of days? I don't know what that means.
BY MR. NADEL:
Q. If you --
A. What's reasonable?
Q. You don't know what an unreasonable number of days could -- would be?
A. Well, it's -- no. A reasonable amount of days are the days you work.
Q. Well, in this case, it would be the days you bill for, correct? So there could be days that you're billing for that you actually didn't work, right? Or days that you work for an hour and you bill for the day?
A. It depends on what the terms of the agreement were and what the billing practice was, but you usually don't bill for time you don't work.
Q. Right. But in this case, where you have a daily billing rate, there is no particular hours requirement, correct?
A. I don't know what the structure was.

Q. When you reviewed Steve Hedrick's invoices --
Did you review Steve Hedrick's invoices?
A. A few of them, yes.
Q. Did you review them all?
A. I don't believe I reviewed all of them, no.
Q. Did you review his invoices for 2024?
A. I don't recall the dates on what I saw.
Q. Are you aware that he continued to work on the project after all of the vendors and other consultants' work had stopped?
A. In terms of closeout, I suspect, no, I'm not aware.
Q. Okay. Not in terms of closeout.
For example, were you aware that in the spring of 2024, after all of the vendors' work on the project had stopped, Steve Hedrick was still designing menus for the restaurants and the theme park?
A. I am not aware of that.
Q. Were you aware that he was billing $2,000 a day to do that?

A. No, I'm not aware of that.

Q. Does that affect your opinion on whether or not his billing was reasonable?

A. I don't know the circumstances around that, so I can't say.

Q. You wrote in your report, "Everyone seemed to be in this to earnestly develop the park."

Whose state of mind are you evaluating there?

A. I'm evaluating the work product delivered by individuals and by firms that everyone appeared to be working in earnest to create a themed destination theme park.

Q. Is determining people's intent within your expertise?

A. Only in terms of what I see as work product.

Q. The people who seemed to be working earnestly -- you had their names as part of the material you reviewed, correct?

A. Correct.

Q. Why didn't you interview any of them?

A. I -- I know most -- I knew most of them.

And I saw some of the work product in the files I was given, but I didn't see a reason to interview them.

Q. And if you had interviewed them, they might have said to you, "We were working to earnestly develop the park," and then you would at least have some fact to rely on in saying that, right?

MS. JACKSON: Object to form.

A. Perhaps, but again, I'm going off of what I see as actual work product.

BY MR. NADEL:

Q. Your opinions in this case rely on what Steve Hedrick has told you, right?

MS. JACKSON: Object to form.

A. Oh, not solely. No.

BY MR. NADEL:

Q. Well, your knowledge of Steve Hedrick's background and what he did at Disney before you got there are based on what Steve Hedrick told you, right?

MS. JACKSON: Object to form.

A. Some. Some of that is true.

BY MR. NADEL:

Q. And your knowledge of what Steve Hedrick

did after Disney is based exclusively on what Steve Hedrick told you, correct?

A. Yes.

Q. And your understanding of how Steve Hedrick was hired for the project came exclusively from what Steve Hedrick told you, right?

A. And the -- and his deposition. I can't recall, but yes.

Q. And your view that Steve Hedrick conceived of the theme for the American Heartland Theme Park also came from what Steve Hedrick told you or testified, correct?

A. Correct.

Q. And if Steve Hedrick was not telling the truth about those things, your opinions would be invalid, right?

MS. JACKSON: Object to form.

A. I don't know how to respond to that.

BY MR. NADEL:

Q. You opine that there were no shortcuts taken.

What do you mean by "shortcut"?

A. Where do I say that? Contextually?

Q. We are now on the conclusion, I believe, on Page 21 in the first paragraph of the conclusion.

"In conclusion, I have reviewed the complaint and it is not consistent with the work provided. There was a tremendous amount of due diligence involved in the development of this project. Based on the deliverables, everyone seemed to be in this to earnestly develop and design and construct a successful theme park. There were no shortcuts taken. Steve and his team earned the money that was billed on this project."

Did you write those words, sir?

A. I did.

Q. What did you mean by "there was no shortcuts taken"?

A. I didn't -- I didn't believe from looking at the deliverables that there were shortcuts taken. Everything looks like it had been addressed as it should have been. And therefore I believe that the team earned their money that was billed to the project.

Q. When you said, "There was a tremendous

amount of due diligence involved in the development of the project," what did you mean?

A. It's evidenced by the deliverables. I mean, it's a -- and the creative packages.

As I said before, it's a complicated effort. And I see a lot of time and heart in trying to figure out what this is from an experience perspective, and then also what it is from a design and technical design perspective.

