**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) O. GENE BICKNELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 25-cv-00383-SH |
| | ) | |
| (1) RICHARD M. SILANSKAS, JR.,<br>(2) LARRY K. WILHITE, and<br>(3) STEPHEN D. HEDRICK, | ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANT LARRY WILHITE'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

J. Christopher Davis, OBA #16639
Deric J. McClellan, OBA #32827
CROWE & DUNLEVY, P.C.
222 North Detroit Ave., Suite #600
Tulsa, OK 74120
(918) 592-9800
(918) 592-9801 (Facsimile)
chris.davis@crowedunlevy.com
deric.mcclellan@crowedunlevy.com

-and-

Evan G. Vincent, OBA #22325
Galen N. Thorp, OBA #36847
CROWE & DUNLEVY, P.C.
Braniff Building
324 North Robinson Ave., Suite #100
Oklahoma City, OK 73102-8273
(405) 235-7700
(405) 239-6651 (Facsimile)
evan.vincent@crowedunlevy.com
galen.thorp@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT LARRY K. WILHITE**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

I. Background ........ 2

II. Silanskas and the American Heartland Project ........ 3

III. Wilhite Believed the Religious Messages and Treated Them as Genuine ........ 6

IV. Silanskas Admits Writing and Sending the Religious Messages ........ 9

V. Plaintiff's Experts Offer No Opinion on What Wilhite Knew ........ 11

VI. Signing Contracts ........ 13

VII. Financial Payments to Wilhite ........ 14

LEGAL STANDARD ........ 15

ARGUMENT AND AUTHORITIES ........ 16

I. Plaintiff's fraud and deceit claims fail for lack of evidence that Wilhite acted knowingly or recklessly. ........ 16

A. Plaintiff must prove scienter by clear and convincing evidence, and circumstantial proof suffices only if it yields an irresistible deduction of fraud. ........ 16

B. No evidence shows that Wilhite knew the messages were fabricated. ........ 18

C. Wilhite's use of Docusign on behalf of Plaintiff was not fraud. ........ 22

II. Plaintiff's constructive fraud claim fails because Wilhite did not know the fact Plaintiff says he should have disclosed. ........ 22

III. Plaintiff's IIED claim fails because Wilhite did not knowingly or recklessly inflict distress. ........ 23

IV. Plaintiff's civil-conspiracy claim fails because there is no underlying fraud or agreement involving Wilhite. ........ 24

V. Wilhite was not unjustly enriched. ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 16, 20

*Applied Genetics Int't, Inc. v. First Affiliated Sec., Inc.*,
912 F.2d 1238 (10th Cir. 1990) ........ 16

*Bowman v. Presley*,
2009 OK 48, 212 P.3d 1210 ........ 16, 17

*Computer Publications, Inc. v. Welton*,
2002 OK 50, 49 P.3d 732 ........ 23

*Croslin v. Enerlex, Inc.*,
2013 OK 34, 308 P.3d 1041 ........ 22

*Downs v. Longfellow Corp.*,
1960 OK 107, 351 P.2d 999 ........ 17, 21

*Emergency Servs. of Oklahoma, P.C. v. Aetna Health, Inc.*,
580 F. Supp. 3d 1032 (W.D. Okla. 2022) ........ 21

*Feldman v. MCZ Dev. Corp.*,
No. 12-CV-431-GKF-TLW, 2013 WL 12131596 (N.D. Okla. Feb. 4, 2013) ........ 16

*French Energy, Inc. v. Alexander*,
1991 OK 106, 818 P.2d 1234 ........ 24

*Funnell v. Jones*,
1985 OK 73, 737 P.2d 105 ........ 17

*Gaylord Ent. Co. v. Thompson*,
1998 OK 30, 958 P.2d 128 ........ 24

*Gibson v. Weyerhaeuser Co.*,
35 F. App'x 834 (10th Cir. 2002) ........ 21

*Horn v. Gov't Emps. Ins. Co.*,
86 F. App'x 405 (10th Cir. 2004) ........ 16

*Johnson v. Caldwell*,
1937 OK 327, 71 P.2d 620 ........ 17, 19, 20

*Lapkin v. Garland Bloodworth, Inc.*,
2001 OK CIV APP 29, 23 P.3d 958 ........ 24

*Oak Tree Partners, LLC v. Williams*,
2020 OK CIV APP 5, 458 P.3d 626 ........ 17, 20, 21

*P.E.A.C.E. Corp. v. Oklahoma Nat. Gas. Co.*,
1977 OK 151, 568 P.2d 1273 ........ 17

*Pelt v. Utah*,
539 F.3d 1271 (10th Cir. 2008) ........ 16

*Pine Tel. Co. v. Alcatel-Lucent USA Inc.*,
617 F. App'x 846 (10th Cir. 2015) ........ 16, 17, 21, 23

*PWB Dev., L.L.C. v. Acadia Ins. Co.*,
No. CIV-17-387-R, 2018 WL 4088793 (W.D. Okla. Aug. 27, 2018) ........ 21

*Randle v. City of Tulsa*,
2024 OK 40, 556 P.3d 612 ........ 24, 25

*Roberts v. Wells Fargo AG Credit Corp.*,
990 F.2d 1169 (10th Cir. 1993) ........ 17, 21

*Specialty Beverages, L.L.C. v. Pabst Brewing Co.*,
537 F.3d 1165 (10th Cir. 2008) ........ 23

*Thacker v. Walton*,
2021 OK CIV APP 5, 499 P.3d 1255 ........ 24

**Statutes**

15 O.S. § 59 ........ 22

**Other Authorities**

Fed. R. Civ. P. 56(a) ........ 15

FRCP 56 ........ 1

LCvR 56.1 ........ 1

Pursuant to FRCP 56 and LCvR 56.1, Defendant Larry Wilhite ("Wilhite") moves for summary judgment on all of Plaintiff O. Gene Bicknell's remaining claims against Wilhite.

## INTRODUCTION

After discovery, Plaintiff has no affirmative evidence that Wilhite knew the religious messages at the center of this case were fabricated. To be sure, the messages were false, and Wilhite received and shared many of them. But fraud does not turn on those undisputed facts. It turns on whether Wilhite knew the truth, and the record does not show that he did.

The affirmative evidence points the other way. Wilhite testified that he believed the messages were divinely inspired, and his conduct matched that belief. He tried to identify the anonymous senders, shared the messages with his own family as words from God, and worked with his wife to preserve them as a chronicle of the Project. Other witnesses observed that belief or identified no role by Wilhite in creating or sending the messages. Most significantly, Defendant Richard Silanskas admits that he composed and sent the messages, yet testified that Wilhite did not know and that Silanskas allowed him to continue believing they came from God. And Plaintiff's experts do not fill the evidentiary gap.

At the pleading stage, the Court observed that Wilhite "may have a plausible explanation for all these facts." Dkt. No. 146 at 23. Discovery has now supplied those explanations. What it has not supplied is evidence from which a reasonable jury could find, clearly and convincingly, that Wilhite acted with knowledge of falsity or reckless disregard for the truth. Plaintiff may place a suspicious interpretation on some of Wilhite's conduct, but suspicion does not establish fraud when the same conduct remains consistent with the sincere belief reflected throughout the record.

