IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| O. GENE BICKNELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25-cv-00383-SH |
| | ) | |
| RICHARD M. SILANSKAS JR., | ) | |
| LARRY K. WILHITE, AND | ) | |
| STEPHEN D. HEDRICK, | ) | |
| | ) | |
| Defendants. | ) | |

Video Deposition of Larry Wilhite

June 10, 2026

Reporter: Jude Arndt, CSR, CCR, RPR
CSR No. 084-004847
CCR No. 1450

EXHIBIT
D

Deposition of Larry Wilhite, taken pursuant to Notice of Taking Deposition, before Jude Arndt, a Certified Shorthand Reporter and Certified Court Reporter, at Crowe & Dunlevy, P.C., 222 North Detroit Avenue, Suite 600, Tulsa, Oklahoma, on June 10, 2026.

APPEARANCES OF COUNSEL

On Behalf of Plaintiff:
McDermott Will & Schulte LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
202-756-8000
By: SAGAR K. RAVI
RACHEL M. PELTZER
MICHAEL S. NADEL
THERESA M. BABENDREIER (via Zoom)
sravi@mcdermottlaw.com
rpeltzer@mcdermottlaw.com
mnadel@mcdermottlaw.com
tbabendreier@mcdermottlaw.com

On Behalf of Defendant Larry K. Wilhite:
Crowe & Dunlevy, P.C.
222 North Detroit Avenue, Suite 600
Tulsa, OK 74120
918-592-9800
By: DERIC J. MCCLELLAN
J. CHRISTOPHER DAVIS
deric.mcclellan@crowedunlevy.com
chris.davis@crowedunlevy.com

Crowe & Dunlevy, P.C.
324 North Robinson Avenue, Suite 100
Oklahoma City, OK 73102
405-235-7700
By: GALEN N. THORP
galen.thorp@crowedunlevy.com

APPEARANCES OF COUNSEL
(continued)

On Behalf of Defendant Stephen D. Hedrick:
Liz George & Associates
8101 South Walker, Suite F
Oklahoma City, OK 73139
405-689-5502
By: JENNIFER JACKSON

Also present: Jeff Watts
Mary Hill
Caroline Sherrard (via Zoom)
Nathan Arndt, videographer

EXAMINATION

BY MR. RAVI:

Q. Sir, please state your name.

A. Larry Wilhite.

Q. You understand, Mr. Wilhite, that you're testifying under oath?

A. Yes.

Q. And that you're under a penalty of perjury?

A. Yes.

Q. Sir, we have met before. Right?

A. I don't recall.

Q. You attended Gene's deposition in December 2025?

A. Yes. Yes.

Q. Okay. And you heard him testify at his deposition. Right?

A. Yes.

Q. Okay. And, sir, at Gene's deposition, he testified and said, quote, "I trusted Larry like a son. I tried to treat him like a son. I even had him in my will. That's how much I thought of him. And I trusted

him explicitly." End quote.

What was your reaction when you heard that?

A. I believed it.

Q. And was it true, that at least prior to November 2024, that Gene Bicknell treated you like a son?

A. Yes.

Q. And you treated him as a father figure?

A. Yes.

Q. And you were very close. Right?

A. Correct.

Q. You trusted Gene?

A. Yes.

Q. And you believed he trusted you?

A. Yes.

Q. And you had worked together for decades. Correct?

A. Yes.

Q. And ultimately, you know, Gene also testified that -- and I'm quoting now -- "The biggest part of this that hurts me is the fact that the knife in the gut from Rick and Larry after I had been as good

he -- he told me he was going to make a donation.
Q. How much did he donate at that time?
A. I don't know exactly.
Q. That would have been the early 2000s?
A. I don't know for sure.
Q. So describe how your relationship with Gene evolved from when you started putting on a worship service at The Mansion Theatre for Backstage Ministries.
A. I just -- you know, we did the service on Sundays. Sometimes Gene would be in town for the development of the show that he was putting on -- you know, they were building for the show, for the stage.
And he attend -- I can't remember if he ever attended the service before or after he talked to me about coming in and managing the theater.
Q. You ultimately did end up getting hired by Gene Bicknell. Right?
A. Yes.
Q. Okay. How did you end up getting hired?
A. He was coming in to town, and he called me and said he would like to talk to me.

I went in, and he told me he was having some -- I wouldn't say trouble but the manager -- I can't remember all the details -- but asked me if I would want to manage the theater.

Q. What was your response?

A. I told him that I had the ministry and was -- had plenty, you know, and I really liked doing that.

He said, "You can still do the ministry, you know, and come take care of the theater."

And I literally said, "Well, that's -- I will come and help, see what I can help do, and in a few months if it's not working, you know, I will just go back to the ministry."

Q. So what ended up happening?

A. I started trying to take care of the theater, and was there 20 years.

Q. You ended up taking on a full-time position. Correct?

A. Correct.

Q. Okay. Approximately when did you take that full-time position on?

A. I believe it was 2004.

Q. So at that point in time, you were in charge of The Mansion Theatre. Correct?

A. Yes.

Q. So over the course of the next, you know, decade or even longer, you know, describe how your relationship with Gene evolved.

A. I was just doing what he had me do for the theater, trying to keep the show going, and casting for the parts for the shows, you know, developing the shows to sell tickets.

Q. How closely did you work with Gene when he came to the theater?

A. I would say very close, because we were trying to produce the show.

Q. How much time did you spend together, generally, on theater business?

A. I could -- I mean --

Q. Was it daily, for example?

A. Well, he wasn't there every day, no, but when he was there we were working on theater business.

Q. Well, you know, we talked -- earlier we

A. I don't really remember.
Q. Did your work and responsibilities at the theater change over time?
A. Yes.
Q. How?
A. Expanded with other properties that Gene asked me to make sure were okay. Like there was -- there is a cafe property. There is various acres of land.
And then he purchased another theater, which became the Oak Ridge Boys Theater, and I took that responsibility on.
Q. So at times Gene would ask you to help manage in the operations of other properties?
A. Yes.
Q. When was the Oak Ridge Boys Theater obtained?
A. It was either 2006 or 2007.
Q. And how long was that under your care?
A. From the beginning of the purchase.
Q. Is it still in existence, the Oak Ridge Boys Theater?

