IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

O. GENE BICKNELL, )
)
Plaintiff, )
)
vs. ) Case No. 4:25-cv-00383-SH
)
RICHARD M. SILANSKAS JR., )
LARRY K. WILHITE, and )
STEPHEN D. HEDRICK, )
)
Defendants. )
____________________________)

VIDEOTAPED DEPOSITION OF
O. GENE BICKNELL
Englewood, Florida
Monday, December 8, 2025

STENOGRAPHICALLY REPORTED BY:
RHONDA HALL-BREUWET, RDR, CRR, CSR, CCR, LCR, FPR
Realtime Systems Administrator

EXHIBIT
E

December 8, 2025
10:04 a.m.

Videotaped Deposition of O. GENE BICKNELL, held at 792 North Manasota Key Road, Englewood, Florida 34223 before Rhonda Hall-Breuwet, Registered Diplomate Reporter, Certified Realtime Reporter, CA CSR NO. 14411, TX CSR NO. 11956, NJ CCR NO. 30X100245000, NM CCR NO. 584, NV CCR NO. 990, TN LCR NO. 675, LA CCR NO. 2017004, WA CCR NO. 21000131, GA CCR NO. 5087-2801-9674-7264, IL CSR NO. 084004980, AL CCR NO. 729, FL FPR NO. 693, and Notary Public of the State of Florida.

A P P E A R A N C E S:

REPRESENTING THE PLAINTIFF:

JENNIFER B. ROUTH, ESQUIRE
MICHAEL S. NADEL, ESQUIRE
THERESA M. BABENDREIER, ESQUIRE (Via Zoom)
SAGAR K. RAVI, ESQUIRE (Via Zoom)
RACHEL PELTZER, ESQUIRE (Via Zoom)
McDermott Will & Schulte
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000
jrouth@mwe.com
mnadel@mwe.com
tbabendreier@mwe.com
sravi@mwe.com
rpeltzer@mwe.com

REPRESENTING THE DEFENDANT SILANSKAS:

RICHARD M. SILANSKAS, JR., Pro Se (Via Zoom)
1338 Peace in the Valley Road
Blue Eye, Missouri 65611

REPRESENTING THE DEFENDANT WILHITE:
EVAN G.E. VINCENT, ESQUIRE
Crowe & Dunlevy
Braniff Building
324 North Robinson Avenue, Suite 100
Oklahoma City, Oklahoma 73102
(405) 235-7700
evan.vincent@crowedunlevy.com
- and -
DERIC MCCLELLAN, ESQUIRE
Crowe & Dunlevy
222 North Detroit Avenue, Suite 600
Tulsa, Oklahoma 74120
(918) 592-9800
deric.mcclellan@crowedunlevy.com

REPRESENTING THE DEFENDANT HEDRICK:
LYSBETH LOU GEORGE, ESQUIRE (Via Zoom)
Law Office of Liz George, PLLC
8101 South Walker, Suite F
Oklahoma City, Oklahoma 73139
(405) 689-5502
liz@georgelawok.com

ALSO PRESENT:

LARRY WILHITE

JULIA WILHITE

VIDEOGRAPHER:

MARY SCOTT

Q. Who was the triune?
A. Sorry?
Q. Who was the triune? Who was in the triune?
A. Rick Silanskas, Larry Wilhite, and Gene Bicknell.
Q. Let me take that from you.
MS. ROUTH: We can mark this as Exhibit 3.
(Exhibit Number 3, Email from Julia Wilhite to Larry Wilhite, dated 2/8/22; Subject: Today's Word, Bates-stamped GB00002121 - 2123, was marked for identification.)
BY MS. ROUTH:
Q. All right. Mr. Bicknell, you've been handed what's been marked as Exhibit 3 to your deposition.
A. I'm sorry. Would you repeat that?
Q. Sure. You've been handed this document which is marked as Exhibit 3 to your deposition.
A. Okay.
Q. And it bears the Bates label GB00002121, and Exhibit 3 is an email dated February 8th, 2022. And it has a Today's Word message in it.
Did you receive the contents of this message?

