IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| O. GENE BICKNELL,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD M. SILANSKAS JR.,<br>LARRY K. WILHITE, and<br>STEPHEN D. HEDRICK,<br><br>Defendants. | Case No.<br>4:25-cv-00383-CDL |

VIDEO DEPOSITION OF STEPHEN HEDRICK

LOS ANGELES, CALIFORNIA

WEDNESDAY, JUNE 3, 2026

REPORTED BY:

LISA MOSKOWITZ

CA-CSR 10816, RPR, CRR, CLR

WASHINGTON CCR 21001437, NEVADA CCR 991

ILLINOIS CSR 084.004982

EXHIBIT
H

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) O. GENE BICKNELL,<br><br>Plaintiff,<br><br>vs.<br><br>(1) RICHARD M. SILANSKAS JR.,<br>(2) LARRY K. WILHITE, and<br>(3) STEPHEN D. HEDRICK,<br><br>Defendants. | Case No.<br>4:25-cv-00383-CDL |

Deposition of STEPHEN HEDRICK, taken at McDermott Will & Schulte, LLP, 2049 Century Park East, Suite 3200, Los Angeles, California, commencing at 9:06 a.m., Wednesday, June 3, 2026, reported stenographically by Lisa Moskowitz, California Certified Shorthand Reporter Number 10816, Certified Realtime Reporter, Nevada CCR Number 991, Washington CCR Number 21001437, Illinois CSR Number 084.004982, RPR, CLR, NCRA Realtime Systems Administrator.

APPEARANCES:

For the Plaintiff:

MCDERMOTT WILL & SCHULTE
Attorneys at Law
BY: MICHAEL S. NADEL
BY: SAGAR K. RAVI
BY: RACHEL PELTZER (via Zoom)
500 North Capitol Street, N.W.
Washington, DC 20001
(202) 756-8000
mnadel@mcdermottlaw.com
sravi@mcdermottlaw.com
rpeltzer@mcdermottlaw.com

For the Defendant Stephen D. Hedrick:

LIZ GEORGE AND ASSOCIATES
Attorneys at Law
BY: JENNIFER JACKSON
8101 South Walker Avenue
Suite F
Oklahoma City, Oklahoma 73139
(405) 689-5502
jennifer@georgelawok.com

For the Defendant Larry K. Wilhite

CROWE & DUNLEVY
Attorneys at Law
BY: DERIC MCCLELLAN (via Zoom)
BY: GALEN THORP (via Zoom)
222 North Detroit Avenue
Suite 600
Tulsa, Oklahoma 74120
(918) 592-9800
deric.mcclellan@crowdunlevy.com
galen.thorp@crowdunlevy.com

Also Present:

KEITH FARRIS, Videographer
LARRY WILHITE

Hyperbole, lots of that.

But Gene Bicknell loved the guy. They were attached at the hip. Wherever -- even though Kristy Adams and I were saying: He's got some bad press in the past. It would be a good thing if he weren't so connected with American Heartland because people are smart. They'll look it up and say: What the hell is going on?

So Kristy and I were trying to minimize that. But lo and behold, Gene would bring him to every event, which was kind of frustrating.

Q. Did you ever talk to Gene about Rick's involvement with DreamVision and how that ended?

A. I did not. I was actually reluctant to talk to him because they were such close friends. I mean, Rick wrote a symphony about Gene and did an animated film of him and his wife.

The one -- I had a songwriter write a song for the theme park called This is Heartland. It was a beautiful tune. Just on a synthesizer and a beautiful vocalist. We were very proud of it.

I sent it off to Gene. I said: Gene, this is just the beginning of the creative, but I wanted to share this with you.

And he calls me and says: What the hell are you doing hiring a songwriter? Rick Silanskas is the best damn songwriter I've ever known. He wrote a symphony.

And I went: Wow.

Rick Silanskas is not where you want to go with this man. So no, I did not talk to Gene Bicknell about Rick Silanskas.

