IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

O. GENE BICKNELL,
Plaintiff,
vs. Case Number 4:25-cv-00383-SEH-SH
RICHARD M. SILANSKAS, JR.,
LARRY K. WILHITE, and
STEPHEN D. HEDRICK,
Defendants.

VIDEO-RECORDED DEPOSITION OF KRISTY ADAMS, a witness, taken on behalf of Defendant Larry K. Wilhite, pursuant to Notice and Subpoena, on May 6, 2026, at the offices of POLSINELLI, PC, 900 West 48th Place, Suite 900, Kansas City, Missouri 64112, before

JUSTINA M. WROTEN

Registered Professional Reporter, Certified in Missouri and Kansas.

EXHIBIT
I

APPEARANCES

For the Plaintiff and the witness:

MR. SAGAR K. RAVI
MR. MICHAEL S. NADEL
MS. RACHEL M. PELTZER (via videoconference)
MS. THERESA M. BABENDREIER (via videoconference)
MS. CAROLINE SHERRARD (via videoconference)
McDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, Northwest
Washington, DC 20001
sravi@mcdermottlaw.com
mnadel@mcdermottlaw.com
rpeltzer@mcdermottlaw.com
tbabendreier@mcdermottlaw.com
csherrard@mcdermottlaw.com
(202) 756-8000

For Defendant Larry K. Wilhite:

MR. DERIC J. McCLELLAN
CROWE & DUNLEVY
222 North Detroit Avenue, Suite 600
Tulsa, Oklahoma 74120
deric.mcclellan@crowedunlevy.com
(918) 592-9833

MR. GALEN N. THORP
CROWE & DUNLEVY
324 North Robinson Avenue, Suite 100
Oklahoma City, Oklahoma 73102
galen.thorp@crowedunlevy.com
(405) 234-3241

For Defendant Stephen D. Hedrick:

MS. JENNIFER JACKSON (via videoconference)
LIZ GEORGE AND ASSOCIATES
8101 South Walker Avenue, Suite F
Oklahoma City, Oklahoma 73139
jennifer@georgelawok.com
(405) 689-5502

APPEARANCES (Continued)

Videographer:

MR. DAVID LOMBARDO
TELE-BUSINESS COMMUNICATIONS, INC.
415 Southeast Douglas Street, Suite A
Lee's Summit, Missouri 64063
production@tbcvideo.com
(816) 221-3376

Also present:

Mr. Larry Wilhite (via videoconference)

mean, he worked for him for two decades.

Q. Do you know if --

MR. NADEL: I think you -- I think you want to reask those questions. I think the names got mixed up.

MR. McCLELLAN: I'm sorry.

A. Larry --

Q. (By Mr. McClellan) What was Rick's relationship with Larry?

A. Oh. Extremely close.

Q. What did Rick -- that you observed, what did Rick do to ingratiate himself to Gene?

A. He spoke to him about his Christianity, his faith, his adoption of his daughter, anything personal to -- to bond the relationship.

Q. When you say that Rick and Gene became close, what did that look like?

A. Specifically, he would call him frequently. He would -- when he came to the building to visit, he would immediately be there to go to the meetings with Larry. He would visit him in his home, in both Kansas and Florida. He would visit him if he were in the hospital, all sorts of things that an employee wouldn't really normally do.

Q. Okay. Would they write music together?

A. They did.
Q. What do you know about that?
A. I know Gene loves music, so they would frequently go to his office when he was there, and they would work on something he was writing. He worked on the music for Gene's 6th Symphony with him and also for our PBS special.
MR. RAVI: Can we take a break?
MR. McCLELLAN: Yeah.
THE VIDEOGRAPHER: Stand by, please. Going off record at 11:01 a.m.
(A recess was taken.)
THE VIDEOGRAPHER: Resuming record at 11:10 a.m.
Q. (By Mr. McClellan) Ms. Adams, you understand you're still under oath; is that correct?
A. Yes, sir.
Q. Before we took a break, you mentioned that you looked into Rick's past whenever he was hired; is that correct?
A. Yes.
Q. Did you tell Gene what you had found?
A. Not at that time, no.
Q. Do you know if Gene was aware of Rick's prior history?