Q. When you say "due diligence," what do you mean?

A. And again, I'm just looking for context.

Where do I say that?

Q. Second line of that paragraph.

A. Oh. What do I mean by "due diligence"?

Q. Yes.

A. I mean, just the amount of detail that is in those -- in those deliverables.

Q. That's what you mean by "due diligence"?

A. Yes.

Q. When you say, "Steve and his team earned the money that was billed on this project," who besides

Steve Hedrick are you referring to?
A. I'm referring to the consultants in the consulting firms.
Q. When you prepared for your deposition, sir, did you review your report?
A. I did.
Q. Were you able to tell which facts in the report came from which source?
A. Which facts from which source? Sorry.
Q. Yes. So you've got 124 sources --
A. Ah.
Q. -- here listed and no footnotes or citations.
Were you able to tell which fact in this report came from which source?
A. I did not document that, no.
Q. But were you able to identify it?
A. I -- in many cases, yes.
Q. Okay. And do you know how many of these 124 sources of information that are listed here you actually considered?
A. As I said before, I believe I skimmed the

majority of them and I dug into certain specific ones.

Q. The report states that your opinions are to a reasonable degree of professional certainty.

What does that mean?

A. Where do I say that?

Q. On Page 1, at the bottom.

A. To a reasonable degree of professional certainty based on my expertise in theme park and themed entertainment industry.

And your specific question, I'm sorry, again is?

Q. What did you mean by "reasonable degree of professional certainty"?

A. Again, it's my evaluation of deliverables and the packages that I reviewed.

Q. By "reasonable degree of professional certainty," you meant your evaluation of deliverables and the packages you reviewed?

A. Yes.

Q. Did you write that sentence, "The opinions set forth in this report are stated to a reasonable degree of professional certainty"?

A. I did.

Q. And so what does that mean quantitatively?
A. Quantitatively?
Q. Yeah. So like what percentage are you sure of the opinions in your report when you say "to a reasonable degree of professional certainty"?
A. I know what you're asking for. That's a good question. I'd have to give that some thought to figure out.
Q. Well, what did you mean when you said it?
A. Sorry.
Again, I think it -- I think it also ties to the last sentence.
(Reads to self.)
Q. Right. So does that mean you're 80 percent sure, 100 percent sure?
What does it mean?
A. I can't -- I can't quantify that for you. Sorry.
Q. Did someone to tell you to use that phrase, "reasonable degree of professional certainty"?
A. No, I did -- no.
Q. Why did you use that phrase?

A. That was my -- that's my crafting of language. I didn't get that from anywhere else.

Q. On Page 2, the qualification section of your report describes your work with Walt Disney engineering from July 1998 to July 2025.

What was the most senior position you held at Disney?

A. It was executive producer.

Q. And when you left, what was your total annual compensation?

A. My annual compensation was approximately --

Is that relevant to this?

Q. Yes.

A. My annual compensation was approximately [redacted]

Q. Was that the highest your annual compensation had been?

A. Yes.

Q. What was Shanghai Disney Resort?

A. What is it?

Q. Yes.

A. Shanghai Disney Resort is a theme park in Pudong in Shanghai.
It is a theme park, hotel, recreation area, lake, et cetera.
Q. Who was the executive in charge of developing it?
A. Executive in charge of developing it creatively was Bob Weiss.
Q. And so is that role that Bob Weiss had equivalent to the role Steve Hedrick had on the American Heartland Project?
A. Yes.
Q. What were Bob Weiss's qualifications for that role?
A. His experience with Disney and experience outside of Disney.
Q. Had he previously developed a theme park?
A. Yes. We talked about him having worked on TDS somewhat. He worked on TDL.
He also I think was the lead on -- other than Shanghai, he was the lead on the studio's park in Florida.

Q. And he had worked for Walt Disney for a number of years.
Is that right?
A. Yes. Yes.
Q. Was he an employee or a consultant?
A. He was -- I think he worked in both capacities, but he was mostly an employee.
Q. During the time that he was paid to develop Shanghai Disney Resort, what was his compensation?
A. Oh, I have no idea.
Q. You were also involved in Hong Kong Disneyland, correct?
A. Correct.
Q. Who was the executive in charge of developing Hong Kong Disneyland?
A. That was Tom Morris and John Berry.
Q. One and then the other, or did they work as a team?
A. They worked as a team.
Q. Okay. And had they been long-time employees of Walt Disney at the time they were put in

that role?
A. Yes.
Q. Were they employees or consultants?
A. They were employees.
Q. What was their compensation at the time that they were in that role with respect to Hong Kong Disneyland?
A. I do not know.
Q. And explain what Tokyo DisneySea was.
A. Tokyo DisneySea is the sister park to Tokyo Disneyland, built by Disney and the Oriental Land Company. That opened in 2001.
Q. Does it have an aquatic theme? Is that what the sea part means?
A. Yes.
Q. And who was the executive in charge of developing that?
A. Steve Kirk.
Q. And was he the person with the role equivalent to Steve Hedrick's role on the American Heartland Project?
A. Yes.