Plaintiff's separate Docusign theory fares no better. Plaintiff now denies authorizing certain signatures, but that dispute does not establish that Wilhite knew he lacked authority. Wilhite had signed electronically for Plaintiff in prior transactions for years; Kristy Adams ("Adams"), Wilhite's assistant

general manager, also signed Plaintiff's name as part of the parties' established practice; and Defendant Rick Silanskas told Wilhite that Plaintiff had authorized the disputed signatures. Even accepting Plaintiff's denial, the record contains no evidence that Wilhite knew the authorization relayed to him was false.

That same absence of knowledge defeats the remaining claims. Constructive fraud cannot rest on Wilhite's failure to disclose a fact he did not know, and there is no evidence that he agreed with anyone to commit fraud. Similarly, forwarding messages he believed does not amount to intentional or reckless infliction of emotional distress. Finally, the compensation and reimbursements Wilhite received for work he actually performed and a proposed ownership interest he never received do not support unjust enrichment. The Court should enter summary judgment in Wilhite's favor on all remaining claims.

## STATEMENT OF MATERIAL FACTS

### I. Background

1. Plaintiff is an accomplished businessman who describes himself as the founder of five companies, along with separate investments in "farm, cattle, motel, commercial properties, and real estate." Ex. A, O. Gene Bicknell, https://www.genebicknell.com/resume.

2. Plaintiff has long been involved in the arts, considering himself an author, composer, vocalist, actor, screenwriter, and executive director, and has owned one or more theaters in Branson, MO since the 1990s. Ex. B, O. Gene Bicknell, https://www.genebicknell.com/projects.

3. Wilhite is a theater manager and musical artist who has lived in Branson, MO since 1985 and remained involved in music entertainment in several capacities. Ex. C, Wilhite Decl. ¶¶ 1, 3.

4. Wilhite was employed by Plaintiff from 2004 to December 2024 as the general manager of the Mansion Theatre. *Id.* ¶ 3.

5. Wilhite served as Plaintiff's employee and right-hand man in Branson for over twenty years, doing whatever Plaintiff required, including regularly checking on all of Plaintiff's properties in Branson, managing a second theater from 2007-2015, assisting with the purchase and sale of Plaintiff's properties, and exploring other arts ventures Plaintiff was considering. *Id.* ¶¶ 6, 8; Ex. D, Wilhite Dep. 10:13-11:18, 17:17-19:4, 35:2-36:15.

6. Wilhite trusted Plaintiff, including any guidance or direction on business matters. Wilhite Decl. ¶ 7. Plaintiff trusted Wilhite "like a son" and included him in his will. Ex. E, Bicknell Dep. I 41:4–7. Plaintiff still said he trusted Wilhite when he fired him. Ex. D, Wilhite Dep. 354:11-355:3. In twenty years, Plaintiff never observed Wilhite to be ungrateful and never sensed that Wilhite wanted his money. Ex. E, Bicknell Dep. I 54:4–10.

7. In 2012, Plaintiff and Wilhite agreed to set up Big Time Production LLC ("Big Time") as a corporation nominally owned by Wilhite to operate theaters in Branson, with Wilhite remaining a salaried employee of Plaintiff. Ex. C, Wilhite Decl. ¶ 10; Ex. D, Wilhite Dep. 301:1-307:3; Ex. E, Bicknell Dep. I 52:16-25.

8. While Wilhite formally owned Big Time and Big Time's profits or losses were treated as passthrough income on Wilhite's personal tax return, both Plaintiff and Wilhite understood that Plaintiff would exercise control over the use of Big Time's assets when Plaintiff wished to do so. Ex. C, Wilhite Decl. ¶ 11; Ex. D, Wilhite Dep. 306:15-307:3; Ex. E, Bicknell Dep. I 43:15-25.

## II. Silanskas and the American Heartland Project

9. Plaintiff and Wilhite's status quo was disrupted when Rick Silanskas ("Silanskas") got involved in early 2021. Ex. C, Wilhite Decl. ¶¶ 17-20.

10. Wilhite believed Silanskas to be trustworthy because he was recommended by two prominent people who knew him. First, Gary McSpadden, a famous singer and pastor whom Wilhite had known for a long time, introduced Silanskas to Wilhite in late 2019. Ex. C, Wilhite Decl. ¶¶ 13-14; Ex. D,

Wilhite Dep. 36:21-38:2. Second, Ron Logan, a longtime Disney executive, met in person with Plaintiff and Wilhite on multiple occasions and recommended Silanskas without reservation. Ex. C, Wilhite Decl. ¶ 18; Ex. D, Wilhite Dep. 40:17-21, 42:9-20, 64:2-21.

11. Silanskas pursued Wilhite throughout 2020 before requesting at least four times to be introduced to Plaintiff. Ex. C, Wilhite Decl. ¶ 15; Ex. D, Wilhite Dep. 39:7-15, 44:15-45:7.

12. Once introduced to Plaintiff in January 2021, Silanskas pressed Plaintiff and Wilhite regarding his ideas for branding and expanding the Mansion Theatre into new directions, including animation, film and television, sound studios, and a theme park. Ex. C, Wilhite Decl. ¶¶ 16-19; Ex. D, Wilhite Dep. 45:8-15, 100:9-101:19.

13. Over the course of 2021, Silanskas pursued connection with Plaintiff, including one-on-one music writing sessions at the Mansion Theatre, and planning an animated short film regarding Plaintiff's life. Ex. C, Wilhite Decl. ¶ 17; Ex. D, Wilhite Dep. 58:11-13, Ex. I, Adams Dep. 52:16-53:7.

14. In August 2021, Silanskas asked Plaintiff for a formal position and a $110,000 salary, and Plaintiff hired him. Ex. C, Wilhite Decl. ¶ 17; Ex. D, Wilhite Dep. 74:1-5.

15. In January 2022, with Plaintiff's approval, Silanskas organized an announcement that the Mansion Theatre was branching out in several new directions, including Mansion Animation, Mansion Film & Television, and Mansion Studios. Ex. C, Wilhite Decl. ¶ 19.

16. Plaintiff was very involved in exploring the possibility of locating a studio and soundstage in Missouri or Oklahoma, and he ultimately decided on Oklahoma and began purchasing land there. Ex. C, Wilhite Decl. ¶¶ 20-21; Ex. F, Silanskas Dep. 102:21-103:20; Ex. G, Hedrick Decl. ¶ 6; Ex. D, Wilhite Dep. 105:3-21, 106:5-16.

17. Ron Logan and Silanskas suggested Stephen Hedrick ("Hedrick") to lead the creative development of the Project. Ex. G, Hedrick Decl. ¶ 4; Ex. C, Wilhite Decl. ¶ 22; Ex. F, Silanskas Dep. 46:5-47:8, 58:9-60:19.

18. Hedrick came to Branson in April 2022 for an initial planning session and was hired by Plaintiff. Ex. G, Hedrick Decl. ¶¶ 7-11; Ex. H, Hedrick Dep. 44:4-19; Ex. C, Wilhite Decl. ¶ 22; Ex. D, Wilhite Dep. 112:3-9.

19. Hedrick repeatedly presented evidence that the Project was feasible, and Wilhite accepted this because he had no basis to doubt Hedrick's expertise. Ex. G, Hedrick Decl. ¶¶ 12-24; Ex. D, Wilhite Dep. 130:8-131:14; Ex. C, Wilhite Decl. ¶¶ 23, 25.