A. No.
Q. What happened to it?
A. It is -- it was sold, and is now a Mercy Hospital.
Q. When was the theater sold, approximately?
A. Twenty -- I think it was 2012.
Q. And you continued working at the theater and managing those operations until the American Heartland project.
Is that right?
A. I continued all the way until he let me go.
Q. Okay. Up through the American Heartland project, you were managing the operations of the theater, and that continued afterwards. Right?
A. Yes.
Q. At some point you met someone named Rick Silanskas.
Is that right?
A. Yes.
Q. How did you meet Rick Silanskas?
A. He was introduced to me through a friend,

Gary McSpadden. I believe it was 2019, we had a show, and Gary and -- was there at the show, and Rick, and after the show he just introduced me.

Q. Did Gary McSpadden tell you how he knew Rick?

A. He said he was a member of his church there in Branson.

Q. Which church is that?

A. Oh, gosh. Hmm. I can't -- can't recall the name right now. Hmm. I can't recall the name.

Q. It's a church in Branson?

A. Yes.

Q. Do you remember what type of denomination it was?

A. I believe it was just interdenominational.

Q. How close were you with Gary McSpadden?

A. We were good friends.

Q. Did you also trust Gary McSpadden?

A. Yes.

Q. And what was the purpose of him introducing you to Rick Silanskas?

A. I -- he just introduced us. He said he

was a member of his church. Said he was talented, and was helping there in the church.

Q. So tell me about your first interactions with Rick Silanskas.

A. I did meet him again -- well, I didn't really meet him. He came in and was helping with a Christmas production that we were doing with Gary's church, was doing at the theater for the community, and Rick was helping the church with production values, video and some sound.

Q. What did you talk about with Rick the first time you met him?

A. The first time was just, "Hi, how are you?" I'm Larry, he's Rick, and that was about it.

Q. What happened next?

A. The Christmas show. I didn't -- we didn't talk during that time, but I saw him at the boards.

Q. Was the Christmas show at The Mansion Theatre, or somewhere else?

A. At The Mansion.

Q. So he worked on a -- Rick Silanskas worked on a show at The Mansion Theatre?

A. Well, for the church.

It was more of a Christmas presentation. The choir came in and sang, there were some different artists came in and sang throughout the evening.

Q. What happened next in your relationship with Rick Silanskas?

A. I didn't hear from him until 2020, and he came by the theater and asked to meet with me.

Q. What did he -- what did Rick Silanskas want to meet with you about at the theater?

A. He just said that he would like to talk to me. He told me about his background, and that Gary, you know, had mentioned that we ought to meet, and with his abilities, and see if there was anything that could be done to work together.

Q. What did Rick Silanskas tell you about his background?

A. He was a composer, and he had done animation, and he had worked with various production companies and things in Florida, and worked with Ron Logan on some projects.

Q. Did Rick Silanskas claim to have worked

for the Walt Disney company?
A. He said he had worked with them. I don't know that he said he was employed by them, but he worked with them on projects, I guess, with Ron Logan. Ron Logan worked for Disney.
Q. Rick said that he had worked with Disney. Is that right?
A. I believe so.
Q. Do you know whether Rick Silanskas actually worked for Disney?
A. I do not.
Q. Did you investigate anything about Rick Silanskas's background when you met him?
A. Not right off, no.
Q. Did you eventually look into his background?
A. Well, I met with Ron Logan and Gene, and that -- you know, listened to what Ron had to say.
Q. What did Ron have to say?
A. He said -- praised him as a great guy, very creative, competent in what he did.
Q. Where did that meeting take place with Ron

A. Yes.
Q. And there you wrote that, "Wilhite further admits that Silanskas claimed to have worked for the Walt Disney company and other entertainment companies, that he had worked as a developer for various theme parks in Asia."
Did that happen, sir?
A. Yes.
Q. What did Rick Silanskas tell you about his work for various theme parks in Asia?
A. That he was working with Ron Logan on some of them. I don't recall every detail.
And Ron Logan confirmed that.
Q. You specifically asked Ron Logan about theme parks in Asia?
A. No.
Q. Okay. So when you say Ron Logan confirmed that, what did you mean?
A. That he had worked -- they had worked together in different parks.
Q. And if you turn to Paragraph 34, you wrote, "Wilhite admits that Silanskas repeatedly

industry.
Q. And what was the basis for why you thought he was a good guy at that time?
A. I -- I don't know. I mean, just --
Q. You had only met him a couple of times at that point. Right?
A. Right.
Q. You thought he was a good guy?
A. Well, yeah, friendly guy, yes.
Q. Describe how he came off as a person. Like what was his personality like?
A. Very energetic, creative, you know, someone that had been in the entertainment industry, you know.
Q. And you wrote, or admitted, that he had requested to meet with Gene Bicknell four times.
Is that right?
A. Yes.
Q. How do you know it was four times?
A. I don't. You know, I just -- I'm sorry. I was just guessing, I guess. I don't know that I have a hard number to that.

Q. You were guessing in your formal answer to the complaint?

A. No, I felt like there was four times, yes. I couldn't tell you exactly when.

Q. You're saying it was approximately four times?

A. Yeah.

Q. And how did -- what was he saying about why he wanted to meet with Gene Bicknell?

A. That he would just like to meet with him, you know. He could help build the brand, expand the entertainment side of the theater.

Q. And what did you make of that request?

A. I just thought he wanted to meet with Gene.

Q. Why did he go through you to meet with Gene? Why didn't he just reach out directly?

A. I don't know. I don't know that he had that contact information.

Q. Did you -- did other people also want to meet with Gene go through you?

A. Yes.

like he forwards you this e-mail again on November 23rd, 2020.

Is that right?

A. Yes.

Q. Now, you ultimately decide -- you can put that aside, sir.

You ultimately decide to introduce Rick Silanskas to Gene Bicknell. Correct?