A. Yes. And this is Julia, Larry's wife, part of this, and Larry said that Julia was interpreting the Latin part of the Daily Word message to say what it was.

And so Larry was sharing that with Julia, and Julia was responding with Larry. So that's what this is.

MS. ROUTH: Okay.

(Exhibit Number 4, Email from Larry Wilhite to Julia Wilhite, dated 7/31/22; Subject: Today's Word, Bates-stamped GB00002099 - 2120, was marked for identification.)

BY MS. ROUTH:

Q. Okay. Mr. Bicknell, you've been handed what's been marked as Exhibit 4 to your deposition, which bears the Bates label GB000 --

A. I'm sorry. I didn't hear you.

Q. This is for the record. We want to get the Bates number on the record, which is GB00002099, and this is an email dated July 31st, 2022, with a compilation of Today's Word messages dated February 11th, 2022, to February 28th.

Did you receive the contents of these messages?

A. Yes, I did. Yeah. And I read this at the

BY MS. ROUTH:
Q. All right. Last one like this, Mr. Bicknell. This is Exhibit 6, which bears the Bates label GB00002036.
Exhibit 6 is an email dated July 31st, 2022, with a compilation of Today's Word messages dated April 1st through May 21st, with a message at the end dated March 22nd.
Did you receive the contents of these messages?
A. Yes, I did.
Q. Okay. Did you talk about the Today's Word and Sister Catherine messages with Larry Wilhite and Rick Silanskas?
A. Yes, I did.
Q. How often did you talk to Larry Wilhite and Rick Silanskas about the Today's Word and Sister Catherine messages?
A. Frequently.
Q. Did you intend to give Larry Wilhite and Rick Silanskas each a third of the completed American Heartland project?
A. Yes, I agreed to do that.
Q. Why?
A. God told me to.

Q. How did God tell you that?
A. Through the Word.
Q. The Today's Word messages that you received?
A. The Word said to divide it in three, and that's obvious it's still there.
Q. Did you talk about the fact that you were going to give them each a third, to Larry Wilhite and Rick Silanskas?
A. Yes, I did. They knew it.
Q. What were you going to do with your third?
A. Give it to charity.
Q. What effect did the Today's Word and Sister Catherine messages have on your relationship with your family?
A. It's very destructive. We became estranged because of it because they didn't -- they didn't believe in the project, and they weren't going to give me another $22 million, bills that Rick and Larry and Steve had built up when I was ill in Florida and not aware of it.
As a matter of fact, very little information was shared to me about the inner working of any of this. And Rick Silanskas always asked to beg off on telling me later and trusting him, and

obedience is the same as full disobedience."

So it was affecting me very hard mentally. I was alone in this house, and I would walk from one side to the other yelling at the top of my voice, say, "God, just tell me how. I'll do what you say, but tell me how to get $22 million."

I had nowhere to go. I had borrowed 10 million, put myself in debt. I sold all my stocks. I sold personal property, sold assets. I did everything I could to raise money for this because, supposedly, it was just seed money to get us to the financiers.

So I was doing my best to comply, and it affected me terribly. As a matter of fact, it still affects me because it destroyed my life.

Q. Was Larry Wilhite authorized to sign your name on contracts?

A. No, he was not. He was a chief operating officer -- I'm sorry. He was the chief executive officer of Mansion Entertainment Group.

(Exhibit Number 7, Email Chain, Bates-stamped GB00002212, was marked for identification.)

BY MS. ROUTH:

Q. All right. Mr. Bicknell, this is

Exhibit 7, and the Bates number is GB00002212.

The second email on the page is sent by Rick Silanskas to Larry Wilhite on December 11th, 2023, and there's a message that says at the top: "I ask you to send and sign all Park contracts on my behalf as approved. O. Gene Bicknell."

A. I'm sorry. I'm losing you.

Q. I'm just reading this part of the message here. It -- the email message from Rick Silanskas to Larry Wilhite --

A. No, I did not send this.

Q. Okay. Let me read it to you. It says: "I ask you to send and sign all Park contracts on my behalf as I have approved O. Gene Bicknell."