Q. When you came up with the name American Heartland, who approved that name?

A. Well, everybody.

Q. Is that everybody meaning Larry Wilhite?

A. Everybody on the project who was -- so Kristy Adams, Larry, Rick, Gene Bicknell. They all had to sign off on it. I put together a presentation, which was kind of what we call a blue sky presentation with the name and what the park could be. There was a body of water like we did at Tokyo and DisneySea, and everybody bought off on it.

Q. Is it fair to say that you were in charge of the development of the American Heartland project?

A. The creative development, yes.

Q. You mentioned some other people.

did a presentation to the council of the nine tribes. I may not have that name right.

So they were very impressed, and then Mr. Bicknell asked them for a $1 billion line of credit, which wasn't part of the initial discussions; so I was a little surprised by that.

Q. What did they say?

A. They did not answer. They just shook their heads and said we'll talk about it, and then I didn't hear any more about it.

Q. When was the groundbreaking?

A. I want to say October of '23. Again, let me check that and get back to you.

Q. How far did construction progress?

A. Not very far because Crossland Construction Company was not getting their upfront money that they had requested. Again, these are companies that do not want to extend themselves until they have guarantees that their construction will be funded. And at the time they were not being paid, Mr. Bicknell threatened to -- they threatened to sue each other.

Q. There were payment problems at least as early as August 2023; correct?

A. There were.

Q. And, in fact, by August 2023, the American Heartland project was millions behind in overdue payments; right?

A. With the promises that they would be paid, yes.

Q. Sir, you were served with document requests in this case; correct?

A. I was.

Q. How did you go about collecting documents for review and production?

A. Well, give me a starting point.

Q. Well, when you received the document requests, what did you do to collect documents responsive to those requests?

A. Well, it asked me to identify my emails, which I did. I looked at -- I searched each inbox and sent box and deleted folders for all relevant project-related texts and emails. I drug those over into a folder, and that's how I went through them to make sure they were all project-related.

Q. How did you search the inbox for relevant related -- for relevant project-related texts and emails?

A. I went through all of them, one by one. I think there were 4,600 or more text messages

that I went through one by one and identified those.

Q. So you went through each email to look at whether or not it was responsive to a request; is that right?

A. The best I could, yes.

Q. Did you use word searching?

A. I did.

Q. What did you use word searching for if you were looking at each of the emails?

A. I would research -- I would word search people's names. Gene Bicknell. Larry Wilhite. Rick Silanskas. Kristy Adams. Don Hilson. John Sorenson, he was the land planner that we got involved early in the project.

But to be more than thorough, I went through each and every one of them.

Q. Did you work with a vendor to collect documents from your devices?

A. No, but we have an appointment scheduled later this month.

Q. Did you work with a vendor to perform a forensic collection of documents from your cell phone?

A. No, but we will do that later this month.

A. I don't know.
Q. Did you ask Larry to stop sending them to you?
A. I did not.
Q. You also received text messages from Gene Bicknell; correct?
A. True.
(Exhibit Number 187 was marked for identification.)
BY ATTORNEY NADEL:
Q. You've been handed what's been marked as Exhibit 187. These are text messages between you and Gene that you produced as Hedrick 068014.
I'll just -- have you seen this before, sir?
A. Yeah.
Q. The way it's produced here is that these are group texts, and there's a Phone column, and it has all the phone numbers of people in the group texts. And the Email addresses are where texts were going to email addresses. And the Name column is if one of the phone numbers was in your contacts, that shows up in the name column.
So if you look at the first one, for example, it's a group text between all these phone

numbers. And one of them is Gene Bicknell, and it's January 23, 2023, received by you.

Understand?

A. Say that again. What date?

Q. January 23, 2022.

A. And it's received by me? Or sent by me?

Q. Well, these are -- it's either received or sent, depending on whether it says received or sent.

A. Yeah.

Q. This one is received by you on that date.

A. That makes sense that Gene would send this to me.

Q. Correct.

A. I did not send it to him.

Q. Right. You never sent -- that I know of, you never sent text messages to -- or regarding Today's Word to Gene Bicknell; correct?