Q. Yeah. That's what Gene told you?
A. That's what Larry told us, Gene told us, everyone.
Q. Okay. Do you remember any other reason being mentioned for why Oklahoma was chosen?
A. Other than Gene was born in Prichet [sic]. I mean, he's from Oklahoma.
Q. At -- at this time, in -- at the time that Vinita was chosen, do you remember Gene saying anything about Vinita being picked because it was chosen by God?
A. No.
Q. How would you describe Gene's involvement with the project?
A. He was -- he was looped in on all of the -- you know, the development and all of that, but he -- he was not -- the way the project flowed was, he was given the plans and shown the -- he was involved. He signed the contracts, you know, for the architectural and -- and things like that, but on a day-to-day basis, he wasn't overly involved.
Q. So he wasn't overly involved day to day, but was he the ultimate decision-maker?
A. No. Gene is always the ultimate decision-maker, I guess, but Larry was the

decision-maker of the project, so -- through the expertise of Steve Hedrick.

Q. What did you mean by "Gene is always the ultimate decision-maker"?

A. Gene's our boss.

Q. Okay. So when you said "Gene is always the ultimate decision-maker," did you mean that for the project, for BigTime Productions, for everything involving Mansion Theatre? Is that what you were referring to right there?

MR. RAVI: Objection to form.

A. I'm really not sure how to answer. I mean, Gene -- Gene is our boss. If he -- if he said to do something, we would do it. He's -- he's in charge. But I'm not sure he was making all of the decisions, no.

Q. (By Mr. McClellan) Do you recall Larry making independent decisions about the project?

A. Yes. That was his job.

Q. Do you recall any specific decisions he made without consulting Gene?

A. Not specifically.

Q. Okay.

(Exhibit Number 8 was marked for identification.)

and get his thoughts and how he wants to proceed.
Do you see that?
A. I do.
Q. So what do you understand Larry to be saying here?
A. That we need to run it by Gene.
Q. Okay. So was this Larry's routine approach?
A. Not always, no.
Q. Okay. When would he not run something by Gene?
A. I can't -- I can't speak to, you know, when he would choose to do that or not.
Q. Do you recall any specific significant decisions where Larry did not consult with Gene?
A. I don't.
Q. Okay. Do you know when Steve Hedrick got involved with the project?
A. To my knowledge, he was involved at the very beginning.
Q. And what do you know about Steve Hedrick being brought in to the project?
A. Only that he was an expert on theme parks, according to Rick and Larry. That's what they said.
Q. Did you participate in any meetings where

document production. Do you think that you received any after October 5, 2023?

A. Not if this is the last one you got from my cell phone. I wouldn't have -- I mean, that would have been the last one I received.

Q. Okay. Did you ask Larry to stop sending the messages to you?

A. I did not.

Q. Okay. Do you know why they stopped coming?

A. It's my belief that they stopped coming because I questioned them.

Q. Okay. When did you question them?

A. From about November 26, 2022.

Q. Okay. And how did you go about questioning them?

A. After receiving them daily for a while, I asked Larry, who was in my office, if he really thought those text messages came from God, and I asked a few questions about them, and it's my belief that he -- I mean, he answered me that he did.

Q. He -- he told you that he thought they came from God?

A. They all said they thought they came from God. "They" meaning Gene, Rick, and Larry.

messages?
A. Not that I recall.
Q. Okay. What is your understanding of how the Today's Word messages were coming in?
A. My belief or my understanding?
Q. Your understanding at the time.
A. That Larry was receiving them from a fictitious number. He didn't know where they were coming from.
Q. And did -- did Gene ever start receiving them from a fictitious number as well?
A. I don't know that.
Q. You don't know. Okay.
And what -- what -- what did Larry say to you about your skepticism when you expressed that to him?
A. Not much.
Q. Okay.
A. Kind of -- he -- he knew how I felt. It wasn't a debate or anything. He ...
Q. Was it a -- like, did he mention, you know, hey -- strike that.
Was it a conversation about faith?
A. No.
Q. Okay. Did he ever express any