Q. And had he been a long-time Disney employee before he went into that role?

A. I don't know. I believe so, yes.

Q. Was he an employee or a consultant?

A. He was an employee.

Q. And Steve Hedrick did not report to him, correct?

A. Correct.

Q. And Steve Hedrick did not report to a person who reports to him, right?

A. That's correct. To my knowledge, yes.

Q. Other than those three parks, did you work on any other Disney theme parks?

A. Those three parks -- not new builds, no. I oversaw entertainment development at several properties. But no, those were the built-from-scratch parks that I worked on.

Q. Did you work on any built-from-scratch Disney theme parks in the United States?

A. No, I did not.

Q. But prior to Disney, you worked at theme parks in the United States, correct?

A. Yes.
Q. Your role was show producer?
A. Yes.
Q. And that ended in January 1997.
Is that right?
A. Correct.
Q. Before that, you worked for Knott's Berry Farm in California.
Is that right?
A. Yes.
Q. And your job was to establish cost tracking and control procedures for the production of the 17th annual Halloween Haunt in the fall of 1989, correct?
A. Correct.
Q. Did you ever assemble a team of firms to develop a theme park during the course of your career?
A. To develop a theme park, no.
Q. Did you ever supervise someone who assembled a team of firms to develop a theme park?
A. No.
Q. Presently, you work for Torde Sillas

Talent & Literary.
Is that right?
A. Yes.
Q. And you're a consultant?
A. Yes.
Q. For whom have you consulted?
A. I consulted for Ovations Live, as I mentioned earlier.
Q. Anyone else?
A. No.
Q. Who is Herbie Hanson?
A. Herbie Hanson? I don't know.
Q. Handing you what's been marked as Exhibit 352. Sorry. 351. Handing you what's been marked as Exhibit 351.
[Heartsner Exhibit 351 marked for identification.]
BY MR. NADEL:
Q. Is this a post you made to Facebook on August 8th, 2025?
A. That is correct.
Q. Steve Hedrick commented on this post.

Do you remember that, sir?

A. I do remember Steve commenting. I don't recall what the comment was.

Q. Have you gone back and looked at this Facebook post since you were retained as an expert in this case?

A. I have not.

Q. Handing you what's been marked as Exhibit 352.

[Heartsner Exhibit 352 marked for identification.]

BY MR. NADEL:

Q. This is Steve Hedrick's comment on your Facebook post.

He wrote, "What a great run you had with the mouse. You should be proud. I know I loved making magic with you. Congrats and wishing you new and wonderful worlds to explore."

Do you see that?

A. Yes.

Q. And then you replied, and you wrote, "Thank you, Steve," in all caps. "None of this was

possible without you."
What did you mean by that?
A. Well, I am giving Steve a tremendous amount of credit, as I mentioned before, for exposing me to Disney by bringing me on board, which allowed me to build a career there.
Q. When you wrote, "Thanks for taking a chance," what did you mean by that?
A. Well, what I meant was that Steve engaged me to come on to a big project -- a high-risk project, big stakes -- and he took a chance on giving me a high level of responsibility, knowing me somewhat but not knowing me that well, but he took a chance.
Q. So none of your career at Disney was possible without Steve Hedrick, right?
A. I -- again, the foot in the door is all due to Steve.
The rest of it was me, but I do credit Steve for bringing me in and exposing me to the company.
Q. Let's look at the next one.
You've been handed Exhibit 353.
[Heartsner Exhibit 353 marked for

identification.]

BY MR. NADEL:

Q. This shows Diane Hedrick also commenting on your Facebook post, right, sir?

A. Yes.

Q. And that's Steve Hedrick's wife.

A. That's correct.

Q. And she wrote, "Congratulations, Roger. It's been quite a ride. On to new adventures."

And then what did you write?