20. Hedrick led the development of the Project and presented information to Plaintiff about plans and finances throughout the Project. Ex. G, Hedrick Decl. ¶¶ 14-18, 21-23, 27, 29-36; Ex. H, Hedrick Dep. 43:21-47:24, 54:3-13, 173:2-176:16, 259:21-260:13, 264:8-269:23; Ex. C, Wilhite Decl. ¶ 26.

21. Wilhite also kept Plaintiff informed about the Project. Ex. C, Wilhite Decl. ¶ 26, 52; Ex. D, Wilhite Dep. 120:1-8, 122:4-8, 139:9-13. Adams could not recall any significant decision about the Project where Wilhite did not consult Plaintiff. Ex. I, Adams Dep. 72:14-16; 70:20-22; *see also* Adams Dep. 69:15-21 (Plaintiff "was looped in on all of . . . the development and all of that . . . he was given the plans . . . he was involved. He signed the contracts . . . for the architectural and – and things like that, but on a day to day basis, he wasn't overly involved"); Ex. I, Adams Dep. 69:24-25 ("Gene is always the ultimate decision-maker").

22. In November and December 2022, Hedrick made presentations to Plaintiff explaining that to execute the plan that had been developed on the timetable Plaintiff wanted, about $72 million was needed for the first six months of 2023, and more than $1.5 billion overall. Plaintiff directed Hedrick to proceed and said that he would take care of the money. Ex. G, Hedrick Decl. ¶¶ 21-23; Ex. H, Hedrick Dep. 66:2-67:11.

23. In May 2023, two months before the public announcement of the Project, Hedrick met with Plaintiff again and discussed the budget. Ex. G, Hedrick Decl. ¶ 27; Ex. H, Hedrick Dep. 67:6-25. When asked what his alternative plan was if other investors did not come, Plaintiff announced "I am Plan B." *Id.*; Ex. H, Hedrick Dep. 67:15-25; Ex. K, McComb Dep. 101:18-102:22; 221:11-222:16.

24. Contrary to his own expectation, Plaintiff did not bring other investors on board and was unable to access his family's trust to fund the Project. Ex. E, Bicknell Dep. I 24:20-25:21; Ex. L, Bicknell Dep. II 111:5-9, 132:4-18; Ex. C, Wilhite Decl. ¶¶ 28-30; Ex. G, Hedrick Decl. ¶¶ 42-45.

25. By January 2024, most of the vendors had suspended work. Hedrick Decl. ¶ 42; Hedrick Dep. 188:4-189:15. Despite Plaintiff's repeated assurances to Hedrick, Wilhite, and the vendors, he was unable to access funds to pay the long-overdue invoices. Ex. G, Hedrick Decl. ¶¶ 42-45; Ex. H, Hedrick Dep. 171:1-15.

26. In October 2024, Plaintiff grew angry with Hedrick and the team regarding the amount of money that had been spent. Ex. G, Hedrick Decl. ¶ 44; Ex. H, Hedrick Dep. 171:12-172:15. On November 6, 2024, he informed Wilhite and Silanskas that their employment would end in December. Ex. D, Wilhite Dep. 351:11-352:12.

## III. Wilhite Believed the Religious Messages and Treated Them as Genuine

27. Wilhite received hundreds of Todays Word text messages from ever-changing numbers, beginning in 2020 and ending in December 2024. Ex. D, Wilhite Dep. 155:22-156:2; Ex. C, Wilhite Decl. ¶ 31; Ex. J, Adams Interview Tr. 53:14-54:12.[1]

28. Wilhite first thought he had been added to a devotional list; over time he came to believe the messages were guidance from God. Ex. D, Wilhite Dep. 155:16–156:14, 157:1–16; Ex. C, Wilhite

[1] This interview was produced to Wilhite as an audio file and was relied on by Watts in his report. Wilhite had the audio file transcribed by Professional Reporters. The interview had not been produced to Wilhite at the time of Adams's deposition.

Decl. ¶ 32. Asked whether God was sending them, he answered: "I believed they were inspired. I don't know who was sending them." Ex. D, Wilhite Dep. 158:17–21.

29. Wilhite tried calling the numbers that sent the messages and got no answer. *Id.* 160:21–162:20; Ex. M, J. Wilhite Dep. 235:19–236:4; Wilhite Decl. ¶ 41. Adams also checked some of the numbers that contacted Wilhite without success. Ex. J, Adams Interview Tr. 53:14-16; Ex. I, Adams Dep. 114:3–9.

30. Wilhite sent the messages to people who asked for them, including Adams, Hedrick, and Gene McComb ("McComb"), along with his family, and he told his wife, his daughters, his daughter-in-law, and his mother that he believed they came from God. Ex. D, Wilhite Dep. 171:9–173:10; Ex. C, Wilhite Decl. ¶ 33.

31. Wilhite's family treated the messages as though they came from God and did not express any doubt about that to Wilhite. Ex. C, Wilhite Decl. ¶¶ 34-35. In response to Wilhite or his wife forwarding Todays Word messages, his wife and children's responses reflect belief. *See, e.g.*, *id.* ¶ 35, Subex. 16 at LW_001939 (July 18, 2022) (Amy Leaming "Again so overwhelmed with God speaking to us! It has changed each of my days from the first text we got. It's really a peace I feel each day and utter humility that God is speaking directly to us. Wow!"); *id.* ¶ 35, Subex. 16 at LW_001951 (July 26, 2022) (Ashley Ogle "Thanks Dad for always sharing, I enjoy these SO much and we read them to the girls each day also."); *id.* ¶ 35, Subex. 18 at JW_003375 (July 20, 2023) (Julia "Whoah! God is blessing you. The winds have shifted." Amy Leaming "Oh Wow!! Goose bumps. Tears of Joy!!" Ashley Ogle "Speechless!! Dad, you are so deserving of this position, of this blessing." Micah Wilhite "It all lines up. Absolutely amazing").

32. When Adams asked Wilhite whether he thought the messages came from God, he said he did. Ex. I, Adams Dep. 109:17–25. Asked whether Wilhite believed them, Adams answered, "He -- he appeared to." *Id.* 116:2–8. In her interview with Jeff Watts, Adams also described Wilhite's belief in

the messages. He "didn't know where [the Todays Word] came from." Ex. J, Adams Interview Tr. 52:21–24. When Adams showed him an app that sends anonymous "message[s] from heaven," "he just did not believe it." *Id.* 53:1–10. When a message addressed a specific problem, it was not suspicious "to him. It was not that way to him. It was a message." *Id.* 55:1–5. He read the messages aloud in meetings as encouragement, *id.* 50:23–51:7, and he "thought [Sister Catherine] was real too, or he appeared to think that she was real," *id.* 61:9–12.

33. In 2022, Wilhite, Plaintiff, and Silanskas discussed archiving the messages as a history of the Project, and Plaintiff "even mentioned it would be great to compile them." Ex. D, Wilhite Dep. 163:9–164:12, 166:2–167:7; Ex. C, Wilhite Decl. ¶ 36. Julia Wilhite compiled and printed them. Ex. M, J. Wilhite Dep. 229:18–231:11. Plaintiff received the contents of those compilations, and Wilhite told him at the time that Julia was interpreting the Hebrew passages. Ex. E, Bicknell Dep. I 21:22–22:7, 37:16–38:23; Ex. M, J. Wilhite Dep. 237:14-16. At certain points in time, Julia Wilhite stored the compilations in her late mother's e-mail account because her own account was full. Ex. M, J. Wilhite Dep. 231:12–232:5; Ex. D, Wilhite Dep. 284:22–287:3; Ex. C, Wilhite Decl. ¶ 46.