A. Yes.

Q. Why did you do that?

A. Because Gene, him being a composer, I told him that Rick was a composer, and Gene loves to write music, and thought he might want to meet with him.

[Exhibit 221 marked for identification.]

BY MR. RAVI:

Q. I'm showing you what has been marked as Plaintiff Exhibit 221. And this is an e-mail from you to Gene Bicknell on January 18th, 2021.

Is that correct?

A. Yes.

Q. And in this e-mail, you write, "Gene, this is some of the work Rick has done. Rick is the

A. I believe it was, yes.

Q. Who was present at that meeting with Ron Logan?

A. Rick, Gene, and myself.

Q. What was the topic?

A. Introduction with Gene and Ron. Rick introduced them, and they talked and discussed their past and history. And Ron gave good reviews of Rick and his abilities. And that the ideas of expanding what Gene had, as far as the theater and studios and things, were great ideas.

Q. What was the purpose of the meeting with Ron Logan? Why was Ron Logan involved?

A. Rick wanted him to meet Ron, and because of Ron's abilities, I guess, being a Disney legend.

Q. Was the idea that Ron Logan was going to participate in the expansion of The Mansion Theatre?

A. I think he would help by being a consultant.

Q. What type of consultant?

A. Just on the productions and creativity.

MR. MCCLELLAN: We've been going for about

A. I didn't see a need to. I mean, Gene talked to him and agreed to hire him.

Q. And what was Rick's salary when he got hired?

A. Gene gave him $110,000.

Q. And how much were you making at the time?

A. $80,000.

Q. Did you -- so Rick Silanskas got a higher salary than you did?

A. Yes.

Q. Did that upset you?

A. No.

Q. Why not?

A. Because he had hired people before to work, paid them more than I made.

Q. Who did he hire before at the theater who made more money than you did?

A. Bill Traylor (ph).

Q. Who is Bill Traylor?

A. He was a gentleman that worked with Gene and the theater out of Nashville.

Q. What was Bill Traylor's role with the

studios and other concepts.

Is that right?

A. Yes.

Q. When did that project evolve into the American Heartland project?

A. I don't know the exact date or time.

The studio was being developed -- we already had a studio, but it was being redone.

Q. So how did the project evolve from an expansion of The Mansion Theatre into the development of the American Heartland Theme Park?

A. In one of the meetings with Ron Logan, Gene and Ron were talking about the industry at that time, about movies and the independent movie projects, and that the sound stage -- or sound studio that we had would be a great asset for post-production.

Q. How did the fact that a sound studio would be a great asset for post-production result in the idea of a theme park?

A. Gene and Ron talked about sound stages, the sound stage to build for film and television could be filmed, and Gene wanted to start building a sound

stage.

Q. So Gene wanted to start building a sound stage.

Did that ultimately result in the idea for a theme park? Those seem pretty different.

A. Well, eventually it turned that, yes.

Q. Well --

A. Gene in the past had said that the area needed another theme park for -- good for competition.

Q. You said Gene in the past had said that the area needed another theme park?

A. Yes.

Q. When did he tell you that?

A. Early on, when I started work there. He had some land there, and he said that it would be good if there was a theme park. Another theme park would be great competition, somewhere, you know, in the area.

Q. Which area?

A. I guess in the Branson area.

Q. You said early on when you started work there.

Where are you talking about?

Is that right?
A. Yes.
Q. So I'm trying to understand from you how that actually happened.
Can you explain?
A. Gene talked about sound stages, wanted to build a sound stage, and talked about putting it first in the Branson area.
But the incentives from Missouri weren't -- I don't think there were any really in place, and to build a sound stage you would need incentives to attract producers.
And Georgia and Oklahoma and I believe Texas, maybe Arkansas, had incentives, and Gene just decided to put it in Oklahoma.
Q. It's your testimony that Gene is the one who decided to put it in Oklahoma?
A. He bought the land, yes.
Q. Did anyone else suggest Vinita, Oklahoma, would be a good place to build a theme park?
A. Not that I know of.
Q. What about Steve Hedrick?

MS. JACKSON: Object to form.
A. I don't believe Steve mentioned Vinita, Oklahoma.
BY MR. RAVI:
Q. What's your understanding as to why Vinita, Oklahoma, was selected as the site for the American Heartland Theme Park?
A. Again, I don't know.
Q. Were you part of any discussions about choosing Vinita, Oklahoma, as the site of the theme park?
A. No.
Q. You were not part of any discussions about where the theme park was going to be located?
A. Not until Gene bought the land. We talked about Oklahoma.
Q. And sir, you mentioned a few times that Gene had wanted to build the sound studios.
When was the first time he had mentioned wanting to build a theme park, in connection with what is happening in 2021?
MR. MCCLELLAN: Object to form. You can

the day-to-day operations of the project?
A. That would have been Steve.
Q. Who hired Steve Hedrick?
A. Gene.
Q. Did you have any role in that?
A. Just attended the meeting.
Q. Which meeting?
A. When Stephen -- when Steve came to Branson and Gene hired him.
Q. Did you have any discussions with Steve Hedrick about whether he was qualified to take on this project?
A. No.
Q. And Steve reported to you. Correct?
A. And Gene.
Q. He reported to you. Correct?
MR. MCCLELLAN: Object to the form.
A. Me and Gene.
BY MR. RAVI:
Q. So Steve Hedrick testified at his deposition, quote, "I worked for Larry Wilhite," end quote.