A. Absolutely not.

Q. You did not write that?

A. I did not.

Q. Okay. Did you know about this at the time?

A. I did not know what they were doing. I didn't know they were building $22 million of debt. I was in Florida with MRSA and staph infection with an injury in my foot that took the tendons out of my foot, and they didn't know if I was going to save my foot or not. So I was flat on my back and in

sir, I wanted to ask you about. You said that you were provided the contents of some of these emails, but you didn't actually receive them as emails.

Did I understand that right?

A. No.

Q. Okay. What is it -- what did I misunderstand?

A. I -- I saw the written copy of those.

Q. How did you see that, sir?

A. They were provided for me from counsel.

Q. Okay. But at the time they were sent, were you provided a written copy of the document?

A. As much information as was possible was held from me. They weren't keeping me abreast of what was going on.

So reading that, I remember that Larry mentioned that Julia would interpret the Latin in the messages. So I was seeing -- receiving those on my phone and also my iPad.

Q. All right. Well, why are the copies that your counsel was showing you between Larry and Julia Wilhite and not sent to Gene Bicknell's email address?

A. Because evidently Larry was sharing them with Julia, and Julia was interpreting the Latin,

according to what Larry told me. So they were sharing that information. So that's why the written from Larry to Julia and Julia to Larry.

Q. And then are you saying that that information then came to you at that time?

A. Had came to me when I was provided that written copy, and it didn't -- it came over my phone, either text or email. So that was provided to me through -- electronically at the time.

Q. All right. I'll just ask this one more time, and then I want to go on.

But when you say it's provided to you electronically, these emails between Larry and Julia were sent to you via email? Is that what you're saying?

A. I'm saying Larry shared those with me.

Q. Okay. How did he share it with you, sir?

A. Through my -- on my phone.

Q. Did he send it to you in an email?

A. I don't recall if it was email or text, but he sent it to me and informed me. I mean, it could have been a phone call. But he mentioned that Julia was interpreting the Latin.

Q. And the -- within the emails, it shows Mr. Wilhite's email @themansiontheatre.com.

Q. Okay. How was your relationship with Mr. Wilhite during the time when he -- when he managed the theater?

A. I trusted Larry like a son. I tried to treat him like a son. I even had him in my will. That's how much I thought of him. And I trusted him explicitly.

And when he trusted Rick Silanskas, I trusted Rick too. So Wilhite had a big effect on me, and we were very close, I thought.

And the biggest part of this that hurts is the fact that the knife in the gut from Rick and Larry, after I had been as good to them as I had, and for them to do that to me and see the suffering I was going through because of the fact that I couldn't find the money and they still kept it up -- so that -- that was a big, hard blow for me. Still is.

Q. During the time that he worked for you, did Mr. Wilhite ask you for anything?

A. He never had to. All he would ask for was money to pay the bills, and he was in charge of the operations; so, consequently, he was free to run the theater.

Q. Was he being paid a salary to run the

A. We have evidence that's available, if you want to see it.

Q. I think it's already been requested, but I'm asking you now.

What do you know about that evidence?

A. Ask me again.

Q. What is it that you've seen in terms of money coming from the theater to Mr. Wilhite's entity?

A. Well, it was money to Daniel, his son. There was money to Big Time Ministry -- I mean -- sorry. There was money going to Backstage Ministry, and there was -- there was several examples that we have available I don't have in my head.

Q. Okay. But that's money going from the theater to the ministry's entity; is that right?

A. I owned the theater. I thought Big Time Productions was a part of the theater. But Larry would go in and say, "I'm the owner of this, and I'm going to make an owner's withdrawal." And we have that in writing.

Q. And did Mr. Wilhite need your permission to make an owner's draw from Big Time Productions?

A. I didn't know a thing about it until this started.

My job was to be a creative presenter. So I was just for creation. I did not make and could not make decisions for Mansion Entertainment Group because I didn't hold an office except as a contributor of creativity.

Q. During the years that Larry Wilhite ran the Mansion Theatre in Branson, would he often ask you for permission about theater operations?