A. That is correct.

Q. And to clear up the date, it's January 1 -- it's January 23, 2023; correct?

A. That's what it says.

Q. And I think you said you received text messages from Gene as part of the group text; correct?

Q. In April 2024, you were billing Mansion Entertainment Group at $2,000 a day; correct?
A. Correct. Not as many days, but correct.
Q. And at that time while you were working on the hotel for the American Heartland theme park and other parts of the American Heartland theme park, you were also developing your cigar lounge in Prescott, Arizona; correct?
ATTORNEY JACKSON: Object to form.
THE WITNESS: In April? That was before the cigar lounge was -- before there was a lease on the property.
BY ATTORNEY NADEL:
Q. Right. But you were working on --
A. Ideas?
Q. Correct.
A. Ideas, yeah.
Q. When was there a lease on the property?
A. I believe it started in August.
Q. August of what year?
A. Same year.
Q. 2024?
A. Yes.
Q. What did your son Nate do for the American Heartland project?

A. Nathan was the creative developer for the pirate stunt show. The pirate stunt show is a water-based show, similar to the style of the WaterWorld show at Universal Studios Hollywood where you have a half arena and a large body of water in front of it. And for the WaterWorld shows, they use jet skis and other special effects and stunts that are similar to the movie WaterWorld, which is what Universal does.

When I came up with the idea of doing a pirate stunt show, I thought I need someone with stunt experience. It's a musical because I wanted most of the dialogue to be sung by these pirates. It needs -- this person needs connections with the stunt contractors. They need to have a musical theater background, and they need extensive experience both in stunts, doing them themselves and also managing stunt performers and equipment.

All those boxes were checked by Nathan, who graduated magna cum laude from college. He has a master's degree in musical theater. He worked at WaterWorld as both a stunt performer and as a manager for 14 years, and he knew the contacts of Action Horizons, who was the stunt consulting company and provider of the stunt

performers for Universal Studios Hollywood.

So that's why Nathan was perfect to do the stunt show for American Heartland.

Q. You said the pirate stunt show is a water-based show, similar to the style of the WaterWorld show at Universal Studios Hollywood.

Actually, that was what the pirate stunt show was going to be in your mind, but, in fact, it was never created; correct?

A. Actually, the creative was created.

Q. Well, it was never built; right?

A. It was never built, but the creative was done.

Q. Was it ever performed?

A. It couldn't be performed unless it was built.

Q. Had any stunt people been hired?

A. We actually did try to hire the Action Horizon company to start providing information that the architects would need to build into the facility itself.

Q. You said you tried to hire them.

Did you hire them?

A. They wanted a guarantee, which I couldn't give them because we were still waiting on Gene

Bicknell to reacquire his fortune from his family.
Q. Did Gene Bicknell lose his fortune to his family?
A. You know, I don't know, but there was, from Gene's text to me, he was saying he was having a disagreement or a struggle with his family about his money and that he was hiring an attorney, I believe.
And then hearing from others, maybe Larry, he knew more about it than I did. So . . .
Q. What did you hear from Larry about it?
A. I don't recall specifics, but that there was an argument about Gene's fortune and that he thought he had more money, or access to more money, than he actually had.
Q. Did Nate Hedrick have a role on the project other than being the creative developer for the pirate stunt show?
A. He also worked on another stunt show in Electropolis, which was a theater in the round show based on Tesla and Tesla coils, if you know what those are. They're giant sparks that shoot across the stage. And performers would interact with these giant sparks flying from the ceiling, et cetera.

So he was also consulting on that.
Q. Was he in charge of developing that?
A. He was, along with our entertainment creative director Robert Jordan -- I'm sorry, Jordan Peterson.
Q. Jordan Peterson?
A. I think I got that name wrong. Same name as the conservative. That's his name.
Q. Not the same guy, though?
A. Not the same guy.
Q. Okay. How much was Nathan Hedrick paid for his work on the American Heartland project?
A. I would have to look at the invoices to remind myself. It was standard to what other people were paid for developing creative concepts.
(Exhibit Number 202 was marked for identification.)
BY ATTORNEY NADEL:
Q. Plaintiff's Exhibit 202 is Bates-labeled Hedrick68017.
What is this?
A. Apparently, it is Nathan's r sum . It says that he has a master's degree in music and theater 2002, and BFA in theater, magna cum laude, 2000 from Stephens College, Columbia, Missouri.