A. He did on occasion.
Q. Okay. Okay. Did you have any sense of whether Larry believed the Today's Word messages?
MR. RAVI: Objection to form.
A. I -- I really can't answer what he believed.
Q. (By Mr. McClellan) Uh-huh.
A. He -- he appeared to.
Q. Did you ever hear any Wilhite family member comment on the Today's Word?
A. I did.
Q. And what -- and who was that?
A. His wife, Julia.
Q. And what would she say?
A. I don't know for sure what she would say. I mean, everything was always just a basic comment: Did you see Today's Word?
Q. Sitting here today, do you think that Larry wrote the Today's Word text messages?
A. I don't know.
Q. Who do you think wrote the messages?
A. Rick Silanskas.
Q. What makes you say you don't know about Larry Wilhite?
A. Because I -- I wasn't in the room. I --

I -- I don't know. I just have always had the belief that Rick Silanskas wrote them.
Q. Have you ever DocuSigned Gene's name, Gene Bicknell's name?
A. I have.
Q. And what were those circumstances?
A. I would have to know the specific one you were talking about, because I have done it different times, but usually it was a contract that either he had not been in town to sign or wasn't going to be in town anytime soon that needed to be signed, and he would tell me to DocuSign them.
Q. Okay. Gene would tell you to do that?
A. Both. Gene told me on some, but Larry told me on most.
Q. Okay. So did Gene Bicknell have the capability of using DocuSign?
A. Yes. I mean, he has a computer.
Q. Okay. Why would he ask you to DocuSign for him?
A. It's not always a smooth process. It's -- you know, usually you have to pull up a document. You have to get a text message. There's a lot in the -- the process. And, I mean, he -- he's older, he's by himself, so it was easier for me to do it,

so ...
Q. But Gene did use DocuSign himself on occasion?
A. I -- I don't know that.
Q. You don't know that. Okay.
When Gene would be in town, would he sign contracts in ink?
A. Yes.
Q. Okay. So DocuSign was used whenever he wasn't around in person to sign things physically?
A. Correct.
Q. Okay.
A. And -- and, also, you're aware, like, those contracts would have came to Larry, not, you know, Gene. And then Larry --
Q. Sure.
A. -- would have given them to Gene to sign. So when a DocuSign comes through to one person, it's in one email, so --
Q. Sure. Understood. Thank you for clarifying that.
Are you aware of circumstances where Gene asked Larry to DocuSign for him on -- on matters that were unrelated to the project?
A. I'm not aware.

Q. Okay. Are you aware of circumstances where Gene asked Larry to DocuSign for him on matters related to the project?
A. I'm not aware.
Q. Okay. But Gene asked you to sign for him on occasion?
A. Yes.
Q. But you don't know if he asked Larry to do so?
A. Only because I'm not -- I wasn't in that conversation. So if he -- if Gene said that to Larry, I was not present.
Q. Okay. Are you aware whether Larry generally kept Gene apprised of documents that needed to be signed?
A. Pertaining to the project?
Q. Yes.
A. Yeah, I -- I think they had conversations about that on most occasions.
Q. Okay. Were you a part of those conversations?
A. I was not.
Q. Okay. Do you know if Larry did, in fact, DocuSign for Gene?
A. I wouldn't have been in the room if he did

CERTIFICATE OF REPORTER

I, Justina M. Wroten, a Certified Court Reporter of the State of Missouri, do hereby certify:

That prior to being examined, the witness was first duly sworn;

That said testimony was reported by me at the time and place hereinbefore stated and was thereafter reduced to typewriting under my direction;

That the foregoing transcript is a true record of the testimony given by said witness;

That I am not a relative or employee or attorney or counsel of any of the parties or a relative or employee of such attorney or counsel or financially interested in the action.

Witness my hand and seal May 19, 2026.

**Justina M. Wroten**
**Certified Court Reporter**
**KS #1507, MO #911**

Justina M. Wroten
Missouri Supreme Court
Certified Court Reporter