A. As listed, "Quite indeed. Many thanks to you and Steve."

Q. What were you thanking Diane Hedrick for?

A. As I mentioned earlier, my introduction to Steve was through Diane. So I was thanking both of them.

Q. Have you talked to Diane Hedrick about this case?

A. Oh, I've not. No.

Q. Have you talked to Diane Hedrick since you've been engaged on this case?

A. No.

Q. When you came into this engagement as an expert, you didn't come in neutral as to Steve Hedrick, right?

A. I came in with a lot of knowledge of Steve.

Q. And you came in believing, presuming that Steve was qualified for the job that he had, correct?

A. I did assume that he was well-positioned to take on that role, yes.

Q. And you also assumed that he had done the things that he was supposed to do and that he had acted earnestly and honestly, correct?

A. Yes.

Q. And you assumed that he had completed the deliverables that he was supposed to complete, right?

A. Yes. And by looking at deliverables, that confirmed that.

Q. And your view when you were called to be an expert in this case was that Steve Hedrick was a supremely qualified executive, correct?

MS. JACKSON: Object to form.

A. I do consider Steve a qualified executive

or professional.

BY MR. NADEL:

Q. And you believed that at the time that you were called and asked to be an expert in this case, correct?

A. Yes.

Q. And you believed before you looked at any of the materials in this case that Steve Hedrick was qualified to develop a major American theme park, right, sir?

A. Yes.

Q. And when you heard that he was developing a major American theme park back in 2022, you believed based on your prior relationship with him, that he would've done a good job.

Is that right?

A. Yes.

Q. At the beginning of the deposition, I asked you who drafted your expert report, and you answered, "I did."

And I asked you, "Did anyone else draft it?"

You answered, "No."

And I asked you, "Did any other person supply language for your report?"

And you answered, "No. Counsel reviewed for format, but no language was provided."

That testimony was untruthful, correct, sir?

A. I think -- I think the refined answer or a little bit more focused answer is that we worked on putting together Steve's historical information and Ron Logan's historical information.

Q. Well, the more refined answer was that language was provided, correct?

A. Yes, that language was provided.

Q. Language was provided by your counsel, and then you copied that language into your report, and then you testified "no language was provided," right?

A. We talked -- we talked that through, and I put that in there. But we talked through the history piece.

MR. NADEL: Why don't we take a break?

THE VIDEOGRAPHER: We are going off the record at 3:01 PM.

[A recess was taken.]

THE VIDEOGRAPHER: We are back on the record at 3:19 PM.

BY MR. NADEL:

Q. Sir, when's the last time you saw Steve Hedrick?

A. Last time I saw Steve -- oh, it may be that time in -- physically saw Steve -- it may be that time in 2022 for breakfast.

Q. Is it possible that that was actually in August of 2023?

A. It's possible, yes.

Q. Where was that breakfast?

A. Pasadena.

Q. Was that at Russell's on Fair Oaks?

A. It was.

Q. So throughout the deposition, we've been talking about the conversation that you had in 2022. That was actually in 2023 in Pasadena at Russell's.

Is that right?

A. I believe that's correct.

Q. And that was the last time you saw Steve?

A. I believe that's the last time I saw him.

Q. When was the time you saw him before that?
A. Oh, it'd been a long time. A very long time.
Q. You'd seen him since you left Disney, though?
A. I had not seen Steve since I left Disney.
Q. Had you seen Steve between when he left Disney in 2021 and when you saw him at Russell's in Pasadena in 2023?
A. Yes.
Q. When was that?
A. I saw him, I believe, in 2022. No. Sorry. 2002.
And then I believe I saw him in 2013, '14. I believe.
Q. That was when he was doing the consulting in China?
A. Yes.
Q. What were the circumstances of your seeing him in 2022?
A. I -- in 2020 --
Q. What were the circumstances of your seeing

him in 2002?

A. 2002? He was hosting an open house I think launching his new consulting company, and I saw him at a function that he had held there.

Q. Was that in California?

A. Yes.

Q. And then you didn't see him again until 2013 or '14?

A. I may not have seen until then. I don't recall.

Q. And where was it that you saw him in 2013 or '14?

A. I saw him at Disney, actually. He was visiting friends and colleagues at Disney in Glendale.

Q. The corporate offices?

A. The Imagineering campus.

Q. And then after that you didn't see him until 2022.

Is that correct?

A. '22 or '23.

Q. '23? That was the breakfast?

A. I believe so, yes.

Q. When's the last time you saw Diane Hedrick?

A. I haven't seen Diane in forever. It may have been actually as far as back as -- unless I'm forgetting -- I may not have seen Diane since '02.

Q. Have you talked to her since then?

A. I have not.

Q. Back during the period that you and Steve were working together at Disney, you said you socialized with Steve Hedrick and Diane Hedrick, correct?