34. Wilhite understood passages in the Todays Word messages directed to "the one tasked with administration and leadership" to refer to him, and interpreted the sometimes ALLCAPS passages to mean that he should stay in his lane, keep his head down, and not raise questions or concerns about the Project. Ex. C, Wilhite Decl. ¶ 39-40.

35. Wilhite forwarded Sister Catherine messages so they could be archived like the Todays Word messages. Ex. D, Wilhite Dep. 290:8–18; Ex. C, Wilhite Decl. ¶ 46.

36. The first Sister Catherine message Wilhite saw was forwarded by Plaintiff himself, "FYI," together with Plaintiff's own reply. Ex. C, Wilhite Decl. ¶ 42. Wilhite also received other Sister Catherine messages forwarded by Plaintiff, and sometimes received messages forwarded by both Silanskas and Plaintiff. Ex. C, Wilhite Decl. ¶¶ 43-44. Wilhite's understanding was that whenever

Silanskas forwarded a Sister Catherine message or Plaintiff's reply to a message, Plaintiff had sent them to Silanskas. Ex. D, Wilhite Dep. 271:3–5, 299:20–300:19; Ex. C, Wilhite Decl. ¶ 45.

37. Wilhite's belief that the Todays Word and Sister Catherine messages came from God changed only after this lawsuit was filed. Ex. D, Wilhite Dep. 176:12–177:9.

38. Hedrick received Todays Word messages from Wilhite and testified: "I don't believe he made it up. He may have been sent the Todays Words from an app or something and shared them, but I don't think he wrote them, and I don't think he used them to manipulate anyone." Ex. H, Hedrick Dep. 255:10–19. Hedrick also described Wilhite as "an honest person" and a "straightforward guy" who "did not talk in code." Ex. H, Hedrick Dep. 175:6–13; *see id.* 250:21–24. When Wilhite forwarded Todays Word messages to Hedrick, Hedrick understood that Wilhite, "a religious man," wanted to share them and assumed they might have originated from an app or daily devotional service. Ex. H, Hedrick Dep. 82:3–19.

## IV. Silanskas Admits Writing and Sending the Religious Messages

39. Plaintiff's and Wilhite's counsel traced some of the religious messages to a Pinger account associated with the email address mountainfreshmusic@gmail.com. That account was assigned over 300 numbers that changed almost daily between August 2023 and December 2024. *See* Ex. N, PINGER_LW_000050.

40. A comparison of the Pinger account and the user table extracted from Wilhite's Samsung phone confirms that at least 286 of the Pinger numbers were in contact with Wilhite's phone. *See* Ex. C, Wilhite Decl. Ex. 90, Comparison Chart.

41. Silanskas admitted that he sent Todays Word messages through Pinger's TextFree app and agreed that he changed the sending number almost every day. Ex. F, Silanskas Dep. 209:9–15, 212:5–14. His Apple account shows that he accessed a Pinger app as early as January 2023 and paid for "Text Free Plus" subscriptions from September 2023 through December 2024. Ex. O, RS00156874. His

Apple account also shows that he accessed or downloaded many other texting or anonymous calling apps in 2023 and earlier. *See id.*

42. Silanskas testified that once the Todays Word messages began referring to the "Triune" and the Project, he was the one drafting and sending them. Ex. F, Silanskas Dep. 157:8–16, 204:2–6.

43. Silanskas created, operated, and terminated the Sister Catherine e-mail accounts used after January 16, 2024. Ex. F, Silanskas Dep. 205:18–21, 292:9–293:16.

44. Silanskas knew the messages were not coming from God. *Id.* 201:7–11.

45. After he left the Mansion Theatre, Silanskas deleted the Todays Word messages from his e-mail and then emptied his deleted folders, which he attributed to fear of "[r]etribution." *Id.* 219:2–220:16.

46. When Silanskas was asked whether Wilhite knew Silanskas was composing the Todays Word messages, Silanskas answered: "No, he did not." *Id.* 174:16–18.

47. Silanskas knew Wilhite believed the messages came from God and let him continue to believe it. *Id.* 175:2–14, 180:7–21. Silanskas testified: "I should have never hurt Larry like that. I should have told him . . . what was going [on] and just left the company. That's what I should have done, but I didn't." *Id.* 220:2–5.

48. When Silanskas was asked whether Wilhite wrote any religious messages about the Triune, Silanskas answered, "No, I don't believe it was Larry Wilhite." *Id.* 163:13–21.

49. Silanskas testified that Plaintiff demanded that he continue composing and sending the Todays Word messages, sometimes directed the subjects to address, and knew that Silanskas was composing them. Ex. F, Silanskas Dep. 152:15–154:10, 157:8–16, 173:13–174:18.

50. According to Silanskas, Plaintiff told him on multiple occasions that he wanted the Todays Word messages to "keep coming," and Silanskas believed that Plaintiff knew he was composing them. Silanskas testified that Wilhite, by contrast, did not know. Ex. F, Silanskas Dep. 173:13–174:18.

51. Plaintiff testified that he thinks Rick was solely responsible for the messages. In response to a question asked by Silanskas at Bicknell's deposition, Bicknell answered:

> I think you're the one that did this whole thing. I think you did a marvelous job of fooling me and creating a Daily Word that made logic. And I'll go to my grave knowing that you're the one that did this to me. . . the fabricator of a mission of a Daily Word which you created, in my opinion, and you did all this to me, and you ruined my life.

Ex. E, Bicknell Dep. I 74:6–24.

52. Adams testified that she "always had the belief that Rick Silanskas wrote" the Todays Word messages. She identified no role by Wilhite in creating or sending them. Ex. I, Adams Dep. 116:18 - 117:2. And during her interview with Jeff Watts, Adams described Wilhite's technical ability as "[z]ero." He "couldn't operate his phone very well," "had trouble sometimes with emails," and came to her "for tech help." Ex. J, Adams Interview Tr. 28:8–9, 28:17–25. He "can't Google," at least "not by himself," and "could have never transferred those text messages to any kind of a program and laid it out nice and neat." *Id.* 57:5–22. Silanskas, by contrast, was "tech savvy, email savvy," kept a false e-mail account and a false Facebook account, and had his son help with what he could not do himself. *Id.* 27:21–28:14, 63:4–9. When Watts asked about deleted e-mails, Adams told him, "Larry didn't know how to do that." *Id.* 109:17–111:5.

53. Plaintiff has identified no evidence produced in discovery that Wilhite had any role in the creation of the Todays Word or Sister Catherine messages, that Wilhite had any access to the email or texting accounts that originally sent them, or that Wilhite had any knowledge of who created or sent the messages. *See generally* Ex. P, Watts Rpt.; Ex. S, Pochron Rpts.