A. Would give -- when the contracts came in to be signed, I would give them to Gene.

Q. Would you have discussions with Gene about the contracts?

A. I would tell him what they were, yes.

Q. And what would you tell him?

A. Depending on the contract, who it was, and what it was for, or what I believed it was for.

Q. So you're talking about the contracts, and you had discussions with Gene about them. Correct?

A. (Nodding "yes.")

Q. Is that right?

A. Yes. Yes.

Q. Did you recommend that the contracts be signed?

A. I guess so, inadvertently, just handed them to him, you know, told him what they were for and that we needed them.

Q. So your testimony is that you inadvertently told --

A. Maybe that's not right the right word to use.

Q. Sorry. Can you let me finish my question?
Sir, you testified that you inadvertently told him what they were for and that we needed them?
Is that your testimony?
MR. MCCLELLAN: Object to the form.
A. No. That was the wrong -- that was the wrong word.
BY MR. RAVI:
Q. So what are the right words?
A. I would give them to him, and explain that it was either architect or an engineer, and here's the contract.
Q. And in doing so, did you provide a recommendation that these contracts be signed?
A. I don't know that I verbally said I recommend it. It was understood that we needed the contracts to keep the project going.
Q. And did Gene sign them after you presented them to him?
A. Yes.
Q. Did you also sign some contracts on Gene's behalf?

MR. MCCLELLAN: Object to the form.
A. Yes.
BY MR. RAVI:
Q. Did you always get authorization from Gene when you signed contracts from him?
A. Yes.
Q. That's your testimony, sir?
A. I believe so, yes.
Q. Now, turning back to the expenses and the invoicing.
If you had no role in actually approving invoices or reviewing them, why didn't Steve just send them directly to accounting?
A. I don't know. I think some of them did go to me and accounting.
Q. So what was your role when you were sent invoices and expenses that needed to be approved?
A. I looked at them and gave them to accounting and said, "We need to pay these."
Q. So by doing so, you then approved of the invoices and expenses that needed to be paid.
Is that right?

Q. Do you believe them now?
A. Yes, we would have been happy to have it there.
Q. Sir, did you believe at the time that this was issued that Vinita, Oklahoma, could support the American Heartland project?
A. Yes, I did.
Q. Okay. And sir, you believed in the project generally at the time. Correct?
A. Yes.
Q. And you believed it was possible to build a Disney-style resort in northeast Oklahoma?
A. Is it possible? Yes.
Q. And you thought the project would be successful.
Is that right?
A. From my understanding with the feasibility study.
Q. Who told you about the feasibility study?
A. Steve had one done.
Q. Did you read it?
A. Yes, I read through it.

Q. And what did you learn from it?
A. That there was a good possibility that it would be successful.
Q. Were you involved in developing that feasibility study?
A. No.
Q. When did you read the feasibility study, if you remember?
A. I don't -- I don't remember.
Q. And sir, then you believed that the project could bring in millions of visitors.
Is that right?
A. If that's what -- yeah, if that's what the feasibility study said.
Q. Now, sir, is it your position that you received no compensation specifically for the American Heartland project?
A. I got a raise, and I don't know if that was intended for any responsibility.
Q. What raise did you get?
A. Gene gave me a raise.
Q. How much was the raise?

A. I don't think so. I mean, I just -- Gene gave me a raise.
BY MR. RAVI:
Q. Okay. So sir, you stand by your statement in your response to the interrogatory that "Wilhite received no compensation specifically for the project."
Is that right?
A. Yes.
Q. Why would you work and hold yourself out as this chief executive officer of the American Heartland project with no compensation?
A. Because it was Gene asked me -- or wanted me to do. I did what Gene wanted me to do.
Q. And did Gene tell you he wanted you to work without compensation?
MR. MCCLELLAN: Object to the form.
A. No.
BY MR. RAVI:
Q. Sir, what was your understanding of how much the American Heartland project would cost in total?
A. The estimated price that Steve gave, the

A. Correct.

Q. So if you believe that he had the ability to fund it, then you believed that he had access to $2 billion.

Is that right?

A. I guess, yes.

Q. Did Gene Bicknell ever tell you how much money he had?

A. No.

Q. And you also understood that at some point, Gene Bicknell intended to give you an ownership stake in the project when it was completed.

Is that right?

MR. MCCLELLAN: Object to the form.

A. He said he would give shares to me, and he wanted to give them to Rick, to Gene McComb, Kristy, Jordi. He mentioned Jordi -- you know, that he wanted to give shares.

BY MR. RAVI:

Q. When did Gene Bicknell tell you that he wanted to give you a share?

A. I don't remember.

Q. Do you remember approximately when?

A. No.

Q. Was it the beginning of the project, the middle, the end?

A. If I was guessing, I would say the middle.

Q. And was that a conversation that took place in-person?

A. Yes.

Q. Describe with as much specificity as you can what Gene told you.

A. He just said he wanted to get it built and he wanted to reward -- give me a share, Kristy, Gene McComb, Rick, and Jordi.

Q. So did he say all of that in the same conversation, or in different conversations?

A. Just throughout the whole project, he would bring that up.

Q. So how many conversations did you have with him about who would get an ownership stake?

A. I don't recall.

Q. So let me ask you about your conversation about your ownership stake.

How many times did you speak with Gene Bicknell about that?

A. I don't -- I don't recall.

Q. What size of an ownership stake did you understand you were going to get?

A. I didn't. He never said.

Q. Did you believe it would be a third?

A. No.

Q. A third because you're part of the Triune?

MR. MCCLELLAN: Object to the form.

A. No.

BY MR. RAVI:

Q. You didn't believe that?

A. Gene owned it all, and I figured whatever he gave me, he told me in the past with other projects that he would give me a share of something, and I just trusted him for what he said he would do.

Q. Let's talk about where you said that Gene told you in the past with other projects he would give you a share.

When did those conversations take place?

A. Early on in other things that were going

MR. MCCLELLAN: Object to the form.
MS. JACKSON: Object to form.
A. I don't -- I can't agree that that's the only reason.
BY MR. RAVI:
Q. But you agree it was part of the reason that he put money into the park?
A. I could see that, yes.
Q. So let's talk about those religious messages.
Sir, what is the Today's Word?
A. It was a devotional-type message that came, a daily devotional.
Q. And what do you mean by daily devotional?
A. Inspirational messages.
Q. Who did you believe was sending these devotional messages?
A. I didn't know. I just -- I started getting them on a daily -- on Today's Word. I thought it -- I thought it might be an app or something, a ministry sending them out.
Q. When did you start receiving the Today's

Word?