A. I don't know what you're saying.

Q. I'm asking if -- you said Mr. Wilhite was in charge of the Mansion Theatre -- and you hired him to do that --

A. Yeah.

Q. -- for 20 years; is that right?

A. Yeah.

Q. Yeah. During that time period, would he need to come and involve you in decisions and ask you for permission to do things?

A. The only thing I can remember him asking me is to -- to use Big Time Productions.

Q. To use it for what, sir?

A. To hire talent, entertainers. And, supposedly, there would be a tax break in doing that. But I thought Big Time Productions was also part of the theater operation, but it wasn't.

A. The reason was because I trusted him like a son, and I wanted to leave him something for our relationship.

Q. Did you ever -- in all those years of working with Mr. Wilhite, did you ever observe him to be ungrateful toward you?

A. No.

Q. Did you ever get a sense that he wanted some of your money?

A. No.

Q. During those -- and after having managed the theater in Branson for 20 years, why would you feel that Larry Wilhite needed to be the point person for a multibillion-dollar project?

A. That's a question that's almost like asking a question. You know, Larry Wilhite was obviously in a position, as manager of the theater, to be involved; and so when Rick Silanskas presented the theme park, there were three of us involved.

And Larry and Rick were under salaries; so it didn't make any difference what was going on. The businesses that they had been taken care of. So if you're managing something or you're the chief executive officer, those are decisions that have to be made in running the company. So that's what his

this question, Mr. Bicknell: Did you ever tell anyone else besides Mr. Silanskas or Mr. Wilhite that you would give them a percentage of the American Heartland project if -- when it was completed?

A. Gene McComb knew that.

Q. You told Gene McComb that he would have a percentage?

A. I told him he could have a percentage too.

Q. Did you tell anyone else?

A. I don't remember.

Q. Do you remember telling a woman name Kristy?

A. Kristy ran -- runs the Mansion Theatre. So, yes, I probably talked to her. I don't remember specifics, but she runs the theater now, and she was there when Larry was there. And she's doing a very good job.

Q. Was there a person named Jordi that you told you might give a percentage of the project to?

A. Jordi?

Q. Yes, sir.

A. Jordi was the animation guy out of Spain, and he didn't enter into this. So I only met Jordi one time, and that was in the theater, for about ten

A. I don't understand what he's trying to say, but I believe that he was fabricating most of this himself. So he should know. Rick, I think you're the one that --

Q. I'd like to ask the question again.

A. I think you're the one that did this whole thing. I think you did a marvelous job of fooling me and creating a Daily Word that made logic. And I'll go to my grave knowing that you're the one that did this to me.

Q. Can I continue with questions, please?

(Previous question read back.)

MR. MCCLELLAN: Yes. Go ahead, Rick.

MS. GEORGE: Okay.

BY MR. SILANSKAS:

Q. Do you remember on multiple occasions confidential comments you made to me regarding Larry Wilhite?

A. You know, I'm talking to --

MS. ROUTH: Asked and answered.

THE WITNESS: -- the fabricator of a mission of a Daily Word which you created, in my opinion, and you did all this to me, and you ruined my life. You ruined my health. You put me where I can do nothing on my own except through a caregiver,

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF CHARLOTTE

I, the undersigned authority, certify that O. GENE BICKNELL personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 17th day of December, 2025.



__________________________________________________
Rhonda Hall-Breuwet, RDR, CRR, CSR, LCR, CCR, FPR
NCRA Realtime Systems Administrator
Notary Public - State of Florida
My Commission Expires: 9/28/27
Commission No. HH 414033

CERTIFICATE OF STENOGRAPHER

STATE OF FLORIDA:

I, RHONDA HALL-BREUWET, RDR, CRR, CSR, LCR, CCR, FPR, NCRA Realtime Systems Administrator, shorthand reporter, do hereby certify:

That the witness whose deposition is hereinbefore set forth was duly sworn, and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of December, 2025.

_______________________________________________

RHONDA HALL-BREUWET, RDR, CRR, CSR, LCR, CCR, FPR,
NCRA Realtime Systems Administrator
Shorthand Reporter