Q. The reason why I asked you what it is, is because you produced this document in discovery in this case.
Were you involved in creating this r sum ?
A. I asked Nathan to send in a r sum , and this is what he sent in. He may have asked my advice once he had done it, but I don't recall.
Q. Did you ask him to send in the r sum in connection with this lawsuit?
A. I may have.
Q. Why did you do that?
A. Because I was sure that in a deposition like this, I would be accused of hiring my two idiot sons who have no business being on the project, and I wanted to prove that they indeed had credentials.
My youngest son Aaron worked in the restaurant business. He managed restaurants. Nathan worked in the stunt business, has extensive experience in stunts and stunt shows.
So that's why I asked him.
Q. You testified earlier that he had experience in the management of stunt shows.
Did I get that right?

and you look at paragraph 11.
A. Paragraph 11.
Q. That's what I was just reading to you from. There's a reference to Mansion Entertainment Group, which is MEG, and Mansion Entertainment.
Mansion Entertainment Group is the LLC that was in charge of the American Heartland theme park; correct?
A. I think that's correct. But they were kind of interchangeable all the way along the line.
Q. Are you familiar with a group called Mansion Entertainment?
A. I believe that was the theater. And Mansion Entertainment Group -- you know, I think they were interchangeable. I didn't really study any documents that purported to form an LLC or refer to a Mansion Entertainment owner of the Mansion Theater. I couldn't tell you.
Q. You said Kristy Adams, you believe, set it up.
Why do you believe Kristy Adams was involved in setting up the LLCs?
A. Because she was involved as far as

BY ATTORNEY NADEL:
Q. Mr. Hedrick, in your counterclaim, you say: Not only did OGB help in supervising the project by getting regular updates and offering opinions, he was the one who continued to promise payment.
What do you mean by "regular updates"?
A. Meaning that we would give him updates on the creative.
Q. How?
A. Presentations that were put together for him to update him on the project. We would send graphs and requests for -- excuse me. Allergies.
We would send him documents that say: We need the project funded for this amount for these reasons, for these architects, et cetera.
Q. Would you do that by email to him?
A. Most of the time, it went through Mansion.
Q. What do you mean by "it went through Mansion"?
A. Well, Larry and I would talk about it. He would either pass on my comments or concerns or documents to Gene.
Q. Were those documents that were prepared

by you?

A. And others on the project. For example, Pamela McGowan created documents of contracts that needed to be signed by Mr. Bicknell. These documents were forwarded to Gene Bicknell. And it's my understanding that he signed those contracts.

Q. Right. Now I'm not talking about the contracts. I'm talking about the regular updates you say you provided him.

Were those updates you provided to Larry who would pass them through to Gene?

A. Sometimes.

Q. Or were they documents that were provided directly to Gene?

A. I'd have to check.

Q. You'd be checking your email?

A. Yes.

Q. Do you remember ever providing updates to Gene?

A. Oh, yes.

Q. By email?

A. By email.

Q. And sometimes you would provide them to Larry?

A. Yes. Or we would get on a Zoom call with Gene.

Q. When you would provide documents to Larry to pass on to Gene, how do you know that he actually did that?

A. Well, Larry's an honest person. I have no doubts that he did that.

Q. What do you base your statement that Larry's an honest person on?

A. By working with him. I knew it when I first met him back in 2022. He seemed like a straightforward guy. He did not talk in code. He said what he said, and I respected that.

My time working with him, he was very upfront. He would tell me when things were going well and when they weren't going well. When you could not get a hold of Gene to pass on important information because Gene was playing hide-and-seek, especially when things got rough. Larry would say: I've been trying to get a hold of Gene. He has not returned my call. Oh, he just flew off to Florida. He has not returned my call.