A. Yes. I saw them quite a bit while we worked together.

Q. Did you go to their home?

A. Yes.

Q. How many times?

A. Steve would often throw functions for the team at his house. I don't remember how many times.

Q. Were there times you went to his home where it was not the whole team but just you?

A. I don't recall if I did that or not.

Q. Has Steve Hedrick been to your home?

A. No.
Q. Have you vacationed together with Steve or Steve and Diane?
A. No, we have not.
Q. Were you at Aaron Hedrick's wedding?
A. I was not.
Q. When is the last time you saw Aaron Hedrick?
A. I believe the last time I saw Aaron was performing at Universal.
Oh, I'm sorry. That was Nathan.
Aaron I have not seen physically probably since Japan.
Q. What was the purpose of the breakfast in Pasadena in August 2023?
A. As I believe I mentioned before, Steve had contacted me, asked me to breakfast, wanted to tell me about the project.
And I think he was gauging interest in my interest and availability to join the project.
Q. But then he never asked you to join the project?

A. Not formally. I think he was just feeling me out to see if it was a possibility.
Q. Did you indicate to him that it was not a possibility?
A. I didn't necessarily close the door, but I did not prompt him to continue. I'll put it that way.
Q. What did he tell you about the financial condition of the project at that point in August 2023?
A. He did not speak to the financial condition.
Q. Did he tell you that the project was experiencing difficulties at that point in August 2023?
A. No.
Q. Did he imply one way or the other?
A. Did he what? I'm sorry? Imply?
Q. Imply.
A. No.
Q. Was most of that breakfast spent discussing the American Heartland Theme Park?
A. Since we had not seen each other in a long time, it was -- that was a topic, but it was just general catch-up otherwise.

Q. Was it -- was it mostly catching up, or was it mostly talking American Heartland Theme Park business?

A. I think it was 60/40 catch-up and a little bit on the project, as I recall.

Q. Who is Jeff Krish (ph)?

A. Jeff Krish? Jeff Krish is a costume design manager who used to work for -- I don't know if Jeff is still working for Disney or not.

Q. So Jeff Krish sent you an email in September 2023, and he wrote, "Hi, Roger. It was great seeing you on Sunday despite the unfortunate circumstance. I'm following up on your invitation to contact you regarding the American Heartland Project."

And he sent his r sum .

What were the circumstances of that email?

A. The circumstances actually were that Steve was asking for some recommendations of project team members that he had roles to fill, and I believe I referred to Jeff, and Jeff may have just left Disney. I don't recall.

But it was one of a few names that I gave to

Steve.

Q. Did you pass Jeff's r sum on to Steve by email?

A. I don't recall. I probably did. I know I passed his name along.

Q. Did Jeff end up working on the American Heartland Project?

A. I do not know.

Q. Would you characterize that breakfast in August 2023 as a business breakfast?

A. Partially, but I think it was also -- since Steve was residing part-time in Pasadena, I think it was the ability, since he was so close, to catch up as well.

MR. NADEL: Roger Heartsner, thanks for taking the time to talk to us today.

A. Thank you.

MS. JACKSON: Galen, do you guys have any questions?

Wilhite attorneys? Anyone?

THE WITNESS: I'm muted. Now muted.

THE VIDEOGRAPHER: It's not muted, right?

THE WITNESS: They're muted on their end.
THE VIDEOGRAPHER: They're muted.
THE WITNESS: Now unmuted.
MS. JACKSON: Galen?
Okay. I'm just going to ask some questions. If you guys decide you need to ask any, let us know.
If you're talking, we can't hear you at all.

EXAMINATION

BY MS. JACKSON:
Q. Mr. Heartsner, can you please look at what has been identified as Plaintiff's Exhibit 350 on Page 4 where it states "summary of opinions."
Who provided those opinions?
A. These are my opinions.
Q. Did me or the office of Liz George & Associates provide those opinions for you?
A. No.
Q. Did me or my office draft those opinions for you?
A. No.
Q. Did anyone other than yourself come up with or draft the summary of opinions on Page 4?

A. No. That was me.
Q. And counsel for Mr. Bicknell asked you a lot of questions kind of towards the end right before that last break about assumptions.
Do you recall those questions?
A. I do.
Q. And in your mind is an assumption like a hypothesis?
A. Yes. Something that should be proven.
Q. So when you went into evaluating this project or this work that Steve did on the American Heartland Project, were you only going to prove yourself correct?
A. I was going to -- I wanted to prove my thoughts and ideas. I had no reason to disbelieve Steve or think that he was doing anything untoward.
But I did want to validate all of that and I did that through the examination of the materials provided.
Q. So after you had basically a hypothesis.
Is that correct?
A. Yes.
Q. And then you do a process of reviewing

materials, deliverables, documents to determine if that hypothesis was correct or incorrect.
Does that sound right?
A. Yes.
Q. And after evaluation of the deliverables, is that how you performed and came up with the summary of opinions on Page 4?
A. Yes.
Q. And there's been a lot of discussion about the information about Steve and his background coming from conversations.
Do you recall those -- the testimony and questions today?
A. Yes.
Q. You had occasion to review Stephen Hedrick's deposition testimony.
Is that correct?
A. That's correct.
Q. And during the course of that deposition testimony, he outlined the various work that he did at Walt Disney in Orlando leading up to working with Ron Logan.