## V. Plaintiff's Experts Offer No Opinion on What Wilhite Knew

54. Jeff Watts, a retired Stillwater police chief, was retained by Plaintiff's counsel as an investigator in January 2026, after this suit was filed, and became Plaintiff's testifying expert "as [he] was coming to conclusions." Ex. Q, Watts Dep. 6:4–7, 9:2–24, 11:4–7, 13:7–10. Watts testified that he does not know what Wilhite believed, agreed that his opinion "would be different" if Wilhite believed the

messages, and never considered whether Wilhite was a victim. *Id.* 110:22–112:2, 203:15–22. Wilhite has moved to exclude Watts's testimony, in part on the ground that his opinion is impermissibly being used to tell the jury that Wilhite is lying about his sincere belief regarding the messages. *See generally* Dkt. No. 209, Mot. to Exclude Watts.

55. Plaintiff's psychiatric expert, Dr. Reagan Gill, has no opinion about who created the messages and will not testify on that subject. Ex. R, Gill Dep. 82:4–17, 83:5. She has no information about whether Wilhite believed the messages and did not read his or Silanskas's depositions. *Id.* 83:6–11, 84:1–5. She attributes Plaintiff's distress to those "involved in or supportive of the fraud," *id.* 87:3–19, and agreed that a supporting role "would require a level of knowledge about the messages being fake": "That's correct." *Id.* 116:5–117:7.

56. Pochron identified 239 message-delivery receipts in one XML backup without corresponding parent messages and concluded that the parent messages had once existed but were no longer present. Pochron Rpt. ¶¶ 13–15, 28–34. Pochron offers no opinion whether the missing messages were deleted from Wilhite's phone before the backup was created or later removed from an XML file, which possibility is more likely, who removed them, or why. *Id.* ¶¶ 28–29; Ex. T, Pochron Dep. 80:2–16, 109:11–112:14. He is not opining that Wilhite engaged in spoliation or that any deletion was "sinister," and he offers no opinion regarding Wilhite's deletion habits. Ex. T, Pochron Dep. 47:1–12; 144:3–19.

57. Plaintiff's financial expert, J. Donald Fancher, calculates that Wilhite received $412,607 from 2022 through 2024, which is less than one percent of Plaintiff's total expenditures. Ex. U, Fancher Dep. 114:19–115:9. Almost all of that amount is salary and expense reimbursements. *Id.* 116:1–117:10, 118:14–119:12. Wilhite remained general manager of the Mansion Theatre throughout. *Id.* 119:13–22. Fancher offers no opinion on whether Wilhite's compensation was reasonable, *id.* 125:2–13, and his "but for" premise was an assumption he did not test, *id.* 25:10–26:8, 27:3–10.

**VI. Signing Contracts**

58. Even though Wilhite was given the title CEO of Mansion Entertainment Group, he hesitated to sign contracts on Plaintiff's behalf. *See* Ex. J, Adams Interview Tr. 25:6-10; Ex. F, Silanskas Dep. 240:3-13; Ex. W, Pl.'s Resp. to Wilhite's First Set of Req. for Admission, Interrog. and Req. for Produc. of Doc. at 7-8, Interrog. No. 3 (Nov. 5, 2025).

59. Plaintiff signed many of the contracts for the Project in ink. *See* Ex. I, Adams Dep. 69:19-20, 118:6-8; Ex. D, Wilhite Dep. 121:13-20; Ex. C, Wilhite Decl. ¶ 55.

60. At his deposition, Plaintiff denied that Wilhite was authorized to sign contracts on his behalf. Ex. E, Bicknell Dep. I 27:16-18 ("Q. Was Larry Wilhite authorized to sign your name on contracts?" A. No, he was not. . . . He was chief executive officer of Mansion Entertainment Group.").

61. But Adams routinely signed Plaintiff's name at his or Wilhite's direction, Ex. I, Adams Dep. 117:3–119:7; Ex. J, Adams Interview Tr. 24:2-25:5, 92:20-93:12.

62. And Plaintiff's staff were not aware of Plaintiff himself ever using Docusign at this time. Ex. I, Adams Dep. 117:19-118:4; Ex. C, Wilhite Decl. ¶ 50.

63. Wilhite had completed electronic signatures on Plaintiff's behalf more than 30 times in 2017 and 2018 in the course of assisting Plaintiff with the sale of an apartment and duplex in Branson. Ex. C, Wilhite Decl. ¶ 51.

64. And Wilhite signed some Project contracting documents in 2022 and 2023 with Plaintiff's approval. *See* Ex. C, Wilhite Decl. ¶ 53; Ex. D, Wilhite Dep. 121:21-122:8.

65. Only the use of Docusign from November 2023 to April 2024 is disputed in this case. *See* Compl. 130-132; Ex. Q, Watts Dep. 189:12-190:19.

66. On November 6, 2023, Wilhite Docusigned a contract with the electricity company for the Project after forwarding the Docusign notice to Plaintiff and Adams that same day and receiving Plaintiff's approval. Ex. C, Wilhite Decl. ¶ 57.

67. On December 11 and 13, 2023, Wilhite signed a series of vendor contracts and change orders after receiving an email from Silanskas stating that Plaintiff had authorized Wilhite to sign vendor contracts for the Project. Ex. C, Wilhite Decl. ¶ 58.

68. The circumstances led Wilhite to believe that Silanskas was relaying Plaintiff's genuine authorization. Ex. C, Wilhite Decl. ¶ 58.

69. Plaintiff denies authorizing signatures on December 11, 2023, but Wilhite had no knowledge that Plaintiff denied making that authorization until the lawsuit was filed. Ex. E, Bicknell Dep. I 28:1-20 (denying authorization of the email, stating "I did not know what they were doing."); Ex. C, Wilhite Decl. ¶ 58.

70. On April 28 and June 13, 2024, Wilhite signed additional contracts after getting Plaintiff's approval. Ex. C, Wilhite Decl. ¶¶ 59-60.

71. Plaintiff never stated to Wilhite that he was not authorized to sign contracts for the Project. Ex. C, Wilhite Decl. ¶ 48; Ex. F, Silanskas Dep. 239:22–240:9.

**VII. Financial Payments to Wilhite**

72. At the beginning of 2021, when Silanskas came on board, Wilhite was 63 and had been employed by Plaintiff as general manager of the Mansion Theatre for about 17 years and expected Plaintiff to employ him until Wilhite's retirement. Ex. C, Wilhite Decl. ¶ 6.

73. Wilhite remained general manager of the Mansion Theatre through December 31, 2024. Ex. C, Wilhite Decl. ¶ 6.

74. Wilhite's salary did not increase in 2022, 2023 or 2024, as compared to his salary before the Project. Ex. C, Wilhite Decl. ¶ 65; Payne Rpt. 14-16. Wilhite received no additional compensation for his assistance with the Project. Ex. C, Wilhite Decl. ¶ 65.

75. The additional employment compensation singled out by Plaintiff's expert, including $20,000 in retirement and investment account contributions and $5,447 in health insurance premiums, is

unchanged from Plaintiff's prior compensation of Wilhite. Ex. C, Wilhite Decl. ¶¶ 66-67; Ex. X, Payne Rpt. 19.

76. The business expense reimbursements paid to Wilhite and his son were not personal compensation and provided no benefit to Wilhite. Ex. C, Wilhite Decl. ¶¶ 68-69; Ex. X, Payne Rpt. 18. The $25,000 owners draw used to pay for a vehicle to be used for the Project and Mansion Theatre also conferred no benefit on Wilhite. Ex. C, Wilhite Decl. ¶ 70; Ex. X, Payne Rpt. 18.