A. I got some in 2020, I believe.

Q. And so you initially believed that you were put on some sort of list to receive these messages?

A. Yes.

Q. Then eventually did your belief change?

A. What do you mean by change?

Q. Well, did you eventually believe that the messages consisted of guidance from God?

A. Yes.

Q. Directly from God?

MR. MCCLELLAN: Object to the form.

A. Eventually, yes.

BY MR. RAVI:

Q. Sir, if you could turn to Page 14 of Exhibit 229. Oh, sorry. Put that aside.

Turn to Exhibit 216. 216, which is your answer in this case. I think it's the other document next to you.

A. Oh.

Q. If you could turn to Page 7.

And at the bottom of Page 48, you wrote, "Wilhite admits that he sent messages to plaintiff upon plaintiff's request. At the time he first started receiving the Today's Word text messages, he believed he had somehow been added to the distribution list for general Christian devotional messages, written by an unidentified person.

"Over time, as the Today's Word text messages became more specific, Wilhite believed that the messages were guidance from God, but had no opinion regarding how they were being drafted or who the author was. Wilhite denies that he had any knowledge regarding the creation of the messages." End quote.

So sir, is that an accurate statement of what you admit?

A. Yes.

Q. Okay. Now, when you said that the Today's Word text messages became more specific, what do you mean by that?

A. I interpreted it became more about what was going on in my life.

Q. And what was going on in your life that

you think it became more about?
A. Just the daily things that were happening, you know, with -- in the project.
Q. The American Heartland project?
A. Yes.
Q. So you came to believe that the Today's Word messages were referring to the American Heartland project. Correct?
A. Yes.
Q. And you understood that they were written to appear as if they were coming from God.
Is that right?
A. Yes.
Q. And so, sir, you're an ordained minister. Right?
A. Yes.
Q. And you -- did you believe that --
Well, did you believe that God was sending these messages?
A. I believed they were inspired. I don't know who was sending them.
Q. So you believed -- you knew a person was

MR. MCCLELLAN: Object to the form.
A. I didn't know.
BY MR. RAVI:
Q. You had -- you wrote in your answer that you had no opinion regarding how they were being drafted or who the author was. Right?
A. Uh-huh.
Q. So you believed you were receiving specific guidance from God and had no opinion as to how they were being drafted?
MR. MCCLELLAN: Object to the form.
BY MR. RAVI:
Q. That's your testimony?
A. As far as how they were being drafted, I don't know.
Q. You weren't at least even curious as to who was drafting them or how you were getting text messages from God?
A. I --
MR. MCCLELLAN: Object to the form.
A. The phone numbers -- I would try to call those phone numbers, and there was nothing, no answers.

BY MR. RAVI:

Q. When would you call the phone numbers?

A. Just when I first started getting them -- not when I first, but as they kept coming, I wondered where they were coming from. And I would call the number that was on there.

Q. So these would come from different phone numbers to your cell phone?

A. Yes.

Q. Were the phone numbers, did they -- did the same message ever come from the same phone number?

A. I don't remember ever -- there were so many different phone numbers.

Q. And how often did you try calling back the phone number that sent you the text message?

A. A couple of times, three times, maybe. I don't know.

Q. When approximately did you call the phone numbers that sent you the text messages?

A. I don't recall.

Q. Would you just try calling three times?

A. Again, I don't recall exactly how many. I

would try it periodically, but I don't know an exact number.

Q. What would happen when you called that phone number that sent you the Today's Word message via text?

A. Nothing. It was just -- there was nothing. There was no answer, nothing.

Q. Did it ring?

A. No, I -- hmm. Some of them may have rung. I don't remember all of -- I don't -- they would ring through, and then there was just no answer.

Q. It would just ring until you hung up?

A. No, it would ring, and then just quit.

Q. Was there a voicemail?

A. No.

Q. What were you planning on saying if there had been an answer?

A. I would ask --

MR. MCCLELLAN: Object to the form.

A. Ask who this is, and try to find out.

BY MR. RAVI:

Q. And you said that it may have rung.

Do you specifically recall the an -- the -- that there was ringing when you called?

A. Some of them rang, and some of them were just like nothing. I mean, there was just -- there was no answer of anything.

Q. And you're testifying that you only tried calling approximately three times?

A. I couldn't say exactly how many.

Q. What happened to the copies of the original messages that you believed you were getting from God?

A. What do you mean, happened to them?

We -- I printed them off.

Q. Okay.

A. My wife did.

Q. So you had copies, you received text messages to your phone that you believe were messages from God.

Is that correct?

A. Yes.

Q. What happened to the text messages on your phone that had the messages from God?

MR. MCCLELLAN: Object to the form.
A. I deleted them.
BY MR. RAVI:
Q. You -- you deleted messages that you believed were coming from God?
MR. MCCLELLAN: Object to the form.
A. Yes. I -- I sent them to my wife to print off so we would have them archived, a discussion that Gene and Rick and I had, and Gene even mentioned it would be great to compile them. So we did, and I figured once I had them printed off, I don't need them on my phone.
BY MR. RAVI:
Q. When did that happen?
A. When?
Q. When did you decide to delete the messages you believed came from God?
MR. MCCLELLAN: Object to the form.
A. I deleted my texts and e-mails all the time.
BY MR. RAVI:
Q. When do you decide whether to delete a

Q. So when did that happen, approximately?
A. I want to say in 2022 when we talked and Gene -- and we discussed having them compiled for archives.
Q. Who was present at that conversation?
A. Gene and Rick and myself.
Q. Where did that conversation take place?
A. At the theater, probably.
Q. Are you sure it was at the theater?
A. Yes. I mean, that's where we met.
Q. Do you remember where in the theater you were meeting?
A. I -- I don't remember where exactly.
Q. Okay. So what happened during that discussion?
A. We just agreed that it would be good to have an archive -- archive them for the project.
Q. Why?
A. For the history of the building of the project. And we'd collect pictures and other things, too.
Q. Whose idea was it to archive these?