So I feel bad for Larry, that he was trying his best to get Gene information and get

Q. You don't know, as you sit here?
A. That's correct.
Q. Do you believe that Gene Bicknell was intending to deceive you?
A. I do.
Q. And you believe that started in September or October of 2024?
A. Actually, that started in 2023.
Q. When?
A. When he was promising to pay his bills. When I told him that Cunningham Architects had stopped work, he ranted that they paid too much money. They've got too many people on staff. He's not paying them.
So it started about a year before, actually.
Q. What was the deceit in him ranting about Cunningham Architects?
A. Because he knew that was not true. That was his fallback. Whenever someone was owed money and he couldn't pay them, he would start a rant. So I've seen his rants before with the Cherokees that we've discussed earlier.
Did we discuss the Cherokees?
Q. We discussed the nine tribes. I don't

BY ATTORNEY NADEL:
Q. Peter Alexander testified that you said: There's no point in doing estimates. We're designing what we're designing, and it's going to be what it's going to be, and we don't need your budgets either.
Is that true?
ATTORNEY JACKSON: Object to form.
THE WITNESS: No, it's not true.
BY ATTORNEY NADEL:
Q. Peter Alexander testified that you told him that people would fly to the American Heartland theme park, and he told you you couldn't assume that.
Is that true?
ATTORNEY JACKSON: Object to form.
THE WITNESS: Probably. Because I believe that.
BY ATTORNEY NADEL:
Q. You believe that people would fly to visit the American Heartland theme park?
A. I did.
Q. Where would they fly to?
A. Tulsa.
Q. Peter Alexander testified that you told

him to come up with a study that said there would be 5 million annual visitors.

Is that true?

A. I told him that was our target, and it was his job to validate that.

Q. How did you arrive at that target?

A. That is the size of a medium-sized theme park. 5 million is about the profitability milestone.

Q. What's an example of a medium-sized theme park that has approximately 5 million annual visitors?

A. That would be like SeaWorld of Orlando.

Q. Can you provide other examples?

A. Perhaps Legoland in California would be a medium-sized theme park.

Q. How would you be able to get comparable attendance at a park in Vinita, Oklahoma to a park in Orlando or California where you have suitable weather for a theme park year-round?

A. Can you repeat that?

Q. How would you be able to get comparable attendance at a park in Vinita, Oklahoma to a theme park in Orlando or California where you have suitable weather for a theme park year-round?

A. The weather was supposedly calculated within the feasibility study. That's what we wanted to find out. And that's why were hired Peter.

Q. How many annual visitors did he conclude you could attract in the American Heartland theme park?

A. It changed over time because his assumptions changed over time. He was assuming a smaller drive market where most of the -- the majority of the attendees would drive from -- I don't remember the exact distance -- 200 miles and no further.

Then as the design developed and he began to understand this is more than a Dollywood-type theme park, as I sent him the designs, he went -- I think I have his emails -- where he goes: Wow, this is much more than I had anticipated. I think we can revise the feasibility study accordingly.

And he did. In his email I think he said: This is now more like a Disney light theme park.

And he did indeed revise the feasibility study.

Q. He testified that his study showed that,

assuming all the cool rides you told him about could be built, maybe you could draw 3.3 million visitors.

Did he tell you that?

ATTORNEY JACKSON: Object to form.

THE WITNESS: His documents say otherwise.

BY ATTORNEY NADEL:

Q. Did he tell you that?

ATTORNEY JACKSON: Object to form.

THE WITNESS: I don't remember him telling me that. I remember him sending documents that supported a 4 to -- 4 and a half to 5 million yearly attendance.

BY ATTORNEY NADEL:

Q. He testified that in response to his telling you that you could draw maybe 3.3 million visitors, you had him redo the study; is that true?

A. No.

Q. He testified that you said: Press it. Make it as good as it's going to look.

And he said: Okay. I've got 3.7 million, and I'm really pushing it, you know.