Is that correct?
A. That's correct.
Q. And there's a whole litany of testimony under oath about the nature of his work and job experience from the moment he graduated high school essentially until almost the present day.
Do you recall that?
A. I do.
Q. And is it your understanding that Mr. Hedrick was under oath the same as everyone else who has testified during the course of this deposition?
A. Yes.
Q. There were some questions asked about topographical analysis and environmental analysis.
Do you recall that?
A. I do.
Q. And I believe it relates to Page 20, the site selection portion of your report.
Do you recall during the review of your materials information related to FEMA and floodplains?
A. Floodplains, definitely.
FEMA, I believe so. A little fuzzy.

But floodplains, yes.
Q. So that would directly correlate to topographical and environmental analysis.
Is that correct?
A. Yes.
Q. And Page 5 of the report, where we talked about sources of information.
Earlier you testified that Anthony Silanskas was a party to the case.
Do you recall stating that?
A. I do recall stating that.
Q. Do you understand that that is not correct?
A. I do now, yes.
Q. And the actual party to the case based upon the complaint, which is also in front of your report, is O. Gene Bicknell versus Richard M. Silanskas, Larry Wilhite, and Stephen Hedrick?
A. Yes.
Q. Do you have an understanding of who Anthony Silanskas was?
A. No, I don't.

Q. Do you recall reading his deposition testimony?
A. I don't -- I don't recall directly.
Q. There was a little bit of discussion about what starts on Page 17 of your report, the common phase of work down.
A. Uh-huh.
Q. Common phase of work breakdown.
Can you describe what the blue sky phase is?
A. Yes. Blue sky is the initial blank piece of paper visioning of any project. When a project just starts -- we're going to build a theme park. Okay.
Then one figures out what the parameters are and then starts that process in a blue sky effort.
Q. And then what's the next phase?
A. Next phase is -- it can either be feasibility or concept, depending on the nature of the project, but it usually goes into concept, where you take a first pass at realizing what blue sky is before you move into feasibility to prove that the concept piece is feasible.
Q. And then you move to feasibility.

Is that correct?
A. Yes. After concept, correct.
Q. And what is feasibility?
A. Feasibility is what you developed in concept, will it work. Before you move into a more detailed design phase, you want to make sure that it's feasible so you don't waste any time or money in the schematic design phase.
So feasibility validates everything put forth in concept.
Q. And then we have value engineering and scope adjustment.
Is that right?
A. Yeah. Review and approval check-ins at the bottom of 17 and value engineering and scope adjustments at the top of 18 is something you do as you move through every phase of work.
You review. You will adjust your concept if you need to from a money perspective or some other driving force.
And you'll also review and approve before you move to the next phase of work.

Q. And then what's the next phase of work?
A. Schematic design comes after that, where it's put into a schematic to make sure, again, that you can move into a full design development.
So schematic allows you to understand how the site is formed, what dependencies it needs from an infrastructure perspective.
And then that allows you to proceed if you successfully move through that into full design development.
Q. What's involved in design development?
A. Design development is the actual literal design phase where you get into what everything literally is.
So that's all the facade detail, it's all your exteriors and interiors, what you need for this entertainment facility call out.
It's the core of the design work to bring it to fruition before it goes into construction drawings, which are used to bid the construction of the project.
Q. Did the American Heartland Theme Park, based upon your review of deliverables, follow this

common phase of work breakdown?

A. Yes.

Q. Is this common phase of work breakdown the structure or lens through which you evaluated the deliverables in this case?

MR. NADEL: Objection.

A. Yes.

BY MS. JACKSON:

Q. And was it your understanding that the project got up until construction drawings before it ended?

A. I don't think they made their way through schematic. I think they were just completing schematic when it got paused.

Q. Now, as someone who has worked in the theme park industry or grown up their professional experience through the theme park industry, do they work in isolation in their specific area of practice?

A. No, they --

MR. NADEL: Objection.

A. The effort is a highly collaborative one. It takes a village to develop a theme park, as

evidenced by this project and any other project.