77. The $10,000 donation from Big Time Production LLC that passed through Backstage Ministries for the purpose of making donations to two music artists conferred no benefit on Wilhite. Ex. C, Wilhite Decl. ¶ 72; Ex. X, Payne Rpt. 19-20.

78. The $100 sponsorship of a local girls volleyball team was reasonable publicity for the Mansion Theatre and conferred no benefit on Wilhite. Ex. C, Wilhite Decl. ¶ 71; Ex. X, Payne Rpt. 19.

79. Plaintiff testified that he agreed to give Wilhite and Silanskas each one-third of the completed Project because the religious messages told him to, and that "[t]hey knew it." Ex. E, Bicknell Dep. I 24:20–25:10. Wilhite never expected a third: "Gene owned it all." Ex. D, Wilhite Dep. 143:4–17. Plaintiff also spoke of giving shares to others, including McComb and Adams. *Id.* 141:15–142:17; Ex. E, Bicknell Dep. I 57:1–15; Ex. K, McComb Dep. 42:9-43:20; 182:6-183:4; 242:1-19.

80. Plaintiff has produced no evidence that any ownership interest was transferred to Wilhite, or any other person, or that any document was prepared to effect a transfer. Ex. V, Pl.'s Resp. to Wilhite's Second Set of Interrog. and Req. for Produc. of Doc. at 28-29, Req. No. 59 (requesting all documents concerning any ownership stake in the Project).

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). While the Court must construe all justifiable inferences in favor of the nonmoving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat summary judgment. *Horn v. Gov't Emps. Ins. Co.*, 86 F. App'x 405, 407 (10th Cir. 2004). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the non-moving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

## ARGUMENT AND AUTHORITIES

### I. Plaintiff's fraud and deceit claims fail for lack of evidence that Wilhite acted knowingly or recklessly.

#### A. Plaintiff must prove scienter by clear and convincing evidence, and circumstantial proof suffices only if it yields an irresistible deduction of fraud.

Because fraud must be proved by clear and convincing evidence, the Court must evaluate Plaintiff's evidence "through the prism" of that heightened burden. *Pine Tel. Co. v. Alcatel-Lucent USA Inc.*, 617 F. App'x 846, 859 (10th Cir. 2015) (quoting *Anderson*, 477 U.S. at 254–55). Thus, while Plaintiff need not conclusively prove fraud at summary judgment, he must present evidence from which a reasonable jury could find every element clearly and convincingly established. *Id.*; *Applied Genetics Int't, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1243 (10th Cir. 1990).

Under Oklahoma law, actual fraud requires: "1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false, or made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his/her own detriment." *Feldman v. MCZ Dev. Corp.*, No. 12-CV-431-GKF-TLW, 2013 WL 12131596, at *6 (N.D. Okla. Feb. 4, 2013) (quotation marks omitted); *see also Bowman v. Presley*, 2009 OK 48, ¶ 13, 212 P.3d 1210, 1217–18. "Fraud is never presumed and each of its elements must be proved by clear and

convincing evidence." *Bowman*, 2009 OK ¶ 13, 212 P.3d 1210, 1218. Scienter is "[a]n essential element," and its absence is fatal. *P.E.A.C.E. Corp. v. Oklahoma Nat. Gas. Co.*, 1977 OK 151, ¶¶ 19–20, 568 P.2d 1273, 1277 (affirming judgment where record was "devoid of proof" that defendant knew of falsity); *see also Pine Tel. Co.*, 617 F. App'x 846, 859 (10th Cir. 2015) (affirming grant of summary judgment where plaintiff "failed to provide any evidence that [defendant] knew the statements to be false when made or that it was reckless in making those statements").

Fraud may be proved by circumstantial evidence, but only if "facts are produced from which an irresistible deduction of fraud reasonably arises." *Johnson v. Caldwell*, 1937 OK 327, ¶ 15, 71 P.2d 620, 623; *Roberts v. Wells Fargo AG Credit Corp.*, 990 F.2d 1169, 1173 (10th Cir. 1993) (citation omitted). The circumstances must be ones that "in reason cannot be harmonized with good faith." *Johnson*, 1937 OK 327, ¶ 15, 71 P.2d at 623. Circumstances that are "equally consistent with contradictory hypotheses" are not enough. *Oak Tree Partners, LLC v. Williams*, 2020 OK CIV APP 5, ¶¶ 89–91, 458 P.3d 626, 646–47 (affirming grant of summary judgment on fraud claim) (quoting *Downs v. Longfellow Corp.*, 1960 OK 107, ¶ 25, 351 P.2d 999, 1005). This Court has already applied the same rule in this case. Dkt. No. 146 at 29. And "[w]hen a transaction is fairly susceptible of two constructions, the one which will free it from the imputation of fraud will be adopted." *Funnell v. Jones*, 1985 OK 73, ¶ 17, 737 P.2d 105, 108 (citation omitted).

At the pleading stage, the Court accepted Plaintiff's allegations and noted that Wilhite "may have a plausible explanation for all these facts." Dkt. No. 146 at 23. Now, after discovery, the question is no longer merely whether Plaintiff's theory is plausible. It is whether the record contains evidence from which a reasonable jury could find, clearly and convincingly, that Wilhite acted with knowledge of falsity or reckless disregard for the truth. And because Plaintiff relies on circumstantial evidence, those circumstances must support an irresistible deduction of fraud rather than an inference equally consistent with Wilhite's good faith. The record does not meet that standard.

**B. No evidence shows that Wilhite knew the messages were fabricated.**

Wilhite testified that he believed the messages were divinely inspired and did not know who was sending them. UMF ¶ 28. His conduct matched that belief. He tried to call the anonymous numbers, shared the messages with his wife, children, mother, and others as words from God, and worked with Julia to preserve them as a history of the Project. UMF ¶¶ 29–35. Wilhite's belief changed only after this lawsuit was filed. UMF ¶ 37. Julia corroborated that account, and Plaintiff knew the messages were being compiled and received the resulting compilations. UMF ¶¶ 29, 33.

The other witnesses' testimony points in the same direction. Adams heard Wilhite say that he believed the messages came from God and testified that he "appeared to" believe them. UMF ¶ 32. Hedrick, who received Todays Word messages from Wilhite, testified: "I don't believe he made it up. He may have been sent the Todays Words from an app or something and shared them, but I don't think he wrote them, and I don't think he used them to manipulate anyone." UMF ¶ 38. Hedrick understood Wilhite to be a religious man sharing what Hedrick assumed might have originated from an app or daily devotional service. *Id.*

The electronic evidence supplies no missing connection. The Pinger evidence connects the Todays Word messages to an account used by Silanskas, who acknowledged sending Todays Word messages to Wilhite through Pinger's TextFree app and changing the sending number almost every day. UMF ¶¶ 39–42. Silanskas also admitted creating, operating, and terminating the Sister Catherine accounts. UMF ¶ 43. Plaintiff has identified no evidence that Wilhite helped create either set of messages, accessed the accounts used to send them, or knew who controlled those accounts. UMF ¶ 53.

Plaintiff himself accused Silanskas of being "the one that did this whole thing" and "the fabricator" who "created" the Daily Word and "ruined his life." UMF ¶ 51. Adams likewise testified

that she had "always" believed Silanskas wrote the Todays Word messages and identified no role by Wilhite in creating or sending them. UMF ¶ 52.