A. I think it was a general consensus, but I think Gene mentioned it because he loved to write books and things. So I don't know what his thoughts were there.

Q. And how did the archiving occur?

A. Again, I would send it to Julia, and she would get it on her computer and print it off.

Q. How would you send the messages to Julia?

A. I just sent her the text.

Q. How would you send it to her?

A. Through text.

Q. You would -- you would copy the text from your -- your text message that you received, the Today's Word, and then you would send it in a separate text message to Julia Wilhite?

A. Yes.

Q. Is there any other way you did that?

A. No, that's the only way I knew how.

Q. So you received the Today's Word message text. Correct?

A. (Nodding "yes.")

Q. And then you would copy that on your

A. Me and when Gene would tell me he got them.
Q. And so to your knowledge, Rick Silanskas never got Today's Word messages?
A. Not to my knowledge.
Q. Did you receive the Today's Word from other people?
A. No.
Q. And you also sent the Today's Word out to multiple people. Right?
A. Yes.
Q. In addition to your wife Julia, you sent it out to Rick Silanskas?
A. Yes.
Q. Steve Hedrick?
A. Yes.
Q. Gene McComb?
A. Yes.
Q. Kristy Adams?
A. Yes.
Q. Why did you send the Today's Word out to these individuals?

A. Because in conversation I just mentioned it, shared it at different times, and they said, "Well, send it to me."

Q. So is your testimony that Kristy Adams asked you to send the Today's Word to her?

MR. MCCLELLAN: Object to the form.

A. Yes, I believe.

BY MR. RAVI:

Q. When did that happen?

A. I don't recall the exact time.

Q. Can you describe the conversation?

A. Again, just other than talking about it and saying, "Well, send it to me." I never forced it on anybody.

Q. Did anyone -- was anyone surprised you were getting messages from God to your phone?

A. I don't know that they expressed that. No one expressed that.

Q. No one expressed any surprise that you were receiving messages from God on your phone?

A. No, I don't think anyone -- I don't remember saying it was from God. I just said it was a

daily devotion.

Q. Sir, you believed it was coming from God. Right?

A. Yes, eventually, yes.

Q. Did you tell other people you believed it was coming from God?

A. My family.

Q. Who in your family?

A. My wife, our two daughters, Micah our daughter-in-law. I sent my mom some.

Q. Anyone else?

A. I can't recall right now.

Q. Who else other than your family did you tell you believed these messages were coming from God?

A. I don't remember telling anybody I believed they were coming from God other than my family and Gene.

Q. What about Rick Silanskas?

A. Yeah, Rick -- I mean, I felt like they were coming -- yes, you know, Rick, I told him. I said, "These are unbelievable."

Q. What was Rick's reaction?

A. No, I just deleted them.

MR. RAVI: I'm about to start a segment that has to do with a bunch of text messages. It might make sense to take a break here.

MR. MCCLELLAN: You want to eat? Yeah, sounds good.

THE VIDEOGRAPHER: We are going off the record at 12:43 PM.

[A recess was taken.]

THE VIDEOGRAPHER: We are back on the record at 1:32 PM.

A. You had asked me if I believed that the word was from God, and I said yes, I believe it, and then you asked me again, and I don't know if I made myself clear.

I think you asked me if I still believed it, or something like -- sitting here today, I don't.

BY MR. RAVI:

Q. Okay. So your testimony is that -- let me ask you a different question.

When did you stop believing that the messages were from God?

A. After seeing some of the things in the case, pointed -- you know, that -- believed that things weren't coming from God.

Q. So that your belief changed after this lawsuit was filed?

A. Yes.

Q. It did not change before this lawsuit was filed?

A. No.

Q. Sir, before we broke for lunch, we talked about how, to your knowledge, it was you and Gene Bicknell that were receiving the Today's Word messages from God.

Is that right?

A. Yes.

Q. Okay. I want to show you what has been marked as Plaintiff Exhibit 230.

[Exhibit 230 marked for identification.]

BY MR. RAVI:

Q. Sir, the first page of this reflects conversations between a number belonging to you, is that 417-335-1460, is that your phone number?

might want it.

Q. Why did you think that?

A. Because Gene would send him e-mails, and Rick would forward them to me if he didn't send them to me.

Q. And you also sent your wife Julia these Today's Word that you got through e-mail. Is that right?

A. I believe so.

Q. Was that also so that she could compile them?

A. Yes.

Q. And we saw earlier that you also sent the Today's Word messages to Steve Hedrick. Correct?

A. Yes.

Q. Why did you send them to Steve Hedrick?

MR. MCCLELLAN: Object to the form.

A. Because at one time we were talking about it, and I mentioned it to Steve, and I sent them to him.

BY MR. RAVI:

Q. Did he also ask to receive them?

Q. Showing you what has been marked as Exhibit 248.

[Exhibit 248 marked for identification.]

BY MR. RAVI:

Q. This is another Sister Catherine e-mail?

A. Uh-huh.

Q. And this is the same one we spoke about earlier, except you're forwarding it to the account of Mary Jean McDuffey. Is that right?

A. Yes.

Q. Who is Mary Jean McDuffey?

A. My mother-in-law.

Q. Why are you sending this e-mail to your mother-in-law's account?

A. Because that's an account that Julia had in taking care of her mother's business until she passed, and then she kept it.

Q. Why are you not sending this to -- well, when you sent this e-mail, was -- had Mary Jean McDuffey passed away?

A. Yes.

Q. So why are you sending this Sister

Catherine e-mail to an account in the name of your deceased mother-in-law?

MR. MCCLELLAN: Object to form.

A. Because Julia's e-mail was full. From what I understand, the Google -- I am not familiar with all of that, but she said it was full and wouldn't receive any more e-mails, so she said just start sending it to that e-mail address.

BY MR. RAVI:

Q. And your wife Julia had a number of e-mail accounts. Right?

MR. MCCLELLAN: Object to the form.