Is that true?

ATTORNEY JACKSON: Object to form.
THE WITNESS: I don't remember that.
BY ATTORNEY NADEL:
Q. He testified: They were always pressing for this 5 million magical number.
Is that true?
ATTORNEY JACKSON: Object to form.
THE WITNESS: No.
BY ATTORNEY NADEL:
Q. Why would Peter Alexander make up all these things?
ATTORNEY JACKSON: Object to form.
THE WITNESS: I don't know.
BY ATTORNEY NADEL:
Q. Did you have a falling out with Peter Alexander?
A. I did not.
Q. When's the last time you spoke to him?
A. A year ago, maybe. I don't know.
Q. Have you spoken to him since this lawsuit was filed?
A. I have not.
Q. Can you think of any reason Peter Alexander would offer all of these instances of testimony about you that you say are not true?

ATTORNEY JACKSON: Object to form.
THE WITNESS: I would not know.
(Exhibit Number 203 was marked for identification.)
BY ATTORNEY NADEL:
Q. Exhibit 203 is a document Bates-labeled GB00000016.
Is this an email from you to Gene Bicknell?
A. It appears so, yes.
Q. It says -- and it's dated May 16, 2023; correct?
A. Yes.
Q. It says: I just got some excellent news from our feasibility study consultant. With the latest info we sent, they now consider us to be more than a regional park like Dollywood. We're now classified as a destination park, drawing visitors from all over the country. They said it's like you're plopping a Universal Studios in the middle of the U.S. They said the attendance numbers I showed you today will increase even more. The new study should be done by the end of next week. It just keeps getting better.
Who is the feasibility consultant you're

discussing here?

A. I think I have an email from Peter Alexander that says exactly this: It looks like you plopped a Universal Studios in the middle of the U.S.

Q. So the feasibility study consultant that you're talking about in this email is Peter Alexander?

A. It is.

Q. When he said: This is like plopping a Universal Studios in the middle of the country, he meant it wouldn't be successful because there were no nearby population centers to draw from; right?

ATTORNEY JACKSON: Object to form.

THE WITNESS: That is not correct.

BY ATTORNEY NADEL:

Q. Why do you think that's not correct?

A. Because of the email that he sent that said he was delighted at the -- with the improvements in design of the rides and the attractions and that he was excited about it.

Q. And at this point when you're sending this to Gene Bicknell, you knew that Gene Bicknell believed that God was at work in the construction of the American Heartland project; correct?

ATTORNEY JACKSON: Object to form.
THE WITNESS: I did not know that.
BY ATTORNEY NADEL:
Q. Did Gene Bicknell tell you that God is at work?
A. That was his right to say anything he wanted about God. That was not for me to object to it.
Q. I didn't ask you anything about objecting to it, sir.
My question was: At this point when you were sending this note to Gene Bicknell, you knew that Gene Bicknell believed that God was at work in the construction of the American Heartland project?
ATTORNEY JACKSON: Object to form.
THE WITNESS: I did not know that.
BY ATTORNEY NADEL:
Q. Gene Bicknell had told you at this point that God was at work; correct?
ATTORNEY JACKSON: Object to form.
THE WITNESS: He may have.
BY ATTORNEY NADEL:
Q. He may have, you said? Did you say he may have?

A. He may have.
Q. Could you look at Exhibit 203, sir. I think it's in front of you. I think it's the one we were just looking at. No, it's right there right in front of you.
A. This one?
Q. No. Right there.
A. Oh.
Q. There's an email lower on the page; right, sir?
A. Yes.
Q. Who's that one from?
A. I assume it's his response.
Q. You're actually responding to him; right?
A. No. That's: Thanks for today, Steve. A lot of traveling for you. Sorry. God is at work. You're the leader. Bless you.
Q. Right. And then you responded to him with the email above.
That's how emails work; right?
ATTORNEY JACKSON: Object to form.
THE WITNESS: Thank you, my friend.
Yes, that looks about right.
BY ATTORNEY NADEL:
Q. So Gene Bicknell writes to you and says:

Thanks for today, Steve. A lot of traveling for you. Sorry. God is at work, three exclamation points. You're the leader; correct?