Lots of people work hand-in-hand to create something like a theme park.

BY MS. JACKSON:

Q. So if someone did not previously design a ride, does that make them unqualified to lead the development of a theme park?

A. No.

Q. Is a creative lead and/or executive producer similar to a general contractor in the construction realm?

A. Similar to a general contractor, no.

Q. What's the difference?

A. The difference is a general contractor is just that. They're going to provide construction services usually when it comes to this business, whereas the other two roles are executive roles that oversee the project and the team designing and delivering the park.

Q. Does a general contractor actually do the plumbing of a home?

A. General contractor often will subcontract

a plumbing trade to the plumbing of a home.
Q. Does a general contractor do the electricity in a home?
A. They'll usually sub unless their specialty also includes that or they choose to do that within their scope, but usually they manage a number of trades.
Q. So a general contractor manages a number of trades like a creative lead and executive producer manages a number of various people in -- within their expertise.
A. In various disciplines, yes.
Q. So someone who is not an architect can still be qualified to oversee the design and development of a theme park.
Is that correct?
A. Yes.
Q. And so you went into this with assumptions or hypothesis.
Is that right?
A. Yes.
Q. And then if your assumptions or hypothesis

that you went in with were disproven by your analysis of the deliverables, would you have created opinions stating that Stephen Hedrick did a good job?

A. I may have indicated where I saw deficiencies, but I didn't see any deficiencies. But I may have indicated that it was deficient by not having done a certain thing perhaps.

Q. Okay. So your -- again, listen to my question.

You're not -- would you have drafted a report and testified under oath if the assumptions you had going into this evaluation of the American Heartland Project were proven to be incorrect?

Do you understand my question?

A. I would ask you to maybe ask a slightly different one.

Q. Okay. So if your assumption was that Steve had the education, training, and experience to create and lead the American Heartland Project, but after you reviewed the deliverables you found that to be inaccurate, would you have gone ahead and written a report and come to testify stating that he was in

fact -- that he did in fact have the education, training, and experience to lead this project?

A. I don't think so, based on the context of your question.

MS. JACKSON: I don't have any further questions at this time.

MR. NADEL: I have questions, but before I go --

Team Wilhite, do you have questions?

THE WITNESS: Still muted.

MR. NADEL: If -- Mr. Thorp, if you're trying to talk, we can't hear you. If you want to ask questions before we end the deposition, why don't you call me on my cell phone and we'll do what we can to arrange things over here so that you're able to ask questions.

Otherwise we're going to proceed with the redirect and then end.

EXAMINATION

BY MR. NADEL:

Q. Mr. Heartsner, you said you didn't think Steve Hedrick did anything untoward, but you wanted to

evaluate whether he did.
Is that right?
A. I wanted to prove the assumptions that I entered this -- entered this effort with.
Q. So you entered this effort with the assumption that Steve did not do anything untoward, correct?
A. I did.
Q. And then you wanted to prove that your assumption was correct.
Is that right?
A. Yes.
Q. And you undertook your expert engagement with that goal in mind, correct?
A. Yes. To do analysis to hopefully -- yes, at the end of the day prove my assumption to be correct.
Q. And you didn't, as far as you remember, read Mr. Bicknell's testimony, correct?
A. I believe I did.
Q. Or at least you didn't list that in your report as something that you read, right?

A. It may not be listed in the report.
Q. And if you read it, then you only read one deposition when he was actually deposed twice, correct?
A. I believe so.
Q. You didn't interview Mr. Bicknell, correct?
A. I did not.
Q. You understand now that one of the named defendants in this case is Richard Silanskas.
And you didn't read his deposition, correct?
A. I don't recall reading his.
Q. You didn't list his, right?
A. I don't -- I don't believe it's listed.
Q. You did list the deposition of his brother Anthony Silanskas.
But you didn't read that deposition, correct?
A. I may -- I don't recall. Sorry.
Q. I'm sorry. You did list the deposition of Rick Silanskas's son, Anthony Silanskas.
But you didn't read that deposition, correct?
A. I don't recall.
Q. You don't remember reading it, right?

A. Right.
Q. You didn't ask to speak with Mr. Bicknell, correct?
A. Correct.
Q. Did Steve Hedrick know about the Today's Word messages that were sent to Mr. Bicknell?
A. I don't know. I believe in his deposition he indicated that he had seen some of them, but I'm not exact -- I can't recall exactly what he said.
Q. Did you ask Steve Hedrick what his involvement was with the Today's Word messages?
A. I did not because I believe in his deposition he said he did not respond to those, nor did he consider those.
I may have this wrong.
But he didn't consider those germane to what his work was.
Q. Right. That's what he said at his deposition.
Why didn't you ask him?
A. I would agree, to the degree that I understood what was being communicated, why that would

have anything to do with the project team trying to execute the project.