Finally, the admitted author and alleged co-conspirator testified that Wilhite did not know the messages were fabricated. When Silanskas was asked whether Wilhite knew he was composing the Todays Word messages, Silanskas answered: "No, he did not." UMF ¶ 46. Silanskas knew Wilhite believed the messages came from God, allowed him to continue believing that, and later testified: "I should have never hurt Larry like that. I should have told him . . . what was going [on] and just left the company. That's what I should have done, but I didn't." UMF ¶ 47.

*Johnson v. Caldwell* is the Oklahoma Supreme Court's clearest application of the irresistible-deduction rule to a defendant who passed along representations he believed. 1937 OK 327, ¶ 2, 71 P.2d 620, 621. There, Johnson, a pharmacist, persuaded one of his customers to move her savings into stocks he recommended. *Id.* The building-and-loan association later collapsed after its president's embezzlement was discovered. *Id.* ¶¶ 2–7. Although a jury found Johnson liable for fraud, the Oklahoma Supreme Court reversed with instructions to dismiss because the evidence "wholly fail[ed] to show that Johnson knew or had reason to suspect or investigate" the underlying fraud. *Id.* ¶ 8.

The court found Johnson's own conduct particularly significant. He had invested heavily in the same companies before recommending them and invested another $73,000 during the following two years. *Id.* ¶ 12. That conduct "sp[oke] in thundertones of his lack of suspicion" and demonstrated his "unlimited confidence" in the investments he recommended. *Id.* Nor did Johnson's position as vice president of the failed association "charge him per se with knowledge of facts unobtainable by him." *Id.* ¶ 13. Because no affirmative proof of fraudulent intent appeared, the court held that "fraud cannot be imputed to the defendant upon any theory." *Id.* ¶ 17.

The same reasoning applies here. Wilhite does not merely deny knowing that the messages were fabricated. His contemporaneous conduct corroborates his testimony. He tried to call the

anonymous numbers, shared the messages with his wife, children (who shared them with his grandkids), daughter-in-law, mother, and many others in Plaintiff's orbit as words from God, and worked with his wife to compile and preserve them as a history of the Project. UMF ¶¶ 29–35. His family's contemporaneous responses likewise treated the messages as genuine. UMF ¶ 31. That conduct, like Johnson's continued investment, is inconsistent with Plaintiff's theory that Wilhite knew the representations he passed along were false.

And, like in *Johnson*, Wilhite's business position did not give him access to the facts Silanskas concealed. Although Wilhite worked with Silanskas on the Project, nothing about that relationship revealed that Silanskas was privately composing the messages and sending them through anonymous, frequently changing telephone numbers and email accounts that Silanskas alone created and controlled. UMF ¶¶ 39–43. Plaintiff has identified no evidence that Wilhite created or accessed those accounts, knew Silanskas controlled them, or helped compose the messages. UMF ¶ 53. Wilhite's title as CEO and his working relationship with Silanskas therefore cannot substitute for evidence that Wilhite knew what Silanskas was doing. Indeed, both Hedrick and Silanskas testified consistently with Wilhite's lack of knowledge. UMF ¶¶ 38, 46–47.

Thus, as in *Johnson*, the record contains no affirmative proof of fraudulent intent. Discovery is closed, and fraud cannot be imputed to Wilhite merely because Plaintiff asks the jury to disbelieve his testimony. *See Anderson*, 477 U.S. at 256–57 (holding that a plaintiff cannot defeat summary judgment "without offering any concrete evidence" merely by asserting that the jury might disbelieve the defendant's denial).

*Oak Tree Partners, LLC v. Williams* applies that same principle at summary judgment. 2020 OK CIV APP 5, ¶ 91 458 P.3d 626, 647. There, the defendant's conduct supported an inference of fraud, but the same conduct was also consistent with nonfraudulent explanations. The court therefore affirmed summary judgment because the circumstances were "equally consistent with each of these

contradictory hypotheses," and circumstantial evidence cannot establish fraud when it "give[s] equal support to inconsistent conclusions" or is "equally consistent with contradictory hypotheses." *Id.* ¶¶ 89–91 (quoting *Downs v. Longfellow Corp.*, 1960 OK 107, ¶ 25, 351 P.2d 999). The same is true here. Plaintiff may offer a suspicious interpretation of Wilhite's conduct, but that conduct remains at least equally consistent with the sincere belief reflected in Wilhite's contemporaneous actions and the testimony of the other witnesses.[2]

Discovery produced no evidence tying Wilhite to the fabrication. Plaintiff instead relies on an investigator-turned-expert whose opinions ask the jury to disbelieve Wilhite. Wilhite has moved to exclude Jeff Watts's testimony and incorporates that motion by reference. *See* Dkt. No. 209. But even if Watts' testimony is considered, he concedes that he does not know what Wilhite believed, that his opinions would change if Wilhite believed the messages, and that he never considered whether Wilhite was himself a victim. UMF ¶ 54. Gill likewise has no opinion about who created the messages or whether Wilhite believed them. UMF ¶ 55. Pochron's analysis similarly supplies no evidence of scienter. He identified delivery receipts whose corresponding messages were no longer present, but he cannot determine whether the messages were deleted from Wilhite's phone before the backup was created or later removed from an XML file, which possibility is more likely, who removed them, what

[2] *See also Roberts v. Wells Fargo AG Credit Corp.*, 990 F.2d 1169, 1173 (10th Cir. 1993) (applying *Johnson* and affirming summary judgment where the plaintiffs produced no evidence that the defendant intended not to perform when the alleged promise was made); *Gibson v. Weyerhaeuser Co.*, 35 F. App'x 834, 836–37 (10th Cir. 2002) (affirming summary judgment because the plaintiffs failed to produce clear and convincing evidence that the defendant's statements were false when made or made with knowledge of falsity); *Pine Tel. Co.*, 617 F. App'x 846, 859–60 (affirming summary judgment where the plaintiff failed to produce evidence that the defendant knew its statements were false or acted recklessly); *Emergency Servs. of Oklahoma, P.C. v. Aetna Health, Inc.*, 580 F. Supp. 3d 1032, 1035–36 (W.D. Okla. 2022) (granting summary judgment because the evidence did not support a natural and irresistible inference of fraud); *PWB Dev., L.L.C. v. Acadia Ins. Co.*, No. CIV-17-387-R, 2018 WL 4088793, at *5–6 (W.D. Okla. Aug. 27, 2018) (granting summary judgment where the plaintiff failed to produce evidence permitting a rational finding of fraud under the clear-and-convincing standard).

the messages said, or why they were removed. UMF ¶ 56. He is not opining that Wilhite engaged in spoliation or that any deletion was "sinister," and he offers no opinion whether the missing messages resulted from Wilhite's ordinary deletion practices. *Id.*

### C. Wilhite's use of Docusign on behalf of Plaintiff was not fraud.

Plaintiff's fraud claim also rests on Wilhite's use of Docusign to execute certain Project contracts in Plaintiff's name. Compl. ¶¶ 130, 132, 211. Plaintiff denies authorizing those signatures. UMF ¶ 60. But a dispute over whether Wilhite actually possessed authority does not itself establish fraud. Plaintiff must produce clear and convincing evidence that Wilhite knew he lacked authority or acted recklessly without knowing whether he had it. The record supports neither conclusion.