A. Yeah, I believe so.

BY MR. RAVI:

Q. So she had juliawilhite2459@gmail.com. Right?

A. Yes.

Q. She had juliawilhite79@gmail.com?

A. I believe so.

Q. She also used an account "omascoupons"?

A. Yes.

Q. Why didn't you send it to one of those

accounts?
A. Because she asked me to send it to that one.
Q. Why?
A. Omascoupons she had for just coupons and household things, and I sent them to where she asked me to send them so she could print them off.
Q. So sir, is it your position that instead of sending e-mails to any of these other accounts of your wife or freeing of space on her account, that you sent the Sister Catherine e-mails to the account of Mary Jean McDuffey?
MR. MCCLELLAN: Object to the form.
A. Again, please?
BY MR. RAVI:
Q. So instead of having, sending the Sister Catherine e-mails to your wife's other accounts, or freeing up space on those accounts, you sent them to the account of Mary Jean McDuffey. Is that right?
A. Correct.
MR. MCCLELLAN: Object to form.
BY MR. RAVI:

Q. And you did that because your wife instructed you to do that?
A. Yes.
Q. So from January 16, 2024, onward, did you only send e-mails to your wife at this Mary Jean McDuffey account?
MR. MCCLELLAN: Object to the form.
A. I believe so.
BY MR. RAVI:
Q. Showing you what has been marked as Plaintiff Exhibit 249.
[Exhibit 249 marked for identification.]
BY MR. RAVI:
Q. Sir, this is a set of some other e-mails that you sent to jwilhite2459 in 2024.
So why did you send some e-mails to Mary Jean McDuffey's account and send other e-mails to Julia Wilhite's account during the same period of time?
MR. MCCLELLAN: Object to the form.
A. I believe that -- I think Julia got this one cleared out to where it would start accepting e-mails.

Here's a message that appears to be -- well, let me just ask you.

What are you sending in Exhibit 251 to the Mary Jean McDuffey account?

A. It looks to be like from Sister Catherine.

Q. Okay.

A. Well, it says Sister Catherine.

Q. Why are you sending this e-mail?

MR. MCCLELLAN: Object to the form.

A. To be archived.

BY MR. RAVI:

Q. To be archived like the Today's Word messages?

A. Yes.

Q. Did you also speak with Gene Bicknell about archiving the Sister Catherine messages?

A. I think I told him that we were archiving these as well. But I didn't get but a few.

Q. Whose decision was it to archive these?

A. I just thought we would go ahead and archive them.

Q. So you made that decision?

A. Right.
Q. Why not?
A. Again, I didn't respond to everything.
Q. You then sent this to Julia Wilhite's jwilhite2459@gmail.com account?
A. Yes.
Q. Okay.
MR. MCCLELLAN: Take another break?
MR. RAVI: Sure.
MR. MCCLELLAN: Larry, for your leg?
THE VIDEOGRAPHER: We are going off the record at 4:20 PM.
[A recess was taken.]
THE VIDEOGRAPHER: We are back on the record at 4:38 PM.
BY MR. RAVI:
Q. Sir, did you discuss the Sister Catherine e-mails with Gene Bicknell?
A. I don't remember any conversation.
Q. Now, sir, it's your position that when Rick forward you -- forwarded you Gene's responses to Sister Catherine, that Gene had forwarded those

responses to Rick. Is that right?
A. Yes.
Q. And so Gene then therefore knew that Rick had his responses to Sister Catherine. Is that right?
A. I believe so.
MR. MCCLELLAN: Object to form.
BY MR. RAVI:
Q. Did you ever discuss Gene's responses to Sister Catherine with Gene?
A. No.
Q. Did you ever forward the responses Rick sent you to Gene?
A. No.
Q. Why not?
A. I thought Gene sent them to Rick.
Q. Did you think Gene didn't want you to see his responses?
MR. MCCLELLAN: Object to the form.
A. I never thought that.
BY MR. RAVI:
Q. It's your testimony, sir, that you never discussed Gene's responses with him. Correct?

A. Correct. That I can recall. I don't think we ever discussed it.

Q. Sir, why did you create Big Time Production LLC?

A. Because Gene told me to start the company.

Q. Why did Gene tell you to start the company?

A. He was going to sell the Oak Ridge Boys Theater and shut The Mansion down for renovation.

Q. So how does that lead to you creating Big Time Production LLC?

A. He told me to start my own company, basically, and that he wanted to sell the Oak Ridge Boys Theater and put The Mansion dark and was going to do some rehab on it.

And then he said I could -- we could work a deal with Mercy on the Oak Ridge Boys Theater and I could get a lease back until they called, you know, wanted the building, because they weren't going to start demolition immediately.

Q. When did you have that discussion with Gene Bicknell?

A. Fall of I think 2012.
Q. Why did -- what did Mr. Bicknell specifically say to you about why he wanted you to create your own company, as opposed to Gene creating a new company?
MR. MCCLELLAN: Object to form.
A. He just said he wanted me to start my own company, and that he was backing away from things. I think he told me -- he said I don't want to touch anything right now.
BY MR. RAVI:
Q. Did he use those exact words, "I don't want to touch anything right now"?
A. I don't know if that was the exact words, but he just said he was going to -- he just wanted me to do it, you know.
Q. Did you have any discussions in writing with Gene Bicknell about the creation of Big Time Production?
A. Other than the lease he worked out with Mercy for me.
Q. What did you understand Gene to be telling

you to do specifically with respect to Big Time Production?

A. Just to start the company and keep doing -- I could keep doing shows, booking shows, and use the theater, or lease that theater back.

Q. And the company you were going to create -- first of all, who came up with the name Big Time Production?

A. Gene and were both talking and he told me, I said what do we call it? We just -- I don't know. Just Big Time Production came out.

Q. Your testimony is that Gene came up with that name?

A. Yeah, we corroborated on it, and -- because we were batting things back and forth, and productions, big time, and he was -- yeah, let's do Big Time Productions.