A. Correct.

Q. And then you responded to him, telling him what the feasibility study was showing; right?

A. Yes.

Q. And at this point, you knew because he was sending them to you, that Gene Bicknell was receiving Today's Word messages; correct?

ATTORNEY JACKSON: Object to form.

THE WITNESS: I don't know how you connect those dots.

BY ATTORNEY NADEL:

Q. Well, I'm not connecting any dots.

A. People say "God bless you" all the time. "God is at work." That's what religious people say. I don't try to connect that with anything other than bless you.

Q. You didn't connect it with the American Heartland theme park?

A. That's the way people talk in that part of the country.

Q. So your testimony is that in Exhibit 203 when Gene Bicknell says: God is at work, you did

not connect that with the American Heartland theme park; correct?

A. No, I did not.

Q. In May of 2023, you knew that Gene Bicknell was receiving the Today's Word messages; correct?

ATTORNEY JACKSON: Object to form.

THE WITNESS: He was, and so was I.

BY ATTORNEY NADEL:

Q. You were receiving them both from Gene Bicknell and Larry Wilhite; right?

THE WITNESS: Correct.

BY ATTORNEY NADEL:

Q. In your interrogatory responses, you wrote: We can only assume Bicknell's drastic transformation from cheerleader to victim was due to his realization that he was never going to reclaim his fortune from his family.

You wrote that yourself; right, sir?

A. I did.

Q. Having read the Today's Word messages and the Sister Katherine messages quoted in the Complaint, don't you agree that Gene Bicknell was a victim?

ATTORNEY JACKSON: Object to form.

THE WITNESS: I do not believe that.
BY ATTORNEY NADEL:
Q. Why not?
A. Because he's a smart man.
Q. Did you read the responses to the Today's Word and Sister Katherine messages quoted in the Complaint that Gene Bicknell sent?
A. I may have, but I don't remember them.
Q. Fair to say that you don't have sympathy for Gene Bicknell?
ATTORNEY JACKSON: Object to form.
THE WITNESS: I have no opinion.
BY ATTORNEY NADEL:
Q. But you don't believe he was a victim; right?
A. I don't believe he was a victim.
Q. What facts do you know about Gene Bicknell's inability to reclaim his fortune from his family?
A. Just what he sent me in text and what I heard from other people, who I'm trying to remember. I don't know. Maybe it was Larry. Maybe it was other people.
Q. You don't know whether Gene's -- Gene Bicknell's family has his fortune or not; correct?

A. Because if we are indeed going to restart this project as we were being told, all we needed to do was get -- for Gene to get his money. Then I wanted all these documents to be ready to hand over to the design team and said while things were slow, I looked at all these documents. Here's some value engineering we should do on the hotel. Here's some modifications we need to do to the food and beverage offerings, et cetera.

So I was spending a lot of time going through the entire park and every design in the hopes that we were going to continue.

Q. And when you say "if we were going to restart this project as we were being told," who was telling you that in April of 2024?

A. Can I look at Gene Bicknell's text at that time?

Q. You can look at whatever you like, sir, but I don't think you've been given Gene Bicknell's texts for that time in this deposition.

A. Okay. Well, I was getting texts from Gene about this time about it's only a matter of time.

Q. Until you can restart the project?

A. Correct.

Q. And so we should just look at the texts and the emails from Gene at this time, and then we'll find what he said to you?

A. Yes.

Q. It wasn't orally?

A. No.

Q. And were you also hearing that you were going to restart the project from Larry Wilhite?

A. Not necessarily.

Q. What do you mean by "not necessarily"?

A. Well, I think Larry had as much faith as I did that Gene was telling us the truth and that it was only a matter of time before he got into his trust and we could restart the project.