Q. Well, you said that you didn't think Steve Hedrick did anything untoward, but you wanted to evaluate whether he did.

And then you didn't ask him whether he did the things he's being accused of in this case, right?

MS. JACKSON: Object to form.

A. You'd have to break that down a little bit.

BY MR. NADEL:

Q. You said you didn't think Steve Hedrick did anything untoward when you entered into the engagement, correct?

A. Yes. I wouldn't make that assumption, that he did.

Q. Right. In fact you made the assumption that he did not.

That's what you said, right?

A. That's what I said.

Q. But you said you wanted to evaluate whether in fact he did do something untoward.

A. I wanted to -- yeah. I wanted to prove that.
Q. And then you didn't ask him whether he did the things that are the basis for the claims against him in this case, right?
MS. JACKSON: Object to form.
A. I didn't -- say the last part again.
BY MR. NADEL:
Q. You didn't ask him whether he did the things that are the basis for the claim against him in this case?
A. I did not.
Q. And you didn't look at the religious messaging that is the basis for the claim in this case, right?
A. I didn't look at the religious messaging?
Q. Correct.
A. That is one of the claims in the case?
No, I did not look at the religious messaging.
Q. Did Steve Hedrick know about the Sister Catherine messages?
A. I don't know.

Q. You didn't ask him, right?
A. I did not ask him.
Q. You didn't look or ask to look at any of the documents that might show that one way or the other, correct?
A. I did not.
Q. Why didn't you?
A. Because I didn't believe that communication was relevant to what Steve was asked to do.
Q. Isn't it relevant to whether Steve Hedrick did something untoward?
A. No, I don't see the connection.
Q. You don't see the connection between whether Steve Hedrick knew about the Sister Catherine or Today's Word messages and whether he did something untoward?
A. Yes.
Q. Okay. You said you looked at materials related to FEMA.
What were they?
A. No. I said floodplains. I saw something

about floodplains.
Q. What did you see related to floodplains?
A. I believe there was an analysis of that, but I don't recall specifically anything about FEMA.
Q. Who did the analysis related to floodplains?
A. I'm sorry. I forgot.
Q. Where did you see that?
A. I saw that in a deposition, I believe.
Q. In a deposition somebody talked about an analysis relating to floodplains?
A. Yes.
Q. Did they say that there was an analysis done?
A. I believe so.
Q. Who said that?
A. I don't recall.
Q. Was it Steve Hedrick?
A. It may have been. I don't know.
Q. Have you seen documents reflecting that there was an analysis related to floodplains?
A. I remember seeing something, I just

can't -- sorry, I can't recall exactly what it was.
Q. What is a topographical analysis?
A. Just is the site as you go into it or as you take it acceptable from a -- is it suitable to usually flatten if it's not already flattened, to be elementary, and if it's workable for a site -- a theme park site.
Q. And you don't know whether that was done in this case or not?
A. I assume it was, but no, I don't know for a fact.
Q. You said you didn't have an understanding of Anthony Silanskas's testimony, correct?
A. Correct.
Q. But it's listed under the sources of information you considered.
There is no way to tell from your report what materials that are listed as sources of information were considered by you and which were not, correct?
A. Definitively that is correct.
Q. You answered some questions about general contractors.

You've never been a general contractor, have you?

A. I have not.

Q. And you don't hold yourself out as an expert in how general contractors function, correct?

A. An expert -- I know generally how they function. An expert -- I wouldn't say so.

Q. You agree that a general contractor is not analogous to the role Mr. Hedrick played on the American Heartland Theme Park?

A. It's not the same, no.

MR. NADEL: Thanks. That's all I have.

MS. JACKSON: Galen said he has no questions.

MR. NADEL: Okay. I think we're done.

THE VIDEOGRAPHER: We are going off the record at 3:53 PM.

THE REPORTER: I assume all attorneys just want the same as last time?

MS. JACKSON: Yes.

MS. PELTZER: Yes.

MR. NADEL: Yes.

MS. JACKSON: We'll read and sign.

[3:53 p.m.]

[SIGNATURE RESERVED.]

C E R T I F I C A T E

I, Mark Arndt, a Certified Shorthand Reporter and Certified Court Reporter, do hereby certify that ROGER HEARTSNER, prior to the commencement of the examination, was sworn by me on September 9, 2026, to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

MARK ARNDT, CSR, CCR, CRR

CSR NO. 084-004711

CCR NO. 1398