To the contrary, the parties' prior practice gave Wilhite reason to believe that he could sign documents electronically on Plaintiff's behalf. Wilhite had routinely done so in prior transactions, UMF ¶ 63-64, and Adams—who reported to Wilhite—likewise signed Plaintiff's name at Plaintiff's direction, UMF ¶ 61. For the contracts at issue here, Silanskas told Wilhite that Plaintiff had authorized the signatures. UMF ¶¶ 67–68. Indeed, Wilhite did not learn that Plaintiff denied granting that authority until Plaintiff filed this suit. UMF ¶ 69. Thus, even accepting Plaintiff's testimony that he did not authorize the signatures, no evidence shows that Wilhite knew the authorization relayed by Silanskas was false.

## II. Plaintiff's constructive fraud claim fails because Wilhite did not know the fact Plaintiff says he should have disclosed.

Constructive fraud does not require an intent to deceive, but it requires a breach of duty that misleads another to the defendant's advantage. *See* 15 O.S. § 59; *Croslin v. Enerlex, Inc.*, 2013 OK 34, ¶ 12, 308 P.3d 1041, 1045–46. When the alleged breach is nondisclosure, the duty extends to facts

within the defendant's knowledge. *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1181–82 (10th Cir. 2008); *see also Pine Tel. Co.*, 617 F. App'x at 860.

Plaintiff's theory is that Wilhite should have disclosed that Silanskas was fabricating the religious messages. But no evidence shows that Wilhite knew that fact. As discussed above, no witness or expert connects Wilhite to the accounts used to send the messages or identifies evidence that Wilhite knew Silanskas controlled them. UMF ¶¶ 46, 53. Even assuming, without conceding, Wilhite owed Plaintiff a duty of complete disclosure, that duty did not require him to disclose a concealed fact he did not know.

Plaintiff also cannot establish that Wilhite gained an advantage from any nondisclosure. Wilhite's salary did not increase during the Project, he received no additional compensation for Project work, and no ownership interest was transferred or documented. UMF ¶¶ 14, 74, 80–81. Plaintiff's financial expert characterizes Wilhite's receipts principally as salary and expense reimbursements and offers no opinion that his compensation was unreasonable. UMF ¶ 57.

## III. Plaintiff's IIED claim fails because Wilhite did not knowingly or recklessly inflict distress.

Intentional infliction of emotional distress requires intentional or reckless conduct that is extreme and outrageous and causes severe distress. *Computer Publications, Inc. v. Welton*, 2002 OK 50, ¶ 7, 49 P.3d 732, 735. Whether conduct may reasonably be regarded as outrageous is initially a question for the Court. *Id.* ¶ 8. Plaintiff's theory depends on Wilhite knowingly using fabricated religious messages to influence him. But, for the reasons discussed above, no evidence shows that Wilhite knew

the messages were fabricated. Forwarding messages one sincerely believes is neither intentional nor reckless infliction of distress, much less conduct beyond all possible bounds of decency.

## IV. Plaintiff's civil-conspiracy claim fails because there is no underlying fraud or agreement involving Wilhite.

Civil conspiracy does not independently create liability. *Gaylord Ent. Co. v. Thompson*, 1998 OK 30, ¶ 40, 958 P.2d 128, 148. Instead, the alleged conspirators must pursue an independently unlawful purpose or use independently unlawful means. *Id.* Because Plaintiff cannot prove the underlying fraud, the conspiracy claim fails with it. *See Thacker v. Walton*, 2021 OK CIV APP 5, ¶ 19, 499 P.3d 1255, 1262. The claim also independently fails because there is no evidence of a meeting of the minds involving Wilhite. The alleged co-conspirator testified that Wilhite did not know the messages were fabricated and instead believed they came from God. UMF ¶¶ 46–47.

## V. Wilhite was not unjustly enriched.

Unjust enrichment requires a benefit that, in equity and good conscience, the defendant should not retain. *French Energy, Inc. v. Alexander*, 1991 OK 106, ¶ 11, 818 P.2d 1234, 1237. The claim ordinarily arises from an exchange in which one party "substantially and unjustly benefit[s] at the expense of another." *Randle v. City of Tulsa*, 2024 OK 40, ¶ 27, 556 P.3d 612, 620. Plaintiff cannot make that showing.

Wilhite remained the Mansion Theatre's general manager throughout the Project. UMF ¶ 57. His salary did not increase in 2022, 2023, or 2024, and he received no additional compensation for his work on the Project. UMF ¶¶ 73–74. Plaintiff's financial expert calculates that Wilhite received $412,607 over three years, which is less than one percent of Plaintiff's total expenditures, and concedes that nearly all of that amount was salary and expense reimbursement. UMF ¶ 57. Fancher does not opine that Wilhite's compensation was excessive or unreasonable. *Id.* Wilhite did not receive a salary increase after the start of the Project. UMF ¶ 74. Wilhite's salary cannot support an unjust enrichment claim because compensation for services actually performed is not unjust enrichment. *See Lapkin v.*

*Garland Bloodworth, Inc.*, 2001 OK CIV APP 29, ¶ 13, 23 P.3d 958, 963. And the remaining expenses identified by Fancher similarly conferred no benefit on Wilhite as a result of the Project. UMF ¶¶ 14, 72–78.

The anticipated ownership interest similarly does not support Plaintiff's unjust enrichment claim. Plaintiff discussed possible future shares with several Project participants, but no interest was transferred to Wilhite and no document was prepared to effect a transfer. UMF ¶¶ 79-80. Wilhite did not expect one-third because he understood that "Gene owned it all." UMF ¶ 79. Accordingly, a proposed future gift that was never made is not a benefit Wilhite holds and can be ordered to return.

Finally, unjust enrichment requires active wrongdoing such as fraud, abuse of confidence, or unconscionable conduct. *Randle*, 2024 OK 40, ¶ 26, 556 P.3d 612, 620. The absence of evidence that Wilhite knowingly participated in fabricating the messages defeats that predicate as well. UMF ¶¶ 46, 53–56.

## CONCLUSION

For these reasons, no genuine dispute of material fact remains as to Plaintiff's claims against Wilhite. The Court should grant Wilhite's motion for summary judgment and enter judgment in his favor on Counts III through VIII.

Respectfully submitted,

*/s/ Deric J. McClellan*

J. Christopher Davis, OBA #16639
Deric J. McClellan, OBA #32827
CROWE & DUNLEVY, P.C.
222 North Detroit Ave., Suite #600
Tulsa, OK 74120
(918) 592-9800
(918) 592-9801 (Facsimile)
chris.davis@crowedunlevy.com
deric.mcclellan@crowedunlevy.com

-and-

Evan G. Vincent, OBA #22325
Galen N. Thorp, OBA #36847
CROWE & DUNLEVY, P.C.
Braniff Building
324 North Robinson Ave., Suite #100
Oklahoma City, OK 73102-8273
(405) 235-7700
(405) 239-6651 (Facsimile)
evan.vincent@crowedunlevy.com
galen.thorp@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT LARRY K. WILHITE**

**CERTIFICATE OF SERVICE**

☒ ☐ I hereby certify that on this 7th day of October, 2026, I electronically transmitted the attached document to the Court Clerk using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Ameilia A. Fogelman
Joseph W. Lang
Michael S. Nadel
Rachel M. Peltzer
Theresa M. Babendreier
**Attorneys for Plaintiff**

Lysbeth L. George
**Attorney for Defendant Hedrick**