Q. Did you mean you collaborated on it?

A. Well, we just -- I said what do we call it, what do we do?

Q. And what was Big Time Production going to do?

A. Carry on just booking dates and -- with artists.

Q. It was going to be owned by you, sir?

A. That's what he told me.

Q. What assets was it going to have?

A. I didn't have any assets with it. We used the theater from Mercy, and they left the -- all the sound and lights and everything in it.

Q. When you say we used the theater from Mercy, what do you mean?

A. They owned the property and the theater, and the lease was with Mercy Hospitals.

Q. You're talking about The Mansion Theatre or a different theater?

A. The Oak Ridge Boys Theater.

Q. You're talking about the Oak Ridge Boys Theater.

So the idea was that that was being leased to Gene previously through Mercy Hospital?

A. No, it was -- Gene owned it. And he sold it to Mercy.

Q. Okay. And how was Big Time Production

going to play a role in that lease?
A. I just had a lease with them, just book shows and events like we were doing.
Q. Why did you -- what did Gene Bicknell tell you about why he wanted you to own Big Time Production?
MR. MCCLELLAN: Object to the form.
A. I don't know why -- if he told me why; he just told me he wanted me to do it.
BY MR. RAVI:
Q. Had you ever owned a company before?
A. Well, I owned Backstage Ministries.
Q. The funding that was going to come in to Big Time Production would come from where?
A. Ticket sales.
Q. Ticket sales at the theater. Correct?
A. Yes. At the theater.
Q. And those ticket sales revenue belonged to Gene. Right?
A. They belonged to Big Time Productions. We were booking the acts and paying for them.
Q. So then the revenue from the theater belonged to you?

A. At the Oak Ridge Boys Theater, yes, you know, we booked the shows, paid the artists, kept the upkeep on the building.

Q. Did you believe the revenue from the Oak Ridge Boys Theater belonged to you or to Gene?

A. I believe it was Big Time Productions's.

Q. And Big Time Productions was opened by you. Right?

A. Yes.

Q. So did you then have a right to the revenue from the Oak Ridge Boys Theater?

MR. MCCLELLAN: Object to the form.

A. I would say so, yes.

BY MR. RAVI:

Q. So that's your position, sir, that you were entitled to anything that -- any of the revenues earned by Big Time Production?

MR. MCCLELLAN: Object to the form.

A. I don't know if I would say I was entitled to them, but I used them to keep the business going.

BY MR. RAVI:

Q. At whose direction?

A. Mine and Gene -- Gene would check on me and ask me how things were going, and I told him, you know, we're selling tickets, trying to keep going.

Q. So before the existence of Big Time Production, the theater and your job at the theater was directed by -- let me rephrase.

Prior to Big Time Production, Gene Bicknell owned the theater and therefore, you know, received any of the revenue from the theater. Is that right?

MR. MCCLELLAN: Object to the form.

A. Did or didn't?

BY MR. RAVI:

Q. Did.

A. Yes.

Q. Okay. So what changed after Big Time Production was created?

A. What are you -- ask me again.

Q. I'm just asking, before you testified about your role -- you had testified about your role at the theater, and the work you did at the direction of Gene. Correct?

A. Yes. Yes.

MR. MCCLELLAN: Object to the form.
A. No. That was earlier that she was filing everything.
BY MR. RAVI:
Q. Why was she filing things?
A. On what the days were.
Q. Now, at some point soon after this e-mail that was sent in October 8, 2024, you were fired by Gene. Correct?
A. Yes.
Q. How did you learn about being fired?
A. He texted me.
Q. And if you look at the last page of Exhibit 236, which is that long text message chain between you, Rick, and Gene -- you see that long -- it's that big text message chain that was separately --
A. Oh, here?
Q. I think it's in that pile.
A. Oh.
Q. It's the huge pile of text messages.
A. Oh, okay.
Q. If you go to the very back of that. I

think if you pick up the whole thing and look at the very back page.

It's that right there.

A. Yeah.

Q. And it's a text message from Gene that says, "I'm giving you a heads-up January 1st is your retirement date."

Do you see that?

A. Yes.

Q. Is that the text message in which you learned that you were fired?

A. Yes.

Q. What was your reaction to getting that text message?

A. I was taken by it.

Q. What do you mean by that?

A. I was shocked.

Q. Why were you shocked?

A. That he told me I was retiring.

Q. What did you do in response to getting this text message?

A. I called him.

the text, too.

Q. And what was that discussion?

A. I -- I don't remember. I was kind of in shock. He -- he just said he got -- he got a text, the same text, I guess.

Q. That was it? That's all you remember speaking to Rick Silanskas about the both of you getting fired in December 2024?

A. That's -- yeah. I don't remember.

Q. Did you say goodbye to anyone?

A. Well, eventually. I mean, Gene told me to stay and help close out the year.

And I told him I would leave. That's what he wanted, I told him I would take, go get off the bank accounts and everything.

And he told me, no, I don't want you to do that. I trust you. I just, you know --

Q. So you agreed to close out the year --

A. Yes.

Q. -- at the theater?

A. Yes.

Q. Gene said he trusts you still?

A. Yes.
Q. He used those exact words?
A. Yes.
Q. Sir, after you left the theater, you spoke with someone named Bob Langford. Is that right?
A. Yes.
Q. How do you know Bob Langford?
A. He is a friend.
Q. And you spoke to him about what happened with your firing?
A. Yeah, I did. I told him --
MR. MCCLELLAN: Object to the form.
A. -- I need to, got to get a job, and I also talked to him about Backstage Ministries, trying to rejuvenate it back to full-time status.
BY MR. RAVI:
Q. Okay. And did you have discussions with Mr. Langford about whether anyone is bringing any legal moves against you?
MR. MCCLELLAN: We have asserted privilege about his communications with Mr. Langford -- is that right -- in our privilege log?

C E R T I F I C A T E

I, Jude Arndt, a Certified Shorthand Reporter and Certified Court Reporter, do hereby certify that LARRY WILHITE, prior to the commencement of the examination, was sworn by me on June 10, 2026, to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

_______________________________

JUDE ARNDT, CSR, CCR, RPR
CSR NO. 084-004847
CCR NO. 1450