Q. Right. So my question was: Was Larry one of the people saying that you are indeed going to restart the project?

A. I don't know if he said those words exactly. I think that was everyone's assumption.

Q. What about Rick?

A. I don't remember Rick being a part of that.

Q. Let's look at May 6. On May 6, you wrote that you spent 2 hours preparing for meeting with Gene and Marty Bicknell regarding State

BY ATTORNEY NADEL:
Q. Sir, I'm handing you Exhibit 204, which are the initial disclosures that you served in this case.
Have you seen those before?
A. Give me a second.
This looks like the consulting companies that worked on the project.
Q. Right. This is a list of people you identified as potentially having information that you might use to support your claims and defenses.
A. Yeah, okay.
Q. Have you seen this document before?
A. I think I have.
Q. Do you know how it was put together?
A. I do not.
Q. One of the people identified is Cale Heit. You wrote: Mr. Heit is employed by FORREC Architects, where he worked on the former theme park project. FORREC Architects is among one of the many companies to which plaintiff owes payment for services rendered.
Do you see that?
A. Yes, I do.
Q. To your knowledge, there was no contract

between FORREC Architects and plaintiff Gene Bicknell; correct?

ATTORNEY JACKSON: Object to form.

THE WITNESS: I believe there was a contract.

BY ATTORNEY NADEL:

Q. The contract was with Mansion Entertainment Group, LLC; correct?

A. Of which Gene Bicknell was the CEO.

Q. Was Gene Bicknell the CEO of Mansion Entertainment Group, LLC?

A. That was my understanding.

Q. What was that based on?

A. I just heard that.

Q. From whom?

A. You know, I don't remember who, but I think Gene Bicknell signed some of these contracts that we're talking about.

Do you not have copies of those?

Q. I do have copies of the contract, sir, and those contracts, at least the FORREC one that we're talking about, is between FORREC Architects and Mansion Entertainment Group, LLC; correct?

A. I don't know.

Q. You don't know? Do you know whether

project?

A. No.

Q. Do all of these messages, even if they do have Bible verses or statements, identify themselves as Today's Word messages?

A. I don't see that on these.

Q. So is it fair to say that some do and some don't?

A. That would be fair.

Q. In considering these Today's Word messages, did they prompt you to do any of the work on this project?

A. They did not.

Q. Do you recall if you ever forwarded these messages to Gene?

A. I didn't. To the best of my recollection, I never forwarded any of these emails to anyone else.

Q. Or text messages?

A. Or text messages, yes.

Q. When did you first hear the term "triune"?

A. Obviously, there was a text from Gene that mentioned it. But at the time, I had no idea what the word meant or that it had any meaning for

the project. It could have meant friends. It could have meant whatever.

Q. Did you ask him: What are you talking about, dude?

A. No.

Can we take a quick break?

ATTORNEY JACKSON: Yes.

THE VIDEOGRAPHER: Going off the record at 5:15.

(Recess taken from 5:15 p.m. to 5:20 p.m.)

THE VIDEOGRAPHER: We are back on the record at 5:20. This is Media Number 5 in the deposition of Mr. Stephen D. Hedrick.

ATTORNEY JACKSON: I have no further questions at this time.

ATTORNEY NADEL: I have some follow-up.

(Exhibit Number 205 was marked for identification.)

FURTHER EXAMINATION

BY ATTORNEY NADEL:

Q. Mr. Hedrick, earlier I tried to show you texts between yourself and Dave Goodman produced from your phone, and it was the wrong exhibit. I

REPORTER'S CERTIFICATE

I, LISA MOSKOWITZ, California CSR 10816, Nevada CCR 991, Washington CCR 21001437, Illinois CSR 084.004982, Certified Realtime Reporter, RPR, CLR, NCRA Realtime Systems Administrator, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is true, correct, and complete transcript of said proceedings;

I further certify that I am not interested in the event of the action.

Witness my hand this 9th day of June, 2026.

California CSR 10816, RPR, CRR, CLR
Washington CCR 21001437, Nevada CCR 991
Illinois CSR 084.004982
NCRA Realtime Systems Administrator